### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JPRx)                   Date:  July 27, 2018

Title: VIZIO, INC. V. LEECO V. LTD. ET AL

PRESENT:

#### THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Lewman | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING IN PART LEECO'S MOTION TO DISMISS [47]; DENYING JIA'S MOTION TO DISMISS [62]; DENYING LELE HOLDING'S MOTION TO DISMISS [63]; AND GRANTING IN PART VIZIO'S MOTION TO DISMISS [65]**

     Before the Court are four motions to dismiss: (1) Defendant LeEco V. LTD.'s ("LeEco" or "Counterclaimant") Motion to Dismiss ("LeEco Motion") (Dkt. 47); (2) Defendant Yueting Jia's ("Jia") Motion to Dismiss ("Jia Motion") (Dkt. 62); (3) LeLe Holding LTD.'s ("LeLe Holding") separate Motion to Dismiss ("LeLe Motion") (Dkt. 63); and (4) Plaintiff Vizio, Inc.'s ("Vizio" or "Counterdefendant") Motion to Dismiss ("Vizio Motion") (Dkt. 65) LeEco's first and third counterclaims in its Counterclaim ("CC") (Dkt. 61). The Court finds these matters suitable for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the papers and considered the parties' arguments, the Court GRANTS IN PART LeEco's Motion, DENIES Jia and LeLe Holding's Motions, and GRANTS IN PART Vizio's Motion.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                       Page 2

I.      **Background**

        A.      **Facts**

                1.      **First Amended Complaint**

        Plaintiff and Counterdefendant Vizio is a California corporation with its principal place of business in Irvine, CA, and Vizio is involved in consumer electronic sales worldwide. First Amended Complaint ("FAC") (Dkt. 3) ¶ 1. Vizio brings this suit against Defendants LeEco, LeEco Global Group LTD ("Global Group"), LeLe Holding, Jia, and DOES 1-10. *Id.* LeEco is an exempted company with limited liability, incorporated under the laws of the Cayman Islands. *Id.* ¶ 2. Global Group is a corporation, organized and existing under the laws of the People's Republic of China ("PRC"). *Id.* ¶ 3. Lele Holding is a personal holding company, organized and existing under the laws of the British Virgin Islands. *Id.* ¶ 4. Jia and DOES 1-10 are individuals. *Id.* ¶¶ 1–7.

        Starting in or about December 2015, and continuing through and including approximately July 6, 2016, Vizio entered into a series of negotiations regarding the proposed merger of Vizio with LeEco. *Id.* ¶ 11. On July 6, 2016, Vizio, LeEco, and Global Group, through Jia, entered into a written agreement entitled Agreement and Plan of Merger ("Merger Agreement") (Dkt 47-2 Ex. A). *Id.* ¶ 16. Under the Merger Agreement, LeEco agreed to acquire Vizio for $2 billion with the goal of closing by April 6, 2017. *Id.* ¶ 28.

        The Merger Agreement provides that in the event of termination, LeEco shall pay an $100 million termination fee to Vizio, and this termination fee is broken into two components: a $50 million escrow deposit, and a $50 million remainder. *Id.* ¶¶ 22–23. The $50 million escrow deposit was required to be (and was in fact) placed into escrow by LeEco (and related entities) upon the signing of the Merger Agreement. *Id.* The $50 million remainder was required to be paid directly to Vizio by LeEco within three business days of a closing or valid termination of the Merger Agreement. *Id.*

        Vizio alleges that LeEco was unable to finance the merger on or about April 6, 2017, as required by the Merger Agreement, thus Vizio terminated the Merger Agreement, obligating LeEco to pay a $100 million termination fee to Vizio. *Id.* ¶¶ 28–32.

        However, LeEco entered into a new agreement with Vizio (the "Framework Agreement") (Dkt 47-2 Ex. B), in which the parties agreed that rather than LeEco paying the $100 million termination fee, LeEco would pay Vizio $40 million from escrow upon

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                                            Page 3

the execution of the Framework Agreement, as well as contribute capital with a value of
at least $50 million to a new joint venture in China with Vizio, and within forty-five days
of execution of the joint venture agreement, LeEco would pay Vizio the remaining $10
million from escrow. *Id.* ¶ 33. Vizio alleges that the Framework Agreement also included
LeEco's promise to negotiate in good faith and execute a formal joint venture agreement
within forty-five days of the execution of the Framework Agreement. *Id.* ¶¶ 33, 38. Upon
execution of the Framework Agreement, LeEco made the first payment of $40 million to
Vizio. *Id.* ¶ 37. However, the parties never consummated the joint venture under the
Framework Agreement. *Id.* ¶¶ 43–47. Furthermore, Vizio alleges that LeEco avoided
negotiating in good faith with Vizio for the joint venture in China, and as a result Vizio
demanded the second payment of $10 million from escrow due to LeEco's alleged failure
to negotiate in good faith. *Id.* ¶¶ 44, 50–51. LeEco did not release the second payment of
$10 million, and Vizio subsequently filed this action. *Id.* ¶¶ 51–53.

Vizio further alleges that during the time in which the parties were negotiating the
completion of the merger, Defendants and their affiliated corporate entites were
experiencing cash flow and financial problems. *Id.* ¶ 12. Vizio claims that because of
these financial problems, Defendants needed to either obtain the financial stability,
credibility, and resources that a merger with Vizio would bring, or at least to create a
widespread and dramatic public impression of their own financial health and well-being
that would come with the announcement of an intended merger to grow or continue in
business. *Id.* ¶ 14. Vizio claims that Defendants concocted a secret plan to use the
publicly announced intended merger with Vizio to gain or try to obtain access to Vizio's
large corporate clients and key decision makers for Defendants' own purposes. *Id.* ¶ 15.

**2.     Counterclaim**

LeEco filed a Counterclaim. CC. LeEco alleges that the Merger Agreement could
be terminated without penalty (wherein the $100 million termination fee would not be
payable) if either the United States or the PRC did not approve the merger. *Id.* ¶ 9.
However, the option to terminate without penalty would not apply if the failure to grant
approval was based primarily on LeEco's failure to "have available sufficient cash on
hand, together with Committed Financing, to consummate the Merger . . . ." *Id.* ¶¶ 8–9.
The PRC did not grant its approval of the Merger Agreement, but did not provide its
reasons for withholding approval. *Id.* ¶ 10. Vizio and LeEco disputed the primary reason
for the PRC's nonapproval: Vizio contended that it was LeEco's failure to be sufficiently
capitalized as defined under Section 9.1(e) of the Merger Agreement, while LeEco
contended that LeEco was sufficiently capitalized, and that the PRC's imposition of
restrictive currency controls during the relevant period was likely the reason that the PRC
did not approve the merger. *Id.* ¶ 11. The parties then agreed to extend the closing date of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                    Date: July 27, 2018
                                                                            Page 4

the Merger Agreement to April 6, 2017 in order to allow themselves additional time to obtain the PRC's approval. *Id.* ¶ 31. The PRC never gave its approval. *Id.* ¶ 13.

In order to settle their dispute, the parties agreed to the Framework Agreement discussed above, which LeEco alleges had the effect of terminating the Merger Agreement in its entirety. *Id.* ¶¶ 15–17. LeEco claims that the Framework Agreement grants LeEco—conditioned upon the receipt by Vizio of $40 million (held in escrow under the Merger Agreement)—a full and unconditional release of all actual or potential claims that Vizio actually made, or might have been able to make under the Merger Agreement, as a result of the failure of the proposed merger to come to fruition. *Id.* ¶ 18. Vizio received $40 million upon the execution of the Framework Agreement. *Id.* ¶ 19. LeEco claims that the remaining $10 million in escrow was to be paid out conditionally upon the formation of a joint venture in China between the parties. *Id.* ¶ 25. Since Vizio and LeEco allegedly failed to execute, or even negotiate in good faith, the proposed China joint venture, this condition allegedly has not been met, and thus, LeEco argues that the $10 million in escrow must be returned to LeEco. *Id.* ¶¶ 25–26. In spite of these negotiations, Vizio unilaterally requested that escrow give them the $10 million, allegedly in breach of the Framework Agreement. *Id.* ¶ 31.

### B.    Procedural History

Vizio initiated this action against LeEco on July 11, 2017. Complaint (Dkt. 1). In its initial Complaint, Vizio brought the following six claims against LeEco and LeEco Global Holding LTD: (1) breach of the Framework Agreement; (2) fraud underlying the Framework Agreement; (3) negligent misrepresentation underlying the Framework Agreement; (4) promissory estoppel; (5) rescission of the framework agreement for fraud; and (6) breach of the Merger Agreement. Compl. ¶¶ 53–113.

On August 11, 2017, Vizio requested the entry of default against LeEco. Request for Default (Dkt. 15). On August 15, 2017, a default was entered as to LeEco. Default (Dkt. 20).That same day, LeEco filed a Motion to Set Aside Default. Motion to Set Aside Default (Dkt. 22). On September 21, 2017, the Court granted LeEco's Motion to Set Aside Default (Dkt. 31).

On November 6, 2017, Vizio filed its First Amended Complaint ("FAC"), naming LeEco, Lele Holding, LeEco Global Group, Ltd.,[1] and Jia as Defendants. *See* FAC ¶ 1. In the First Amended Complaint, Vizio brings six claims (the first five are brought against all Defendants and the sixth is brought against LeEco): (1) breach of the Framework

---

[1] According to the docket, Global Group has not been served and has not appeared in this action.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                              Page 5

Agreement, (2) fraud underlying the Framework Agreement; (3) negligent misrepresentation underlying Framework Agreement; (4) promissory estoppel; (5) rescission of the Framework Agreement for fraud; and (6) breach of the Merger Agreement. FAC ¶¶ 55–116.

On November 20, 2017, Defendant LeEco filed the LeEco Motion to Dismiss the second through sixth claims, along with the Declaration of Robert H. Bruber ("Bruber Declaration") (Dkt. 47-2). On December 4, 2017, Vizio filed its Opposition ("LeEco Opposition") (Dkt. 50). On December 18, 2017, LeEco filed its Reply ("LeEco Reply") (Dkt. 51).

On February 15, 2018, LeEco filed the Counterclaim (Dkt. 61) against Vizio, in which LeEco asserts three claims: (1) breach of the Framework Agreement, (2) breach of contract by failing to negotiate in good faith, and (3) request for declaratory relief. CC ¶¶ 18–46.

On March 1, 2018, Defendant Jia filed the Jia Motion to Dismiss the case along with the Declaration of Yueting Jia ("Jia Declaration") (Dkt. 63-2). Also on March 1, 2018, Defendant LeLe Holding filed the LeLe Motion, along with the Declaration of Chaoying Deng ("Deng Declaration") (Dkt. 64).

On March 8, 2018, Vizio filed the Vizio Motion to Dismiss LeEco's first and third counterclaims. On March 12, 2018, Vizio filed its Opposition to Jia Motion ("Jia Opposition") (Dkt. 68), Opposition to LeLe Motion ("LeLe Opposition") (Dkt. 71), along with the Declaration of Dean M. Carroll ("Carroll Declaration") (Dkt. 66), Declaration of Cesar Hernandez-Govea ("Govea Declaration") (Dkt. 67), Declaration of Christine Wessel ("Wessel Declaration") (Dkt. 71-1), and Declaration of Jason L. Haas ("Haas Declaration") (Dkt. 71-2).[2]

On March 26, 2018, Defendant and Counterclaimaint LeEco filed their Opposition to Vizio Motion ("Vizio Opposition") (Dkt. 79). On April 9, 2018, Vizio filed their Reply ("Vizio Reply") (Dkt. 84). Also on April 9, 2018, Defendant Jia filed his Reply to Jia

---

[2] The Court permitted portions of the LeLe Opposition and Wessel Declaration to be filed under seal because this is a non-dispositive motion and because the sealed portions contain information filed by Vizio and LeEco with the Committee on Foreign Investment in the United States ("CFIUS"); and the CFIUS filings are protected as confidential pursuant to 5 U.S.C. § 552(B), 50 U.S.C. § 4565(C), 31 C.F.R. § 800.702, and 32 C.F.R. § 286. *See* Application to File Under Seal (Dkt. 69). However, these confidentiality requirements are subject to "limited exceptions," and those exceptions provide that information may be made public "as may be relevant to any administrative or judicial action or proceeding." *In re Glob. Crossing Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (citing 50 U.S.C. § 2158, *et seq.*; 31 C.F.R. § 800.702). Accordingly, the Court will not seal its own references to this material, because the materials cited by the Court are "relevant" to this judicial action. *See id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                        Date: July 27, 2018
                                                                                            Page 6

Opposition ("Jia Reply") (Dkt. 85), filed concurrently with his Objections to Evidence
and Request to Strike ("Jia Objection") (Dkt. 86). Defendant LeLe Holding also filed its
Reply to LeLe Opposition ("LeLe Reply") (Dkt. 88).

## II.      Legal Standard

### A.      Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed
when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the
complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v.
Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order
to survive a motion to dismiss). The pleadings must raise the right to relief beyond the
speculative level; a plaintiff must provide "more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S.
at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a
court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual
inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire &
Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not required to accept as
true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents
of the complaint and material properly submitted with the complaint. *Van Buskirk v.
Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v.
Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the
incorporation by reference doctrine, courts may also consider documents "whose contents
are alleged in a complaint and whose authenticity no party questions, but which are not
physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994),
*overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002). Courts may treat
such a document as "part of the complaint, and thus may assume that its contents are true
for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342
F.3d 903, 908 (9th Cir. 2003).

Dismissal with leave to amend should be freely given "when justice so requires."
Fed. R. Civ. P. 15(a)(2). This policy is applied with "extreme liberality." *Morongo Band
of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203
F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be
granted even if no request to amend was made). Dismissal without leave to amend is
appropriate only when the court is satisfied that the deficiencies in the complaint could

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                      Date: July 27, 2018
                                                                                          Page 7

not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

### B.      Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may seek dismissal of an action, or of particular claims, for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). In deciding personal jurisdiction, courts may consider evidence presented in affidavits and declarations. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Plaintiffs bear the burden of showing that courts have personal jurisdiction over defendants. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). Absent formal discovery or an evidentiary hearing, "this demonstration requires that the plaintiff make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id*. (quotations omitted). To make this prima facie showing, a plaintiff can rely on the allegations in its complaint to the extent that the moving party does not controvert those allegations. *See Doe*, 248 F.3d at 922.

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach*, 453 F.3d at 1154–55 (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996)). Under Federal Rule of Civil Procedure 4(k)(1)(A), federal district courts have personal jurisdiction over a defendant if the defendant would be "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," here California. Because California's long-arm statute authorizes jurisdiction to the full extent permitted by federal due process requirements, the Court may exercise personal jurisdiction so long as that jurisdiction comports with due process. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011); Cal. Civ. Proc. Code § 410.10.

"[D]ue process requires that the defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has recognized two bases for exercising personal jurisdiction over a non-resident defendant: (1) general (or all-purpose) jurisdiction, which arises when a defendant's "affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State'" and thus justify the exercise of jurisdiction over it in all matters; and (2) specific (or conduct-linked) jurisdiction, which arises when the claim in question "arises out of or relates to" the defendant's specific

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                            Date: July 27, 2018
                                                            Page 8

contacts with the forum. *Daimler*, 571 U.S. at 122, 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414 (1984)); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050–51 (9th Cir. 1997).

        In determining whether to exercise specific jurisdiction over a non-resident defendant, the Ninth Circuit applies a three-prong test:

> (1) the defendant either purposefully direct[s] its activities or purposefully avails itself of the benefits afforded by the forum's laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, *i.e.*, it [is] reasonable.

*Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (internal quotation marks and citation omitted); *see also Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The plaintiff "bears the burden of satisfying the first two prongs," and if the plaintiff does so, "the burden then shifts to [the defendant] to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

        Finally, even if a defendant is not subject to personal jurisdiction in a forum, it can waive its right to assert such a challenge, and submit itself voluntarily to the jurisdiction of the forum's courts. *Star Fabrics, Inc. v. Zappos Retail, Inc.*, No. CV1300229MMMMRWX, 2013 WL 12124096, at *6 (C.D. Cal. July 19, 2013) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.")). Generally, the defense of lack of personal jurisdiction must be brought in a party's first responsive pleading or by motion before the responsive pleading. *See* Fed. R. Civ. P. 12(b); *Alvarez v. NBTY, Inc.*, 2017 U.S. Dist. LEXIS 201159, *11 (S.D. Cal. Dec. 6, 2017). If it is not raised at that time, the defense is deemed waived. Fed. R. Civ. P. 12(g)(2), (h)(1); *see also Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1983) ("[Rule 12(h)(1)] provide[s] a strict waiver rule with respect to [the lack of personal jurisdiction] defense. . . . It is clear under this rule that defendants wishing to raise [this] defense[] must do so in their first defensive move, be it a Rule 12 motion or a responsive pleading."). This strict rule, however, has a narrow exception: it applies only to defenses that were "available to the party" at the time. Fed. R. Civ. P. at 12(g)(2); *Glater*, 712 F.2d at 738 ("[D]efendants do not waive the defense of personal jurisdiction if it was not available at the time they made their first defensive

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                      Date: July 27, 2018
                                                                       Page 9

move."). A defendant can show that a defense was not previously available by demonstrating that the argument that the court lacked jurisdiction over the defendant "would have been directly contrary to controlling precedent in this Circuit." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 854 (N.D. Cal. 2018), *order clarified*, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018) (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135–36 (2d Cir. 2014).

### C.     Insufficient Service of Process

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Federal Rule of Civil Procedure 4." *Travelers Cas. & Sur. Co. of Am. V. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009). However, "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *United Food & Comm. Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984). What is required is "substantial compliance" with Rule 4, with "neither actual notice nor simply naming the defendant in the complaint" being sufficient. *Direct Mail Specialists, Inc v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988) (quoting *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986), *cert. denied*, 484 U.S. 870 (1987)).

## III.   Request for Judicial Notice

LeEco requests that the Court take judicial notice of two documents from another case in this district, found at Exhibits 1 and 2 of the Request for Judicial Notice ("RJN") (Dkt. 52), including:

- Judgment to Enforce Arbitration Award (ECF Dkt. No. 480) in *Burton Way Hotels, Ltd., et al. v. Four Seasons Hotels Limited*, C.D. Cal. Case No. 11-cv-00303-PSG (PLAx) ("*Burton*"); and

- Order Granting Four Season Hotels Limited's Motion for Summary Disposition  (ECF Dkt. No. 437-1) in *Burton*.

RJN Exs. 1–2.

"Judicial notice" is a court's recognition of the existence of a fact without the necessity of formal proof. *See Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992). Under Federal Rule of Evidence 201, a court may take judicial notice of court filings and other matters of public record. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that a court may take judicial notice of "undisputed matters of public record"); *see also Reyn's Pasta Bell a, LLC v. Visa USA, Inc.*, 442 F.3d 741,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                          Page 10

746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court
filings). In addition, judicial notice is appropriate for information obtained from
government websites, *see Paralyzed Victims of Am. v. McPherson*, 2008 WL 4183981, at
*5 (N.D. Cal. Sept. 8, 2008), as well as copies of "records and reports of administrative
bodies." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003). The Court does not,
however, take judicial notice of reasonably disputed facts contained within the judicially-
noticed documents. *See Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

        Therefore, the Court takes judicial notice of the *existence* of the documents above
contained in Exhibits 1 and 2 described aboe, since they are court records from previous
suits. *See Burbank-Glendale-Pasadena Airport Auth.*, 136 F.3d at 1364. However, the
Court does not take judicial notice of the facts within these exhibits because they may be
subject to reasonable dispute. *See Lee*, 250 F.3d at 690 ("On a Rule (12)(b)(6) motion to
dismiss, when a court takes judicial of another court's opinion, it may do so not for the
truth of the facts recited therein, but for the existence of the opinion, which is not subject
to reasonable dispute over its authenticity." (internal quotations omitted)).

## IV.    Discussion

        First, in the LeEco Motion, LeEco urges dismissal of Vizio's second through sixth
claims on the following four grounds: (1) the Framework Agreement clearly released all
claims that potentially could have been brought for a violation of the Merger Agreement;
(2) Vizio has failed to plead its fraud claims with sufficient particularity; (3) Vizio's
promissory estoppel claim is inapplicable here because its allegations concern two
written agreements in which Plaintiff relied on a "bargained for" performance; and (4)
Vizio has failed to satisfy the elements of rescission. *See LeEco Mot.* Defendants Jia and
LeLe Holding also join in LeEco's Motion to Dismiss. *See Jia Mot.* at 7; LeLe Holding
Mot. at 16. Additionally, Jia and LeLe Holding bring separate Motions to Dismiss due to
alleged improper service. *See Jia Mot.* at 4–6; LeLe Holding Mot. at 13–17. Lele Holding
further moves to dismiss on the basis of lack of personal jurisdiction. *See LeLe Holding
Mot.* at 5–12. Finally, Vizio, as the counterdefendant, also brings its own Motion to
Dismiss the first and third claims in LeEco's Counterclaim, on the basis that LeEco fails
to sufficiently state those claims. *See Vizio Mot.* at 2–3. The Court will address each
argument in turn.

### A.    Claim for Breach of Merger Agreement

        Defendants first argue that Vizio's sixth claim for breach of the Merger
Agreement, brought against LeEco and Does 1–10, must be dismissed pursuant to the
plain language of the Framework Agreement. LeEco Mot. at 6. Defendants argue that all

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                          Date: July 27, 2018
                                                                                                         Page 11

parties used "the clearest language imaginable" when describing the settlement in both the Merger Agreement and the subsequent Framework Agreement. *Id.* at 6–7. Specifically, Defendants argue that the Framework Agreement clearly establishes that upon Vizio's receipt of $40 million, Defendants were released from the settlement and all claims that could have been brought for violation of the Merger Agreement, including anything concerning the negotiation of the Merger Agreement. *Id.* Therefore, because Vizio received the $40 million, Defendants contend that they were released from the terms of the Merger Agreement. *Id.*

      In support of their argument, Defendants point to section 6.2 of the Framework Agreement, which states:

> 6.2   <u>Release by Company</u>. Effective as of the Effective Time, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "<u>Company Releasor</u>" and collectively, the "Company Releasors") hereby generally releases, remises and forever discharges Buyer, Merger Sub and each of their respective past, present and future representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "<u>Buyer Released Party</u>") and collectively, the "<u>Buyer Released Parties</u>") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "<u>Company Released Claims</u>"); provided, however, the Company Released Claims shall not include any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                    Page 12

> Claims arising from any breach by Buyer or Merger Sub of its
> obligations under this Agreement.

Framework Agreement, Ex. B, ¶ 6.2. Defendants argue that, "Effective as of the Effective
Time," was defined as "receipt by the Company of US $40,000,000 of the Buyer
Termination Fee Deposit pursuant to Section 1.2 hereof." LeEco Mot. at 7 (citing
Framework Agreement, Ex. B, ¶ 1.1). Defendants emphasize that Vizio acknowledged
that the sum was received by Vizio. *Id.* at 7 (citing FAC ¶ 37 ("That $40,000,000 sum
was released from the CNB escrow and paid directly to Vizio concurrently with the
execution of the Framework Agreement.")). Thus, Defendants claim that once Vizio
received the $40 million in escrow, Defendants were released from all claims that may
arise from any act or failure to act under the Merger Agreement. *Id.*

Defendants also point to section 6.3 of the Framework Agreement, which
stipulates that Vizio would not be able to sue under any of the released claims including
under any of the terms of the Merger Agreement:

> 6.3    <u>Covenant Not to Sue</u>. Buyer and Merger Sub, each on behalf
> of itself and the other Buyer Party Releasors, irrevocably covenants
> that neither Buyer, Merger Sub nor any of the other Buyer Party
> Releasors will, directly or indirectly, assert any Claim or demand,
> commence, institute, or voluntarily aid in any way, or cause to be
> commenced or instituted any proceeding of any kind against any
> Company Released Party in respect of any Buyer Party Released
> Claim. The Company, on behalf of itself and the other Company
> Releasors, irrevocably covenants that neither the Company nor any
> of the other Company Releasors will, directly, or indirectly, assert
> any Claim or demand, commence, institute, or voluntarily aid in any
> way, or cause to be commenced or instituted any proceeding of any
> kind against any Buyer Released Party in respect of any Company
> Released Claim.

*Id.* ¶ 6.3. Thus, Defendants argue that Section 6.2 and 6.3 of the Framework Agreement
clearly state that Defendants are released from the terms of the Merger Agreement, and
that both parties agree not to sue under these terms. LeEco Mot. at 11. Defendants
contend that these provisions are clear and unambiguous, and therefore, the terms of the
Framework Agreement should be given effect. *Id.* As a result, Defendants move the
Court to find that the Framework Agreement precludes Vizio's sixth claim and to dismiss
that claim with prejudice. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                          Page 13

    In opposition, Vizio argues that because it was fraudulently induced to enter into
the Framework Agreement, which, if valid, would have provided the release of claims
under the Merger Agreement, Vizio properly seeks rescission of the Framework
Agreement and breach of the "only agreement" now between the parties—the Merger
Agreement. LeEco Opp'n at 22–24.

    As discussed in greater detail below, Vizio alleges with specificity that the
Framework Agreement was executed under fraud on the basis that specific, false
promises were made on behalf of Defendants to secure the execution of the Framework
Agreement. FAC ¶¶ 65–78. By statute and California public policy, LeEco and Vizio
cannot agree to release Defendant LeEco from liability for fraud, regardless of any
statement to the contrary in a contract. *See* Cal. Civ. Coder § 1688. California Civil Code
§ 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to
exempt anyone from responsibility for his own fraud, or willful injury to the person or
property of another, or violation of law, whether willful or negligent, are against the
policy of the law." *Id.* In other words, and as the California Court of Appeal noted:

> A party to a contract who has been guilty of fraud in its inducement
> cannot absolve himself or herself from the effects of his or her fraud
> by any stipulation in the contract, either that no representations have
> been made, or that any right that might be grounded upon them is
> waived. Such a stipulation or waiver will be ignored, and parol
> evidence of misrepresentations will be admitted, for the reason that
> fraud renders the whole agreement voidable, *including the waiver*
> *provision.*

*McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 794 (2008) (citation omitted).
Therfore, the Framework Agreement's elease of all claims that potentially could have
been brought for a violation of the Merger Agreement is invalid if it was "procured by
misrepresentation, overreaching, deception, or fraud," which Vizio alleges in the FAC.
*See Jiminez v. 24 Hour Fitness USA, Inc.*, 237 Cal. App. 4th 546, 563 (2015); *see also*
*Seeger v. Odell*, 18 Cal. 2d 409, 414 (1941) (holding that one "who has been induced by
fraudulent misrepresentations to enter into a contract . . . may have the contract . . . set
aside"). Therefore, because Vizio alleges that the Framework Agreement was executed
under fraud, the plain meaning of the contract, regardless of any terms or waivers, does
not bar Vizio's claim for breach of the Merger Agreement.

    Accordingly, the Court DENIES LeEco's Motion to Dismiss Vizio's sixth claim to
the extent that the Motion is premised on the purported release contained within the
Framework Agreement.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                     Page 14

### B.      Fraud Claims

Defendants next seek to dismiss Vizio's second through fifth claims for fraud underlying the Framework Agreement, negligent misrepresentation underlying Framework Agreement, promissory estoppel, and rescission of the Framework Agreement for fraud, arguing that these claims: (1) fail to meet Rule 9(b)'s particularity requirement; and (2) are barred by California's economic loss rule. LeEco Mot. at 11–20. Defendants further argue that Vizio's contractual interpretation arguments are "plainly wrong on all . . . essential points." *Id.* The Court will address Rule 9(b), the economic loss rule, and the interpretation of the contract in turn.

### 1.      Heightened Pleading Standard under Rule 9(b)

Defendants argue that Vizio fails to plead its second through fifth claims with the specificity required by the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b). *Id.* at 11–13. "To comply with Rule 9(b), allegations of fraud must be 'pecific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir. 1993)). A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (citing *Semegen v. Weidner*, 780 F.2d 727, 734–35 (9th Cir. 1985)). While statements as to the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient. *Id.*

Vizio claims under its second and third claims that Defendants fraudulently induced them into entering the Framework Agreement and/or negligently misrepresented the terms of the contract. *See generally* FAC. Vizio's fourth and fifth claims for promissory estoppel and rescission are based on the allegedly fraudulently-induced contract. *See id.* Under California law, "fraudulent deceit" is defined as "one who willfully deceives another with intent to induce him to alter his position to his injury or risk" and "is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709. The elements of fraud are: (1) "misrepresentation," which includes either a "false representation, concealment or nondisclosure"; (2) "knowledge of falsity," also referred to as "scienter"; (3) "intent to defraud," which includes an intent "to induce reliance"; (4) "justifiable reliance"; and (5) damages. *Lazar v. Superior Court*, 12 Cal. 4th 631, 637 (1996) (citing Cal. Civ. Code § 1710). "[F]raud allegations must include the 'time, place, and specific content of the false representations as well as the identities of the parties to

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                     Page 15

the misrepresentations." *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1106 (C.D. Cal. 2015). "For corporate defendants, a plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Id.* at 1107.

Here, Vizio alleges that Defendants made specific false promises on behalf of Defendants, which Defendants did not intend to perform. FAC ¶¶ 33, 34; LeEco Opp'n at 8. Specifically, Vizio alleges:

> Starting in or about December 2015, and continuing through and including approximately July 6, 2016, ("the Serious Negotiations Period"), VIZIO by and through William Wang ("Wang"), its Chief Executive Officer, Ben Wong ("Wong"), its President, and Kurt Binder ("Binder"), its Chief Financial Officer, among others, entered into serious negotiations over the phone, electronically and in person at Irvine, California, and Beijing, People's Republic of China, with both Lele Holding by and through JIA, its sole and controlling owner, as well as with Global Group, by and through, among others, JIA, Winston Cheng ("Cheng"), its Sr. Vice President of Finance, and Charles Hsieh ("Hsieh"), a director of Global Group, for the merger of Vizio with LeEco and merger Sub.

FAC ¶ 11. Next, Vizio alleges that

> during the Serious Negotiations Period, Lele Holding and Global Group, through, inter alia, JIA, represented to one or more of Wong, Binder, and/or Wang, among others, over the phone, electronically and in person at Irvine, California, and Beijing, People's Republic of China, that Lele Holding and Global Group and various other subsidiary or affiliated corporate entitites, were financially healthy and that they had the financial wherewithal to complete a $2,000,000,000.00, merger transaction with Vizio.

FAC ¶ 12. Vizio alleges that Defendants made these false representations, and at the time of the negotiations period, Defendants did not have the financial wherewithal to complete a $2 billion merger with Vizio. *Id.* ¶12. Vizio also alleges that Defendants created a "secret plan" to use this publicly announced merger to obtain access to Vizio's confidential client information. *Id.* ¶ 15. Additionally, shortly after Vizio delivered its notice of termination of the Merger Agreement to LeEco on March 30, 2017, Vizio

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                     Page 16

alleges that LeLe Holding, Global Group, and LeEco, by and through Jia and other
officers of LeEco, discussed with Vizio that they mutually terminate the Merger
Agreement, and began negotiations for the Framework Agreement. *Id.* ¶¶ 31, 33. Vizio
alleges that the promises made during the negotiations of the Framework Agreement
were also false at the time they were made and that Defendants made thse promises with
knowledge of their falsity and the intent to induce Vizio to jointly terminate the Merger
Agreement. FAC ¶ 34. Defendants allegedly falsely represented that they would be
contributing $50 million in non-cash assets to the proposed China joint venture in order
for Vizio to release them from the terms of the Merger Agreement. *Id.* ¶¶ 33, 35, 66, 68;
LeEco Opp'n 8–9. Defendants allegedly misrepresented that they would negotiate in
good faith to establish a commercial relationship in which a 50/50 distributorship would
be created to sell Vizio branded televisions at competitive rates, distributed by LeEco. *Id.*
¶ 85. Vizio alleges that this misrepresentation repeated throughout their negotiations over
phone and email repeatedly over the Framework Agreement, when Defendants had no
intention to perform critical promises. *Id.* ¶¶ 11, 34, 76, 94. The misrepresentations were
largely repeated in the Framework Agreement, according to Vizio. LeEco Opp'n at 9.
After April 5, 2017, when the Framework Agreement was executed, Vizio alleges that
there was only "radio silence" from Defendants, which indicates that Defendants had no
intention to negotiate in good faith the prospective joint venture in China. FAC ¶ 43.
Vizio alleges that up until the May 20, 2017 deadline, they made repeated attempts to
negotiate with LeEco during the agreed upon 45-day execution period for the proposed
China joint venture. *Id.* ¶¶ 43–44, 87. Therefore, Vizio claims that from this, it can be
inferred that the Framework Agreement was a subterfuge in order for Defendants to
reduce the $100 million liability from the termination of the Merger Agreement to the
$40 million that was disbursed to Vizio. *Id.* ¶ 45. LeEco Opp'n 9. Thus, given these
extensive allegations, Vizio has alleged the who, what, where, when, and why of the
alleged fraud, and properly pleads the first three elements for a fraud claim.

        For the fourth element of reliance, LeEco cites cases to argue that, as a matter of
law, Vizio cannot claim reliance because both parties were represented by "sophisticated
counsel" and because the agreement contains a "no representation clause" in which
parties specificied that they were not relying on any representation made by another.
LeEco Mot. at 12–13 (citing, e.g., *Facebook, Inc. v. ConnectU, Inc.*, No. C 07-1389 JW,
2008 WL 8820476, at *5 (N.D. Cal. June 25, 2008); *Scognamillo v. Credit Suisse First
Boston LLC*, No. C.03-2061 TEH, 2005 WL 2045807, at *6 (N.D. Cal. Aug. 25, 2005)).

        However, to the latter point, the California Court of Appeal in *Ron Greenspan
Volkswagen, Inc. v. Ford Motor Land Dev. Corp.*, 32 Cal. App. 4th 985, 996 (1995)
specifically held that "a contract provision stating that all representations are contained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                      Date: July 27, 2018
                                                                      Page 17

therein does not bar an action for fraud." *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.*, 32 Cal. App. 4th 985, 992 (1995) (rejecting the sole contrary decision, *Fisher v. Pennsylvania Life Co.* 69 Cal. App. 3d 506 (1977), as at odds with California law).

      As to the presence of sophisticated counsel, the cases cited by LeEco are not on point. First, in *Facebook*, the parties were involved in a settlement negotiation in which one party was accused of fraudulently misrepresenting Facebook's present value in the settlement agreement, thus making the contract unenforceable. *Facebook*, 2008 WL 8820476, at *5. The court found that there was no misrepresentation because both parties proceeded knowing they lacked potentially relevant information. *Id.* The presence of the "sophisiticated counsel" was significant only because the valuation of the Facebook shares was material information that parties could have discovered easily. *Id.* Unlike the counsel in *Facebook*, Vizio here had no means to discover the falsity of the alleged promises at the time they were made, and there was justifiable reliance upon these negotiations. FAC ¶¶ 46, 61, 76, 90, 103. Specifically, Vizio claims that they relied upon the Framework Agreement negotiations by foregoing the immediate payment of the termination fee that would have been required by the Merger Agreement. FAC ¶ 46. Because Vizio would not have been able to know Defendants' intentions in proceeding with the Framework Agreement at the time of the execution, Vizio has properly pled reliance upon Defendants' promises. *See Lazar*, 12 Cal. 4th at 637. Defendants also cite *Scognamillo* for the proposition that reliance cannot be reasonable when a plaintiff was represented by counsel. *Scognamillo*, 2005 WL 2045807, at *6. While the court in *Scognamillo* held that—even though reliance is a question of fact—based on the sophistication of the parties in the case, no set of facts would enable the plaintiff to show reliance in the negotiation, and execution of a merger agreement; here, as discussed above, Vizio plausibly alleges that there were no means to discover the falsity of the alleged promises at the time they were made, and therefore it plausibly was reasonable to rely on Defendants' representations, even though Vizio was represented by counsel. Therefore, Vizio has plausibly pled the element of reliance.

      Next, as to the damages element of a fraud claim, Vizio believes that it suffered reliance and/or lost opportunity damages in the sum of $60 million (the $10 million still remaining in escrow and the $50 million termination fee remaining) in damages. *Id.* ¶¶ 22, 47. Vizio claims it relied upon the allegedly false representation that Defendants were able to execute a $2 billion merger when signing the Merger Agreement. *Id.* ¶ 22. Furthermore, Vizio claimes it relied upon the promises underlying the Framework Agreement—specifically the promise of the $50 million contribution capital in the form of non-cash assets for their proposed joint venture in China. *Id.* ¶ 33. By relying on these

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                   Date: July 27, 2018
                                                                    Page 18

promises, Vizio was allegedly induced to forego the immediate payment of the $100 million termination fee. *Id.* ¶ 34. Therefore, Vizio properly pleads the last element of damages for a claim for fraud. *See Lazar*, 12 Cal. 4th at 637.

"The elements of a cause of action for negligent misrepresentation are the same as those of a claim for fraud, with the exception that the defendant need not actually know the representation is false." *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003). "Rather, to plead negligent misrepresentation, it is sufficient to allege that the defendant lacked reasonable grounds to believe the representation was true." *Id.* As discussed above, Vizio sufficiently alleges a claim under fraud, and has therefore also established a claim under negligent misrepresentation.

Accordingly, the Court DENIES LeEco Motion to Dismiss Vizio's fraud claims to the extent that Defendants argue that these claims are not pled with sufficient particularity.

## 2.     California's Economic Loss Rule

Next, Defendants claim that Vizio's fraud-based claims are barred by California's economic loss rule because they do not demonstrate harm above and beyond a broken contractual promise. LeEco Mot. 13–14. In response, Vizio argues that the economic loss rule does not bar claims of fraudulent inducement, which Vizio alleges here. LeEco Opp'n at 14–21.

In California, the economic loss rule generally bars tort claims for contract breaches, thereby limiting contracting parties to contract damages. *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000) ("A person may not ordinarily recover in tort for breaches of duties that merely restate contractual obligations"). The rule "prevents the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). "The term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property." *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). By preventing tort claims, the rule encourages parties to reach a "mutually beneficial private bargain." *United Guar. Mort. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1180 (C.D. Cal. 2009).

Defendants argue that Vizio's fraud-based claims are "exactly the kind of claims that the economic loss rule is supposed to weed out." LeEco Mot. at 14. LeEco claims that because Vizio's reliance and/or lost opportunity damages of $60 million are the exact same damages that would result from a breach of contract claim, there is no difference

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                      Date: July 27, 2018
                                                                       Page 19

between their breach of contract claims and their tort claims for fraud, negligent
misrepresentation, and promissory estoppel, and thus the economic loss rule bars these
claims as flowing solely from the breach of contract. *Id.* at 14–15; *see* FAC ¶¶ 77, 91,
104. Other district courts applying California law have similarly found tort claims barred
in cases in which one party breached a contract it allegedly never intended to perform
because such tort claims alleged damages that are the "same economic losses arising
from the alleged breach of contract." *See, e.g. Advanced Riggers & Millwrights, LLC v.
Hoist Liftruck MFG, Inc.*, No. ED-CV-151400 JLS(DTBx), 2015 WL 12860470, at *7
(C.D. Cal. Oct. 29, 2015). Generally, unless plaintiffs can identify an independent duty
that was violated, their claims are barred by the economic loss rule. *UMG Recordings,
Inc. v. Global Eagle Entertainment, Inc.*, 117 F. Supp. 3d 1092, 1104 (C.D. Cal. 2015)
(citing *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 973 (1997)). Courts
have also applied the economic loss rule to bar negligent misrepresentation claims where
the purportedly negligent conduct is conceptually indistinct from a contract breach. *See
id.; United Guar. Mortg. Co.*, 660 F. Supp. 2d at 1184–85 ("For the negligence and
negligent misrepresentation claims, Countrywide's allegedly tortious conduct and
representations were all made pursuant to a purely contractual duty . . . . Here, all the
representations were made prior to, or at the moment of, contract formation. Nor were the
representations collateral to the contract.").

        Nonetheless, "tort damages have been permitted in contract cases where . . . the
contract was fraudulently induced." *Robinson Helicopter*, 34 Cal. 4th at 989; *Erlich v.
Menezes*, 21 Cal. 4th 543, 550–51 (2004). In *Robinson Helicopter*, the Court explained
that the fraudulent inducement exception to the economic loss rule is consistent with
California's public policy to permit tort recovery "when the actions that constitute the
breach violate a social policy that merits the imposition of tort remedies." *Robinson
Helicopter*, 34 Cal. 4th at 992. In pursuing a valid fraud action, a plaintiff advances the
public interest by punishing intentional misrepresentations and deterring future
misrepresentations. *Robinson Helicopter*, 34 Cal. 4th at 992; *Lazar v. Superior Court*,
909 P.2d 981, 990 (1996). "California also has a legitimate and compelling interest in
preserving a business climate free of fraud and deceptive practices." *Robinson
Helicopter*, 34 Cal. 4th at 992 (citing *Diamond Multimedia Systems, Inc. v. Superior
Court*, 19 Cal. 4th 1036, 1064 (1999)). While "[a] breach of contract remedy assumes
that the parties to a contract can negotiate the risk of loss occasioned by a breach . . . . 'a
party to a contract cannot rationally calculate the possibility that the other party will
deliberately misrepresent terms critical to that contract.'" *Id.* at 993 (citing Tourek et al.,
*Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and
Common Law Causes of Action for Fraud and Misrepresentation*, 84 Iowa L. Rev. 875,
894 (1999)). Thus, allowing plaintiffs to pursue tort remedies for fraudulently induced

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                              Date: July 27, 2018
                                                                         Page 20

contracts allows for an additional deterrence and imposes an extra measure of
accountability.

Here, Vizio has pled that it was fraudulently induced into signing the Framework
Agreement, and had it known that the other party had no intention of performing in good
faith, Vizio would never have executed the agreement. FAC ¶¶ 61–63. Vizio alleges that
not only did Defendants not have any intent of performing the contract, they also
deceived Vizio into abandoning the Merger Agreement under false pretenses. FAC ¶¶
67–68. Thus, Vizio has alleged more than a simple breach of contract, and and
Defendants' allegedly reprehensible behavior goes against California's policy of
preserving a business climate free of fraud and deceptive practices. *See Robinson
Helicopter*, 34 Cal. 4th at 992. Vizio asks not only for the $10 million in escrow and the
$50 million for the proposed joint venture in China, but also requests punitive and
exemplary damages for the fraud-based claims. FAC ¶ 78. For these reasons, Vizio's
separate tort claims for fraud and negligent misrepresentation under the Framework
Agreement are not barred by California's economic loss rule.

Accordingly, the Court DENIES LeEco's Motion to Dismiss Vizio's fraud-based
claims to the extent that Defendants argue that these claims are barred by California's
economic loss rule.

**3.       Incorrect Interpretation of the Contract**

Next, Defendants argue that Vizio completely misintrepets the language in the
Framework Agreement, and that a plain interpretation of the contract would show that
LeEco is not in breach for not paying to Vizio $10 million from escrow. LeEco Mot. 15–
20. On a motion to dismiss, "[r]esolution of contractual claims . . . is proper if the terms
of the contract are unambiguous." *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554
F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) (quoting *Bedrosian v. Tenet Healthcare Corp.*,
208 F.3d 220 (9th Cir. 2000)); *see also Westlands Water Dist. v. U.S. Dep't of Interior*,
850 F. Supp. 1388, 1408 (E.D. Cal. 1994) ("A motion to dismiss cannot be granted
against a complaint to enforce an ambiguous contract."). However, at the motion to
dismiss stage, "[the Court must] strive to resolve any contractual ambiguities in the [non-
moving party's] favor." *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d
69, 72 (2d Cir. 1995). A contract provision will be considered ambiguous when it is
capable of two or more reasonable interpretations. *Safeco Ins. Co. of Amer. v. Robert S.*,
26 Cal. 4th 758, 763 (2001); *Bay Cities Paving & Grading, Inc. v. Lawyers Mut. Ins. Co.*,
5 Cal. 4th 854 (1993). Determining whether a contract provision is ambiguous depends
on the facts and circumstances of the case at hand. *Bank of the West v. Superior Court*, 2
Cal. 4th 1254, 1265 (1992). "Even apparently clear language may be found to be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                   Date: July 27, 2018
                                                                    Page 21

ambiguous when read in the context of the policy and the circumstances of the case."
*Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 919 (2008). Where
the language "leaves doubt as to the parties' intent," the motion to dismiss must be
denied. *Consul Ltd. v. Solide Enters., Inc*., 802 F.2d 1143, 1149 (9th Cir. 1986).

    The parties dispute whether the terms of the Framework Agreement were violated
on their face by LeEco's failure to pay Vizio $10 million. *See* LeEco Mot. at 17–18;
LeEco Opp'n at 20. Vizio points to Section 1.1 of the Framework Agreement, which
states, "the merger Agreement shall become null and void . . . except for Section 6.5
(Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the
Merger Agreement and the terms governing the release of the remaining Buyer
Termination Fee Deposit." LeEco Opp'n at 20. Vizio argues that this language in the
Framework Agreement explicitly carves out exceptions to the Merger Agreement that
remain in effect—specifically "the terms governing the release of the remaining Buyer
Termination Fee Deposit." *Id*. In other words, in Vizio's view, the original $50 million
escrow deposit amount must still be paid to Vizio by LeEco, even under the terms of the
Framework Agreement, regardless of whether or not the joint venture was executed. *See
id.*

    However, Defendants claim that if this portion of the Merger Agreement was still
in effect, it would directly contradict other portions of the Framework Agreement. LeEco
Mot. at 17. Specifically, Defendants argue that Section 1.2.2 of the Framework
Agreement allegedly governs the $10 million at issue and says, "Buyer agrees to
concurrently with the execution of the JV Agreement (as defined below) issue with
[LeEco] a Joint Release Instruction . . . releasing the remaining US$10,000,000 from the
Buyer Termination Fee Escrow Account . . . to the [LeEco]." *Id*. at 16. Defendants claim
that this language clearly contradicts Vizio's reasoning because it stipulates that the
release of the $10 million is to occur at the same time as the execution of the China joint
venture. *Id*. at 15–16. Furthermore, Defendants assert that there is no explicit provision
regarding what happens to the $10 million if the condition of the joint venture in China
does not occur. *See id*. at 16. Defendants also argue that no language in the Framework
Agreement exists in support of the theory that the Framework Agreement "carved out"
sections of the Merger Agreement that were still in effect (but, contradicting Defendants'
argument, Section 1.1 says "except"). *See id*. at 15. Therefore, Defendants content that
Vizio's argument is unsupported by the language of the Framework Agreement and is
"nonsensical." *Id*. at 15–16.

    The dispute between the parties regarding the language of the Framework
Agreement, specifically its terms and releases, and what remains of the Merger
Agreement demonstrates the ambiguity of the language of the Framework Agreement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                            Page 22

*See* LeEco Mot. at 17–18; LeEco Opp'n at 20. Both parties can point to language in the Framework Agreement that appears to support their claims. LeEco Opp'n at 20. Vizio points to Section 1.1, which, on its face, could reasonably allow for certain terms of the Merger Agreement to remain in effect, specifically, the terms of the release of the $50 million termination fee deposit. *Id.* Defendants point to Section 1.2.2, which stipulates that the China joint venture would be executed with the release of the remaining termination fee deposit. LeEcot Mot. at 16. Because the Framework Agreement is capable of two or more reasonable intrepretations—specifically as to whether or not LeEco must pay to Vizio the $10 million remaining in escrow if the joint venture agreement is not executed—the Framework Agreement is "ambiguous" and "leaves doubt as to the parties' intent." Therefore, the interpretation of the Framework Agreement is a factual matter to be determined by the circumstances, and the Court declines to resolve the contractual claims on a motion to dismiss.

Accordingly, the Court DENIES Defendant's Motions to Dismiss Vizio's second through fifth claims on the basis of misinterpretation of the contract.

## C.     Claim for Promissory Estoppel

Additionally, Defendants argue that Vizio's fourth claim for promissory estoppel must fail because "promissory estoppel as a legal cause of action exists only in the absence of a contract embodying bargained-for consideration, and here there is no dispute regarding whether such a contract exists, only its interpretation." LeEco Mot. at 4. Because there are two existing contracts in dispute, Defendants contend that Vizio should not be allowed to make a claim under promissory estoppel. *Id.*

A party seeking relief under the doctrine of promissory estoppel must show: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Granadino v. Wells Fargo Bank*, *N.A.*, 236 Cal. App. 4th 411, 416 (2015), *as modified* (Apr. 29, 2015) (internal quotation omitted). "[A] cause of action for promissory estoppel might lie if the defendant made a clear, unambiguous promise to negotiate in good faith and if the plaintiff reasonably and foreseeably relied on the promise in incurring expenditures connected with the negotiation." *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1263 (2002). Here, Vizio alleges that Defendants made a promise to negotiate in good faith for the proposed China venture, Vizio relied on this promise and executed the Framework Agreement, the reliance was reasonable and foreseeable, and Vizio was harmed as a result. FAC ¶¶ 92–103. Thus, Vizio has properly alleged the elments of promissory estoppel. *See Granadino*, 236 Cal. App. 4th at 416.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                           Page 23

Defendants also argue that because Vizio already pleads a claim for breach of contract, it cannot consistently also plead a claim under promissory estoppel. LeEco Mot. at 20–21. Vizio is correct, however, that "the Federal Rules of Civil Procedure and the applicable case law uniformly permit promissory estoppel and breach of contract claims to be pleaded in the alternative where there may be a dispute about the terms or validity of the alleged contract." *Rowland v. JP Morgan Chase Bank, N.A.*, Case No. C14–00036LB, 2014 WL 992005, at *7 (N.D. Cal. 2014). Rule 8(d)(2)–(3) expressly permits a party to plead alternative and even inconsistent claims. Fed. R. Civ. P. 8(d)(2)–(3). Therefore, Vizio's claim for breach of contract does not bar its alternative claim under promissory estoppel.

Accordingly, the Court DENIES LeEco's Motion to Dismiss Vizio's fourth claim for promissory estoppel.

### D.     Claim for Rescission

Defendants also claim that Vizio, in its fifth claim, fails to satisfy the elements of rescission. LeEco Mot. at 21. "A contract is extinguished by its rescission." Cal. Civ. Code. § 1688. California Civil Code § 1689(b) allows a contract to be rescinded "if the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds." *Id.* § 1689(b). As discussed above, Vizio sufficiently pleads a claim under fraud and negligent misrepresentation because Vizio alleges that there was misrepresentation or fraud that induced it to consent to the Framework Agreement, that Vizio relied upon the terms of the Framework Agreement, and that this led to injury in lost payment and lost future business ventures. Vizio asks for relief in the form of enforcement of the previous Merger Agreement, in which the $40 million already tendered to LeEco would become a credit for the $100 million termination fee. FAC ¶¶ 106–07. Therefore, by stating that the contract was entered into through fraud, Vizio has sufficiently stated the elements of rescission. *See* Cal. Civ. Code. § 1689(b).

In addition, Defendants argue that rescission requires the tender of what was received, which in this case would require Vizio to return the $40 million it received under the Framework Agreement before bringing a claim for rescission. LeEco Mot. at 21. However, California law provides otherwise:

> A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief based upon rescission shall not be denied relief because of a delay in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                    Date: July 27, 2018
                                                      Page 24

> restoring or in tendering restoration of such benefits before judgment
> unless such delay has been substantially prejudicial to the other
> party; but the court may make a tender of restoration a condition of
> its judgment."

Cal. Civ. Code § 1693; *see also Taylor v. Cabrera*, No. SACV151526JVSJCGX, 2015
WL 12661919, at *7 (C.D. Cal. Nov. 20, 2015) ("But Taylor's claim for rescission . . . .
is a claim about the circumstances that brought about the Settlement Agreement
and therefore the tender need not be made prior to determining whether Taylor actually has
adequate grounds to rescind.") (citing Cal. Civ. Code § 1693). Therefore, because Vizio's
claim for recission is about the circumstances that brought about the Freemwork
Agreement, Vizio need not tender the $40 million before a determination of whether
there are grounds to rescind. *See Taylor*, 2015 WL 12661919, at *7.

Next, Defendants argue that rescission is solely a remedy and not a separate cause
of action. LeEco Mot. at 21. Indeed, "rescission under California law is not a claim, but a
remedy." *Melcher v. Fried*, No. 16-CV-02440-BAS(BGS), 2018 WL 2411747, at *6
(S.D. Cal. May 29, 2018) (citations omitted).

Accordingly, the Court DISMISSES WITH PREJUDICE Vizio's fifth claim for
rescission. However, provided that Vizio "can state a cognizable and appropriate
underlying claim, [it] may pursue rescission as a remedy in an amended pleading." *See
id.*

### E.    Improper Service on Jia

Next, Jia argues that the Court must dismiss the claims against Jia because the
attempted service was deficient under Federal Rule of Civil Procedure 4. Jia Mot. at 2.

Federal Rule of Civil Procedure (4)(e) provides that:

> an individual . . . may be served in a judicial district of the United
> States by: (1) following state law for serving a summons in an action
> brought in courts of general jurisdiction in the state where the district
> court is located or where service is made; or (2) doing any of the
> following: (a) delivering a copy of the summons and of the
> complaint to the individual personally; (b) leaving a copy of each at
> the individual's dwelling or usual place of abode with someone of
> suitable age and discretion who resides there; or (c) delivering a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                  Date: July 27, 2018
                                                                   Page 25

copy of each to an agent authorized by appointment or by law to
receive service of process.

Fed. R. Civ. P. 4(e). Under the applicable California statute, California Code of Civil
Procedure § 415.20(a), a summons may be served in lieu of personal delivery by: (1)
leaving a copy of the summons and of the complaint "during usual office hours in his or
her office . . . with the person who is apparently in charge thereof," and (2) "by thereafter
mailing a copy of the summons and of the complaint to the person to be served at the
place where a copy of the summons and of the complaint were left." Cal. Civ. Proc. Code
§ 415.20(a). "When service is effected by leaving a copy of the summons and complaint
at a mailing address, it shall be left with a person at least 18 years of age, who shall be
informed of the contents thereof." *Id.*

 "A defendant may move to dismiss or quash under Rule 12(b)(4) for a defect in
the summons itself and under Rule 12(b)(5) for insufficient service of process." *Verde
Media Corp. v. Levi*, No. 14-CV-00891 YGR, 2014 WL 3372081, at *2 (N.D. Cal. July
8, 2014). "Once service is challenged, plaintiffs bear the burden of establishing that
service was valid." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2003). "Where it
appears that effective service can be made and there is no unfair prejudice to the
defendant, quashing service rather than dismissing the action is the appropriate course."
*Verde Media*, 2014 WL 3372081, at *2. (citing *Umbenhauer v. Woog*, 969 F.2d 25, 30–
31 (3rd Cir. 1992)). Upon Jia's challenge to the propriety of service, Vizio now carries
the burden of establishing that service was valid. *See Brockmeyer*, 383 F.3d at 801.

Service was effected on Jia through substitute service on January 19, 2018 at the
offices of Faraday Future, located at 18455 S. Figueroa St., Gardena, CA 90249
("Faraday Office"). *Id.* at 2–3. Vizio alleges that Jia is the Chief Executive Officer of
Faraday Future, an electric automotive company. Jia Opp'n at 1–2. Defendants do not
dispute this fact in any of their motions or replies, but claim that the internet articles that
describe Jia as the CEO of Faraday Future should be discounted as hearsay. Jia Reply at
7–8. Jia argues that substitute service was deficient because it was received by Chaoying
Deng ("Deng"), an employee at Faraday Future, who, according to Jia, was not an
authorized agent who could have accepted service on Jia's behalf. Jia Mot. at 3; Deng
Decl. ¶¶ 5–7. Deng also claims that she was never given notice of the content of the
service. Jia Mot. at 3; Deng Decl. ¶ 7. Moreover, Jia claims that the process servers did
not do their due diligence when attempting to locate Jia's abode, and that although they
inquired into Jia's address, they never tried to serve notice properly to his home. Jia
Reply at 4–5; *see* Carroll Decl. at 2. Finally, Jia argues that process servers failed to
attempt service after the holiday season at another location besides the Faraday Office.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                      Page 26

Jia Reply at 5. Therefore, Jia argues that service was improper under the Federal Rules and the applicable California statute. *Id.*

Vizio responds that service was proper under Federal Rule of Civil Procedure 4 and under California Code of Civil Procedure § 415.20 because the process servers tried three times to personally find Jia in his offices, and because Jia was never located, the process server gave substitute service to Deng, the Vice President of Faraday Future who was in charge of the office at the time, and a copy of the summons and complaint were mailed to the address that day. Jia Opp'n at 4–6. Therefore, the Court will determine whether substitute service was proper through Deng pursuant to California Code of Civil Procedure § 415.20.

Here, Vizio asserts that Jia is the CEO of Faraday Future, Deng is an officer of Faraday Future who was in charge of the office at the time service was attempted, various attempts were made to serve Jia personally, and Deng was properly served and given notice. *See* Jia Opp'n. at 5; Govea Decl; Carroll Decl.; Proof of Service by Michael Lee ("Proof of Service on Jia") (Dkt. 57). While Deng declares that she never received notice of the content of the summons and that she was not authorized to accept the summons, Vizio submits evidence from the process servers that contradict her statements.[3] *See* Deng Decl. Specifically, Vizio has submitted the Declarations of Govea and Carroll, which show that the process servers tried multiple times to personally serve Jia. Govea Decl. ("I waited for an hour until Chaoying Deng came out and accepted the documents on behalf of Lele Holding but she stated that she could not accept the documents on behalf of Yueting Jia."); Carroll Decl. Additionally, Vizio has submitted the Proof of Service by Michael Lee ("Lee"), in which the process server declares that he served Deng at the office address on January 19, 2018 at 9:20 a.m, and informed her of the general nature of the papers. Proof of Service on Jia at 1–4 ("I informed [Deng] of the general nature of the papers."). Vizio has therefore established that the process servers left a copy of the summons and complaint during usual office hours at Jia's office with the person apparently in charge thereof, informed Deng of the contents, and mailed a copy that same day. Jia Opp'n at 5; Proof of Service on Jia at 4. Thus, in accordance with California procedure, Vizio meets the burden of proof, and service of process was effective as to Jia. *See* Cal. Civ. Proc. Code § 415.20(a) (a summons may be served in lieu of personal delivery by: (1) leaving a copy of the summons and of the complaint "during usual office hours in his or her office . . . with the person who is apparently in charge thereof," and (2) "by thereafter mailing a copy of the summons and of the complaint to the person to be

---

[3] Vizio filed an Evidentiary Objection to the Deng Declaration ("Evidentiary Objections") (Dkt. 68-1) claiming that various statements by Deng contesting that she was authorized to receive personal mail for Jia and that she received notice of the contents of the service are irrelevant to determining whether service is proper. Deng Decl. ¶¶ 4, 6; Evidentiary Objections.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                          Date: July 27, 2018
                                                                          Page 27

served at the place where a copy of the summons and of the complaint were left . . .
When service is effected by leaving a copy of the summons and complaint at a mailing
address, it shall be left with a person at least 18 years of age, who shall be informed of
the contents thereof"); Proof of Service on Jia at 4.

Accordingly, the Court DENIES Jia's Motion to Dismiss to the extent that Jia
argues that service was improper.

**F.     Improper Service on and Lack of Personal Jurisdiction over LeLe
         Holding**

Next, LeLe Holding moves to dismiss all claims against it on two grounds: (1) that
it was not served properly under the Hague Convention rules; and (2) that the Court does
not have personal jurisdiction over LeLe Holding in California. LeLe Mot. at 1.
Specifically, LeLe Holding claims that Deng, an officer of Faraday Future, was not a
proper agent of service as to LeLe Holding. *Id.* at 3–4. Additionally, LeLe Holding also
argues that there is no basis for personal jurisdiction over it because Vizio's sole
connection to LeLe Holding is through Vizio's theory that LeEco is the alter ego of LeLe
Holding (and Global Group) (and that Jia is the alter ego of LeLe Holding and Global
Group), which LeLe Holding contends "has no factual support in the FAC." *Id.* at 1, 9;
*e.g.*, FAC ¶¶ 4, 5, 6, 11, 56–57. Thus, LeLe Holding argues that "Vizio cannot impute
LeEco['s] jurisdictional contacts to LeLe based solely on a parent/subsidiary
relationship." LeLe Mot. at 1–2. Moreover, LeLe Holding argues that it has no contacts
to California that could justify exercising either general or specific jurisdiction there. *Id.*
Because the alter ego theory is relevant to both service of process and personal
jurisdiction, the Court will first address whether LeLe Holding can be held liable for the
conduct of its subsidiaries under Vizio's alter ego theory. Subsequently, the Court will
turn to service of process and personal jurisdiction.

**1.     Alter Ego Theory**

In support of Vizio's theory that LeEco is the alter ego of LeLe Holding (and
Global Group), Vizio asserts that LeLe Holding and the other corporate defendants are all
under the common ownership and control of Jia, and that LeLe Holding shares a principal
place of business and counsel with the other corporate defendants. LeLe Opp'n at 1; *e.g.*,
FAC ¶¶ 4, 5, 6, 11 56–57 Vizio further contends that LeEco "represented to the U.S.
Government that Lele was part of a common enterprise in which Jia would ultimately
control Vizio and that, financially, Lele and LeEco Global are treated as virtually
interchangeable and have the same assets and liabilities." *Id.* at 1–2. Vizio further
contends that Jia misrepresented that LeLe Holding's principal place of business is in the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                Date: July 27, 2018
                                                                 Page 28

British Virgin Islands, not China as represented in the previous merger negotiations. *Id.* at 2; Wessel Decl. Ex. 2 at 36.

"To establish a party as the alter ego of a corporation, the applicant must show '(1) that there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" *Bank of Montreal v. SK Foods, LLC,* 476 B.R. 588, 597 (N.D. Cal. 2012) *aff'd sub nom. Bank of Montreal v. Salyer,* 599 F. App'x 706 (9th Cir. 2015) (quoting *Automotriz del Golfo de California v. Resnick,* 47 Cal. 2d 792, 796 (1957)); *see also United States v. Boyce,* 38 F. Supp. 3d 1135, 1154–55 (C.D. Cal. 2014), *appeal dismissed* (Nov. 13, 2014) (quoting *In re Schwarzkopf,* 626 F.3d 1032, 1038 (9th Cir. 2010)). Both factors are necessary for a Court to impose alter ego liability. *Bank of Montreal*, 476 B.R. at 597.

In assessing the unity of interest prong, courts consider numerous factors, including "inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (citations omitted); *see also Bank of Montreal*, 476 B.R. at 597–98. "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th at 245. Further, "[c]ommon ownership alone is insufficient to disregard the corporate form." *Stewart*, 81 F. Supp. 3d at 961 (quoting *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)) (internal quotation marks omitted).

Here, Vizio has asserted that there is a unity of interest and ownership for LeLe Holding and LeEco, through the defendant Jia. LeLe Opp'n at 16. Vizio submits, as Exhibits 3 and 4 to the Wessel Declaration, the unaudited balance sheets of LeLe Holding, Global Group, and LeEco. Wessel Decl. Exs. 3, 4. Vizio points out that "these statements are *virtually identical* . . . Lele and LeEco Global have almost no separate financial existence." LeLe Opp'n at 17; *see* Wessel Decl. Exs. 3, 4. The balance sheets of the three companies demonstrate that these are not three separate entities, but one company with the same assets. *See id.* LeLe Holding and LeEco both share the same office address in China. Wessel Decl. Ex. 2. Le Technology, Inc. ("Le Tech"), the California Corporation that guaranteed the funds for the merger for LeEco, shares the same office address as Global Group in San Jose, California. Wessel Decl. Exs. 1, 2. Vizio also asserts that LeEco executive Charles Hsieh self-identified as the Director of

Corporate Finance & Development for Le Tech. LeLe Opp'n at 5. This same executive
Charles Hsieh was allegedly also a principal negotiator for Global Group, which owns
LeEco. *See* Hsieh Decl. ¶¶ 2–3. Deng, the Vice President of Jia's other company Faraday
Futures, is also listed as the Chief Executive Officer for Le Tech throughout the relevant
time period. LeLe Opp'n at 5; Haas Decl. Ex. 1. Vizio argues that the fact that Le Tech
offered to guarantee the $50 million termination fee for LeEco without any consideration,
is telling. *See* Wessel Decl. Ex. 1, ¶ 1; LeLe Opp'n at 4–5. This shows a conmingling of
funds and a disregard of corporate formalities between the two companies. Throughout
the parent and subsidiary companies, there is a connection and intermingling between the
employees, assets, and office locations. Thus, Vizio sufficiently establishes facts in
support of the proposition that LeLe Holding and LeEco are interconnected in ownership
(through Jia) and through a unity of interest (through similarities in offices, employees,
and intermingling of assets). Wessel Decl'n Exs. 3–5; LeLe Opp'n at 5.

        As to the second prong of the alter ego analysis (whether, if the acts are treated as
those of the corporation alone, an inequitable result will follow), "the parent is not
'exposed to liability for the obligations of [the subsidiary] when [the parent] contributes
funds to [the subsidiary] for the purpose of assisting [the subsidiary] in meeting its
financial obligations and not for the purpose of perpetrating a fraud.'" *Sonora Diamond
Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000) (quoting *Lowell Staats Mining
Co., Inc. v. Pioneer Uravan, Inc.,* 878 F.2d at 1263). However, "when the corporate form
is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or
inequitable purpose, the courts will ignore the corporate entity and deem the
corporation's acts to be those of the persons or organizations actually controlling the
corporation, in most instances the equitable owners." *Id.* (citing *Robbins v. Blecher,* 52
Cal. App. 4th at 892; *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th at 993–
94). "The doctrine prevents individuals or other corporations from misusing the corporate
laws by the device of a sham corporate entity formed for the purpose of committing fraud
or other misdeeds." *Id.* (citing *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.
App. 2d 825, 842 (1962)).

         Here, Vizio additionally alleges that the "adherence to the fiction of the separate
existence of LeEco, Lele Holding, and Global Group would permit an abuse of the
corporate privilege and promote injustice" by protecting them from liability that was
performed under the LeEco name. FAC ¶ 56. Vizio alleges that the acts of LeLe Holding
were used to perpetuate the fraud in order to avoid the termination fee from the cancelled
merger, and persuade Vizio to join the Framework Agreement. *Id.* ¶ 45. Because LeLe
Holding and LeEco are intertwined in ownership and by assets, it would be unjust to
allow the parent company to escape liability when it was a key player in enabling the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                Date: July 27, 2018
                                                                          Page 30

alleged fraud of the subsidiary company. *Id.* Thus, Vizio has also established the second element of the alter ego doctrine, and Vizio has made a plausible case for finding that LeLe Holding is the alter ego of LeEco.

The Court will next look to whether service was proper and whether jurisdiction exists over LeEco's alter ego, LeLe Holding.

### 2.       Improper Service

LeLe Holding moves to dismiss under Federal Rule 12(b)(5), which "authorizes a defendant to move for dismissal resulting from insufficiency of service of process." Fed. R. Civ. P. 12(b)(5); LeLe Mot. at 13–16. LeLe Holding argues that because it is a company domiciled in the British Virgin Islands ("BVI"), a signatory of the Hague Convention, Vizio must comply with the Hague Convention to effectuate proper service on LeLe Holding. LeLe Mot. at 15. Because neither Deng nor Faraday Futures is LeLe Holding's registered agent for process, LeLe Holding argues that LeLe Holding was not properly served under the Hague Convention rules. *Id.*; Jia Decl. ¶ 5. Pursuant to the Hague Convention rules, LeLe Holding argues that it should have been served through its registered agent for service of process, located in BVI. LeLe Mot. at 14; Jia Decl. ¶ 2.

For service of foreign corporations, partnerships, and other unincorporated associations, Federal Rule of Civil Procedure 4 provides three alternatives:

> Service is effective pursuant to (1) the law of the state where the district court is located or of the state where service is effected, *see* Fed. R. Civ. P. 4(e)(1); (2) by delivering a copy of the summons and complaint in a judicial district of the United States to "an officer, a managing or general agent, or to any other agent authorized by appointment or by the law to receive service of process [.]" Fed. R. Civ. P. 4(h)(1); or (3) an internationally agreed method for effective service such as the Hague Convention. *See id.* at 4(f)(1).

*SVC-Napa, L.P. v. Strategy Resort Fin., Inc.*, No. C 06-03561 SI, 2006 WL 2374718, at *1 (N.D. Cal. Aug. 16, 2006).

Vizio argues that service was proper under Federal Rule of Civil Procedure 4(h)(1), which provides that

> a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served: (1) in a judicial district of the United States:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                    Page 31

> (a) in the manner prescribed by Rule (4)(e)(1) for serving an
> individual; or (b) by delivering a copy of the summons and of the
> complaint to an officer, a managing or general agent, or any other
> agent authorized by appointment or by law to receive service of
> process and—if the agent is one authorized by statute and the statute
> so requires—by also mailing a copy of each to the defendant.

Fed. R. Civ. P. 4(h); LeLe Opp'n at 9. The Ninth Circuit has explained that

> service of process is not limited solely to officially designated
> officers, managing agents, or agents appointed by law for the receipt
> of process. The rules are to be applied in a manner that will best
> effectuate their purpose of giving the defendant adequate notice.
> Thus, the service can be made "upon a representative so integrated
> with the organization that he will know what to do with the papers.
> Generally, service is sufficient when made upon an individual who
> stands in such a position as to render it fair, reasonable and just to
> imply the authority on his part to receive service."

*Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th
Cir. 1988) (quoting *Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni
Viscosa*, 428 F. Supp. 1237, 1251 (S.D.N.Y. 1977); *Insurance Co. of N. Am. v. S/S
"Hellenic Challenger"*, 88 F.R.D. 545, 547 (S.D.N.Y. 1980)). Thus, the Court will weigh
whether it would be "fair, reasonable and just" to serve Deng as an agent of LeLe
Holding. *See id.*

LeLe Holding argues that Vizio's attempt to serve Ms. Deng failed because she is
not "an officer, managing or general agent or . . . other agent authorized" to accept
service under Rule 4(h)(1). LeLe Mot. at 15. Both the Deng Declaration and Jia
Declaration assert that Deng is not an officer, registered agent, general manager, or
anybody otherwise authorized to accept service of process on behalf of LeLe Holding. Jia
Decl. ¶ 5; Deng Decl ¶ 7. Furthermore, LeLe Holding claims that Faraday Future, the
company whose office was served, is completely independent from LeLe Holding and the
other corporate defendants named in this lawsuit. Jia Decl. ¶ 4; Deng Decl. ¶¶ 4–5.

In support of its claim that Deng is an authorized agent or officer of LeLe Holding,
Vizio provides articles taken from the web that link Faraday Future to LeEco, as well as
several public records that show that Deng is an agent for service of process for Le Tech
and another company, LeEco Real Estate Group, LLC ("LREG"). Haas Decl. Vizio
asserts that Le Tech was the entity that guaranteed Vizio payment of the $50 million

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                      Page 32

termination fee if LeEco failed to perform. LeLe Opp'n at 4–5; Wessel Decl. Ex. 1.
While these documents hint at the possibility that Deng might be more involved in Jia
and LeEco's various subsidiary companies and affiliates, none of these documents link
Deng to LeLe Holding directly. *See* Haas Decl.

       However, Deng was also listed as the Chief Executive Officer for Le Technology,
Inc. ("Le Tech"), a California corporation, during the negotiations period between Vizio
and Defendants. LeLe Opp'n at 4–5; Haas Decl. Ex. 1. Vizio points to the Limited
Guarantee Agreement in the Wessel Declaration, which stipulates that Le Tech would
guarantee the payment of the termination fee to Vizio should LeEco fail to execute the
underlying Merger Agreement. *See* Wessel Decl. Ex. 1, ¶ 1; LeLe Opp'n at 4–5. Vizio
argues that the lack of consideration for this guarantee is telling and clearly points to a
substantial connection between the two companies. *Id.* Deng's role as the CEO of Le
Tech suggests that her involvement with LeEco, Jia, and LeLe Holding is greater than
what she stated in her Declaration. *See* Deng Decl.

       In addition, Vizio's proofs of service provided in the Carroll and Govea
Declarations state that Deng herself affirmed that she was an authorized agent for LeLe
Holding while she was receiving the summons. Carroll Decl. at 2.; Govea Decl. at 2.
While accepting service on behalf of LeLe Holding, she, according to the declarations,
distinguished that she could not accept service on behalf of Jia, but could accept service
for LeLe Holding. *See* Govea Decl. at 2. However, Deng states in her declaration the
following

            None of Vizio's process servers ever asked me if I was authorized to
            accept service on LeLe's behalf. One of Vizio's process servers
            asked me if I could leave my office and accept service on behalf of
            LeLe, and I told him that I would not (because I do not have
            authority to accept service on LeLe's behalf). I am not a designated
            agent for service of process, general or managing agent, or officer or
            general manager for LeLe.

Deng Decl. at 1. In contrast, the process servers' declare that Deng represented that she
could accept service for LeLe Holding: (1) "I spoke to Chaoying Deng (female) who
stated that she is the agent for service of LeLe Holdings and that she can accept the
documents"; and (2) "I waited for an hour until Chaoying Deng came out and accepted
the documents on behalf of Lele Holding but she stated that she could not accept the
documents on behalf of Yueting Jia." Carroll Decl. at 2.; Govea Decl. at 2. The process
servers' accounts are persuasive because they corroborate one another and because they
are more unequivocal. *See also* 4A Fed. Prac. & Proc. Civ. § 1083 (4th ed.) ("The general

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                                         Page 33

attitude of the federal courts is that the provisions of Federal Rule 4 should be liberally
construed in the interest of doing substantial justice and that the propriety of service in
each case should turn on its own facts within the limits of the flexibility provided by the
rule itself.") (citing, e.g., *Direct Mail*, 840 F.2d at 685).

        Vizio has met its burden to establish that it would be "fair, reasonable and just" to
find that Deng is an agent of LeLe Holding for the purposes of service: (1) because Deng
is closely connected to LeLe Holding, given that Le Tech (of which Deng was the CEO
during the merger negotiations) acted as the guarantor for LeEco (the plausible alter ego
of LeLe Holding) for the proposed merger; and (2) because Vizio has submitted
declarations persuasively stating that Deng affirmed that she can accept service on behalf
of LeLe Holding. *See Direct Mail*, 840 F.2d at 688. Thus, when Vizio served Deng with a
summons and complaint, service of process was effective as to LeLe Holding under Rule
4(h)(1).

        Accordingly, the Court DENIES LeLe Holding's Motion to Dismiss to the extent
LeLe Holding argues that service was improper.

### 3.      Personal Jurisdiction

        Next, LeLe Holding argues that the Court does not have jurisdiction over it
because LeLeHolding is a foreign corporation with no contacts in California. LeLe Mot.
at 5–13. Vizio responds by arguing that LeLe Holding is subject to personal jurisdiction
both as the alter ego of LeEco and because of its direct involvement in the acts alleged in
the First Amended Complaint. LeLe Opp'n at 10–14. Under the alter ego doctrine, a
nonresident defendant may be subject to personal jurisdiction even if the defendant has
not had any contact with the forum state, if that defendnat's subsidiary had contacts,
because a susidiary's contacts with a forum are imputed to the parent when a plaintiff
makes a prima facie showing that the parent and subsidiary are not really separate
entities. *See Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989); *Doe v.
Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). As discussed above, Vizio has made a
plasubile case that LeEco is the alter ego of LeLe Holding, and thus the Court turns to
whether there is personal jurisdiction over LeLe Holding in California in light of the
plausible alter ego showing.

        LeLe Holding is a BVI company, and is domiciled and has its sole place of
business in BVI. LeLe Mot. at 4. LeLe Holding claims that it has never registered to
conduct business in California; has never had any offices or facilities in California; has
never owned or leased any property in California; has no business license in California;
has never had any employees in California; has never opened a bank account in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                   Date: July 27, 2018
                                                                    Page 34

California, has never paid taxes in California; and otherwise has not directly invested or
conducted any business activities in California, "other than through subsidiaries such as
LeEco V." *Id.* at 4. Therefore, LeLe Holding claims that there are no minimum contacts
with California such that the exercise of personal jurisdiction does not offend "traditional
notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310,
316 (1945).

In determining whether to exercise specific jurisdiction over a non-resident
defendant, the Ninth Circuit applies a three-prong test:

> (1) the defendant either purposefully direct[s] its activities or
> purposefully avails itself of the benefits afforded by the forum's
> laws; (2) the claim arises out of or relates to the defendant's forum-
> related activities; and (3) the exercise of jurisdiction comports with
> fair play and substantial justice, *i.e.*, it [is] reasonable.

*Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (internal
quotation marks and citation omitted); *see also Dole Food Co., Inc. v. Watts*, 303 F.3d
1104, 1111 (9th Cir. 2002). The plaintiff "bears the burden of satisfying the first two
prongs," and if the plaintiff does so, "the burden then shifts to [the defendant] to set forth
a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Mavrix
Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing
*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

Vizio claims that LeLe Holding purposefully directed its activities toward Vizio in
California in order to convince Vizio to engage in a transaction with LeLe Holding's
subsidiaries in California, which would be governed by California law. LeLe Opp'n at
11–12 (citing Merger Agreement § 11.7 (California law governs); Framework Agreement
§ 9.4 (same)). Vizio asserts that LeLe Holding was directly involved in representing to
Vizio that LeEco and Global Group were financially healthy and able to transact a $2
billion merger. *Id.* Vizio claims that the $50 million deposit was deposited into escrow
through LeLe Holding, Global Group and/or their subsidiary or affiliated corporate
entities. *Id.* at 12. Vizio argues that it may have entered into contracts with LeEco, but
"Vizio would not have entered into those transactions without the backing of Lele and
LeEco Global." *Id.* at 14; *see* Wessel Decl. Exs. 3, 4; Wang Decl. ¶¶ 8, 9. Vizio contends
that LeLe Holding and Global Group were the "only entities with any assets for LeEco."
LeLe Opp'n at 14. Without the funding from LeLe Holding, Vizio contends that it would
not have entered into the Merger Agreement or the subsequent Framework Agreement,
out of which this suit rises. *Id.* Thus, by sufficiently alleging that LeLe Group financially
backed and facilitated the merger agreement, which was negotiated in California and in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                    Page 35

China, involved California entities and is governed by California law, Vizio has
established that LeLe Holding purposefully availed itself of California. *Williams*, 851
F.3d at 1023. Further, the claim arises from the alleged fraud and breach of the Merger
and Framework Agreements, which are the agreements that involve the contacts with
California. Therefore, Vizio has satisfied the first two prongs for specific jurisdiction—
purposeful availment and claims arising from forum-related activities—based on Lele
Holdings own actions. Perhaps more significantly, the actions of LeEco and Jia, who
plausibly are alter egos of LeLe Holding, warrant sufficient activity in California to
extend specific jurisdiction. *See Davis*, 885 F.2d at 520. Specifically, by negotiating with
Vizio in Irvine, California over the phone, electronically, and in person, and/or by
entering into contracts that are governed by California law, LeEco and Jia participated
directly in a substantial part of the events or omissions giving rise to Vizio's claims for
fraud and breach of contract, and LeEco and Jia do not contest personal jurisdiction in
their motions. *See* FAC ¶¶ 11–15; LeEco Mot.; Jia Mot.; *see also Ins. Corp. of Ireland v.
Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982) ("[T]he failure to enter a
timely objection to personal jurisdiction constitutes, under Rule 12(h)(1), a waiver of the
objection.").

    LeLe Holding next argues that litigation in California would be unreasonable and
against fair play and justice. LeLe Mot. at 13. The Ninth Circuit has identified several
factors in determining reasonableness, including: (1) the extent of the nonresident
defendant's purposeful interjection into the forum state; (2) the burden on the defendant
of entering the forum; (3) the extent of conflict with the sovereignty of the defendant's
state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient
judicial resolution of the controversy; (6) the importance of the forum to plaintiff's
interest in convenient and effective relief; and (7) the existence of an alternative forum.
*Pac. Atl Trading Co. v. M/M Express*, 758 F.2d 1325, 1329–31 (9th Cir. 1985). LeLe
Holding argues that LeLe Holding has zero contacts with the state other than through its
subsidiaries, and that it has not purposefully interjected itself into California. LeLe Mot.
at 13. As a foreign defendant, the burden on LeLe Holding to defend in California is
much greater. *See Asahi Metal Industry Co.*, 480 U.S. at 114 (recognizing that the
"unique burdens placed upon one who must defend oneself in a foreign legal system
should have significant weight in assessing the reasonableness of stretching the long arm
of personal jurisdiction over national borders"); LeLe Opp'n at 13.

    Vizio contends that LeLe Holding interjected itself into California, and that there
is "particularly no justification for the parties to litigate in the British Virgin Islands." *Id.*
at 14–15. LeLe Holding is represented by the same counsel as LeEco and Jia, the same
witnesses would have to testify on behalf of the other Defendants as LeLe Holding, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-1175-DOC (JDEx)                           Date: July 27, 2018
                                                            Page 36

none of the witnesses or events live or have occurred in the British Virgin Islands. *Id.*
Furthermore, Vizio argues that "California has a strong interest in protecting its
corporations and businesses from being exploited by undercapitalized foreign businesses
that make promises they cannot keep and that then engage in fraud in an effort to avoid
their contractual obligations." *Id.* at 15.

Because LeLe Holding allegedly played a substantial role in furthering the
negotiations for the Merger Agreement, because the conduct from which the claims arise
occurred in Califonia, and because California has a strong interest in protecting its
businesses, the exercise of jurisdiction in California comports with fair play and justice.
*See Williams*, 851 F.3d at 1023. Therefore, personal jurisdiction over LeLe Holding is
proper in California based on specific jurisdiction as to LeLe Holding's own contacts, as
well as through the alter ego theory of liability.

Accordingly, the Court DENIES LeLe Holding's Motion to Dismiss claims to the
extent the Motion is brought on the basis of lack of personal jurisdiction.

Next, the Court turns to Vizio's separate Motion to Dismiss LeEco's first and third
counterclaims.

### G.      Counterclaim for Breach of Contract

In Vizio's Motion to Dismiss LeEco's counterclaims, Vizio argues that LeEco's
first counterclaim for breach of the Merger Agreement is "fatally defective" because it is
contingent upon the Court first ordering a rescission of the Framework Agreement. Vizio
Mot. at 4. Vizio contends that because the Court would first need to order a rescission of
the Framework Agreement, this first counterclaim is premature, and thus does not
sufficiently state a claim upon which relief can be granted. *Id.*

However, LeEco's counterclaim is based on an alleged breach of the Framework
Agreement—not the Merger Agreement—and thus, the counterclaim is not contingent on
a rescission of the Framework Agreement. *See* CC ¶¶ 18–23.

Accordingly, the Court DENIES Counterdefendant's Motion to Dismiss LeEco's
first counterclaim for breach of contract.

### H.      Counterclaim for Declaratory Relief

In its third counterclaim, LeEco seeks a declaration that the terms of the
Framework Agreement relating to the proposed China joint venture do not constitute a
binding contract, but rather a legally unenforceable "agreement to agree" (LeEco also

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                   Date: July 27, 2018
                                                                                                         Page 37

seeks a declaration that the $10 million remaining in escrow should be immediately
returned to LeEco, but Vizio's Motion does not address that request). CC ¶ 34. Vizio
argues that the request for a declaration that the terms of the China joint venture are
unenforceable is inconsistent with the terms of the Framework Agreement on the face of
the agreement, and so the third claim must be dismissed as implausible. Vizio Mot. at 4–
5. Specifically, Vizio contends that the Framework Agreement shows that parties agreed
to the material terms of the proposed China joint venture and the joint venture terms are
enforceable. *Id.* at 2, 5–7.[4] Vizio also asserts that at a minimum the Framework
Agreement's joint venture terms constitute an enforceable agreement to negotiate in good
faith. *Id.* at 8.

On a motion to dismiss a request for declaratory judgment to interpret a contract,
the Court should only grant the motion to dismiss if "the contract language is not
ambiguous." *San Diego Unified Port Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
No. 3:15-CV-1401-BEN-MDD, 2016 WL 3766364, at *5 (S.D. Cal. July 6, 2016)
(citations omitted). However, if a contract provision "is capable of two or more
reasonable interpretations, considering the contract as a whole and the circumstances of
the case . . . the [C]ourt should deny the motion to dismiss." *Id.* (citations omitted).
Determining whether a contract provision is ambiguous depends on the facts and
circumstances of the case at hand. *Bank of the West*, 2 Cal. 4th at 1265. "Even apparently
clear language may be found to be ambiguous when read in the context of the policy and
the circumstances of the case." *Employers Reinsurance Co.*, 161 Cal. App. 4th at 919.

An agreement to agree is indefinite and thus unenforceable under California law.
*Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 213 (2006) ("There is no contract
where the objective manifestations of intent demonstrate that the parties chose not to bind
themselves until a subsequent agreement was made." (brackets and citations omitted)).
The California Court of Appeal explained contract indefiniteness as follows:

> Under California law, a contract will be enforced if it is sufficiently
> definite (and this is a question of law) for the court to ascertain the
> parties' obligations and to determine whether those obligations have

---

[4] Vizio also argues that LeEco cannot consistently claim that the Framework Agreement is both an enforceable
contract in the LeEco Motion, but unenforceable with respect to the proposed China joint venture, and that therefore
LeEco should be estopped from arguing that the Framework Agreement is unenforceable. Vizio Mot. at 9–10.
However, as LeEco points out, LeEco's position is that while the termination and release portions of the Framework
Agreement are binding, the portions of the Framework Agreement pertaining to a proposed joint venture constitute
an unenforceable "agreement to agree"; and the Framework agreement provides that its terms may be severable.
Vizio Opp'n at 13. Accordingly, LeEco is not estopped from arguing that the Framework Agreement is
unenforceable with respect to the joint venture.

Case No. SA CV 17-1175-DOC (JDEx)                                          Date: July 27, 2018
                                                                                          Page 38

> been performed or breached. To be enforceable, a promise must be
> definite enough that a court can determine the scope of the duty, and
> the limits of performance must be sufficiently defined to provide a
> rational basis for the assessment of damages. Where a contract is so
> uncertain and indefinite that the intention of the parties in material
> particulars cannot be ascertained, the contract is void and
> unenforceable. The terms of a contract are reasonably certain if they
> provide a basis for determining the existence of a breach and for
> giving an appropriate remedy. But if a supposed contract does not
> provide a basis for determining what obligations the parties have
> agreed to, and hence does not make possible a determination of
> whether those agreed obligations have been breached, there is no
> contract.

*Id.* (internal quotation marks, brackets, and citations omitted). Where "an essential
element of a promise is reserved for future agreement by both parties," a contract is
indefinite and "there is no legal obligation until such future agreement is made." *Hotel
Del Coronado Corp. v. Foodservice Equip. Distributors Ass'n*, 783 F.2d 1323, 1325 (9th
Cir. 1986) (citing *Coleman Engineering Co. v. North American Aviation, Inc.*, 65 Cal. 2d
396, 405 (1966)). "However, if the term awaiting future agreement is not essential, each
party will be forced to accept a reasonable determination of the unsettled point or if
possible the unsettled point may be left unperformed and the remainder of the contract be
enforced." *Id.* (internal quotation marks and citations omitted). "Whether a term is
essential depends upon the relative importance and the severability of the matter left to
the future; it is a question of degree." *Id.* (internal quotation marks and citations omitted).
"The importance of a term may depend in part on the intentions of the parties." *Id.*
(citations omitted). Courts may consider extrinsic evidence to determine the importance
of a term and the intention of the parties. *Id.* (relying on deposition testimony to analyze
the importance of a term).

       In LeEco's counterclaim for declaratory relief, LeEco raises the following
allegations in support of its request for a declaration that the Framework Agreement's
joint venture terms are not enforceable:

> The requirements regarding the China [joint venture ("JV")] were
> that following Vizio's receipt of $40 million from LeEco (defined in
> the Framework Agreement as the "Effective Time"), "the Parties
> shall negotiate in good faith and use reasonable efforts to form a
> commercial relationship between the [Parties] for expansion efforts

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                                         Page 39

in the People's Republic of China ("China")." [Framework Agreement ("FA")] § 3.1.

The Section of the Framework Agreement discussing the China JV begins with the heading, "The *proposed terms* of the China JV are as follows:" FA §3.2.

The preamble to this Section entitled "Formation of a Joint Venture" (FA §3.1) likewise expresses the fact that the China JV is not a binding contractual commitment between the Parties: "*The proposed commercial relationship would provide for* (i) the Company [i.e., Vizio] granting the China JV the right to sell Company televisions in China subject to the mutual consent of the Company and Buyer on branding and distribution; (ii) the Company preloading EUI and Le contents [i.e., a proposed technology exchange referenced in Section 2 of the Framework Agreement, which involves LeEco's smart television app Leco Le App being made available on Vizio's smart televisions and displays, and a data client, Inscape Data being made available on LeEco's smart televisions and displays] on Company displays sold in China; and (iii) the Company and Buyer entering into the joint venture in China as described in this Section 3 (the 'China JV')." FA § 3.1.

None of the essential terms regarding the proposed China JV were agreed upon as of the date of Framework Agreement. For example, the fundamental commercial relationship identified in the Framework Agreement regarding the proposed China JV required a technology exchange of LeEco's "Le App" technology [a smart television app], and Vizio's "Inscape Data" technology. FA §§ 2.1 & 2.2.

There was no agreement on pricing for this potential technology exchange that was integral to the proposed transaction, other than a commitment to "negotiate in good faith." FA § 2.2.3.

When it came to sales targets for the proposed transaction, the language is similarly undefined, namely that the Parties "will mutually agree on . . . Sales Target[s]" set "at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV." FA § 3.2.5.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                    Date: July 27, 2018
                                                                                    Page 40

> The open terms identified . . . above describe fundamental terms that
> would have to have been agreed upon for this portion of the
> Framework Agreement to have constituted an enforceable
> obligation.
>
> The Parties did not agree upon such terms in the Framework
> Agreement or subsequently.
>
> The Framework Agreement contemplates the severability of its
> provisions in the event any portion of the Agreement is determined
> to be "invalid, illegal, or *incapable of being enforced* . . .
> [notwithstanding which] all other terms … shall nevertheless remain
> in full force and effect . . . ." FA § 9.7.
>
> The portion of the Framework Agreement relating to the creation of
> the China JV is incapable of being enforced, as none of the essential
> terms of the proposed China JV were agreed upon, including pricing,
> sales targets and the technology transfer contemplated by the
> proposed joint venture.

CC ¶¶ 36–45.

In Vizio's Motion to Dismiss this counterclaim, Vizio first argues that LeEco's
allegations are not plausible, and should be dismissed, because "the Framework
Agreement on its face clearly reflects the intention of VIZIO and LeEco to form a joint
venture, with discrete details left with respect to 'post-acquisition' matters." Vizio Mot.
at 6. Specifically, Vizio argues that all the material terms of the joint venture were agreed
to in the Framework Agreement, namely:

> 1) LeEco's contribution of non-cash assets with a fair market value
> equal to $50,000,000.00 to the China JV (Docket No. 61,
> Counterclaim, Exhibit A, ¶ 3.2.1); 2) the parties mutual execution of
> a formal joint venture agreement with a long-term partnership spirit
> to expand the VIZIO branded products (Docket No. 61,
> Counterclaim, Exhibit A, ¶ 3.2.2); 3) the 50/50 ownership and
> control of the China JV of both VIZIO and LeEco (Docket No. 61,
> Counterclaim, Exhibit A, ¶ 3.2.3); 4) the China JV's promotion and
> marketing of VIZIO branded devices through LeEco's
> distributing/omni channels in China (Docket No. 61, Counterclaim,
> Exhibit A, ¶ 3.2.4); and 5) the VIZIO branded devices were to be

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                    Date: July 27, 2018
                                                                                Page 41

> distributed exclusively in China through the China JV, with EUI and
> Le content as the exclusive content/streaming platform (Docket No.
> 61, Counterclaim, Exhibit A, ¶ 3.2.6).

*Id.* at 6–7. In contrast, Vizio contends that discrete matters for the future "merely
concerned the post-acquisition management of the China JV," namely:

> the target number of televisions to be deployed from VIZIO to
> China, the "competitive rates" with which to sell VIZIO units, the
> profit on units sold by the China JV and "upon the achievement of
> the Sales Target…(the parties will negotiate in good faith to extend
> the Initial JV Term.") (Docket No. 61, Counterclaim, Exhibit A, ¶
> 3.2.5). These minor details concerning the sale and distribution of
> VIZIO products do not prevent the formation of the China JV.

*Id.* at 7. In addition, Vizio argues that even if there is indefiniteness in the terms, the
statutory gap fillers of California's Commercial Code (UCC) remove that uncertainty. *Id.*
(citing California Com. Code § 2204(1)(c) (gap filler where price term left open) and
§ 2309(2) (gap filler for unstated duration)).

    In response, LeEco argues that the terms missing from the agreement, such as
price, capital structure, and the length of time of the "proposed" joint venture, are
essential and not mere matters of "post-acquisition management." Vizio Opp'n at 9
(citing *Bustamante*, 141 Cal. App. 4th at 209 (affirming summary judgment in favor of
the defendant on the basis that a proposed joint venture was not enforceable where parties
failed to agree on material terms such as the duration of the plaintiff's management role,
his compensation, and the amount of the defendant's royalty)). In addition, LeEco argues
that the Framework Agreement is not a contract for the sale of goods and thus the UCC
(and California's Commercial Code) does not apply. *Id.* at 7–8. Further, LeEco argues
that even if the UCC applies, the UCC does not solve the problem of a lack of agreement
on essential terms. *Id.*

    The parties' briefing focuses on whether or not all the essential terms of the joint
venture were agreed to in the Framework Agreement (which is relevant to the ultimate
question of indefiniteness) but, at the outset, on a motion to dismiss, the question to be
determined is whether or not the contract language is ambiguous. *See San Diego Unified
Port Dist.*, 2016 WL 3766364, at *5 (explaining that, on a motion to dismiss a request for
declaratory judgment to interpret a contract, if the contract provision at issue is
ambiguous, a court should deny the motion to dismiss). Here, the language of the
Framework Agreement is ambiguous as to whether or not the parties intended to obligate

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                          Date: July 27, 2018
                                                                              Page 42

themselves to actually form the joint venture. *See Bustamante*, 141 Cal. App. 4th at 213
("To be enforceable, a promise must be definite enough that a court can determine the
scope of the duty, and the limits of performance must be sufficiently defined to provide a
rational basis for the assessment of damages."). Specifically, Section 3.1 of the
Framework Agreement states: "Following the Effective Time, the Parties shall negotiate
in good faith and use reasonable efforts to form a commercial relationship between the
Company and Buyer for expansion efforts in the People's Republic of China. The
proposed commercial relationship would provide for . . ." Framework Agreement § 3.1.
The language of "proposed" joint venture, and "reasonable efforts," does not suggest a
firm obligation to actually form the partnership, but rather an obligation to make a good
faith effort to do so. *See id.* On the other hand, Section 4 states: "Buyer and the Company
shall negotiate in good faith and execute one or more agreements to document the China
JV and the other commercial arrangements set forth in Sections 2 and 3 hereof with the
terms specified therein within forty-five (45) days of the date hereof." *Id.* § 4. This
language is more definite, stating that the parties "shall" execute an agreement to
document the joint venture. *See id.* Therefore, the contract is ambiguous as to whether or
not the parties intended to be obligated to actually form the joint venture. As a result, at
this early stage of litigation, dismissal of the counterclaim, which seeks a declaration that
the terms for the formation of a joint venture are unenforceable, is not warranted. *See San
Diego Unified Port Dist.*, 2016 WL 3766364, at *5.

Next, Vizio contends that the counterclaim should be dismissed to the extent that
LeEco seeks a declaration that the Framework Agreement's requirement that the parties
negotiate a joint venture in good faith is unenforceable, because the agreement clearly
requires good faith negotiations. Vizio Mot. at 8; Framework Agreement § 3.1
("[F]ollowing the Effective Time, the Parties shall negotiate in good faith and use
reasonable efforts to form a commercial relationship between the Company and Buyer for
expansion of efforts in the People's Republic of China. The proposed commercial
relationship will provide . . . ."). In response, LeEco argues that the Framework
Argreeement's provision for the parties to negotiate in good faith is not enforceable
because the joint venture is described as a "proposed commercial relationship," and the
agreement lacks essential terms as to the joint venture. Vizio Opp'n at 11–12. However,
under California law, an agreement to negotiate in good faith is independently
enforceable, as the Court of Appeal explained:

> A contract to negotiate the terms of an agreement is not, in form or
> substance, an "agreement to agree." If, despite their good faith
> efforts, the parties fail to reach ultimate agreement on the terms in
> issue the contract to negotiate is deemed performed and the parties

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                   Date: July 27, 2018
                                                                    Page 43

> are discharged from their obligations. Failure to agree is not, itself, a
> breach of the contract to negotiate. A party will be liable only if a
> failure to reach ultimate agreement resulted from a breach of that
> party's obligation to negotiate or to negotiate in good faith. For these
> reasons, criticisms of an "agreement to agree" as "absurd" and a
> "contradiction in terms" do not apply to a contract to negotiate an
> agreement. In addition, it is important to note courts which have
> found purported contracts to be unenforceable "agreements to agree"
> have focused on the enforceability of the underlying substantive
> contract, not on whether the agreement to negotiate the terms of that
> contract is enforceable in its own right.

*Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1257 (2002).
Therefore, the parties' clear and unambiguous agreement in the Framework
Agreement to negotiate the joint venture in good faith is enforceable (regardless of
whether or not the parties' agreement to form the underlying joint venture is
separately enforceable). *See id.* The Framework Agreement's good faith provision
requires "good faith efforts" to negotiate, whether or not an ultimate agreement is
reached. *Id.* Therefore, because the good faith negotiation provision is
unambiguous, dismissal of the counterclaim is appropriate to the extent that LeEco
seeks a declaratory judgment of unenforceability as to the Framework
Agreement's provision that the parties negotiate the joint venture in good faith.
*See San Diego Unified Port Dist.*, 2016 WL 3766364, at *5.

　　　Accordingly, the Court DISMISSES WITH PREJUDICE LeEco's third
counterclaim to the extent that LeEco seeks a declaratory judgment of unenforceability as
to the Framework Agreement's provision that the parties negotiate the joint venture in
good faith.

**V.      Disposition**

　　　For the foregoing reasons, the Court GRANTS IN PART LeEco's Motion to
Dismiss, DENIES Jia and LeLe Holding's Motions to Dismiss, and GRANTS IN PART
Vizio's Motion to Dismiss.

　　　The Court DISMISSES WITH PREJUDICE Vizio's fifth claim for rescission.
However, provided that Vizio can state a cognizable and appropriate underlying claim,
the Court GRANTS Vizio leave to amend to pursue rescission as a remedy. Accordingly,
Vizio may file a second amended complaint, if desired, **on or before August 10, 2018**.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-1175-DOC (JDEx)                                      Date: July 27, 2018
                                                                                              Page 44

      In addition, the Court DISMISSES WITH PREJUDICE LeEco's third counterclaim to the extent that LeEco seeks a declaratory judgment of unenforceability as to the Framework Agreement's provision that the parties negotiate the joint venture in good faith.

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11
CIVIL-GEN                                                            Initials of Deputy Clerk: djl