# EXHIBIT A

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**LEECO V LTD.**

**LE V MERGER SUB INC.,**

**VIZIO, INC.,**

**and**

**SHAREHOLDER REPRESENTATIVE SERVICES LLC,
AS SHAREHOLDER REPRESENTATIVE**

**Dated as of July 6, 2016**

# TABLE OF CONTENTS

Page

ARTICLE I THE MERGER ...................................................................................................2

1.1    The Merger ..................................................................................................2
1.2    Closing; Effective Time ..............................................................................2
1.3    Effect of the Merger ...................................................................................3
1.4    Articles of Incorporation; Bylaws ..............................................................3
1.5    Directors and Officers ................................................................................3

ARTICLE II CONVERSION OF SECURITIES; EXCHANGE OF CERTIFICATES ................3

2.1    Conversion of Securities ............................................................................3
2.2    Exchange of Certificates; Closing Payments .............................................5
2.3    Earnout .......................................................................................................7
2.4    Dissenters' Rights .....................................................................................12
2.5    Adjustment to Closing Date Merger Consideration....................................13

ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING THE
COMPANY .......................................................................................................17

3.1    Organization; Corporate Power ................................................................17
3.2    Authorization of the Transactions ............................................................18
3.3    Company Shareholder Approval ...............................................................18
3.4    Non-Contravention ...................................................................................18
3.5    Governmental Consents and Approvals.....................................................19
3.6    Company Capitalization ............................................................................20
3.7    Company Subsidiaries ...............................................................................22
3.8    Company Financial Statements .................................................................23
3.9    Absence of Unrecorded Liabilities ...........................................................23
3.10   Absence of Certain Changes ....................................................................24
3.11   Material Contracts ...................................................................................24
3.12   Intellectual Property ................................................................................26
3.13   Real Property............................................................................................28
3.14   Tax Matters ..............................................................................................30
3.15   Employee Plans ........................................................................................32
3.16   Labor Matters ..........................................................................................33
3.17   Compliance with Laws.............................................................................35
3.18   Environmental Matters .............................................................................35
3.19   Litigation .................................................................................................36
3.20   Insurance ..................................................................................................37
3.21   Related Party Transactions .......................................................................37
3.22   Significant Customers and Suppliers ........................................................38
3.23   National Security.......................................................................................38

i

| | | |
|---|---|---|
| 3.24 | Brokers | 38 |
| 3.25 | Propriety of Payments | 39 |
| 3.26 | Bank Accounts | 39 |
| 3.27 | Privacy | 39 |
| 3.28 | No Other Representations | 40 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB ....40

| | | |
|---|---|---|
| 4.1 | Organization; Good Standing | 40 |
| 4.2 | Corporate Power; Enforceability | 40 |
| 4.3 | Non-Contravention | 41 |
| 4.4 | Governmental Consents and Approvals | 41 |
| 4.5 | Litigation | 42 |
| 4.6 | Brokers | 42 |
| 4.7 | Operations of Merger Sub | 42 |
| 4.8 | Solvency | 42 |
| 4.9 | Sufficiency of Funds | 43 |
| 4.10 | Financing | 43 |
| 4.11 | Non-Reliance | 44 |
| 4.12 | No Other Representations | 44 |

ARTICLE V PRE-MERGER COVENANTS ....44

| | | |
|---|---|---|
| 5.1 | Conduct of Business by the Company | 44 |
| 5.2 | Access to Information | 47 |
| 5.3 | Further Assurances | 48 |
| 5.4 | Regulatory Approvals | 48 |
| 5.5 | Consents | 53 |
| 5.6 | Shareholder Approval | 53 |
| 5.7 | No Right to Control | 53 |
| 5.8 | Buyer/Merger Sub – Cooperation with Financing | 54 |
| 5.9 | Company – Cooperation with Financing. | 55 |

ARTICLE VI ADDITIONAL AGREEMENTS ....56

| | | |
|---|---|---|
| 6.1 | Tax Matters | 56 |
| 6.2 | Employee Matters | 61 |
| 6.3 | Section 280G Approval | 62 |
| 6.4 | Directors' and Officers' Liability | 62 |
| 6.5 | Confidentiality of Terms of Transaction, Etc | 63 |
| 6.6 | Inscape Transactions | 64 |
| 6.7 | Acknowledgment by the Parties | 65 |
| 6.8 | No Financing Contingency | 66 |
| 6.9 | Resignation of Officers and Directors | 66 |
| 6.10 | Further Actions | 66 |

ARTICLE VII CONDITIONS ..................................................................................66

    7.1   Conditions to all Parties' Obligations ...............................................66
    7.2   Conditions to Obligation of Buyer and Merger Sub ...........................67
    7.3   Conditions to Obligation of the Company ........................................68

ARTICLE VIII INDEMNIFICATION ........................................................................70

    8.1   Survival Periods ..........................................................................70
    8.2   Indemnification of the Buyer Indemnified Parties by Equityholders ....70
    8.3   Indemnification of Equityholders by Buyer......................................72
    8.4   Notice and Defense of Third-Party Claims ......................................73
    8.5   Notice of Non-Third-Party Claims ..................................................75
    8.6   Manner of Payment .....................................................................75
    8.7   Determination of Loss Amount ......................................................76
    8.8   Exclusive Remedy .......................................................................77

ARTICLE IX TERMINATION ..................................................................................77

    9.1   Termination ...............................................................................77
    9.2   Buyer Termination Fee; Escrow ....................................................79
    9.3   Effect of Termination ...................................................................80

ARTICLE X DEFINITIONS ......................................................................................81

    10.1  Interpretation .............................................................................81
    10.2  Certain Definitions ......................................................................81
    10.3  Additional Definitions ..................................................................95

ARTICLE XI MISCELLANEOUS ............................................................................98

    11.1  No Third-Party Beneficiaries ........................................................98
    11.2  Entire Agreement ........................................................................98
    11.3  Successors and Assigns ...............................................................99
    11.4  Counterparts ..............................................................................99
    11.5  Titles .........................................................................................99
    11.6  Notices ......................................................................................99
    11.7  Governing Law ..........................................................................100
    11.8  Consent to Jurisdiction ..............................................................101
    11.9  Amendment or Modification ........................................................101
    11.10 Waivers ...................................................................................101
    11.11 Financing Sources .....................................................................102
    11.12 Specific Performance .................................................................102
    11.13 Expenses .................................................................................103
    11.14 Construction ............................................................................103
    11.15 Severability of Provisions ...........................................................103
    11.16 Representation by Counsel ..........................................................103
    11.17 Shareholder Representative .........................................................104

768801.20-LACSR01A - MSW

Exhibit A     Escrow Agreement
Exhibit B     FIRPTA Certificate
Exhibit C     FIRPTA Notice
Exhibit D     Inscape 51% Restricted Stock Agreement
Exhibit E     License Agreement
Exhibit F     Inscape Stockholders' Agreement
Exhibit G     Inscape CEO Employment Agreement
Exhibit H     Limited Guarantee

768801.20-LACSR01A - MSW

# AGREEMENT AND PLAN OF MERGER

**THIS AGREEMENT AND PLAN OF MERGER** (this "Agreement") is made as of July 6, 2016, by and among LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Buyer"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("Merger Sub"), VIZIO, Inc., a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the Equityholders' representative (the "Shareholder Representative"). Capitalized terms used herein and not otherwise defined herein shall have the meaning given such terms in Article X.

## RECITALS

WHEREAS, the respective Boards of Directors of Buyer, Merger Sub and the Company have approved and declared advisable the merger of Merger Sub with and into the Company (the "Merger") upon the terms and subject to the conditions of this Agreement and in accordance with applicable Law;

WHEREAS, the respective Boards of Directors of Buyer and the Company have determined that the Merger is in the best interest of their respective shareholders, and Buyer has approved this Agreement and the Merger as the sole shareholder of Merger Sub;

WHEREAS, the holders of (i) a majority of the voting power of the Company's Class A Common Stock, no par value (including the Restricted Stock, the "Class A Common Stock"), and Class B Common Stock, no par value (the "Class B Common Stock" and, together with Class A Common Stock, "Common Stock"), voting together as a single class and (ii) a majority of the shares of the Company's Series A Convertible Preferred Stock, no par value (the "Preferred Stock"), have approved this Agreement, the Merger and the other transactions contemplated hereby;

WHEREAS, concurrently with the consummation of the Merger, the Company intends to effect certain transactions with respect to VIZIO Inscape Technologies, LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("Inscape"), as specifically set forth in Section 6.6 below;

WHEREAS, concurrently with the execution and delivery of this Agreement, each of the employees set forth on Schedule A has entered into an employment agreement with the Company and an Affiliate of Buyer, to be effective upon the consummation of the Merger (the "Employment Agreements");

WHEREAS, concurrently with the execution and delivery of this Agreement, as a material inducement to the Company's willingness to enter into this Agreement, Le Technology Inc. and Buyer are entering into a limited guarantee, substantially in the form attached hereto as Exhibit H; and

1

WHEREAS, concurrently with the execution and delivery of this Agreement, as a material inducement to the Company's willingness to enter into this Agreement, the Company, Buyer, the Shareholder Representative and Citibank, National Association, a national banking association, as escrow agent (the "Escrow Agent"), have each entered into an Escrow Agreement, dated as of the date hereof, substantially in the form attached hereto as Exhibit A (the "Escrow Agreement").

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual representations, warranties, promises, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## THE MERGER

1.1     The Merger.   Upon the terms and subject to satisfaction or waiver of the conditions set forth in this Agreement, and in accordance with the California Corporations Code (the "California Law"), at the Effective Time (as defined herein), Merger Sub shall be merged with and into the Company.  As a result of the Merger, the separate corporate existence of Merger Sub shall cease and the Company shall continue as the surviving corporation of the Merger (the "Surviving Corporation") under the California Law as a wholly owned subsidiary of Buyer.

1.2     Closing; Effective Time.

(a)     Unless otherwise mutually agreed in writing between Buyer and the Company, the closing of the Merger (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, California 90071, on a date to be mutually agreed by Buyer and the Company, which shall, subject to the proviso below, be no later than the third (3rd) Business Day following the day on which the last to be satisfied or waived (to the extent permitted by applicable Law) of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied by actions to be taken at the Closing, but subject to the fulfillment or waiver of those conditions) is so satisfied or waived in accordance with this Agreement at 10:00 a.m. Pacific Time.

(b)     At the Closing, the parties hereto shall cause (i) the Merger to be consummated by filing an Agreement of Merger in a form mutually agreed upon by the parties (the "Agreement of Merger") with the Secretary of State of the State of California, in such form as required by, and executed in accordance with the relevant provisions of, California Law (the date and time of such filing, or if another date and time is specified in such filing, such specified date and time, being the "Effective Time"); and (ii) shall consummate the other transactions contemplated herein on the date on which the Effective Time occurs. The date on which the Closing occurs is referred to hereinafter as the "Closing Date".

2

1.3     Effect of the Merger.  At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Agreement of Merger and the applicable provisions of the California Law.  Without limiting the generality of the foregoing, at the Effective Time, except as otherwise provided herein, all the property, rights, privileges, powers and franchises of the Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation.

1.4     Articles of Incorporation; Bylaws.   At the Effective Time, the articles of incorporation and the bylaws of the Surviving Corporation shall be amended in their entirety to contain the provisions set forth in the articles of incorporation and the bylaws of Merger Sub, each as in effect immediately prior to the Effective Time, except that, in each case, the name of the Surviving Corporation shall be "VIZIO, Inc."

1.5     Directors and Officers.   The initial directors and officers of the Surviving Corporation shall be the individuals set forth on Schedule 1.5 to be provided by Buyer to the other parties hereto prior to the Closing, each to hold office in accordance with the articles of incorporation and bylaws of the Surviving Corporation.

ARTICLE II
CONVERSION OF SECURITIES; EXCHANGE OF CERTIFICATES

2.1     Conversion of Securities.  At the Effective Time, by virtue of the Merger and without any action on the part of Merger Sub, the Company or the Equityholders:

(a)     Capital Stock.  Each share of the Company Capital Stock, including Restricted Stock, issued and outstanding immediately prior to the Effective Time (other than any shares of Company Capital Stock to be canceled pursuant to Section 2.1(c) and any shares of Company Capital Stock which are held by Shareholders exercising dissenters' rights pursuant to Chapter 13 under California Law ("Dissenting Shareholders")), shall be converted, subject to Section 2.2(e), into the right to receive (A) in the case of each share of Class A Common Stock and each share of Class B Common Stock, the sum of (i) the Per Share Merger Consideration minus the Per Share Escrow Amount, if any (such amount calculated in the immediately foregoing clause (i) is referred to as the "Common Closing Payment") plus (ii) any Per Share Earnout Amounts paid pursuant to Section 2.3, and (B) in the case of each share of Preferred Stock, an amount equal to the sum of (i) the Per Share Liquidation Preference plus an amount equal to the product of (1) twenty-five multiplied by (2) the Common Closing Payment (such amount calculated in the immediately foregoing clause (i) is referred to as the "Preferred Closing Payment"), plus (ii) an amount equal to the product of (1) twenty-five multiplied by (2) any Per Share Earnout Amounts paid pursuant to Section 2.3.  All such shares of Company Capital Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each certificate previously representing any such shares shall thereafter represent the right to receive (x) the Common Closing Payment and the Preferred Closing Payment, as applicable, and any Per Share Earnout Amounts therefor or (y) payment from the Surviving Corporation of the "fair value" of such shares of Company Capital Stock as determined in accordance with Chapter 13 under the California Law.  Certificates previously representing shares of Company Capital Stock shall be exchanged for the aggregate Common Closing

Payment and Preferred Closing Payment, as applicable, therefor and the right to receive any aggregate Per Share Earnout Amounts upon the surrender of such certificates (or affidavits in support thereof) in accordance with the provisions of Section 2.2, without interest.  The Surviving Corporation shall pay each holder of Restricted Stock who is an employee (each, an "Employee Restricted Stockholder") the amounts due hereunder through the Surviving Corporation's payroll system, and with respect to payments due at Closing, by no later than the first regularly scheduled payroll following the Effective Time subject to Section 2.2(e).

(b)     Options.  No outstanding options to acquire shares of Common Stock issued pursuant to the 2007 Incentive Award Plan (the "2007 Plan") ("Options") will be assumed, continued, substituted or otherwise replaced by Buyer.  At the Effective Time, by virtue of the Merger and without any action on the part of Buyer, Merger Sub, the Company or the holders of any Options, each Option outstanding immediately prior to the Effective Time, whether vested or unvested, will be cancelled and automatically converted into the right of the holder of the Option to receive (i) at the Closing, an amount in cash, without interest, equal to the product of (1) the aggregate number of unexercised shares such holder could have purchased if such holder had exercised such Option in full (including with respect to any unvested shares) immediately prior to the Effective Time, multiplied by (2) the difference between (x) the Common Closing Payment minus (y) the applicable exercise price per share of Common Stock of such Option (such product, the "Option Payment"), plus (ii) an amount in cash, without interest, equal to the product of (1) the aggregate number of unexercised shares such holder could have purchased if such holder had exercised such Option in full (including with respect to any unvested shares) immediately prior to the Effective Time, multiplied by (2) any Per Share Earnout Amounts paid pursuant to Section 2.3.  Holders of Options shall have no further rights with respect to Options at the Effective Time, except the right to receive the consideration (if any) payable with respect thereto pursuant to this Section 2.1(b).  Prior to the Closing, the Company shall have taken all actions required or reasonably necessary to effectuate the provisions of this Section 2.1(b).  The Surviving Corporation shall pay each holder of Options who is an employee (each, an "Employee Optionholder") the amounts due hereunder through the Surviving Corporation's payroll system, and with respect to payments due at Closing, by no later than the first regularly scheduled payroll following the Effective Time, subject to Section 2.2(e).

(c)     Cancellation of Certain Shares.  Each share of Company Capital Stock held in the treasury of the Company or by any wholly owned subsidiary of the Company immediately prior to the Effective Time shall be canceled and extinguished without any conversion thereof and no payment shall be made with respect thereto.

(d)     Merger Sub. Each share of common stock, no par value , of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and be exchanged for one newly and validly issued, fully paid and nonassessable share of common stock of the Surviving Corporation.

(e)     Change in Shares.  If between the date of this Agreement and the Effective Time the outstanding shares of Company Capital Stock or the shares issuable pursuant to outstanding Options shall have been changed into a different number of shares or a different class, by reason of any stock dividend, subdivision, reclassification, recapitalization, split, combination, issuance, redemption, repurchase or exchange of shares, the Common Closing

4

Payment and/or the Preferred Closing Payment, as applicable, shall be correspondingly adjusted to reflect such event(s).

      2.2      Exchange of Certificates; Closing Payments.

      (a)      Surrender Procedures for Company Securities.

(i)      Promptly following the execution of this Agreement, the Company shall deliver to each Equityholder (1) a letter of transmittal, in a form mutually agreed upon by the parties (the "Letter of Transmittal"), (2) instructions for use in effecting the surrender of the certificate or certificates which at such time represent outstanding shares of Company Capital Stock (the "Certificates") and/or the Options held by such Equityholder and (3) such notification as may be required under the California Law to be given to Dissenting Shareholders.

(ii)      Following its receipt of the Letter of Transmittal, each Equityholder that delivers to the Company (or, following the Effective Time, the Surviving Corporation) (1) such Equityholder's Letter of Transmittal, duly executed by such Equityholder, (2) with respect to holders of Company Capital Stock, such Certificates (or affidavits delivered pursuant to Section 2.2(d)) representing shares of Company Capital Stock then held by such Equityholder and (3) such other documents and information as may be reasonably required by the Company or Buyer, shall be entitled to payment of the Common Closing Payment and/or the Preferred Closing Payment, as applicable, and/or Option Payment, as applicable, payable with respect to each share of Company Capital Stock and each Option held by such Equityholder in accordance with Section 2.1.

(b)      Payments. (x) Each Equityholder that has complied with the provisions of Section 2.2(a) at least five Business Days prior to the Closing Date shall be entitled to payment of the following consideration on the Closing Date and (y) each Equityholder that complies with the provisions of Section 2.2(a) after the date that is five Business Days prior to the Closing Date shall be entitled to payment of such consideration within five Business Days following such Equityholder's compliance.  Buyer shall deliver an amount equal to:

(i)      the Common Closing Payment and/or the Preferred Closing Payment, as applicable, to such Equityholder in exchange for each share of Company Capital Stock held by such Equityholder in accordance with Section 2.1(a), by wire transfer of immediately available funds to the account designated in its duly executed Letter of Transmittal;

(ii)      the Common Closing Payment to the Company for each share of Restricted Stock held by the Employee Restricted Stockholders (for further distribution through the Surviving Corporation's payroll system) in accordance with Section 2.1(a) by wire transfer of immediately available funds to the account designated by the Company;

(iii)      the Option Payment, to such Equityholder (other than any Employee Optionholder) for each Option held by such Equityholder in accordance with

Section 2.1(b), by wire transfer of immediately available funds to the account designated in its duly executed Letter of Transmittal; and

> (iv) the Option Payment, to the Company for each Option held by the Employee Optionholders (for further distribution to such Employee Optionholders through the Surviving Corporation's payroll system) in accordance with Section 2.1(b), by wire transfer of immediately available funds to the account designated by the Company.

The aggregate of all amounts paid pursuant to this Section 2.2(b) shall constitute the "Merger Consideration."

> (c) No Further Ownership Rights in Company Capital Stock. At and after the Effective Time, each holder of a Certificate that represented issued and outstanding shares of Company Capital Stock immediately prior to the Effective Time shall cease to have any rights as a holder of securities of the Company, except for the right to surrender its, his or her Certificate(s) in exchange for the aggregate Common Closing Payment and/or Preferred Closing Payment, as applicable, and any Per Share Earnout Amounts payable in respect of such Company Capital Stock under this Article II, or in the case of a Dissenting Shareholder, to perfect its, his or her right to receive payment for his or her shares of Company Capital Stock pursuant to Chapter 13 under the California Law. After the Effective Time, there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of shares of Company Capital Stock which were outstanding immediately prior to the Effective Time. If, after the date hereof, Certificates are presented to the Surviving Corporation for any reason, they shall be cancelled and exchanged as provided in this Article II, except as otherwise provided by Law.

> (d) Lost, Stolen or Damaged Stock Certificates. In the event that any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if reasonably required by Buyer, the delivery by such Person of an indemnification agreement in form and substance acceptable to Buyer, in Buyer's reasonable discretion, Buyer will pay in exchange for such lost, stolen or destroyed Certificate the aggregate Common Closing Payment and/or Preferred Closing Payment, as applicable, and any Per Share Earnout Amounts to be paid with respect thereto, subject to the terms and conditions in this Article II.

> (e) Withholding. Each of Buyer, Merger Sub and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable to any Person to this Agreement such amounts as each of Buyer, Merger Sub or the Surviving Corporation is required to deduct and withhold under the Code, or any provision of state, local or foreign tax Law, with respect to the making of such payment. To the extent that amounts are so withheld by Buyer, Merger Sub or the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. In the event that Buyer determines that withholding is required under applicable Law and permitted under this Agreement, Buyer shall so notify the Company in writing at least five (5) days prior to the Closing Date (or as soon as practicable prior to the Closing Date if the circumstances giving rise to such withholding obligation occur less than five

(5) days prior to the Closing Date).  If such obligation to deduct or withhold can be reduced or eliminated through the provision of an applicable certification or form, Buyer shall use commercially reasonable efforts to provide the applicable shareholder with the opportunity to complete and provide such certification or form prior to the Closing Date upon the prior written request of the applicable shareholder.

(f)     Escrow.  The Total Escrow Amount delivered by Buyer at Closing pursuant to the Escrow Agreement shall be held in segregated escrow funds, with (i) the Closing Payment Escrow Amount being deposited into a fund which shall be used to refund any Closing Over-Payment (together with any earnings thereon, the "Closing Payment Escrow Fund"), (ii) the Indemnification Escrow Amount being deposited into a fund which shall serve as security for any indemnification obligations of the Equityholders hereunder (together with any earnings thereon, the "Indemnification Escrow Fund") and (iii) the Shareholder Representative Escrow Amount being deposited into a fund which shall be used solely to reimburse the Shareholder Representative for, or pay directly, any costs and expenses reasonably and actually incurred by the Shareholder Representative in connection with the administration of his duties and fulfillment of his obligations hereunder and under the Escrow Agreement (together with any earnings thereon, the "Shareholder Representative Escrow Fund").  Releases from the Closing Payment Escrow Fund and the Indemnification Escrow Fund will be permitted only in accordance with the terms and conditions of this Agreement and the Escrow Agreement.

2.3     Earnout.

(a)     Earnout Amounts.  The following Earnout Amounts can be earned and, if earned, shall be paid jointly and severally by Buyer and Company to the Equityholders pro rata based on their respective Earnout Percentage as provided for in this Section 2.3:

(i)     Revenue Earnout Amounts.  The following nine "Revenue Earnout Amounts," aggregating up to One Hundred Twenty Five Million Dollars ($125,000,000), can be earned as follows:

(A)     2017 Revenue Performance.  In the event that Company Revenue for the 2017 Earnout Period is greater than:

1.     $3,445,820,000, then a Revenue Earnout Amount equal to $27,083,334 shall be deemed earned; and

2.     the Revenue Target for the 2017 Earnout Period, then an additional Revenue Earnout Amount equal to $14,583,333 shall be deemed earned.

(B)     2018 Revenue Performance.  In the event that Company Revenue for the 2018 Earnout Period is greater than:

1.     the Revenue Target for the 2017 Earnout Period, then a Revenue Earnout Amount equal to $27,083,334 shall be deemed earned; and

7

        2.      the Revenue Target for the 2018 Earnout Period, then an additional Revenue Earnout Amount equal to $14,583,333 shall be deemed earned.

      (C)    2019 Revenue Performance.  In the event that Company Revenue for the 2019 Earnout Period is greater than:

        1.      the Revenue Target for the 2018 Earnout Period, then a Revenue Earnout Amount equal to $27,083,333 shall be deemed earned; and

        2.      the Revenue Target for the 2019 Earnout Period, then an additional Revenue Earnout Amount equal to $14,583,333 shall be deemed earned.

      (ii)    EBITDA Earnout Amounts.   The following three "EBITDA Earnout Amounts," aggregating up to One Hundred Twenty Five Million Dollars ($125,000,000), can be earned as follows:

      (A)    2017 EBITDA Performance.  In the event that the Company EBITDA Percentage for the 2017 Earnout Period is at least equal to 2.5%, then an EBITDA Earnout Amount equal to $41,666,666 shall be deemed earned.

      (B)    2018 EBITDA Performance.  In the event that the Company EBITDA Percentage for the 2018 Earnout Period is at least equal to 2.6%, then an EBITDA Earnout Amount equal to $41,666,666 shall be deemed earned.

      (C)    2019 EBITDA Performance.  In the event that the Company EBITDA Percentage for the 2019 Earnout Period is at least equal to 2.6%, then an EBITDA Earnout Amount equal to $41,666,667 shall be deemed earned.

Except as expressly provided herein (including, without limitation, under Section 2.3(b) below), each Earnout Amount will stand alone and shall be achieved and calculated separately.   The parties understand and agree that each specific Earnout Amount shall not be deemed earned if the specified target is not achieved, even if such target is not met by an immaterial amount.

      (b)    Force Majeure.  In the event that the Company Revenue is materially and adversely effected as a direct result of a Force Majeure Event occurring during the 2017 Earnout Period or the 2018 Earnout Period, then the Company Revenue for such Earnout Period shall be increased by the excess, if any, of (i) the Company Revenue for the subsequent Earnout Period over (ii) the Revenue Target for the subsequent Earnout Period.  In the event that the Company Revenue is materially and adversely effected as a direct result of a Force Majeure Event occurring during the 2019 Earnout Period, then the Company Revenue for such Earnout Period shall be increased by the excess, if any, of (i) the Company Revenue for the calendar year 2020 over (ii) $4,084,510,000.

      (c)    Payment of Earnout Amounts; Disputes.  Promptly following the applicable Earnout Period, but in no event later than 60 days thereafter, Buyer shall prepare and

submit to the Shareholder Representative a statement setting forth, in reasonable detail, Buyer's good faith calculation of Company Revenue and the Company EBITDA Percentage for such Earnout Period, together with detailed support for such calculations (each, an "Earnout Statement"). If the amounts reflected in the Earnout Statement for the applicable Earnout Period meet or exceed any of the applicable Company Revenue or Company EBITDA Percentage thresholds for such Earnout Period, Buyer shall pay to the Equityholders the applicable Earnout Amounts in accordance with Section 2.3(f) within three (3) Business Days following delivery of such Earnout Statement to the Shareholder Representative. In addition, if the amounts reflected in the Earnout Statement for the applicable Earnout Period fail to meet or exceed any of the applicable Company Revenue or Company EBITDA Percentage thresholds for such Earnout Period, the following procedures shall apply:

(i)      After receipt of the Earnout Statement for the applicable Earnout Period, the Shareholder Representative may request, and Buyer will provide to the Shareholder Representative and its accountants and other representatives, upon reasonable notice, reasonable access during normal business hours to, or copies of, as the Shareholder Representative or such accountants and other representatives shall reasonably request, the information (including the books and records of the Company), data, and work papers used in connection with the preparation of the applicable Earnout Statement, and Buyer and the Company will make their personnel and accountants reasonably available to the Shareholder Representative and its accountants and other representatives to discuss any such information, data, or work papers.

(ii)      In the event the Shareholder Representative disputes the correctness of a Earnout Statement, the Shareholder Representative shall provide notice in writing to Buyer of such objection within 60 days after receipt of such Earnout Statement setting forth in reasonable detail the items with which the Shareholder Representative disagrees and the reasons for such objections (an "Earnout Dispute Notice").

(iii)      If the Shareholder Representative fails to deliver such notice of objections within such 60-day period, the applicable Earnout Statement shall be deemed to be accepted by the Equityholders and shall become final and binding on the Equityholders.

(iv)      If the Shareholder Representative gives a written objection notice complying with the foregoing requirements within the 60-day period, then the Shareholder Representative and Buyer shall attempt in good faith, for a period of not less than 30 days following receipt by Buyer of such notice (or such longer period as they may mutually agree), to resolve the items in dispute. Any items so resolved by them shall be deemed to be final and correct as so resolved and shall be binding upon each of the parties hereto, and Buyer shall pay to the Equityholders the applicable Earnout Amounts in accordance with Section 2.3(f) within three (3) Business Days following such resolution.

(v)      If the Shareholder Representative and Buyer are unable to resolve all of the items in dispute during such 30-day period, then at the request of either the

Shareholder Representative or Buyer, the Shareholder Representative and Buyer shall refer the matter to Ernst & Young LLP, or in the event that Ernst & Young LLP cannot serve or is unwilling to serve in such capacity, such other jointly selected, independent, nationally recognized accounting firm mutually agreeable to Buyer and the Shareholder Representative (the "Accounting Firm"), to resolve the remaining matters in dispute (the "Remaining Earnout Disputes") in a manner consistent with Section 2.3(c)(vi) below.

(vi)     The Parties shall furnish the Accounting Firm, at the time of its engagement, with copies of the applicable Earnout Statement and the applicable Earnout Dispute Notice.  The Accounting Firm shall have full access to the books and records (including any work papers used to prepare the calculation of the amounts set forth in the Earnout Statement) and employees of the Company and any Company Subsidiary in order for them to resolve the Remaining Earnout Disputes.  The parties hereto shall also, within 30 days of the date the Remaining Earnout Disputes are referred to the Accounting Firm, provide the Accounting Firm with a written notice (an "Earnout Position Statement") describing in reasonable detail their respective positions on the Remaining Earnout Disputes (copies of which shall concurrently be delivered to the other party hereto).  If any party fails to timely deliver its Earnout Position Statement to the Accounting Firm, the Accounting Firm shall resolve the Remaining Earnout Disputes solely upon the basis of the information otherwise provided to them.  The Accounting Firm shall resolve all Remaining Earnout Disputes in a written determination to be delivered to each of the Shareholder Representative and Buyer within 30 days after such matter is referred to them.  The decision of the Accounting Firm as to the Remaining Earnout Disputes shall be final and binding upon the Equityholders and Buyer (except to correct manifest clerical or mathematical errors) and shall not be subject to judicial review, and in the event that the Accounting Firm decides the Remaining Earnout Dispute's in the Equityholders' favor, Buyer shall pay to the Equityholders the applicable Earnout Amounts in accordance with Section 2.3(f) within three (3) Business Days following such decision.  One half of the fees, expenses and costs of the Accounting Firm shall be paid by Buyer and one half of the fees, expenses and costs of the Accounting Firm shall be paid by the Shareholder Representative (on behalf of the Equityholders).

(d)     Earnout Covenants.  Subject to Section 2.3(g) below, from the Closing Date through December 31, 2019, unless (i) the Shareholder Representative has granted its prior written consent (which may be granted in its sole discretion), or (ii) in connection with an Acceleration Event, the following covenants shall apply:

(i)     Separate Operations.  Buyer shall maintain the business currently conducted by the Company and the Company Subsidiaries as a separate business unit of Buyer or an Affiliate of Buyer with distinct books and records so as to allow the determination of the Company Revenue and Company EBITDA Percentage attributable to the Company.

(ii)     Ordinary Course Operations.  Buyer shall cause the Company to be operated in a manner that complies in all material respects with applicable Law.  Without limiting the immediately preceding sentence, Buyer and the Company shall cause the

10

Company and its Subsidiaries to be operated in all material respects in a manner that is not reasonably likely to materially and adversely affect the Company's or the Company Subsidiaries' business.

(iii)    <u>Efforts to Achieve</u>.  None of Buyer, the Company or any of their Affiliates shall take any action intending to decrease Company Revenue or Company EBITDA Percentage in order to fail to earn the Earnout Amounts.

(iv)    <u>Insurance Proceeds</u>.   All insurance proceeds received by the Company or any of the Company Subsidiaries shall be promptly reinvested in the business of the Company.  In the event of a business interruption, Company Revenue and Company EBITDA will be increased for purposes of this <u>Section 2.3</u> by the amount of insurance proceeds received by the Company or any of the Company Subsidiaries which an insurer recognized as lost revenue pursuant to any business interruption claim filed with such insurer.

(v)    <u>No Affiliate Circumvention</u>.  Buyer and the Company shall ensure that neither Buyer nor any Affiliates of the Company or of the Buyer conduct any sales of VIZIO-branded televisions or sound bars in the United States, Canada and Mexico other than through the Company and the Company Subsidiaries.

(vi)    <u>No Affiliate Discounts</u>.  To the extent that any discount is provided with respect to the products or services of the Company or any of the Company Subsidiaries in exchange for, or as part of a package of, products or services to be sold or provided by any Affiliate of the Company (other than the Company Subsidiaries) the amount of such discount shall be included in the calculation of Company Revenue and Company EBITDA.

(vii)    <u>No Conflict</u>.  The Company and the Company Subsidiaries shall not enter into or permit to exist any covenants or restrictions, whether in documents pertaining to indebtedness or otherwise, that in any manner restrict payment of any Earnout Amount or compliance with any provisions of this <u>Section 2.3(d)</u>.

(viii)    <u>Management</u>.  The Equityholders are relying, in significant part, on the relationship they have with, and the services to be performed by, Ben Wong, Kurtis Binder, Matthew McRae, Laynie Newsome, Jeffrey Schindler, Robert Brinkman and Jerry Huang (collectively, the "<u>Senior Executives</u>"), as senior executives of the Company.   Accordingly, none of the Senior Executives shall be terminated without replacing such Senior Executives with executives receiving substantially similar salary compensation and assigned substantially similar duties.

(ix)    <u>Access Rights</u>.  The Shareholder Representative shall have access reasonably necessary (subject to customary confidentiality restrictions), upon reasonable notice and at reasonable times, to the books and records, facilities and employees of the Company for the purpose of ascertaining compliance with this <u>Section 2.3</u> and for assessing the likelihood of any portion of the Earnout Amount being payable.

768801.20-LACSR01A - MSW

(e) <u>Acceleration Events</u>. Notwithstanding other provisions of this <u>Section 2.3</u>, in the event that at any time prior to December 31, 2019, the Buyer or the Company shall, directly or indirectly, (i) sell, transfer or license a material portion of the assets of the Company or any Company Subsidiary in one or a series of transactions outside of the ordinary course of business, (ii) liquidate, merge, dissolve or amalgamate the Company or any Company Subsidiary with or into another Person, or sell or issue any securities of the Company or any Company Subsidiaries to any Person (iii) merge, reorganize, consolidate, amalgamate or exchange shares in a manner where the outstanding shares of the Company's capital stock are canceled, converted into or exchanged for a different kind of securities of the successor entity and the successor entity is not an Affiliate of Buyer, except in the case of each of clauses (i), (ii) and (iii), other than to or into an Affiliate of Buyer, (iv) engage in a transaction that would result directly or indirectly in a Person (other than an Affiliate of Buyer), becoming the beneficial owner of in excess of 50% of the voting securities of the Company or any Company Subsidiary, or (v) allow an acquisition of a majority of the outstanding capital stock of the Company by a Person that is not an Affiliate of Buyer, (each of clauses (i)-(v), an "<u>Acceleration Event</u>") then the Earnout Amounts that can be earned for the Earnout Period in which such Acceleration Event occurs and for any remaining Earnout Period, if any, shall become due and payable immediately.

(f) <u>Payment Procedures</u>. Within three Business Days after the date on which agreement in respect of any earned Earnout Amount is reached or a determination is made by the Accounting Firm in accordance with this <u>Section 2.3</u>, Buyer shall deposit, or shall cause to be deposited, with the Payments Administrator (to be appointed pursuant to the Payments Agreement) the applicable Earnout Amount for distribution by the Payments Administrator to the Equityholders pro rata based on their respective Earnout Percentage, subject to any offset pursuant to <u>Section 8.6(c)</u> below. Notwithstanding the foregoing, Buyer may, in its sole and absolute discretion, elect to pay any Earnout Amounts allocable to Equityholders that are employees of the Company or any of its Subsidiaries through and in accordance with the Company's standard payroll procedures; <u>provided, however</u>, that in such case, any amount to be deposited with the Payments Administrator for payment to the Equityholders pursuant to the terms hereof shall be reduced by the amount that will be paid through and in accordance with the Company's standard payroll procedures to the Equityholders that are employees of the Company or any Company Subsidiaries. The parties to this Agreement shall treat a portion of any payment under this <u>Section 2.3</u> as a payment of interest as required and determined under Code Section 483 and the Treasury Regulations thereunder.

(g) For the avoidance of doubt, nothing contained herein shall restrict Buyer's right to control the Company and the Company Subsidiaries in any respect, including without limitation, the hiring or termination of employees, the incurrence of expenses and requiring compliance with Buyer's and its Affiliates' internal controls, corporate governance policies and procedures, legal and regulatory compliance standards and consumer data guidelines and privacy rules and regulations.

2.4 <u>Dissenters' Rights</u>.

(a) Notwithstanding anything in this Agreement to the contrary, if any Dissenting Shareholder shall properly demand payment and appraisal with respect to such Shareholder's shares of Company Capital Stock, as provided in Chapter 13 of the California

Law, such shares shall not be converted into or exchangeable for the right to receive the aggregate Common Closing Payment and/or Preferred Closing Payment, as applicable, or any Per Share Earnout Amounts payable with respect to such Shareholder's shares of Company Capital Stock except as provided in this Section 2.4, and the Company shall give Buyer notice thereof and Buyer shall have the right to participate in all negotiations and proceedings with respect to any such demands.  The Company agrees that, except with the prior written consent of Buyer, or as required under the California Law, the Company will not voluntarily make any payment with respect to, or settle or offer to settle, any such demand for payment.

(b)     If any Dissenting Shareholder shall fail to perfect or shall have effectively withdrawn or lost the right to dissent, the shares of Company Capital Stock held by such Dissenting Shareholder shall thereupon be treated as though such shares had been converted into the aggregate Common Closing Payment and/or Preferred Closing Payment, as applicable, and any Per Share Earnout Amounts payable with respect to such Shareholder's shares of Company Capital Stock in accordance with Section 2.1.

(c)     Each Dissenting Shareholder who, pursuant to the provisions of Chapter 13 of the California Law, becomes entitled to payment of the value of the shares of Company Capital Stock held by such Dissenting Shareholder will receive payment therefor after the value thereof has been agreed upon or finally determined pursuant to such provisions, and any Common Closing Payment and/or Preferred Closing Payment, as applicable, and any Per Share Earnout Amounts that would have been payable with respect to such shares of Company Capital Stock shall be retained by Buyer.

2.5     Adjustment to Closing Date Merger Consideration.

(a)     Preparation of Closing Balance Sheet.

(i)     Not later than two (2) Business Days prior to the Closing, the Company shall provide Buyer (x) a true and complete schedule of the estimated Company Indebtedness (the "Estimated Indebtedness"), (y) an estimated balance sheet (the "Estimated Closing Balance Sheet") for the Company and the Company Subsidiaries as of the close of business on the Business Day immediately preceding the Closing Day, which shall include the Company's good faith calculation, prepared from the books and records of the Company and based on the most recently available financial information, of the estimated Company Cash as of the close of business on the Business Day immediately preceding the Closing Date (the "Estimated Cash") and the estimated Working Capital as of the close of business on the Business Day immediately preceding the Closing Date (the "Estimated Working Capital"), and (z) a true and complete schedule of the estimated Unpaid Transaction Costs (the "Estimated Transaction Costs"). The Estimated Closing Balance Sheet shall be prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation and accrual methodologies that were used in the preparation of the Financial Statements (provided, the determination of Company Cash, Company Indebtedness and Working Capital shall be on a basis consistent with GAAP and the general ledger accounts listed in the Schedule B attached hereto) (collectively, the "Methodologies").

(ii)     As promptly as practicable, but no later than ninety (90) days after the Closing Date, Buyer shall deliver to the Shareholder Representative (x) a schedule setting forth the Company Indebtedness, (y) a balance sheet (the "Closing Balance Sheet") for the Company and the Company Subsidiaries as of the close of business on the Business Day immediately preceding the Closing Date, which shall include Buyer's good faith calculation of Company Cash as of the close of business on the Business Day immediately preceding the Closing Date (the "Closing Cash") and Working Capital as of the close of business on the Business Day immediately preceding the Closing Date (the "Closing Working Capital"), and (z) a schedule setting forth the Unpaid Transaction Costs.  The Closing Balance Sheet shall be prepared in accordance with GAAP applied using the Methodologies.  If Buyer does not deliver a schedule setting forth the Company Indebtedness or a schedule setting forth the Unpaid Transaction Costs within such 90-day period, then the calculation of the Estimated Indebtedness or Estimated Transaction Costs, as applicable, shall be deemed to have been accepted as the Company Indebtedness or Unpaid Transaction Costs, as applicable, and shall be final and binding on all parties.  If Buyer does not deliver a Closing Balance Sheet within such 90-day period, then the calculation of the Estimated Cash and Estimated Working Capital as set forth in the Estimated Closing Balance Sheet shall be deemed to have been accepted as the Final Cash (defined below) and Final Working Capital (defined below) and shall be final and binding on all parties.

(iii)     Within ninety (90) days after receipt of the schedule setting forth the Company Indebtedness and Unpaid Transaction Costs and the Closing Balance Sheet (the "Objection Period"), the Shareholder Representative, on behalf of the Equityholders, by written notice to Buyer may object to Buyer's calculation of the Company Indebtedness, Unpaid Transaction Costs, Closing Cash or Closing Working Capital as set forth in the Closing Balance Sheet, setting forth in such notice a statement describing in reasonable detail the Shareholder Representative's objection (the "Objection Notice") and the Shareholder Representative's proposal or proposals with respect to the calculation of the Company Indebtedness, Unpaid Transaction Costs, Closing Cash or Closing Working Capital, as applicable; provided, that the Shareholder Representative may object to the Company Indebtedness, Unpaid Transaction Costs or Closing Balance Sheet based only on the existence of mathematical or factual errors contained therein or on the failure of the Closing Balance Sheet to be prepared in accordance with GAAP applied using the Methodologies.

(iv)     Within thirty (30) days following timely delivery of the Objection Notice, Buyer and the Shareholder Representative shall attempt, in good faith, to resolve all disputes properly contained in the Objection Notice.  Any discussions relating thereto shall be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar state rule(s) and evidence of such discussions shall not be admissible in any future proceedings between the parties to this Agreement.  If Buyer and the Shareholder Representative do not obtain a final resolution within thirty (30) days after the Shareholder Representative delivers an Objection Notice, then, Buyer and the Shareholder Representative shall submit such dispute to the Accounting Firm.  Promptly, but not later than thirty (30) days after the dispute has been submitted to the Accounting Firm, the Accounting Firm shall determine (based solely on presentations or materials

submitted by the Shareholder Representative and Buyer to the Accounting Firm, and not by independent review) (i) whether the calculation and schedule of the Company Indebtedness or Unpaid Transaction Costs contained mathematical or factual errors, (ii) whether the Closing Balance Sheet contained mathematical or factual errors or failed to be prepared in accordance with GAAP applied using the Methodologies, and (iii) if any such error or failure exists, its calculations to correct for such error or failure.   In determining any disputed item, the Accounting Firm may not assign a value to such item greater than the greatest value for such item claimed by either party or less than the lowest value for such item claimed by either party.  For the purposes of the Accounting Firm's calculation of the Closing Cash and the Closing Working Capital, the amounts to be included shall be the appropriate amounts from the Closing Balance Sheet as to items that are not in dispute, and the amounts determined by the Accounting Firm as to items that are in dispute.  The Shareholder Representative and Buyer shall cooperate with the Accounting Firm in making its determination and such determination shall be conclusive and binding upon the parties hereto absent manifest error.

(v)     If the Shareholder Representative does not deliver an Objection Notice during the Objection Period, then the calculation of the Company Indebtedness, Unpaid Transaction Costs, Closing Cash and/or the Closing Working Capital as set forth in the Closing Balance Sheet, as applicable, shall be deemed to have been accepted and shall be final and binding on all parties.  The term "Final Indebtedness" means the Company Indebtedness, if the Shareholder Representative accepts the schedule of Company Indebtedness as delivered or does not deliver an Objection Notice during the Objection Period, or (B) the Company Indebtedness as finally determined in accordance with the procedures set forth in this Section 2.5(a)(iii) and (iv) to reflect the resolution of any objections thereto, if the Shareholder Representative delivers an Objection Notice during the Objection Period.  The term "Final Transaction Costs" means the Unpaid Transaction Costs, if the Shareholder Representative accepts the schedule of Unpaid Transaction Costs as delivered or does not deliver an Objection Notice during the Objection Period, or (B) the Unpaid Transaction Costs as finally determined in accordance with the procedures set forth in this Section 2.5(a)(iii) and (iv) to reflect the resolution of any objections thereto, if the Shareholder Representative delivers an Objection Notice during the Objection Period.  The term "Final Closing Balance Sheet" means (A) the Closing Balance Sheet, if the Shareholder Representative accepts the Closing Balance Sheet as delivered or does not deliver an Objection Notice during the Objection Period, or (B) the Closing Balance Sheet as finally determined in accordance with the procedures set forth in this Section 2.5(a)(iii) and (iv) to reflect the resolution of any objections thereto, if the Shareholder Representative delivers an Objection Notice during the Objection Period.  The term "Final Cash" means the Closing Cash calculated pursuant to the Final Closing Balance Sheet.  The term "Final Working Capital" means the Closing Working Capital calculated pursuant to the Final Closing Balance Sheet.

(vi)     In the event the parties submit any unresolved objections to an Accounting Firm for resolution as provided in Section 2.5(a)(iv) above, Buyer, on the one hand, and the Equityholders, on the other hand, shall share responsibility for the fees and expenses of the Accounting Firm equally; provided, that any fees and expenses to be paid

15

by the Equityholders shall be paid solely from the Closing Payment Escrow Fund or the Indemnification Escrow Fund, if no funds remain in the Closing Payment Escrow Fund.

(vii)   The Company, will make the personnel work papers and back-up materials used in preparing the Estimated Indebtedness, Estimated Transaction Costs and Estimated Closing Balance Sheet available to Buyer's accountant and other representatives at reasonable times and upon reasonable notice at any time during (A) the review by Buyer of the Estimated Indebtedness, Estimated Transaction Costs and Estimated Closing Balance Sheet, and (B) the resolution by Buyer and the Shareholder Representative of any objections thereto.   Buyer and the Company will make the personnel work papers and back-up materials used in preparing the schedules of the Company Indebtedness and Unpaid Transaction Costs and the Closing Balance Sheet available to the Shareholder Representative's accountant and other representatives at reasonable times and upon reasonable notice during (1) the review by the Shareholder Representative of the Company Indebtedness, Unpaid Transaction Costs and the Closing Balance Sheet, and (2) the resolution by Buyer and the Shareholder Representative of any objections thereto.

(b)      Post-Closing Purchase Price Adjustment.

The Actual Merger Consideration shall be adjusted as follows:

(i)   The Actual Merger Consideration shall be increased by the amount by which the Final Cash exceeds the Estimated Cash or decreased by the amount by which the Estimated Cash exceeds the Final Cash.

(ii)   The Actual Merger Consideration shall be increased by the amount by which the Final Working Capital exceeds the Estimated Working Capital or decreased by the amount by which the Estimated Working Capital exceeds the Final Working Capital.

(iii)   The Actual Merger Consideration shall be decreased by the amount by which the Final Indebtedness exceeds the Estimated Indebtedness or increased by the amount by which the Estimated Indebtedness exceeds the Final Indebtedness.

(iv)   The Actual Merger Consideration shall be decreased by the amount by which the Final Transaction Costs exceeds the Estimated Transaction Costs or increased by the amount by which the Estimated Transaction Costs exceeds the Final Transaction Costs.

(c)      Closing Payment Escrow.

(i)   If the Actual Merger Consideration is less than the Closing Date Merger Consideration, then Buyer and the Shareholder Representative shall instruct the Escrow Agent in writing to (1) deliver to Buyer out of the Closing Payment Escrow Amount an amount in cash equal to the difference between the Actual Merger Consideration and the Closing Date Merger Consideration (the "Closing Over-Payment") and (2) deliver to the Payments Administrator or the Surviving Corporation, for payment

16

to Equityholders, the remaining amount, if any, of the Closing Payment Escrow Fund, to be distributed to Equityholders, pro rata based on their respective Escrow Percentages. Any payment pursuant to this Section 2.5(b)(i) shall be made by wire transfer or delivery of other immediately available funds, within three (3) Business Days after the Escrow Agent's receipt of written instructions from Buyer and the Shareholder Representative contemplated in this Section 2.5(b)(i).  To the extent any Closing Over-Payment exceeds the Closing Payment Escrow Amount, the Escrow Agent shall deliver to Buyer out of the Indemnification Escrow Amount such excess amount, by wire transfer or delivery of other immediately available funds, within three (3) Business Days after Buyer provides notice to the Shareholder Representative of such excess and wire transfer instructions.

(ii)     If Actual Merger Consideration is greater than the Closing Date Merger Consideration, then (1) Buyer and the Surviving Corporation shall, jointly and severally, pay to the Payments Administrator or the Surviving Corporation, for payment to Equityholders, an amount equal to the excess of the Actual Merger Consideration over the Closing Date Merger Consideration (the "Closing Under-Payment"), to be distributed to Equityholders, pro rata based on their respective Escrow Percentages, by wire transfer or delivery of other immediately available funds, and (2) Buyer and the Shareholder Representative shall instruct the Escrow Agent in writing to deliver to the Payments Administrator or the Surviving Corporation, for payment to Equityholders, the Closing Payment Escrow Fund, to be distributed to Equityholders, pro rata based on their respective Escrow Percentages, in each case, within three (3) Business Days following receipt by Buyer of wire transfer instructions from the Payments Administrator.

(iii)     If there is no Closing Over-Payment and no Closing Under-Payment, Buyer and the Shareholder Representative shall instruct the Escrow Agent in writing to deliver to the Payments Administrator or the Surviving Corporation, for payment to Equityholders, the Closing Payment Escrow Fund, to be distributed to Equityholders, pro rata based on their respective Escrow Percentages.

(d)     Sample Calculation.  For clarity, Schedule C attached hereto contains a sample illustrating the calculation of the Closing Date Merger Consideration and the adjustments to the Closing Date Merger Consideration described in this Section 2.5.  The amounts and calculations shown in Schedule C are illustrative and hypothetical only.  In the event of any conflict between Schedule C and this Section 2.5, the terms and provisions of this Section 2.5 shall control.

ARTICLE III
REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Except as set forth in the Company's disclosure schedules dated as of the date of this Agreement and delivered to Buyer and Merger Sub herewith (the "Company Disclosure Schedules"), the Company represents and warrants to Buyer and Merger Sub as follows as of the date of this Agreement and as of the Effective Time:

3.1     Organization; Corporate Power.  The Company is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation, and has

17

the requisite corporate power and authority to conduct its business as it is presently being conducted and to own, lease or operate its properties and assets. The Company is duly qualified to do business and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary (to the extent the "good standing" concept is applicable in the case of any jurisdiction outside the United States), except where the failure to be so qualified or in good standing would not be material to the Company and the Company Subsidiaries, taken as a whole. The Company is not in violation of its Articles of Incorporation or Bylaws. The Company has delivered to Buyer correct and complete copies of its Articles of Incorporation and Bylaws as of the date of this Agreement, and the Articles of Incorporation and Bylaws of the Company have not subsequently been amended and are in full force and effect.

3.2     Authorization of the Transactions.

(a)     The Company has the requisite corporate power and corporate authority to execute and deliver this Agreement, to perform its covenants and obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Company of this Agreement, the performance by the Company of its covenants and obligations hereunder and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company, and no additional corporate proceedings on the part of the Company or any Company Subsidiary are necessary to authorize the execution and delivery by the Company of this Agreement, the performance by the Company of its covenants and obligations hereunder or the consummation of the transactions contemplated hereby.

(b)     This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by Buyer and Merger Sub, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability (i) may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting or relating to creditors' rights generally and (ii) is subject to general principles of equity (clauses (i) and (ii), collectively, the "Enforceability Limitations").

3.3     Company Shareholder Approval.  The approval of a majority of the holders of the Class A Common Stock and Class B Common Stock, voting together as a single class, and the approval of a majority of the holders of the Preferred Stock are the only votes of the holders of any class or series of Company Capital Stock that are necessary under applicable Law and the Company's Articles of Incorporation and Bylaws to adopt this Agreement and consummate the Merger and such approvals have been obtained prior to the delivery of this Agreement by the Company.

3.4     Non-Contravention.

(a)     The execution and delivery by the Company of this Agreement, the performance by the Company of its covenants and obligations hereunder and the consummation by the Company of the transactions contemplated hereby do not and will not:

18

(i)      violate or conflict with any provision of the Articles of Incorporation or Bylaws of the Company or any Company Subsidiary;

(ii)     subject to obtaining such Consents set forth in <u>Section 3.4</u> of the Company Disclosure Schedules, materially violate, conflict with, or result in the breach of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, any material Contract to which the Company or any Company Subsidiary is a party;

(iii)    assuming the Consents referred to in <u>Section 3.5</u> are obtained or made, materially violate or conflict with any material Law or Order applicable to the Company or any Company Subsidiary or by which any of their material properties or assets are bound; or

(iv)    result in the creation of any material Lien (other than Permitted Liens) upon any of the material properties or assets of the Company or any Company Subsidiary.

(b)      The Company has made available to Buyer correct and complete copies of the minutes (or, in the case of minutes that have not yet been finalized, drafts thereof) of all meetings of stockholders, the Board of Directors and each committee of the Board of Directors of the Company held since December 31, 2013, other than the portion of minutes of those meetings of the Board of Directors and committees thereof at which the negotiation and execution of this Agreement or any prior negotiations with any third parties in respect of any similar transactions were discussed. The Company has made available to Buyer correct and complete copies of the stock record books and books of account of the Company.

3.5      <u>Governmental Consents and Approvals</u>.      No Consent to or from any Governmental Entity is required on the part of the Company (including on behalf of or in respect of any of the Company Subsidiaries) in connection with the execution and delivery by the Company of this Agreement, the performance by the Company of its covenants and obligations hereunder and the consummation by the Company of the transactions contemplated hereby, except:

(a)      the filing and recordation of the Agreement of Merger with the Secretary of State of the State of California and such filings with Governmental Entities to satisfy the applicable Laws of states in which the Company and the Company Subsidiaries are qualified to do business;

(b)      Consents required under, and compliance with any other applicable requirements of, the HSR Act and any other applicable Antitrust Laws;

(c)      the submission of a voluntary joint filing of notice of the transaction to CFIUS and any requested supplemental information (the "<u>Joint Notice</u>") pursuant to FINSA, and (ii) the CFIUS Clearance;

(d)      the Taiwan Approvals; and

19

(e)     such other Consents, the failure of which to obtain would not be, individually or in the aggregate, materially adverse to the Company and the Company Subsidiaries, taken as a whole.

3.6     <u>Company Capitalization.</u>

(a)     The authorized capital stock of the Company consists of 75,000,000 shares of Class A Common Stock; 10,862,225 shares of Class B Common Stock; and 25,000,000 shares of Preferred Stock. As of the close of business in California on June 27, 2016 (the "<u>Capitalization Date</u>"): (i) 4,264,533 shares of restricted and unrestricted Class A Common Stock were issued and outstanding, (ii) 10,862,225 shares of Class B Common Stock were issued and outstanding and (iii) 134,736 shares of Preferred Stock were issued and outstanding. All outstanding shares of Company Capital Stock are validly issued, fully paid, nonassessable and free of any preemptive rights.

(b)     As of the close of business in California on the Capitalization Date, there were:

(i)     1,459,714 shares of Class A Common Stock issuable upon the exercise of Options outstanding under the 2007 Plan, as of June 27, 2016;

(ii)     outstanding Restricted Stock awards covering 555,000 shares of Class A Common Stock (each of clauses (i) and (ii), an "<u>Equity Award</u>" and, collectively, the "<u>Equity Awards</u>").

(c)     <u>Section 3.6(c)</u> of the Company Disclosure Schedules includes an accurate and complete list, as of the Capitalization Date, of each outstanding Equity Award, including with respect to each such Equity Award: the name of the grantee, the type of award, the portion that is vested and unvested, whether, in the case of Options, the Option is an incentive stock option or a nonqualified stock option, the date of grant, the expiration date, the number of shares of Class A Common Stock underlying each such Equity Award and, where applicable, the exercise price. With respect to the Options issued pursuant to the 2007 Plan, (i) each grant of an option was duly authorized by all necessary corporate action no later than the date on which the grant of such option was by its terms to be effective (the "<u>Grant Date</u>") and no such grants involved any "back dating," "forward dating" or similar practices with respect to the effective date of grant, (ii) all options have an exercise price equal to no less than the fair market value of the underlying shares of Company Capital Stock on the Grant Date and no option has any feature for the deferral of compensation other than the deferral of recognition of income until the later of exercise or disposition of such option, in each case, as determined in material compliance with Section 409A of the Code, (iii) each such grant was made in material compliance with the terms of the 2007 Plan and all applicable Laws, including valid exemptions from registration under the Securities Act and all other applicable securities laws, (iv) the 2007 Plan is the only plan or program the Company maintains under which outstanding options to acquire Company Capital Stock, restricted stock, stock appreciation rights or other compensatory equity-based awards have been or may be granted and there are no options to acquire Company Capital Stock, restricted stock awards or any other equity or equity-based awards with respect to Company Capital Stock outstanding other than those granted and outstanding under the 2007 Plan, (v) the

20

Company has made available to Buyer true, correct and complete copies of each form of award agreement governing any Equity Award, (vi) no Equity Awards differ in any material respect from such form agreements, (vii) there is no agreement, arrangement or understanding (written or oral) to amend, modify or supplement such 2007 Plan in any case from the form provided to Buyer and (viii) each such grant was properly accounted for in all material respects in accordance with GAAP in the financial statements (including the related notes) of the Company. Except as set forth in Section 3.6(c) of the Company Disclosure Schedules, there are no Restricted Stock awards with respect to which a timely election under Code Section 83(b) has not been properly filed and a copy of each such election has been provided by the Company to Buyer prior to the date hereof.

(d)     Except as set forth in Section 3.6(a) and Section 3.6(b) and for changes since the Capitalization Date resulting from the exercise of Options or the vesting of Restricted Stock awards outstanding as of the Capitalization Date and the issuance of Class A Common Stock, Options or Restricted Stock in compliance with Section 5.1, there are:

(i)     no outstanding shares of capital stock of, or other equity or voting interests in, the Company;

(ii)     no outstanding securities of the Company convertible into or exchangeable for shares of capital stock of, or other equity or voting interest in, the Company;

(iii)     no outstanding options, warrants or other rights to acquire from the Company, or that obligate the Company to issue, any capital stock of, or other equity or voting interest in, or any securities convertible into or exchangeable for shares of capital stock of, or other equity or voting interest in, the Company (including any Options);

(iv)     no obligations of the Company to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar Contract relating to any capital stock of, or other equity or voting interest (including any voting debt) in, the Company; and

(v)     no other obligations by the Company or any Company Subsidiary to make any payments based on the price or value of any securities of the Company. Neither the Company nor any Company Subsidiary is a party to any Contract that obligates the Company or any Company Subsidiary to repurchase, redeem or otherwise acquire any securities of the Company, except in connection with the repurchase or acquisition of Class A Common Stock pursuant to (A) the terms of the 2007 Plan or (B) in the Ordinary Course of Business consistent with past practice.

(e)     Neither the Company nor any Company Subsidiary is a party to any Contract relating to the voting of, requiring registration of, or granting any preemptive rights, anti-dilutive rights or rights of first refusal or other similar rights with respect to any securities of the Company. No Company Subsidiary owns any shares of Company Capital Stock.

3.7     Company Subsidiaries.

(a)     Section 3.7(a) of the Company Disclosure Schedules contains a complete and accurate list of the name, jurisdiction of organization and schedule of stockholders of each Company Subsidiary. Each of the Company Subsidiaries is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its respective organization (to the extent the "good standing" concept is applicable in the case of any jurisdiction outside the United States), except where the failure to be in good standing would not have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     Each of the Company Subsidiaries has the requisite corporate or organizational power and authority to carry on its respective business as it is presently being conducted and to own, lease or operate its properties and assets. Each of the Company Subsidiaries is duly qualified to do business and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary (to the extent the "good standing" concept is applicable in the case of any jurisdiction outside the United States), except where the failure to be so qualified or in good standing would not have, individually or in the aggregate, a Company Material Adverse Effect.

(c)     The Company has delivered to Buyer correct and complete copies of the articles of incorporation and bylaws (or comparable constituent documents) of each of the Company Subsidiaries, in each case as amended as of the date of this Agreement. None of the Company Subsidiaries is in violation of its articles of incorporation, bylaws or other applicable constituent documents.

(d)     All of the outstanding capital stock of, or other equity or voting interest in, each Company Subsidiary: (i) have been duly authorized, validly issued and are fully paid and nonassessable and (ii) are owned, directly or indirectly, by the Company, free and clear of all Liens (other than Permitted Liens) and free of any other restriction (including any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity or voting interest). No vote of the holders of any securities of any Company Subsidiary is required in connection with this Agreement and the consummation of the transactions contemplated hereby.

(e)     Neither the Company nor any Company Subsidiary is a participant in (nor is any part of their businesses conducted through) any joint venture, partnership, strategic alliance or Contract the primary purpose of which is a profit, loss, risk or revenue sharing arrangement, that is material to the business of the Company and the Company Subsidiaries, taken as a whole.

(f)     Except as set forth in Section 3.7(a) of the Company Disclosure Schedules, there are no outstanding:

(i)     shares of capital stock of or other equity or voting interests in, any Company Subsidiary;

(ii)     securities of any Company Subsidiary convertible into or exchangeable for shares of capital stock of or other equity or voting interests in, any Company Subsidiary;

(iii)     options, warrants or other rights to acquire from any Company Subsidiary or from the Company, or that obligates any Company Subsidiary to issue, any capital stock of, or other equity or voting interest in, or any securities convertible into or exchangeable for shares of capital stock of, or other equity or voting interest in, any Company Subsidiary;

(iv)     obligations of any Company Subsidiary to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar Contract relating to any capital stock of, or other equity or voting interest (including any voting debt) in, any Company Subsidiary; or

(v)     other obligations by any Company Subsidiary to make any payments based on the price or value of any shares of any Company Subsidiary (including any share appreciation rights, performance units, contingent value rights, "phantom" shares or similar securities or rights).

(g)     Neither the Company nor any Company Subsidiary is a party to any Contract that obligates the Company or any Company Subsidiary to repurchase, redeem or otherwise acquire any outstanding securities of any Company Subsidiary.

3.8     Company Financial Statements.  The Company has delivered to Buyer true and correct copies of the Company's and the Company Subsidiaries' (a) unaudited consolidated balance sheet as of March 31, 2016 (the "Reference Balance Sheet") and the related unaudited consolidated statements of income, changes in shareholders' equity, and cash flow for the three-month period then ended and (b) audited consolidated balance sheets and related audited consolidated statements of income, changes in shareholders' equity, and cash flow for the fiscal years ended December 31, 2015, December 31, 2014 and December 31, 2013 (the financial statements described in clauses (a) and (b) together, the "Financial Statements").  Except as set forth in Section 3.8 of the Company Disclosure Schedules, each of the Financial Statements (including in all cases the notes and schedules thereto, if any) (i) is derived from the books and records of the Company and each Company Subsidiary; (ii) has been prepared in accordance with GAAP consistently applied within the periods covered thereby, unless noted therein; and (iii) presents fairly in all material respects the financial condition, results of operations, shareholders' equity and cash flow of the Company and the Company Subsidiaries as of the dates and for the periods referred to therein, subject to normal year-end adjustments, none of which would be material, individually or in the aggregate, and, in the case of interim Financial Statements, the absence of notes.

3.9     Absence of Unrecorded Liabilities.  Neither the Company nor any Company Subsidiary has any Liabilities of a type that would be required by GAAP to be reflected or reserved against on a consolidated balance sheet, other than (a) Liabilities reflected or otherwise reserved against in the Reference Balance Sheet, (b) Liabilities arising under this Agreement or incurred in connection with the transactions contemplated by this Agreement, (c) Liabilities incurred since the date of the Reference Balance Sheet in the Ordinary Course of Business consistent with past practice and (d) Liabilities that would not, individually or in the aggregate, be materially adverse to the Company and the Company Subsidiaries, taken as a whole.

23

3.10    Absence of Certain Changes.   Since the date of the Reference Balance Sheet through the date of this Agreement, except for the negotiation and entering into this Agreement, (i) the business of the Company and the Company Subsidiaries has been conducted, in all material respects, in the ordinary course consistent with past practice, and (ii) there has not been or occurred any Company Material Adverse Effect that is continuing.   Since the date of the Reference Balance Sheet, there has not been any event or action that would require consent under Section 5.1 if occurring or taken after the date of this Agreement.

3.11    Material Contracts.

(a)    Section 3.11 of the Company Disclosure Schedules contains a complete and accurate list of all Material Contracts to or by which the Company or any Company Subsidiary is a party as of the date of this Agreement. True and complete copies of all such Material Contracts (including all exhibits, schedules and amendments thereto) have been made available to Buyer.

(b)    "Material Contract" means any of the following to which the Company or any of the Company Subsidiaries is a party as of the date of this Agreement; provided that in no event shall any purchase orders, invoices or similar instruments received or issued by the Company or any Company Subsidiary in the Ordinary Course of Business be considered a Material Contract:

(i)    any Contract that explicitly (A) limits, curtails or restricts the ability of the Company or any Company Subsidiary to compete or conduct activities in any geographic area or line of business or with any Person, or (B) grants the other party or any third Person "most favored nation" or similar status, or any right of first refusal, first notice or first negotiation, in each case in a manner that is material or reasonably would be expected to be material to the operations of the Company and the Company Subsidiaries taken as a whole;

(ii)    any Company IP Agreement (as defined in Section 3.12 below) that is or should have been listed in Section 3.12(c) of the Company Disclosure Schedules;

(iii)    any sale, resale, supply, manufacturing, marketing, merchandising or distribution Contract with any third Person that requires an aggregate payment or receipt by the Company and the Company Subsidiaries under such Contract of more than $2,500,000 over the remaining term of such Contract or more than $5,000,000 annually;

(iv)    any employment or individual consultant Contract that is not terminable at will or for convenience by the Company or any Company Subsidiary on less than 30 days' notice and obligating the Company or any Company Subsidiary to make payments or provide compensation in excess of $75,000 annually or any other Contract providing severance or similar benefits to any person upon a change of control of the Company in excess of $250,000;

24

(v)     any Contract relating to the disposition or acquisition by the Company or any Company Subsidiary of assets whose value, in each case, is in excess of $500,000;

(vi)     any Contract that involves a joint venture or partnership with a third Person that includes the sharing of profits and losses;

(vii)     any Contract involving Indebtedness of the Company or any Company Subsidiary under which the Company and the Company Subsidiaries, taken as a whole, are liable for a principal amount in excess of $500,000;

(viii)     any Contract (A) with any Governmental Entity or (B) where the Company or any Company Subsidiary is acting as a prime subcontractor to another Person in connection with a Contract between such Person and a Governmental Entity;

(ix)     any financial derivatives master agreement or confirmation, currency or interest rates hedging agreements, or futures account opening agreements and/or brokerage statements, evidencing financial, currency or interest rate hedging or similar trading activities;

(x)     any mortgage, pledge, security agreement, deed of trust or other Contract granting a Lien on any material property or assets of the Company or any Company Subsidiary;

(xi)     any Collective Bargaining Agreement (as defined in Section 3.15(h) below);

(xii)     any Lease (as defined in Section 3.13 below);

(xiii)     any Contract that requires the Company or any of the Company Subsidiaries to purchase its total requirements of any material product or service from a third party or that contains "take or pay" provisions;

(xiv)     any Contract between or among the Company or any of the Company Subsidiaries, on the one hand, and any officer, director or Affiliate of the Company or any of the Company Subsidiaries, on the other hand (other than any Employee Plan);

(xv)     any Contract with a Significant Supplier or Significant Customer; and

(xvi)     any Contract that (A) otherwise does not fit within any of the descriptions set forth in the foregoing clauses (i) through (xv) above, and (B) by its terms, calls for aggregate payment or receipt by the Company and the Company Subsidiaries under such Contract of more than $2,500,000 over the remaining term of such Contract or more than $5,000,000 annually.

(c)     Each Material Contract is valid and binding on the Company (and/or each such Company Subsidiary party thereto) and, to the Knowledge of the Company, each other party thereto, and is in full force and effect, enforceable by the Company or each such Company Subsidiary party thereto, as the case may be, in accordance with its terms, subject to the Enforceability Limitations.

(d)     Neither the Company nor any Company Subsidiary that is a party thereto, nor, to the Knowledge of the Company, any other party thereto, is in breach of, or default under, any such Material Contract, and no event has occurred that with notice or lapse of time or both would constitute such a breach or default thereunder by the Company or any Company Subsidiary, or, to the Knowledge of the Company, any other party thereto, except for such failures to be in full force and effect and such breaches and defaults that would, individually or in the aggregate, be material to the Company and the Company Subsidiaries, taken as a whole. Neither the Company nor any Company Subsidiary has waived any of its respective material rights under any Contract to which it is a party.

(e)     Neither the Company nor any Company Subsidiary has received any written notice of termination or cancellation under any Material Contract.

(f)     Neither the Company nor any Company Subsidiary has received any written notice of breach or default in any material respect under any Material Contract which breach has not been cured.

3.12    Intellectual Property.

(a)     Section 3.12(a) of the Company Disclosure Schedules lists, as of the date of this Agreement, (i) all Company Intellectual Property and listing for each item of Company Intellectual Property: (A) the jurisdiction in which each item of Company Intellectual Property has been issued, filed, or recorded; (B) the application, filing, registration or grant number; (C) the date of application, filing, registration or issuance; and (D) the current status (e.g., issued or pending); and (ii) any Action pending with respect to any Company Intellectual Property. To the Knowledge of the Company, each of the Company Intellectual Property is subsisting and has not been held invalid or unenforceable in any Action or by any Governmental Entity as of the date of this Agreement.

(b)     Section 3.12(b) of the Company Disclosure Schedules lists as of the date of this Agreement all Contracts by or to which the Company or any Company Subsidiary is a party or is otherwise bound as of the date of this Agreement and currently in effect in whole or in part (other than (i) rights implied under applicable Law in connection with the Company's or Company Subsidiaries' sale or use of any products, technology or services previously sold by the Company or the Company Subsidiaries to any third Person; (ii) Contracts that grant non-exclusive rights pursuant to one of the Company's standard forms that have been made available to Buyer (or in a form substantially similar to, or with provisions with substantially similar legal effect as the provisions of, one of such forms); (iii) standard (i.e., having terms customary in the Company's industry) non-disclosure, confidentiality and consulting Contracts; and (iv) Contracts with third parties for the provision of manufacturing services to the Company or the Company Subsidiaries and allowing use of the Company Intellectual Property only for that purpose) under

26

which any third Person has been granted, or has an option or right to be granted, any license, release, covenant, authorization or standstill under any Company Intellectual Property ("Company Outbound IP Agreements").

(c)   Section 3.12(c) of the Company Disclosure Schedules lists all Contracts by or to which the Company or any Company Subsidiary is a party or is otherwise bound as of the date of this Agreement and currently in effect in whole or in part (other than (i) Contracts for commercially available software or any clickwrap, shrinkwrap or other similar standard form electronic Contracts; (ii) licenses to Open Source Materials; and (iii) standard (i.e., having terms customary in the Company's industry) non-disclosure, confidentiality and consulting contracts) under which the Company or any of the Company Subsidiaries has obtained, or has an option or right to obtain, any material license, release, covenant, authorization or standstill under any Intellectual Property rights of a third Person ("Company Inbound IP Agreements" and, together with the Company Outbound IP Agreements, the "Company IP Agreements").

(d)   The Company owns the Company Intellectual Property free and clear of all Liens other than Permitted Liens.

(e)   The Company owns, or has a valid license to use, all Intellectual Property necessary to operate the business of the Company and the Company Subsidiaries as of the date hereof, except as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(f)   As of the date hereof, the conduct of the Company's or the Company Subsidiaries' business does not infringe upon, misappropriate or otherwise violate the Intellectual Property rights of any third Person, except as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.  No present or former employee, officer or director of the Company or any of its Affiliates, or agents, consultants or (sub)contractors holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Company Intellectual Property, except as set forth on Section 3.12(f) of the Company Disclosure Schedules.

(g)   The Company and the Company Subsidiaries are not currently involved in any Action alleging that, and since December 31, 2013 through the date hereof the Company has not received written notice of a claim that, the conduct of the Company's or the Company Subsidiaries' business infringes upon, misappropriates, or otherwise violates the Intellectual Property rights of a third Person. As of the date hereof, the Company and the Company Subsidiaries are not subject to any Order by any Governmental Entity that restricts or impairs the use of any material Company Intellectual Property.

(h)   Neither the Company nor any Company Subsidiary has used Open Source Materials in any manner that would or could, with respect to any material Company product, material Company technology or material Company Owned IP, (i) require any material disclosure or distribution in source code form of any material portions of such Company products, Company technology or Company Owned IP, (ii) require any material licensing thereof for the purpose of making derivative works, (iii) create, or purport to create, any material obligations for the Company or any of Company Subsidiary with respect to such Company

Owned IP or grant, or purport to grant, to any third party, any material rights or immunities under such Company Owned IP or (iv) impose any other material limitation, restriction, or condition on the right of the Company or any Company Subsidiary with respect to its use or distribution. The Company and the Company Subsidiaries are in material compliance with the licenses attaching to all Open Source Materials.

3.13    Real Property.

(a)    All real property owned in fee simple by the Company or any Company Subsidiary is listed and identified in Section 3.13(a) of the Company Disclosure Schedules (collectively, the "Owned Real Property"). With respect to each parcel of Owned Real Property:

(i)    the Company or a Company Subsidiary has and owns good and marketable fee simple title to the Owned Real Property owned by it, free and clear of all Liens other than Permitted Liens;

(ii)    the Company and the Company Subsidiaries have delivered to Buyer true, correct and complete copies of all title insurance policies and surveys in the possession of the Company or any Company Subsidiary relating to the Owned Real Property, if any; and

(iii)    except as set forth in Section 3.13(a) of the Company Disclosure Schedules, there are no leases or other agreements granting to any third party or third parties the right of use or occupancy of any Owned Real Property, or any portion thereof, other than Permitted Liens.

(b)    Section 3.13(b) of the Company Disclosure Schedules contains a complete and accurate list of all of the existing leases, subleases or other agreements under which the Company or any Company Subsidiary, as of the date of this Agreement, leases (as lessee), subleases (as sublessee) or licenses (as licensee) or otherwise uses or occupies or has the right to use or occupy, now or in the future, any real property (such property, collectively, the "Leased Real Property," and such leases, subleases and other agreements, collectively, the "Leases"). With respect to each parcel of Leased Real Property:

(i)    the Company and/or the Company Subsidiaries have and own valid leasehold estates in the Leased Real Property, subject to proper authorization and execution of each Lease by the other parties thereto and the Enforceability Limitations. There are no Liens affecting the Leases, other than Permitted Liens;

(ii)    the Company and the Company Subsidiaries have delivered to Buyer true, correct and complete copies of the Leases, together with any and all modifications thereto and all such Leases are, and shall be, in full force and effect and valid and binding, and enforceable in accordance with their respective terms, subject to proper authorization and execution of each Lease by the other parties thereto and the Enforceability Limitations; and

(iii)    the Company or a Company Subsidiary owns all of the lessee's or tenant's interest under the Leases and has not assigned, pledged or otherwise

28

hypothecated any such interest except as set forth in Section 3.13(d) of the Company Disclosure Schedules.  There are no material defaults under the Leases by the Company or the Company Subsidiaries, or, to the Knowledge of the Company, the lessor or landlord thereunder.  Neither the Company nor any Company Subsidiary has received any written notice alleging any material default under any of the Leases, to the Knowledge of the Company no security deposit or portion thereof deposited with respect to and of the Leases has been applied in respect of a material breach or default under such Lease which has not been replenished and there are no material brokerage or leasing commissions, or any similar charges or commissions, due in connection with any of the Leases which will be binding on the Buyer after Closing, except as accrued for in the Financial Statements.  Except as described on Schedule 3.13(b)(iii)(A) of the Company Disclosure Schedules, the consummation of the transactions provided for herein will not create or constitute a default or event of default under any such lease or require the consent of any other party to any such lease to avoid a default or event of default. Except as described on Schedule 3.13(b)(iii)(B) of the Company Disclosure Schedules, with respect to each Lease, the other party to such lease is not an Affiliate of, or otherwise does not have an economic interest in, the Company or any Company Subsidiary.

(c)     With respect to each parcel of the Owned Real Property and the Leased Real Property (together, the "Company Property"):

(i)     the Company Property is in material compliance with all laws, rules, regulations and ordinances related to the business of the Company and the Company Subsidiaries;

(ii)     to the Knowledge of the Company, the Company and the Company Subsidiaries are in compliance with all Liens, easements, restrictions and other matters of record affecting the Company Property, and the Company and the Company Subsidiaries have not received any written notice alleging any default under any of such Liens, easements, restrictions and other matters of record.  The Company's or any Company Subsidiary's possession and quiet enjoyment of the Leased Real Property under such leases has not been disturbed, and to the Knowledge of the Company, there are no ongoing disputes with respect to such Leases;

(iii)     the Company and the Company Subsidiaries have obtained all material permits and licenses necessary to operate the business currently being conducted on the Company Property.  All such permits and licenses are valid and in full force and effect and the Company and the Company Subsidiaries have paid any fees that are currently due in connection therewith.  The Company and the Company Subsidiaries are not in violation under any of such permits and licenses;

(iv)     neither the Company nor any Company Subsidiary has received written notice of any actual or, to the Knowledge of the Company, threatened, condemnation or eminent domain proceedings, or notice of termination or cancellation or material breach or default that could reasonably be expected to affect any Company Property or any part thereof, and neither of the Company nor any Company Subsidiary

29

has received any written notice of the intention of any Governmental Entity or other Person to take all or any part thereof pursuant to any such proceeding;

(v)     to the Knowledge of the Company, there is no writ, injunction, decree, order or judgment outstanding, nor any action, claim, suit or proceeding pending or threatened, relating to the ownership, lease, use, occupancy or operation by the Company or any Company Subsidiary of the Company Property;

(vi)     except for Permitted Liens, the Leases and the renewal and expansion provisions as set forth in the Leases, neither the Company nor any Company Subsidiary owns, holds, is obligated under or is a party to, any option, right of first refusal or offer or other contractual right to purchase, acquire, sell, assign or dispose of any Company Property or any portion thereof or interest therein;

(vii)     to the Knowledge of the Company, the Company Property (A) is in working order sufficient for its normal operation in the manner currently being operated and without any material structural, physical or mechanical defects, ordinary wear and tear excepted, and (B) is structurally adequate and otherwise suitable in all material respects for the uses in which such property is presently used; and

(viii)     neither the Company nor any of its Company Subsidiaries leases (as lessee), subleases (as sublessee), licenses (as licensee) or occupies any real property or interest therein in connection with, or necessary for, the operation of the Company's business, other than the Company Property and rights and interests appurtenant thereto.

(d)     Section 3.13(d) of the Company Disclosure Schedules contains a complete and accurate list of all of the existing leases, subleases and other agreements pursuant to which the Company or any Company Subsidiary has granted to any Person, other than the Company or any Company Subsidiary, any right to use or occupy, now or in the future, any portion of the Leased Real Property, and, to the Knowledge of the Company, no third party has otherwise granted to any Person, other than the Company or any Company Subsidiary, any right to use or occupy, now or in the future, any portion of the Leased Real Property.

3.14     Tax Matters.

(a)     The Company and each of the Company Subsidiaries (i) have timely filed (taking into account any applicable extensions of time in which to file) all material Tax Returns required to be filed by any of them with any Tax Authority and all such Tax Returns are complete and accurate in all material respects, (ii) have paid all Taxes shown as due on such Tax Returns, (iii) have not incurred any material Liabilities for Taxes since the date of the Reference Balance Sheet other than in the Ordinary Course of Business and (iv) have not executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any material Tax beyond the Closing Date.

(b)     No audit, examination, investigation or other proceeding with respect to any material Taxes of the Company or any Company Subsidiary is presently in progress, pending or threatened in writing.

768801.20-LACSR01A - MSW

(c)      Neither the Company nor any Company Subsidiary is or has been during the applicable period specified in Code Section 897(c)(1)(A)(ii), a "United States real property holding corporation" within the meaning of Code Section 897(c)(2).

(d)      Neither the Company nor any Company Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" (within the meaning of Code Section 355(a)(1)(A)) in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code in the two (2) years prior to the date of this Agreement.

(e)      Neither the Company nor any Company Subsidiary has engaged in a "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

(f)      Neither the Company nor any Company Subsidiary is a member of an affiliated group (within the meaning of Code Section 1504(a)) filing a consolidated federal income tax Return (other than a group the common parent of which is the Company). Neither the Company nor any Company Subsidiary is (i) a party to any material Tax Sharing Agreement, nor does the Company or any Company Subsidiary owe any amount under any such agreement or (ii) liable for any Taxes of any person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee, successor or by Contract.

(g)      Neither the Company nor any Company Subsidiary has received from any Tax Authority any written notice of a material proposed adjustment, deficiency or underpayment with respect to Taxes which has not since been satisfied by payment or been withdrawn.

(h)      No Tax Authority in a jurisdiction where none of the Company and the Company Subsidiaries files Tax Returns has ever made a material written claim that the Company or any Company Subsidiary is subject to taxation by that jurisdiction.

(i)      The Company and each of the Company Subsidiaries have withheld and remitted all material Taxes required to have been withheld and remitted under applicable Law in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder, member or other party.

(j)      The Company and each of the Company Subsidiaries is in full compliance with all material terms and conditions of any Tax exemption, Tax holiday or other Tax reduction agreement or order and the consummation of the transactions contemplated by this Agreement will not have any material adverse effect on the continued validity and effectiveness of any such Tax exemption, Tax holiday or other Tax reduction agreement or order.

The representations and warranties in this <u>Section 3.14</u> may only be relied upon for Pre-Merger Tax Periods and not for any taxable period beginning after the Closing Date. Moreover, no provision of this Agreement (including this <u>Section 3.14</u>) shall be construed as providing a representation or warranty with respect to the existence, amount, expiration date or limitations (or availability of) any Tax attribute of the Company or any Company Subsidiary.

31

3.15    Employee Plans.

(a)    Section 3.15(a) of the Company Disclosure Schedules sets forth a complete and accurate list of each material Employee Plan. As used herein, "Employee Plans" means (i) each "employee benefit plan" (as defined in Section 3(3) of ERISA), and (ii) any other bonus, stock option, stock purchase or other equity or equity-based incentive compensation, retirement health, profit sharing, cash incentive, savings, retirement, supplemental retirement, disability, vacation, deferred compensation, severance, termination, retention, change of control and other similar fringe, welfare or other employee benefit and compensation plan, program, agreement, arrangement or policy which is sponsored, maintained or contributed to, or required to be maintained or contributed to, by the Company or any Company Subsidiary or pursuant to which the Company or any Company Subsidiary could have any Liability, but excluding plans mandated by applicable Law.

(b)    Copies of the following materials have been made available to Buyer with respect to each Employee Plan: (i) all current plan documents, including all amendments thereto, (ii) if applicable, the most recent determination letter or opinion letter from the IRS, (iii) all current summary plan descriptions and (iv) if applicable, the most recent annual report (Form 5500 series) filed with the IRS.

(c)    No Employee Plan is, and neither the Company nor any of its ERISA Affiliates maintains, contributes to or has any obligation to contribute to (1) a "pension plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA or (2) a "multiemployer plan" (as defined in Section 3(37) of ERISA). None of the Employee Plans provide for, and neither the Company nor any Company Subsidiary has incurred any current or projected liability in respect of, retiree life or retiree health coverage for any current or former employee, consultant, independent contractor or director or any beneficiary thereof, except as may be required under Part 6 of the Subtitle B of Title I of ERISA, or similar state Laws.

(d)    Each Employee Plan has been established, maintained, operated and administered, in all material respects, in compliance with its terms and with all applicable Law, including the applicable provisions of ERISA and the Code.

(e)    There are no Actions pending or, to the Knowledge of the Company, threatened on behalf of or against any Employee Plan, the assets of any trust under any Employee Plan, or the plan sponsor, plan administrator or any fiduciary of any Employee Plan with respect to the administration or operation of such plans, other than routine claims for benefits.

(f)    Each Employee Plan that is intended to be "qualified" under Section 401 of the Code may rely on a prototype opinion letter or has received a favorable determination letter from the IRS (or there remains sufficient time for the Company to file an application for such determination letter from the IRS) and nothing has occurred since the date of the letter that would reasonably be expected to adversely affect such qualification or exemption.

(g)    Except as contemplated by this Agreement or as set forth on Section 3.15(g) of the Company Disclosure Schedule, neither the execution or delivery of this

32

Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with any other event, (i) result in any severance payment, benefit or other payment becoming due or payable, or required to be provided, to, or result in the increase in compensation of, any current or former director, officer, employee or independent contractor of the Company or any Company Subsidiary, (ii) increase the amount of any benefit or compensation otherwise payable or required to be provided to any such current or former director, officer, employee or independent contractor, (iii) result in the acceleration of the time of payment, vesting or funding (through a grantor trust or otherwise) of any such benefit or compensation or (iv) create any limitation or restriction on the right of the Company or any Company Subsidiary to merge, amend or terminate any Employee Plan.

(h)     No amount that could be received (whether in cash or property or the vesting of property) as a result of any of the transactions contemplated by this Agreement, either alone or in combination with any other event, by any employee, officer or director of the Company or any Company Subsidiary who is a "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) could reasonably be expected to be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code).

(i)     No "leased employee," as that term is defined in Section 414(n) of the Code, performs services for the Company or any ERISA Affiliate.  No person who has been classified by the Company or any of its subsidiaries as an independent contractor, consultant, or in any other non-employee classification (each, a "Contingent Worker") is eligible to participate in, nor does such person participate in, any Employee Plan subject to ERISA or any plan described in Section 423 of the Code and, to the Knowledge of the Company, no facts exist that would reasonably be expected to cause a reclassification of a Contingent Worker as a common law employee of the Company or any of its subsidiaries resulting in retroactive participation in any Employee Plan.

3.16     Labor Matters.

(a)     (i) Neither the Company nor any Company Subsidiary is a party to or bound by any collective bargaining agreement, labor union contract, works council or trade union agreement, other agreement with any group of employees (not including any Employee Plan), or other similar agreement (each a "Collective Bargaining Agreement"), (ii) no employees of the Company or any Company Subsidiary are represented by any labor union, labor organization or works council with respect to their employment with the Company or any Company Subsidiary, (iii) to the Knowledge of the Company, there are no activities or proceedings of any labor or trade union to organize any employees of the Company or any Company Subsidiary, (iv) no Collective Bargaining Agreement is being negotiated by the Company or any Company Subsidiary and (v) there is no unfair labor practice charge, material grievance, material arbitration, strike, lockout, slowdown, or work stoppage against or affecting the Company or any Company Subsidiary pending or, to the Knowledge of the Company, threatened.

(b)     The Company and the Company Subsidiaries have complied, in all material respects, with applicable Laws and Orders from any Governmental Entity with respect to employment and employment practices (including, without limitation, applicable Laws

33

regarding wage and hour requirements, immigration status, discrimination in employment, equal opportunity, plant closures and layoff, affirmative action, workers' compensation, employee leave, unemployment insurance, employee health and safety and collective bargaining).

(c)     The Company and the Company Subsidiaries have not received since December 31, 2013 (i) written notice of any unfair labor practice charge or complaint pending or threatened before the National Labor Relations Board or any other Governmental Entity against them, (ii) written notice of any charge or complaint with respect to or relating to them pending before the Equal Employment Opportunity Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices, (iii) written notice of the intent of any Governmental Entity responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health laws to conduct an investigation with respect to or relating to them or notice that such investigation is in progress or (iv) written notice of any material Action pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any applicable law governing employment or the termination thereof or other discriminatory, wrongful or tortious conduct in connection with the employment relationship.

(d)     To the Knowledge of the Company and the Company Subsidiaries, no employee of the Company or any Company Subsidiary at the level of vice president or above is in any material respect in violation of any material term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation:  (i) to the Company or any Company Subsidiary or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by the Company or any Company Subsidiary or (B) to the knowledge or use of trade secrets or proprietary information.

(e)     Since December 31, 2013, neither the Company nor any Company Subsidiary has taken any action which would constitute a "plant closing" or "mass layoff" within the meaning of the Worker Adjustment and Retraining Notification Act or any similar foreign, state or local applicable Law (the "WARN Act"), issued any notification of a plant closing or mass layoff required by the WARN Act, or incurred any liability or obligation under the WARN Act that remains unsatisfied.

(f)     The Company is not and has not been: (i) a "contractor" or "subcontractor" (as defined by Executive Order 11246), (ii) required to comply with Executive Order 11246 or (iii) required to maintain an affirmative action plan.

(g)     To the Knowledge of the Company and the Company Subsidiaries, (i) the manufacturers, contractors and subcontractors engaged in the manufacturing of products for the Company and the Company Subsidiaries ("Manufacturers") are in compliance with all applicable laws respecting employment and employment practices, (ii) their Manufacturers do not utilize forced labor, prison labor, convict labor, indentured labor, child labor, corporal punishment or other forms of mental or physical coercion in connection with the manufacture of the products for the Company and the Company Subsidiaries, and (iii) no complaint, claim, lawsuit or charge has been made against any Manufacturers that could result in liability to the Company or the

34

Company Subsidiaries, in each case except as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(h)　　The Company has provided to Buyer a true and complete schedule identifying the chief executive officer, each executive who reports to the chief executive officer and each employee in the position of director, senior director and vice president, including for each such employee, the current base salary or wage rate, as applicable, and bonus and other cash incentive opportunity.

(i)　　The Company acknowledges and covenants that each of the individuals listed on Schedule 6.6(g)(i) of the Company Disclosure Schedule is employed by, and performs services exclusively for, Inscape as of the date of this Agreement.

3.17　Compliance with Laws.

(a)　　Each of the Company and each of the Company Subsidiaries is and at all times since December 31, 2013 has been in compliance with all Laws and Orders applicable to the Company and the Company Subsidiaries. No representation or warranty is made in this Section 3.17(a) with respect to (i) compliance with the Securities Act, (ii) Intellectual Property and related matters, which are covered solely in Section 3.12, (iii) applicable Laws with respect to Taxes, which are covered solely in Section 3.14, (iv) ERISA and other employee benefit-related matters, which are covered solely in Section 3.15, (v) labor Law matters, which are covered solely in Section 3.15(h), (vi) Environmental Laws, which are covered solely in Section 3.18 or (vii) Privacy, which is covered solely in Section 3.27.

(b)　　Neither the Company nor any Company Subsidiary has since December 31, 2012 received any written notice from any Governmental Entity alleging any material violation by the Company or any Company Subsidiary of any applicable Law or Order that is material to the Company and the Company Subsidiaries and that remains outstanding or unresolved as of the date of this Agreement. To the Knowledge of the Company, no investigation by any Governmental Entity of the Company or any Company Subsidiary is pending or threatened which would or would reasonably be expected to be material to the Company and the Company Subsidiaries taken as a whole.

3.18　Environmental Matters.

(a)　　The Company and each of the Company Subsidiaries are now and have been in compliance in all material respects with all applicable Environmental Laws, and possess and are now and at all times since December 31, 2013 have been, in all respects, in material compliance with all applicable permits, licenses, registrations, notices and other authorizations required under applicable Environmental Laws.

(b)　　Neither the Company nor any Company Subsidiary has transported, produced, processed, manufactured, generated, used, treated, handled, stored, released, recycled, disposed of, or otherwise managed any Hazardous Substances, except in compliance, in all material respects, with applicable Environmental Laws, or in any manner that would give rise to material liability under applicable Environmental Laws.

35

768801.20-LACSR01A - MSW

(c)     Neither the Company nor any Company Subsidiary has exposed any employee or any third party to Hazardous Substances in violation of, or in any manner that would give rise to material liability under, any Environmental Law.

(d)     Neither the Company nor any Company Subsidiary has received from a Governmental Entity any written, or, to the Knowledge of the Company, oral, notification alleging that it is materially liable for any Release or threatened Release of Hazardous Materials at any location, except with respect to any such notification concerning any such Release or threatened Release which has been fully resolved with the appropriate foreign, federal, state or local regulatory authority or otherwise entails no ongoing material corrective action, liability or obligation on the part of the Company or any Company Subsidiary.

(e)     There are no material Environmental Claims pending or, to the Knowledge of the Company, threatened, against the Company or the Company Subsidiaries or otherwise relating to the Company's or the Company Subsidiaries' activities or operations.

(f)     There are no actions, activities, circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Substances, which would be reasonably likely to form the basis of any material Environmental Claim against the Company, any of the Company Subsidiaries, or, to the Knowledge of the Company, against any Person whose liability for such Environmental Claims the Company or any of its Subsidiaries has or may have retained or assumed either contractually or by operation of law.

(g)     The Company has delivered or otherwise made available for inspection true, complete and correct copies and results of any material reports, data, investigations, audits, assessments (including Phase I environmental site assessments and Phase II environmental site assessments) studies, analyses, tests or monitoring in the possession of or reasonably available to the Company or any of its Subsidiaries pertaining to: (i) any unresolved Environmental Claims; (ii) any Hazardous Substances in, on, beneath or adjacent to any property currently or formerly owned, operated or leased by the Company or any of its Subsidiaries; or (iii) the Company's or any of its Subsidiaries' compliance with applicable Environmental Laws.

3.19    Litigation.  Except as disclosed in Section 3.19 of the Company Disclosure Schedules, as of the date hereof, there are no Actions pending or, to the Knowledge of the Company, threatened against the Company or any Company Subsidiary, in either case, (i) which would, individually or in the aggregate, be material to the Company or any Company Subsidiary, (ii) which question or challenge (A) the validity of this Agreement or (B) the right of the Company to enter into this Agreement, (iii) which may have the effect of preventing delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement or (iv) could result in any change in the current equity ownership of the Company. Neither the Company nor any Company Subsidiary is subject to any outstanding Order from any Governmental Entity. To the Knowledge of the Company, no officer or other key employee of the Company or any Company Subsidiary is subject to any Order that prohibits such individual from engaging or continuing any conduct, activity or practice relating to the business of the Company or any of the Company Subsidiaries.

36

3.20    Insurance.  Section 3.20 of the Company Disclosure Schedules sets forth a true and complete list of all material Insurance Policies in effect on the date of this Agreement maintained by the Company or any Company Subsidiary, together with the aggregate amount of claims paid out and claims pending under each such Insurance Policy. All such Insurance Policies are in full force and effect, no notice of cancellation has been received, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default, by any insured thereunder, except for such defaults that would not have, individually or in the aggregate, a Company Material Adverse Effect. As of the date of this Agreement, there is no material claim pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies and there has been no threatened termination of, or material premium increase with respect to, any such policies.

3.21    Related Party Transactions.

(a)    Except as set forth in Section 3.21(a) of the Company Disclosure Schedule, there are no loans, leases, customer or supplier arrangements or agreements or any other transactions between the Company and any of the Company Subsidiaries or any of their respective Affiliates, officers or directors, other than any Employee Plan. Except as set forth in Section 3.21(a) of the Company Disclosure Schedule, none of the officers or directors or, to the Knowledge of the Company, the employees of the Company or any of the Company Subsidiaries, owns directly or indirectly, individually or collectively, a material interest in any Person that is a material competitor, lessor, lessee, customer or supplier of (or has any material existing contractual relationship with) the Company or any of the Company Subsidiaries or which conducts a business substantially similar to any business conducted by the Company or any of the Company Subsidiaries.

(b)    Except as set forth in Section 3.21(b) of the Company Disclosure Schedule, or pursuant to any Employee Plan, no stockholder, officer, director, manager, member or Affiliate of the Company or any of the Company Subsidiaries (i) owns or holds, directly or indirectly, in whole or in part, any material Company Intellectual Property, (ii) has any material claim, charge, action or cause of action against the Company or any of the Company Subsidiaries, except for claims for reasonable unreimbursed travel or entertainment expenses, accrued vacation pay or accrued benefits under any employee benefit plan existing on the date of this Agreement, (iii) has made, on behalf of the Company or any of the Company Subsidiaries, any material payment or commitment to pay any commission, fee or other amount to, or to purchase or obtain or otherwise contract to purchase or obtain any goods or services from, any other Person of which any shareholder, officer, director or Affiliate of the Company or any of the Company Subsidiaries (or, to the Knowledge of the Company, a relative of any of the foregoing) is a partner or shareholder, (iv) owes any material money to the Company or any of the Company Subsidiaries or (v) has any material interest in any property, real or personal, tangible or intangible, used in or pertaining to the business of the Company or any of the Company Subsidiaries.

(c)    Except as set forth in Section 3.21(c) of the Company Disclosure Schedule, or pursuant to any Employee Plan, none of the Company or any of the Company Subsidiaries has any material outstanding contracts with any of its stockholders, directors or officers that are not cancelable by it on notice of no longer than thirty (30) days and without

37

liability, penalty or premium, or any agreement or arrangement providing for the payment of any bonus or commission based on sales or earnings.

(d)    Except for any Employee Plan, all material transactions of the Company or any of the Company Subsidiaries with any of their respective Affiliates, officers, directors or stockholders since December 31, 2013 have been conducted on an arm's-length basis. All material transactions since December 31, 2013 between the Company or any of the Company Subsidiaries, on the one hand, and any current or former shareholder or any entity in which the Company or any of the Company Subsidiaries or any current or former shareholder had or has a direct or indirect interest, on the other hand, have been on terms comparable to those that would have prevailed in an arm's-length transaction.

3.22    Significant Customers and Suppliers.  Section 3.22(a) of the Company Disclosure Schedule lists the top ten (10) customers of the Company and Company Subsidiaries taken together, as measured by the aggregate amount of revenue by the Company and Company Subsidiaries on a consolidated basis for the year ended December 31, 2015 (the "Significant Customers").   Section 3.22(b) of the Company Disclosure Schedule lists the top ten (10) suppliers of the Company and Company Subsidiaries taken together, as measured by the aggregate amount of payments made to such Persons during the year ended December 31, 2015 (the "Significant Suppliers").  Since December 31, 2013, no Significant Customer or Significant Supplier has ceased its relationship with the Company or any Company Subsidiary or, to the Knowledge of the Company, has threatened to cease such relationship.  Except as described in Section 3.22(c) of the Company Disclosure Schedule, to the Knowledge of the Company, no Significant Customer or Significant Supplier is in the process of materially altering or is threatening to materially alter its relationship with the Company or any Company Subsidiary except for such actions undertaken in the ordinary course of business.

3.23    National Security. (a) Neither the Company nor any Company Subsidiary manufactures or exports any technology, products, technical data or any other material that is (i) subject to the United States International Traffic in Arms Regulations, or (ii) otherwise prohibited from being exported to China under the Export Administration Regulations, (b) neither the Company nor any Company Subsidiary has received, directly or indirectly, grants or similar funds relating to research or development from any U.S. federal Governmental Entity during the past five years, (c) (i) neither the Company nor any Company Subsidiary is, and for the three years prior to the date of the Agreement, neither the Company nor any Company Subsidiary has been, a party to any unclassified customer or supply Contract with any U.S. federal Governmental Entity as a prime contractor (each, a "Government Contract") and (ii) neither the Company nor any Company Subsidiary has, for the five years prior to the date of the Agreement, entered into any Government Contract with respect to a classified program, (d) during the three (3) years prior to the date of this Agreement neither the Company nor any Company Subsidiary has received or placed any priority contracts or orders under the Defense Priorities and Allocations System and (e) neither the Company nor any Company Subsidiary stores information that is classified for national security purposes under Executive Order 13256 (or similar Law).

3.24    Brokers.  Except for Merrill Lynch, Pierce, Fenner & Smith Incorporated there is no financial advisor, investment banker, broker, finder, agent or other Person that has been

retained by or is authorized to act on behalf of the Company or any Company Subsidiary who is entitled to any financial advisors, investment banking, brokerage, finder's or other similar fee or commission payable upon the consummation of the transactions contemplated by this Agreement.

3.25    Propriety of Payments.    Neither the Company nor any of the Company Subsidiaries, nor, to the Knowledge of the Company, any director, officer, employee, representative or agent of the Company or any of the Company Subsidiaries, or any other Person acting for or on behalf of the Company or any of the Company Subsidiaries, in each case, that is an Equityholder, nor, to the Knowledge of the Company, any other director, officer, employee, representative or agent of the Company or any of the Company Subsidiaries, or any other Person acting for or on behalf of the Company or any of the Company Subsidiaries, is in violation of, has violated, or, to the Knowledge of the Company, is under investigation with respect to or has been threatened to be charged with or given notice of any violation of, any applicable anti-corruption laws, including, without limitation, the U.S. Foreign Corrupt Practices Act.    Neither the Company nor any of the Company Subsidiaries or, to the Knowledge of the Company, any current director, officer, agent, employee or other Person acting on behalf of the Company or any of the Company Subsidiaries, has accepted or received any unlawful contribution, payment, gift, kickback, expenditure or other item of value.

3.26    Bank Accounts.    Section 3.26 of the Company Disclosure Schedule sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which the Company and the Company Subsidiaries maintain safe deposit boxes, checking accounts or other accounts of any nature and the names of all Persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

3.27    Privacy.

(a)    Section 3.27(a) of the Company Disclosure Schedules identifies all categories of Personally Identifiable Information collected by any televisions or home theatre displays manufactured by or for the Company or any Company Subsidiary. The Company and each Company Subsidiary has complied in all material respects with all applicable laws, contractual obligations, and the Company's privacy policies relating to the collection, storage, use, transfer and any other processing of any Personally Identifiable Information whether collected or used by the Company or any Company Subsidiary in any manner or maintained by third parties having authorized access to such information on behalf of the Company or any Company Subsidiary. The execution, delivery and performance of this Agreement comply with the Company's privacy policies. Copies of all current and prior privacy policies of the Company that apply to the Company products were provided to Buyer. Each such privacy policy and all materials distributed or marketed by the Company have made all material disclosures to users or customers required by then current applicable laws regulating the collection or use of Personally Identifiable Information and none of such disclosures made or contained in any such privacy policy or in any such materials has been deceptive, inaccurate, misleading or violative of any then-current applicable laws.

(b)    The Company and each Company Subsidiary has at all times taken commercially reasonable steps (including with respect to technical and physical security) to

39

protect all Personally Identifiable Information against loss and against unauthorized access, use, modification, disclosure or other misuse. To the Knowledge of the Company, there has been no material unauthorized access to or misuse of Personally Identifiable Information.

(c)     The Company and each Company Subsidiary has taken commercially reasonable steps to protect the information technology systems used in connection with the operation of the Company and the Company Subsidiaries. The Company and the Company Subsidiaries have commercially reasonable disaster recovery and security plans, procedures and facilities for the business of the Company and the Company Subsidiaries. There have been no material unauthorized intrusions or breaches of the security of such information technology systems.

3.28    No Other Representations. Except for the representations contained in this Agreement or in any other Transaction Document, the Company makes no express or implied representation or warranty in respect of or on behalf of the Company, and the Company disclaims any such representation or warranty, whether by the Company or any of its officers, directors, employees agents or representatives or any other Person, with respect to the execution and delivery of this Agreement or any other Transaction Document or the consummation of the transactions contemplated hereby and thereby, notwithstanding the delivery or disclosure to Buyer or Merger Sub or any of their officers, directors, employees, agents or representatives or any other Person of any documentation or other information with respect to the foregoing.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB

Each of Buyer and Merger Sub represents and warrants to the Company as follows as of the date of this Agreement and as of the Effective Time:

4.1     Organization; Good Standing. Buyer is duly organized and validly existing under the Laws of the Cayman Islands, and has the requisite power and authority to conduct its business as it is presently being conducted and to own, lease or operate its properties and assets. Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of California, and has the requisite corporate power and authority to conduct its business as it is presently being conducted and to own, lease or operate its respective properties and assets. Neither Buyer nor Merger Sub is in violation of its respective organizational documents. Le V Inc. ("MidCo") is duly organized and validly existing under the Laws of California, is an entity treated as a corporation for U.S. federal income Tax purposes, is a direct wholly owned subsidiary of Buyer. Merger Sub is a direct wholly owned subsidiary of MidCo.

4.2     Corporate Power; Enforceability. Each of Buyer and Merger Sub has the requisite power and authority to execute and deliver this Agreement, to perform their respective covenants and obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer and Merger Sub of this Agreement, the performance by Buyer and Merger Sub of their respective covenants and obligations hereunder and the consummation by Buyer and Merger Sub of the transactions contemplated hereby, have been duly authorized by all necessary action on the part of Buyer and Merger Sub, and no additional

40

proceedings on the part of Buyer or Merger Sub are necessary to authorize the execution and delivery by Buyer and Merger Sub of this Agreement, the performance by Buyer and Merger Sub of their respective covenants and obligations hereunder or the consummation by Buyer and Merger Sub of the transactions contemplated hereby. This Agreement has been duly executed and delivered by each of Buyer and Merger Sub and, assuming the due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of each of Buyer and Merger Sub, enforceable against each in accordance with its terms, subject to the Enforceability Limitations.

4.3     Non-Contravention.  The execution and delivery by Buyer and Merger Sub of this Agreement, the performance by Buyer and Merger Sub of their respective covenants and obligations hereunder and the consummation by Buyer and Merger Sub of the transactions contemplated hereby, do not and will not (a) violate or conflict with any provision of the certificates of incorporation, bylaws or other organizational documents of Buyer or Merger Sub, (b) violate, conflict with, or result in the breach of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Buyer or Merger Sub is a party or by which Buyer, Merger Sub or any of their respective properties or assets may be bound, (c) assuming the Consents referred to in Section 4.4 are obtained or made, violate or conflict with any Law or Order applicable to Buyer or Merger Sub or by which any of their respective properties or assets are bound or (d) result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of Buyer or Merger Sub, except in the case of each of clauses (b), (c) and (d) above, for such violations, conflicts, defaults, terminations, accelerations or Liens which would not, individually or in the aggregate, prevent or materially delay the consummation by Buyer or Merger Sub of the transactions contemplated hereby, or the performance by Buyer or Merger Sub of their respective covenants and obligations hereunder.

4.4     Governmental Consents and Approvals.   No Consent to or from any Governmental Entity is required on the part of the Buyer, Merger Sub or any of their Affiliates in connection with the execution and delivery by Buyer and Merger Sub of this Agreement, the performance by Buyer and Merger Sub of their respective covenants and obligations hereunder and the consummation by Buyer and Merger Sub of the transactions contemplated hereby, except:

(a)     the filing and recordation of the Agreement of Merger with the Secretary of State of the State of California and such filings with Governmental Entities to satisfy the applicable Laws of states in which the Company and the Company Subsidiaries are qualified to do business;

(b)     Consents required under, and compliance with any other applicable requirements of, the HSR Act and any other applicable Antitrust Laws;

(c)     the submission of (i) the Joint Notice pursuant to FINSA and (ii) the CFIUS Clearance;

41

(d)     the filings and registrations with, and approvals by, PRC Governmental Entities (including, without limitation, the designated foreign exchange banks in China that are authorized and supervised by SAFE in connection with the transactions contemplated hereby, but solely to the extent of such authorization and supervision and excluding any other capacity in which such banks act) required to obtain the PRC Overseas Investment Approvals with respect to the transactions contemplated hereby;

(e)     the Taiwan Approvals; and

(f)     such other Consents, the failure of which to obtain would not be reasonably expected to prevent or materially impair or materially delay the consummation of the transactions contemplated hereby.

4.5     <u>Litigation</u>.    There are no Actions pending or, to the knowledge of Buyer, threatened against or affecting Buyer or Merger Sub or any of their respective properties that would, individually or in the aggregate, prevent or materially delay the consummation by Buyer or Merger Sub of the transactions contemplated hereby or the performance by Buyer or Merger Sub of their respective covenants and obligations hereunder. Neither Buyer nor Merger Sub is subject to any outstanding Order that would, individually or in the aggregate, prevent or materially delay the consummation by Buyer or Merger Sub of the transactions contemplated hereby or the performance by Buyer or Merger Sub of their respective covenants and obligations hereunder.

4.6     <u>Brokers</u>.    No agent, broker, finder or investment banker is entitled to, or will become entitled to any financial advisors, investment banking, brokerage, finder's or other similar fee or commission payable upon the consummation of the transactions contemplated by this Agreement.

4.7     <u>Operations of Merger Sub</u>.    Merger Sub has been formed solely for the purpose of engaging in the transactions contemplated hereby and, prior to the Effective Time, Merger Sub will not have engaged in any other business activities and will have incurred no liabilities or obligations other than as contemplated by this Agreement.

4.8     <u>Solvency</u>.    Neither Buyer nor Merger Sub is entering into the transactions contemplated by this Agreement with the actual intent to hinder, delay or defraud either present or future creditors of Buyer, Merger Sub, the Company or any of their respective Affiliates. Assuming the accuracy of the representations and warranties of the Company contained herein and the performance by the Company of its obligations hereunder, each of Buyer and the Surviving Corporation will, after giving effect to all of the transactions contemplated by this Agreement, the payment of the aggregate Merger Consideration, the payment of all other amounts required to be paid in connection with the consummation of the transactions contemplated by this Agreement and the payment of all related fees and expenses, be Solvent at the Effective Time. As used in this <u>Section 4.8</u>, the term "Solvent" means, with respect to a particular date, that on such date, (a) the sum of the assets, at a fair valuation, of Buyer and Merger Sub and their subsidiaries (on a consolidated basis) will exceed their debts (on a consolidated basis), (b) Buyer and Merger Sub and their subsidiaries (on a consolidated basis) have not incurred and neither Buyer nor Merger Sub intends to incur debts beyond their ability to

pay such debts as such debts mature and (c) Buyer and Merger Sub and their subsidiaries (on a consolidated basis) will not have an unreasonably small amount of capital with which to conduct their business.  For purposes of this definition, "not have an unreasonably small amount of capital with which to conduct their business" means that Buyer and Merger Sub and their subsidiaries (on a consolidated basis) will be able to generate enough cash from operations, asset dispositions or refinancing, or a combination thereof, to meet their probable obligations as they come due.

4.9     Sufficiency of Funds.   Assuming the accuracy of the representations and warranties in Article III to the extent necessary to satisfy the condition in Section 7.2(a) and performance by the Company of its obligations under this Agreement, Buyer and Merger Sub, at the Closing, shall have available sufficient cash on hand, together with committed Financing (as defined below), to consummate the Merger and the other transactions contemplated by this Agreement, and to perform their respective obligations under this Agreement.

4.10    Financing.

(a)     Buyer has delivered to the Company true, correct and complete copies of each of the executed equity commitment letters, dated as of or prior to the date hereof (collectively, the "Equity Commitment Letters") from each of Leshi Holdings (Beijing) Co. Ltd., Shenzen Leshi Xingen M&A Fund Management Co. Ltd., Shanghai Yuetong Equity Investment Partnership Enterprise and China Everwin Asset Management Co., Ltd. (each, an "Equity Financing Source"), pursuant to which, and subject only to the terms and conditions contained therein, each Equity Financing Source has committed to invest, or cause to be invested, the amounts set forth therein (the "Equity Financing").

(b)     As of the date of this Agreement, (i) the Equity Commitment Letters are in full force and effect and have not been withdrawn or terminated, or otherwise amended or modified in any respect, and no provision thereof has been waived, and (ii) each of the Equity Commitment Letters, in the form so delivered, is a legal, valid and binding obligation of Buyer or LeEco Global Group Ltd., a company organized under the laws of the Cayman Islands ("Parent"), as applicable, and, to the Knowledge of Buyer, the other parties thereto, enforceable in accordance with its terms, subject to the Enforceability Limitations. As of the date of this Agreement, there are no other agreements, side letters, or arrangements to which Buyer or any of its Affiliates is a party relating to the Equity Commitment Letters that would affect the amount, availability or conditionality of the Equity Financing. As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of Parent, Buyer or Merger Sub, as applicable, under any term or condition of the Commitment Letters or, to the Knowledge of Buyer, assuming satisfaction of the conditions in Section 7.1 and Section 7.2 would (x) result in any of the conditions in the Equity Commitment Letters not being satisfied or (y) otherwise result in the Equity Financing not being available. As of the date of this Agreement, no Equity Financing Source has notified Buyer or Parent of its intention to terminate any of the Equity Commitment Letters or not to provide the Equity Financing. Assuming satisfaction of the conditions in Section 7.1 and Section 7.2, as of the date of this Agreement, Buyer has no reason to believe that it will be unable to satisfy, on a timely basis, any condition to Closing to be satisfied by it contained in the Equity Commitment Letters or that the full amounts committed pursuant to the Equity Commitment Letters will not

be available as of the Closing if the conditions to closing to be satisfied by it contained in the Equity Commitment Letters are satisfied.

4.11    Non-Reliance. In connection with the due diligence investigation of the Company by Buyer and Merger Sub and their respective Affiliates, stockholders, directors, officers, employees, agents, representatives or advisors, Buyer and Merger Sub and their respective Affiliates, stockholders, directors, officers, employees, agents, representatives and advisors have received at their request and may continue to receive after the date hereof (including pursuant to Section 5.2) from the Company and its Affiliates, stockholders, directors, officers, employees, agents, representatives and advisors certain estimates, projections, forecasts and other forward-looking information, as well as certain business plan information, regarding the Company and its business and operations. Buyer and Merger Sub hereby acknowledge that there are uncertainties inherent in attempting to make such estimates, projections, forecasts and other forward-looking statements, as well as in such business plans, and that Buyer and Merger Sub are making their own evaluation of the adequacy and accuracy of all estimates, projections, forecasts and other forward-looking information, as well as such business plans, so furnished to them (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, forward-looking information or business plans). Accordingly, Buyer and Merger Sub hereby acknowledge and agree that none of the Company or any of the Company Subsidiaries, nor any of their respective Affiliates, stockholders, directors, officers, employees, agents, representatives or advisors, nor any other Person, has made or is making any express or implied representation or warranty with respect to such estimates, projections, forecasts, forward-looking statements or business plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, forward-looking statements or business plans), unless any information contained in such estimates, projections, forecasts, plans or budgets is also expressly contained in any of the representations and warranties of the Company set forth in this Agreement.

4.12    No Other Representations.   Except for the representations contained in this Agreement or in any other Transaction Document, Buyer and Merger Sub make no express or implied representation or warranty in respect of or on behalf of Buyer or Merger Sub, and Buyer and Merger Sub disclaim any such representation or warranty, whether by Buyer, Merger Sub or any of their respective officers, directors, employees agents or representatives or any other Person, with respect to the execution and delivery of this Agreement or any other Transaction Document or the consummation of the transactions contemplated hereby and thereby, notwithstanding the delivery or disclosure to the Company or any of their officers, directors, employees, agents or representatives or any other Person of any documentation or other information with respect to the foregoing.

ARTICLE V
PRE-MERGER COVENANTS

5.1    Conduct of Business by the Company.  From the date of this Agreement until the Effective Time, unless Buyer and Merger Sub otherwise agree in writing or are expressly permitted by any other provision of this Agreement, the Company will, and will cause each Company Subsidiary to (i) conduct its businesses and operations in the Ordinary Course of Business; and (ii) to use its commercially reasonable efforts to preserve intact its corporate or organizational existence, as applicable, and business organization and to use its commercially

44

reasonable efforts to preserve, in all material respects, the goodwill and present business relationships (contractual or otherwise) with all material customers, suppliers, licensors and distributors. Without limiting the foregoing, and as an extension thereof, except as set forth on Schedule 5.1 or as expressly permitted by any other provision of this Agreement, the Company will not, and will cause each Company Subsidiary not to, from the date of this Agreement until the Effective Time, directly or indirectly, do, or agree to do, any of the following without the prior written consent of Buyer and Merger Sub (which consent shall not be unreasonably withheld):

(a)      sell, lease, license (as licensor), assign, dispose of or transfer (except to a wholly owned Company Subsidiary) any of its assets (whether tangible or intangible), including, without limitation, the Company Property and the Company Intellectual Property, except for (A) retirement of assets, sales of retired assets for salvage value, and the trade-in of vehicles, in each case in the Ordinary Course of Business and consistent with past practice, (B) sales of inventory in the Ordinary Course of Business and (C) sales of other assets not in excess of $1,500,000 individually or $3,000,000 in the aggregate;

(b)      mortgage, pledge, encumber or subject to any Lien any portion of its properties or assets, other than Permitted Liens;

(c)      acquire any ownership interest in any real property;

(d)      except as mandated or required by any Governmental Entity or applicable Law, commit to make or authorize any capital expenditure in excess of $1,500,000 individual and $3,000,000 in the aggregate;

(e)      acquire (including, without limitation, by merger, consolidation or acquisition of stock or assets) any interest in any Person or any division thereof or any assets, other than acquisitions of assets in the Ordinary Course of Business consistent with past practice and any other acquisitions for consideration that are individually not in excess of $1,500,000 individually or $3,000,000 in the aggregate;

(f)      (A) incur any single liability or obligation, or enter into any commitment or transaction, in excess of $5,000,000, or incur any liabilities or obligations, or enter into any commitments or transactions in excess of $10,000,000 in the aggregate, or pay, satisfy, or discharge any obligation (whether absolute, accrued, contingent or otherwise) except, in each case, in the Ordinary Course of Business and consistent with past practice; (B) modify the terms of any Indebtedness or other liability, or permit any modification, release or waiver of any guaranty of such Indebtedness or other liability, whether or not such guaranty is provided by the Company or a Subsidiary or any Affiliate or shareholder thereof, other than with respect to liabilities (other than Indebtedness) in the ordinary course of business consistent with past practice; provided that no such action set forth in clause (B) with respect to liabilities shall be permitted if after giving effect to such action, such Indebtedness or liability would not be permitted to be incurred under clause (A) above; (C) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person; or (D) enter into any "keep well" or other agreement to maintain the financial statement condition of any Person;

(g)    amend, modify, accelerate or terminate any Material Contract, or enter into any Contract that would be a Material Contract had it been entered into as of the date of this Agreement, except in each case in the Ordinary Course of Business;

(h)    issue, sell, pledge, dispose of, grant, encumber, transfer or authorize the issuance, sale, pledge, disposition, grant, encumbrance or transfer of, any equity securities, including restricted stock awards, securities convertible, exchangeable or exercisable into equity securities, or warrants, options or other rights to acquire equity securities, of the Company or any Company Subsidiary other than (1) issuance of shares of Class A Common Stock resulting from the exercise of Options or the vesting of Restricted Stock awards outstanding on the date of this Agreement and (2) grants of Restricted Stock awards covering up to 30,000 shares of Class A Common Stock in the aggregate in connection with new hires and promotions in the Ordinary Course of Business, consistent with past practice;

(i)    declare, set aside, or distribute any dividend or other distribution (whether payable in cash, stock, property or a combination thereof) with respect to any of its capital stock (or other equity securities), or enter into any agreement with respect to the voting of its capital stock (or other equity securities) except for a distribution made from a wholly-owned Company Subsidiary to the Company or another wholly-owned Company Subsidiary;

(j)    reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock (or other equity securities) except for repurchases of Options or Restricted Stock to satisfy the exercise price therefor or the Taxes payable thereon;

(k)    waive, release, assign, settle or compromise any material rights or claims, or any material Action, except in the Ordinary Course of Business consistent with past practice;

(l)    other than pursuant to the terms of this Agreement or as required by any applicable Law or the terms of any Employee Plan in effect on the date hereof (i) increase or accelerate the vesting or payment of any form of compensation or benefits payable or to become payable to any director, officer or other employee of the Company or any Company Subsidiary; (ii) grant any rights to severance or termination pay to, or enter into any severance, change-in-control or other similar agreement with, any director, officer or other employee of the Company or any Company Subsidiary; (iii) hire, engage, change the classification or status of or fire any employee, consultant, director or service provider (except for non-executive employees hired or fired in the Ordinary Course of Business); or (iv) establish, adopt, enter into, amend, modify or terminate any Employee Plan except as required by applicable Law;

(m)    unless required by applicable Law, (i) enter into any labor agreement or Collective Bargaining Agreement or (ii) recognize or certify any labor union or labor organization as the collective bargaining representative for any employees of the Company or the Company Subsidiaries;

(n)    make loans or advances to, guarantees for the benefit of, capital contributions to, or any investments in, (i) any employee of the Company or any Company Subsidiary or (ii) any Person other than such an employee in excess of $500,000 in the

aggregate, excluding intercompany loans or advances between the Company and any Company Subsidiary;

(o)      enter into any agreements or transactions with any Affiliates of the Company or make any payment to such Affiliates outside of the Ordinary Course of Business;

(p)      make any change in accounting policies, practices, principles, methods or procedures, other than as required by GAAP or by a Governmental Entity;

(q)      except as required by Law (i) make, change or revoke any material Tax election; (ii) enter into any closing agreement affecting any material Tax liability or refund; (iii) settle or compromise any material Liability for Taxes or any material claim for Tax refunds; (iv) file any amended Tax Return; (v) enter into any Tax Sharing Agreement; or (vi) consent to any extension or waiver of the statute of limitations period applicable to any material Tax claim or assessment;

(r)      take any action for the winding up, liquidation, dissolution or reorganization of the Company or any Company Subsidiary or for the appointment of a receiver, administrator or administrative receiver, trustee or similar officer of its assets or revenues;

(s)      amend the Company's or any Company Subsidiary's charter documents, bylaws or similar governing documents;

(t)      fail to keep in force any Insurance Policies or, upon the expiration or termination of such Insurance Policies, replacement or revised policies providing insurance coverage with respect to the assets, operations and activities of the Company and each Company Subsidiary as are currently in effect; or

(u)      agree or commit to do any of the foregoing.

5.2      Access to Information. From the date of this Agreement until the Effective Time, the Company will use its commercially reasonable efforts, and will cause each Company Subsidiary to use their commercially reasonable efforts to (a) give Buyer, Merger Sub and their Affiliates, counsel, financial advisors, auditors, employees, agents and other representatives, and their Debt Financing Sources and their representatives, reasonable access on reasonable notice during normal business hours to all material properties, facilities and offices and true, correct and complete copies of books, records and Contracts (including customer and supplier Contracts) and such financial and operating data and other information with respect to the Company and each Company Subsidiary as such persons may reasonably request and (b) instruct its employees, counsel, accountants, financial advisors and other representatives to cooperate reasonably with Buyer in its investigation of the Company and each Company Subsidiary, provided, however, that the Company may restrict or otherwise prohibit access to any documents or information to the extent that (i) any applicable Law requires the Company to restrict or otherwise prohibit access to such documents or information, (ii) access to such documents or information would give rise to a material risk of waiving any attorney-client privilege, work product doctrine or other applicable privilege applicable to such documents or information.

5.3     Further Assurances.  Upon the terms and subject to the conditions set forth in this Agreement, each of Buyer and Merger Sub, on the one hand, and (without limiting the rights of the Company specifically provided under Section 5.4, Section 5.6 and Section 5.7 or the obligations of Buyer or Merger Sub specifically provided under Section 5.4) the Company, on the other hand, shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party or parties hereto in doing, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the Merger and the other transactions contemplated by this Agreement, including using reasonable best efforts to cause the conditions to the Merger set forth in Article VII to be satisfied.

5.4     Regulatory Approvals.

(a)     Without limitation of the obligations set forth in Section 5.3, Buyer and the Company agree to promptly prepare, file, effect and obtain as soon as reasonably practicable all Consents necessary to be obtained from any person, including from any Governmental Entity in order to consummate the Merger and the other transactions contemplated by the Transaction Documents.

(b)     Each of Buyer and Merger Sub (and their respective Affiliates, if applicable), on the one hand, and the Company, on the other hand, shall:

(i)     file with the FTC and the Antitrust Division of the DOJ a Notification and Report Form relating to this Agreement and the transactions contemplated hereby as required by the HSR Act as soon as practicable after the date of this Agreement but in no event later than ten (10) Business Days following the execution and delivery of this Agreement;

(ii)     submit notification filings, forms and submissions to any other Governmental Entities that are required by any other Antitrust Laws as soon as practicable and advisable; and

(iii)     prepare and file all filings required to obtain the PRC Overseas Investment Approvals as promptly as practicable after the date of this Agreement.

(c)     Each of Buyer and the Company shall, to the extent permitted by applicable Law and not prohibited by the applicable Governmental Entity, with respect to the filings described in Section 5.4(b), and the specific provisions of Section 5.4(h) with respect to the CFIUS review process:

(i)     cooperate and coordinate with the other in the making of such filings (including providing copies, or portions thereof, of all such documents to the other parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation, request or other inquiry of any Governmental Entity under any applicable Laws (including Antitrust Laws) or Orders of any Governmental Entity with respect to any such filing, in each case, for the avoidance of doubt, in connection with the transactions contemplated by this Agreement;

48

(ii)     supply the other party (or its outside counsel) with any information that may be required or requested by any Governmental Entity in order to make such filings;

(iii)     respond as promptly as reasonably practicable and advisable to any inquiries received from the FTC, the DOJ or the Governmental Entities of any other applicable jurisdiction in connection with any such filing and supply any additional information that may be required or requested by Governmental Entities in which any filing is made under any Antitrust Law or any other applicable Laws; and

(iv)     take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to (A) cause the expiration or termination of the applicable waiting periods under the HSR Act or other Antitrust Laws as soon as practicable and no later than the End Date, (B) obtain any required Consents under any other Antitrust Laws applicable to the Merger as soon as practicable and not later than the End Date, (C) obtain the PRC Overseas Investment Approvals, and the Taiwan Approvals as soon as practicable (other than as waived by Buyer pursuant to Section 7.1(a) and (D) to avoid any impediment to the consummation of the Merger under any applicable Laws (including Antitrust Laws) or Orders of any Governmental Entity.

(d)     Each of Buyer and Merger Sub (and their respective Affiliates, if applicable), on the one hand, and the Company, on the other hand, shall promptly inform the other of any material communication from the FTC, DOJ, any state attorney general or any other Governmental Entity regarding any of the transactions contemplated by this Agreement in connection with any filings or investigations with, by or before, or with the seeking of any Consent from, any Governmental Entity relating to this Agreement or the transactions contemplated hereby, including any proceedings initiated by a private party.  If any party hereto or Affiliate thereof shall receive a request for additional information or documentary material from any Governmental Entity with respect to the transactions contemplated by this Agreement pursuant to the HSR Act or any other Antitrust Laws with respect to which any such filings have been made, FINSA, any PRC Laws in respect of any PRC Overseas Investment Approvals or any Taiwan Laws in respect of any Taiwan Approvals, then such party shall use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.  In connection with and without limiting the foregoing, unless prohibited by applicable Law or by the applicable Governmental Entity, the parties hereto agree to:

(i)     give each other reasonable advance notice of all meetings or planned communications with any Governmental Entity relating to the Merger or any other transactions contemplated hereby;

(ii)     to the extent not prohibited by the applicable Governmental Entity, give each other an opportunity to participate in each of such meetings or communications;

(iii)    keep the other party promptly apprised with respect to any material oral communications with any Governmental Entity regarding the Merger or any other transactions contemplated hereby to the extent the other party is unable to participate in such communication;

(iv)    cooperate in the compilation of any analyses, presentations, memoranda, briefs, arguments, opinions or other written communications explaining or defending the Merger or any other transactions contemplated hereby, articulating any regulatory or competitive argument and/or responding to requests or objections made by any Governmental Entity;

(v)    provide each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other with respect to, all material written communications (including any filings, analyses, presentations, memoranda, briefs, arguments and opinions) and planned oral communications with a Governmental Entity regarding the Merger or any other transactions contemplated hereby;

(vi)    provide each other (or counsel of each party, as appropriate) with copies of all written communications to or from any Governmental Entity relating to the Merger or any other transactions contemplated hereby; and

(vii)    cooperate and provide each other with a reasonable opportunity to participate in, and consider in good faith the views of the other with respect to, all deliberations with respect to all efforts to satisfy the conditions set forth in Section 7.1(a), 7.1(b) and 7.1(c).

Any such disclosures, rights to participate or provisions of information by one party to the other may be made on a counsel-only basis to the extent required under applicable Law.

(e)    Each of Buyer, Merger Sub and the Company shall cooperate with one another to (i) promptly determine whether any filings not contemplated by this Section 5.4 are required to be or should be made, and whether any other Consents not contemplated by this Section 5.4 are required to be or should be obtained, from any Governmental Entity under any other applicable Law in connection with the transactions contemplated hereby and (ii) promptly make any filings, furnish information required in connection therewith and seek to obtain timely any such consents, permits, authorizations, approvals or waivers that the parties agree are required to be or should be made or obtained in connection with the transactions contemplated hereby.

(f)    Neither the Company nor Buyer or Merger Sub will extend any waiting period or comparable period under the HSR Act or any other Antitrust Laws or enter into any agreement with any Governmental Entity to delay or not to consummate the transactions contemplated by the Transaction Documents, except with the prior written consent of the other.

(g)    Buyer and Merger Sub shall take any and all steps to avoid or eliminate impediments under any Antitrust Laws that may be asserted by the FTC, the DOJ or any other Governmental Entity with respect to the transactions contemplated by this Agreement so as to

50

enable the Closing to occur as promptly as practicable following the date of this Agreement and, in any event, prior to the End Date, including:

(i)     defending through Actions on the merits any claim asserted by any Governmental Entity that would block, delay or impede the Merger and the other transactions contemplated under the Transaction Documents, and otherwise taking all actions necessary to lift any injunction or other legal bars in order to consummate the Merger as promptly as practical; and

(ii)     proposing, negotiating, offering, committing to effect, and effecting, by consent decree, hold separate order, or otherwise, (x) the sale, divestiture, licensing or other disposition of assets, businesses, commercial relationships or product or service lines of Buyer, the Company or any Company Subsidiaries (or those of their Affiliates), (y) limitations on the freedom of action with respect to, or the ability to retain or operate, any of the assets, businesses, commercial relationships or product or service lines of Buyer, the Company or any Company Subsidiaries (or those of their Affiliates) or (z) the creation, termination, or amendment of relationships, licensing arrangements, ventures, contractual rights or obligations of Buyer, the Company or any Company Subsidiaries (or those of their Affiliates) in order to obtain any Consents required to be obtained from any Person, including any Governmental Entity;

All efforts described in this Section 5.4(g) shall be unconditional and shall not be qualified by reasonable best efforts or commercially reasonable efforts, and no actions taken pursuant to this Section 5.4 shall be considered for purposes of determining whether a Company Material Adverse Effect has occurred; provided, however, that notwithstanding any other provision of this Agreement, neither Company, Buyer nor Merger Sub shall be required to take any action described in this Section 5.4(g) (i) that would involve any requirement, restriction, or limitation on Inscape, the Inscape business or the ownership or operation thereof, including with respect to any requirement, restriction or limitation on the Company, Buyer or Inscape in connection with the agreements to be entered into pursuant to Section 6.6, that would materially and adversely reduce or limit the benefits to be received by Buyer from the Inscape business, or (ii) that is not conditioned on the consummation of the Merger; provided further that notwithstanding any other provision of this Agreement, the Company shall not be required to take any action described in this Section 5.4(g) that would reduce or limit the benefits to be received by William W. Wang set forth in Section 6.6(c).

(h)     Each of Buyer and Merger Sub (and their respective Affiliates, if applicable), on the one hand, and the Company, on the other hand, shall:

(i)     submit or cause to be submitted: (A) promptly after the date hereof but in no event later than fifteen (15) Business Days following the execution and delivery of this Agreement, a draft joint voluntary notice of the transaction contemplated by this Agreement to CFIUS and (B) as soon as possible after confirmation (either written or oral) by CFIUS that it has no further comments or questions with respect to the draft joint voluntary notice, the Joint Notice.

(ii)      (A) permit counsel for the other party reasonable opportunity to review in advance, and consider in good faith the views of the other party in connection with, any proposed written communication to CFIUS or any of its member agencies and (B) not participate in any substantive meeting or discussion, either in person or by telephone, with CFIUS in connection with the transactions contemplated by this Agreement without consulting with the other in advance and, to the extent not prohibited by such Governmental Entity, giving the other the opportunity to attend and participate.

(iii)      provide CFIUS with any additional or supplemental information requested by CFIUS during the CFIUS review process as promptly as practicable, and in all cases within the amount of time allowed by CFIUS.  Such parties, in cooperation with each other, shall use best efforts to finally and successfully obtain the CFIUS Clearance as promptly as practicable.  Buyer and Merger Sub shall take, or cause to be taken, all actions that are necessary to obtain CFIUS Clearance, including, but not limited to: (A) negotiating, committing to and effecting, by mitigation agreement, letter of assurance or national security agreement, restrictions or actions that after the Closing would reasonably limit Buyer's (or any of its Affiliate's) freedom of action, ownership, control, influence, management or access over the Company or any portion thereof, and (B) the sale, divesture or disposition of, or holding separate of Buyer's (or any of its Affiliate's) assets, properties or businesses or of the Company's (or any of its Affiliates') assets, properties or businesses to be acquired by Buyer pursuant hereto, and the entrance into such other arrangements.  To the extent the CFIUS Clearance is granted subject to any of the conditions or actions described above, then, notwithstanding anything to the contrary in this Agreement, the Closing condition specified in Section 7.1(a)(ii) shall be deemed satisfied.

All efforts described in this Section 5.4(h) shall be unconditional and shall not be qualified by reasonable best efforts or commercially reasonable efforts, and no actions taken pursuant to this Section 5.4(h) shall be considered for purposes of determining whether a Company Material Adverse Effect has occurred; provided, however, that notwithstanding any other provision of this Agreement, neither Company, Buyer nor Merger Sub shall be required to take any action described in this Section 5.4(h) (i) that would involve any requirement, restriction, or limitation on Inscape, the Inscape business or the ownership or operation thereof, including with respect to any requirement, restriction or limitation on the Company, Buyer or Inscape in connection with the agreements to be entered into pursuant to Section 6.6, that would materially and adversely reduce or limit the benefits to be received by Buyer from the Inscape business, or (ii) that is not conditioned on the consummation of the Merger; provided further that notwithstanding any other provision of this Agreement, the Company shall not be required to take any action described in this Section 5.4(h) that would reduce or limit the benefits to be received by William W. Wang set forth in Section 6.6(c).

(i)      In the event any Governmental Entity seeks to negotiate the imposition of any requirement, restriction, or limitation on Inscape, the Inscape business or the ownership or operation thereof as a condition to its Consent to the transactions contemplated in this Agreement or in any Transaction Documents, including with respect to any requirement, restriction or limitation on the Company, Buyer or Inscape in connection with the agreements to be entered into pursuant to Section 6.6,  then to the extent necessary the parties shall negotiate in good faith

to amend this Agreement or the Transaction Documents in a reasonable manner that satisfies the requirement, restriction or limitation sought by such Governmental Entity and, as closely as reasonably possible, maintains the proposed benefits of the Inscape business for the Company and William W. Wang.

5.5     Consents.     From the date of this Agreement until the Effective Time, the Company shall, and shall cause each Company Subsidiary to, use commercially reasonable efforts to obtain all Consents of, and give all notices to be obtained or given in connection with the transactions contemplated by the Transaction Documents to all third parties required under the Contracts set forth on Schedule 5.5.

5.6     Shareholder Approval.

(a)     After the date of this Agreement, the Company shall promptly provide notice in accordance with Section 603 of the California Law to any Shareholder that was not solicited for purposes of approving this Agreement and the Merger.  Buyer and Merger Sub shall cooperate with the Company in connection with the preparation of any materials delivered to such Shareholders; provided that Buyer, Merger Sub and their counsel shall be given a reasonable opportunity to review and comment on such materials before they are mailed to the Shareholders.

(b)     The Company shall take all action necessary with respect to the rights of Dissenting Shareholders required pursuant to the California Law, including the delivery of notice required under Chapter 13 of the California Law to any Dissenting Shareholders as soon as reasonably practicable after the date of this Agreement.

(c)     The timing and content of all press releases and other public announcements to the Company's and each Company Subsidiary's customers and vendors relating to the transactions contemplated by the Transaction Documents shall be determined jointly by Buyer and the Company prior to the Effective Time and thereafter by the Surviving Corporation; provided that any party hereto may make any public disclosure required by Law (in which case the disclosing party will use its reasonable best efforts to advise the other parties hereto prior to making the disclosure); provided further, that the Company shall have the sole right to determine when and in which manner it will disclose the transactions contemplated by the Transaction Documents to its employees and the employees of the Company Subsidiaries. Notwithstanding the foregoing, after the Closing and the public announcement of the Merger, the Shareholder Representative shall be permitted to publicly announce that it has been engaged to serve as the Shareholder Representative in connection herewith as long as such announcement does not disclose any of the other terms hereof.

5.7     No Right to Control.     Buyer and Merger Sub acknowledge and agree that (a) nothing contained in this Agreement shall give Buyer or Merger Sub, directly or indirectly, the right to control or direct the Company's or the Company Subsidiaries' operations prior to the Effective Time, and (b) prior to the Effective Time, each of the Company and the Company Subsidiaries, on the one hand, and Buyer and Merger Sub, on the other hand, shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations; provided, however, that the parties hereto acknowledge and agree

that the exercise of such control in breach or violation of this Agreement may give rise to Actions and/or indemnification claims; provided further, that nothing in this Section 5.7 shall limit the effect of Section 11.12.

5.8    Buyer/Merger Sub – Cooperation with Financing.    Buyer and Merger Sub shall use their reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary or advisable to (A) consummate and obtain the proceeds of debt financing (the "Debt Financing", and together with the Equity Financing, the "Financing") and (B) arrange the Financing and to consummate the Financing on or prior to Closing.  Such actions shall include, but not be limited to, using reasonable best efforts with respect to the following: (i) maintaining in effect the Equity Commitment Letters; (ii) participation by senior management of Buyer and Merger Sub in, and assistance with, the preparation of rating agency presentations and meetings with rating agencies; (iii) causing the Equity Financing to be consummated upon satisfaction of the conditions contained in the Equity Commitment Letters; (iv) satisfying on a timely basis all conditions precedent to funding under the Equity Commitment Letters (the "Equity Financing Conditions") and in any Debt Financing Document, in each case that are within the control of Buyer or Merger Sub; (v) negotiating, executing and delivering Debt Financing Documents; (vi) drawing an amount of the Financing necessary to fund the Closing Date Payments, in the event that the conditions set forth in Section 7.2 have been satisfied or, upon funding would be satisfied; and (vii) enforcing its rights under the Equity Commitment Letters in the event of a Financing Failure Event.  Buyer and Merger Sub shall give the Company prompt notice of any breach, repudiation or threatened breach or repudiation by any party to the Equity Commitment Letters or any Debt Financing Documents of which Buyer, Merger Sub or their respective Affiliates obtains Knowledge.  Without limiting Buyer's and Merger Sub's other obligations under this Section 5.8, if a Financing Failure Event occurs Buyer shall (i) promptly notify the Company of such Financing Failure Event and, to the Knowledge of Buyer or Merger Sub, the reasons therefor, (ii) use its reasonable best efforts to obtain alternative financing on terms not less favorable to Buyer or Merger Sub than the terms of the unavailable Debt Financing from alternative Debt Financing Sources, in an amount (together with the Equity Financing and cash on hand of the Buyer and Merger Sub) sufficient to make the Closing Date Payments and consummate the transactions contemplated by this Agreement, as promptly as practicable following the occurrence of such event and (iii) use its reasonable best efforts to obtain, and when obtained, provide the Company with a copy of, a new financing commitment, subject only, in the case of a new Equity Financing commitment, to the Equity Financing Conditions, that provides for such alternative financing.  Neither Buyer nor any of its Affiliates shall amend, modify, supplement, restate, assign, substitute or replace any of the Equity Commitment Letters or any Debt Financing Document except for substitutions and replacements pursuant to the immediately preceding sentence without the consent of Company (which such consent shall not be unreasonably withheld, conditioned or delayed) if such amendment, modification, supplement, restatement, assignment, substitution, replacement or waiver (A) results in a net reduction in the aggregate amount of the Financing (unless the Buyer, Merger Sub or their respective Subsidiaries has a corresponding amount of excess available cash on hand such that the proceeds of Financing (taking into account such change) together with such available cash on hand are sufficient to consummate the Merger and the other transactions contemplated by this Agreement and all related fees and expenses to be paid by Buyer or Merger Sub at or prior to the Closing), (B) imposes new or additional conditions to the initial funding or otherwise expands, amends or modifies any of the conditions to the receipt of the initial

54

Financing or (C) expands, amends or modifies any provision of the Equity Commitment Letters, in a manner that would reasonably be expected to (x) materially delay or prevent the funding in full of the Financing (or satisfaction of the conditions to the Financing) on the Closing Date or (y) adversely impact the ability of Buyer or Merger Sub to enforce its rights against other parties to the Equity Commitment Letters or the definitive agreements with respect thereto, in each case, relating to the funding thereunder. For purposes of this Section 5.8, references to "Debt Financing" shall include the financing contemplated by the Debt Financing as permitted to be amended or modified or superseded by this Section 5.8 and references to "Debt Financing Documents" shall include such Debt Financing Documents as permitted to be amended or modified or superseded by this Section 5.8.

     5.9    Company – Cooperation with Financing.

     (a)    The Company agrees to use its commercially reasonable efforts to provide such assistance (and to cause the Company Subsidiaries and its and their respective personnel and advisors to provide such assistance) with the Debt Financing as is reasonably requested by Buyer. Such assistance shall include, but not be limited to, the following: (i) participation in, and assistance with, the Marketing Efforts related to the Debt Financing; (ii) participation by senior management of the Company in, and assistance with, the preparation of rating agency presentations and meetings with rating agencies; (iii) reasonably timely delivery to Buyer and its Debt Financing Sources of the Financing Information and Financing Deliverables; (iv) participation by senior management of the Company in the negotiation of the Debt Financing Documents; (v) taking such actions that are within its control as are reasonably requested by Buyer or its Debt Financing Sources to facilitate the satisfaction on a timely basis of all reasonable conditions precedent to obtaining the Debt Financing; (vi) taking all actions as may be required or reasonably requested by Buyer or its Debt Financing Sources in connection with the repayment of the Existing Company Debt; (vii) using its commercially reasonable efforts to cause its independent auditors to cooperate with the Debt Financing; (viii) cooperate with due diligence requests from the Debt Financing Sources and (ix) using its commercially reasonable efforts to allow the Debt Financing to benefit from the existing lending relationships of the Company and the Company Subsidiaries. The Company will use its commercially reasonable efforts to provide to Buyer and its Debt Financing Sources such information as may be reasonably necessary so that the Financing Information and Marketing Material is complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading. The Company hereby consents to the use of all of its and the Company Subsidiaries' logos in connection with the Debt Financing.

     (b)    Notwithstanding anything to the contrary herein:

          (i)    it is understood and agreed that the condition precedent set forth in Section 7.2(b), as applied to the Company's obligations under this Section 5.9, shall be deemed to be satisfied unless the financing contemplated by the Debt Financing Documents has not been obtained as a direct result of the Company's material breach of its obligations under this Section 5.9;

(ii)     no Affiliate of the Company shall have any obligations under this Section 5.9 following the consummation of the Merger;

(iii)    the assistance described in clause (a) above shall not require the Company or any of its Affiliates to agree to any contractual obligation relating to the Financing that is not conditioned upon the Closing and that does not terminate without liability to the Company or any of its Affiliates upon the termination of this Agreement;

(iv)    the effectiveness of any definitive documentation executed by the Company or any of the Company Subsidiaries related to the Financing shall be subject to the consummation of the Merger;

(v)     any assistance provided by the Company in accordance with clause (a) above shall be at Buyer's written request with reasonable prior notice and at Buyer's sole cost and expense;

(vi)    Buyer shall indemnify and hold harmless the Company and the Company Subsidiaries and their respective directors, officers, employees and agents from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred in connection with the Debt Financing or any assistance or activities provided in connection therewith; provided, however, that the foregoing shall not apply to the Company's or the Company Subsidiaries or other representatives' willful misconduct or gross negligence; and

(vii)   neither the Company nor any Company Subsidiary shall be required to provide any such assistance under this Section 5.9 that would unreasonably interfere with its business operations or that the Company reasonably believes would result in a violation of any Material Contract or any confidentiality agreement or the loss of any attorney-client privilege.

ARTICLE VI
ADDITIONAL AGREEMENTS

6.1     Tax Matters.

(a)     Tax Returns.  The Surviving Corporation shall prepare and timely file or shall cause to be prepared and timely filed, in a manner consistent with past practices of the Company and the Company Subsidiaries, all Tax Returns in respect of the Company or any Company Subsidiary that relate to (i) taxable periods or portions thereof ending on or before the Closing Date but that are required to be filed after the Closing Date and (ii) any Straddle Periods. Buyer shall deliver at least thirty days prior to the due date (taking into account any extension) for the filing of such Tax Returns to the Shareholder Representative for the Shareholder Representative's review and written consent of such Tax Returns, which consent shall not be unreasonably withheld, conditioned or delayed. Buyer shall revise any such Tax Return to reflect any reasonable comments made by the Shareholder Representative prior to the filing of such Tax Return. With respect to Taxes of the Company and the Company Subsidiaries relating to a Straddle Period, the portion of any Tax that is allocable to the taxable period that is deemed to end on the close of business on the Closing Date will be: (x) in the case of Property Taxes,

56

deemed to be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days of such Straddle Period in the Pre-Merger Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period, and (y) in the case of all other Taxes, determined as though the taxable year of the Company terminated at the close of business on the Closing Date; provided, however, that any Taxes attributable to transactions outside the Ordinary Course of Business effected by Buyer on the Closing Date but after the Effective Time shall be deemed to have occurred after the Closing Date. The Transaction Tax Deductions shall be reported on any applicable Tax Returns solely as income Tax deductions of the Company, any Company Subsidiary and the Surviving Corporation for the Tax year that ends on or includes the Closing Date and shall not be treated or reported as income Tax deductions for a Tax year beginning after the Closing Date (including under Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) or any comparable or similar provision under state or local Law).  The parties hereto acknowledge and agree that, as a consequence of the transactions contemplated hereby, (i) the Tax year of the Company and any Company Subsidiary shall close for U.S. federal income Tax purposes at the end of the day on the Closing Date, (ii) to the extent applicable Law in other Taxing jurisdictions so permits, the Tax year of the Company and any Company Subsidiary shall close at the end of the day on the Closing Date, and (iii) all federal, state, local and foreign income Tax Returns shall be filed consistently on the foregoing basis.

57

(b)     Tax Contests.

(i)     Buyer, the Company, any Company Subsidiary, and the Surviving Corporation, on the one hand, and the Shareholders, the Shareholder Representative and their Affiliates, on the other hand, shall promptly notify each other upon receipt by such party of written notice of any inquiries, claims, assessments, audits or similar events with respect to Taxes relating to a Pre-Merger Tax Period (any such inquiry, claim, assessment, audit or similar event, a "Pre-Merger Tax Matter").

(ii)    The Shareholder Representative shall have the right to control the conduct of all Pre-Merger Tax Matters that arise after the Closing Date, including any settlement or compromise thereof, provided, however, that if any such Pre-Merger Tax Matter could reasonably result in an increased Tax liability to Buyer or the Surviving Corporation for any Tax period beginning after the Closing Date, then the Shareholder Representative shall not effect any settlement or compromise of such Pre-Merger Tax Matter without obtaining Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. If the Shareholder Representative shall have the right to control the conduct and resolution of such Pre-Merger Tax Matter but elects in writing not to do so, then Buyer shall have the right to control the conduct and resolution of such Pre-Merger Tax Matter, provided, however, that Buyer shall keep the Shareholder Representative reasonably informed of the progress of any Pre-Merger Tax Matter and shall not effect any such settlement or compromise with respect to which the Equityholders are liable or which could give rise to a claim for indemnification by Buyer under Article VIII without obtaining the Shareholder Representative's prior written consent thereto, which shall not be unreasonably withheld, conditioned or delayed.

(iii)   Upon the receipt by Buyer, the Company, any Company Subsidiary, or the Surviving Corporation of any inquiries, claims, assessments, audits or similar events with respect to Taxes relating to a Straddle Period (any such inquiry, claim, assessment, audit or similar event, a "Straddle Period Tax Matter") that could reasonably result in the Equityholders having to indemnify any Buyer Indemnified Parties pursuant to this Agreement, then Buyer shall promptly notify the Shareholder Representative and shall keep the Shareholder Representative reasonably informed of the progress of any such Straddle Period Tax Matter and shall (x) provide the Shareholder Representative with copies of any pleadings, correspondence and other documents received from the relevant Tax Authority, and all written materials submitted to such Tax Authority by Buyer with respect to any such Straddle Period Tax Matter and (y) provide the Shareholder Representative an opportunity to comment in connection with any such Straddle Period Tax Matter and act reasonably in deciding whether to accept or reject such comments; provided further, that, in addition to and not in limitation of the foregoing, with respect to any such Straddle Period Tax Matter, Buyer shall not effect any settlement or compromise with respect to which the Equityholders are liable or which could reasonably give rise to a claim for indemnification by Buyer under Article VIII without obtaining the Shareholder Representative's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

(iv)     In the event of any conflict or overlap between the provisions of this Section 6.1(b) and Article VIII, the provisions of this Section 6.1(b) shall control.

(c)     Cooperation.  Buyer and the Shareholder Representative agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to Taxes, including, without limitation, access to books and records, as is reasonably necessary for the filing of all Tax Returns by Buyer, the making of any election relating to Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.

(d)     Tax Refunds.

(i)     The Equityholders shall be entitled to the amount (net of any fees, expenses or Taxes attributable to or resulting from) of any refund of Taxes of the Company or any Company Subsidiary to the extent such refund is allocable to a Pre-Merger Tax Period or portion of the Straddle Period deemed to end on the close of business on the Closing Date.  Buyer shall pay, or cause to be paid, to the Payments Administrator (for further distribution to the Equityholders) any amount to which the Equityholders are entitled pursuant to the prior sentence within two Business Days of the receipt or recognition of the applicable refund by Buyer or its Affiliates.  Buyer shall cooperate, and cause its Affiliates and the Surviving Corporation (and its subsidiaries) to cooperate, in obtaining any refund requested by the Equityholders that the Buyer reasonably believes should be available, including without limitation, through filing appropriate forms with the applicable Tax Authorities.

(ii)     To the extent the Company or any Company Subsidiary has paid estimated income Taxes for any Tax year ending on or including the Closing Date and the amount of the estimated income Taxes which were paid prior to the Closing Date exceeds the amount of the anticipated income Tax liability with respect to such Tax year (taking into account the Transaction Tax Expenses), Buyer shall prepare or cause to be prepared IRS Form 4466 (Corporation Application for Quick Refund of Overpayment of Estimated Tax) with IRS Form 8302 (Electronic Deposit of Tax Refund of $1 Million or More) and any analogous application for a state refund of an overpayment of estimated state income Taxes with respect to such Tax year.  Any such refund application shall be treated as a Tax Return that is subject to analogous review, comment, dispute resolution and filing procedures to those set forth in Section 6.1(a).  Upon receipt from the applicable Tax Authority of a refund as a result of such a refund claim, Buyer shall pay or cause to be paid to the Payments Administrator (for further distribution to the Equityholders) an amount equal to (net of any fees, expenses or Taxes attributable to or resulting from) any such refund actually received by Buyer from a Tax Authority.

(iii)     To the extent that the Company, any Company Subsidiary, the Surviving Corporation or any of its subsidiaries would have a net operating loss for any Tax year ending on or including the Closing Date, Buyer shall prepare or cause to be prepared any claim for refund of Taxes (including IRS Form 1139, IRS Form 4466 or any successor form, and any comparable state or local forms) with respect to such Tax year, including a claim for refund or amended Tax Return to effect a carryback of any loss

59

generated or otherwise attributable to the Tax year ending on or including the Closing Date to the fullest extent permitted by Law.  Any such refund claim shall be treated as a Tax Return that is subject to analogous review, comment, dispute resolution and filing procedures to those set forth in Section 6.1(a).  Upon receipt from the applicable Tax Authority of a refund as a result of such a refund claim, Buyer shall pay or cause to be paid to the Payments Administrator (for further distribution to the Equityholders) an amount equal to (net of fees, expenses or Taxes attributable to or resulting from) any such refund actually received by Buyer from a Tax Authority.

(e)     Transfer Taxes.  All transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with this Agreement and the transactions contemplated hereby ("Transfer Taxes") will be borne 50% by Buyer and 50% by the applicable Equityholders upon whose shares such Transfer Taxes are imposed.  Buyer hereby agrees to file in a timely manner all necessary documents (including, but not limited to, all Tax Returns) with respect to all such amounts for which Buyer is so liable, and Buyer and the Shareholder Representative shall reasonably cooperate in preparing and executing any Tax Returns with respect to such Transfer Taxes.

(f)     Conduct of Buyer and its Affiliates.  After the Closing, Buyer and its Affiliates shall not, and Buyer and its Affiliates shall not permit the Surviving Corporation or any of its subsidiaries to, without the prior written consent of the Shareholder Representative, except as required by Law, (i) other than Tax Returns that are filed pursuant to Section 6.1(a), file or amend or otherwise modify any Tax Return of the Company or any Company Subsidiary relating to a Pre-Merger Tax Period or to the portion of the Straddle Period deemed to end on the close of business on the Closing Date, (ii) extend or waive, or cause to be extended or waived, any statute of limitations or other period for the assessment of any Tax or deficiency of the Company or any Company Subsidiary related to a Pre-Merger Tax Period or to the portion of the Straddle Period deemed to end on the close of business on the Closing Date, (iii) make or change any Tax election or accounting method or practice with respect to, or that has retroactive effect to, any Pre-Merger Tax Period (or to the portion of the Straddle Period deemed to end on the close of business on the Closing Date) relating to the Company or any Company Subsidiary, (iv) make any election under Section 338 of the Code for the Company or any Company Subsidiary, or (v) make or initiate any voluntary contact with a Tax Authority regarding the Company or any Company Subsidiary relating to any Pre-Merger Tax Period or to the portion of the Straddle Period deemed to end on the close of business on the Closing Date.

(g)     FIRPTA Compliance.  On or prior to the Closing Date, the Company shall provide Buyer with a properly executed Foreign Investment in Real Property Tax Act of 1980 notification letter (the "FIRPTA Certificate"), which states that the shares of the Company do not constitute "United States real property interests" under Code Section 897(c), for purposes of satisfying the Buyer's obligations under Treasury Regulations Section 1.1445-2(c)(3), in the form attached hereto as  Exhibit B.  In addition, simultaneously with delivery of such FIRPTA Certificate, the Company shall have provided to Buyer a form of notice to the IRS in accordance with the requirements of Treasury Regulations Section 1.897-2(h)(2), properly executed and in the form attached hereto as Exhibit C, along with written authorization for Buyer to deliver such notice form to the IRS on behalf of the Company upon the Closing (the "FIRPTA Notice").  If the Company fails to deliver the FIRPTA Certificate or the FIRPTA Notice, Buyer may (but

60

shall not be required to) waive this condition and withhold appropriate amounts as required under applicable Law.

(h)     U.S. MidCo. Buyer and its Affiliates shall not take any action prior to the one year anniversary of the Closing Date that would cause MidCo to be treated as any entity other than a corporation for U.S. federal income Tax purposes.

6.2     Employee Matters.

(a)     For a period of (x) no less than eighteen (18) months following the Effective Time for each of the Employees listed on Section 6.2(a) of the Company Disclosure Schedule and (y) no less than twelve (12) months following the Effective Time for all other Employees, Buyer will provide (or cause an Affiliate of Buyer to provide) to each such Employee who continues in employment with Buyer or one of its Affiliates following the Effective Time (each, a "Continuing Employee") with: (i) a base salary or an hourly wage rate, as applicable, and target cash bonus opportunity that is no lower than the base salary or hourly wage rate and target cash bonus opportunity provided to such Continuing Employee immediately prior to the Effective Time, and (ii) employee benefits (exclusive of equity and equity-related benefits) that are no less favorable, in the aggregate, than those provided to such Continuing Employees by the Company and its Affiliates immediately prior to the Effective Time.

(b)     For purposes of determining eligibility, vesting, participation and benefit accrual under Buyer's and its Affiliates' plans and programs providing employee benefits (including, without limitation, severance) to Continuing Employees after the Effective Time (the "Buyer Benefit Plans"), each Continuing Employee shall be credited with his or her years of service with the Company (and its Affiliates and predecessors) prior to the Effective Time, except to the extent providing such credit would result in any duplication of benefits.  In addition, Buyer shall cause (i) each Continuing Employee to be immediately eligible to participate, without any waiting time, in any and all Buyer Benefit Plans to the extent such Continuing Employee was eligible to participate, without any waiting time, in the comparable Employee Plan as of the Effective Time; (ii) each Buyer Benefit Plan providing medical, dental, hospital, pharmaceutical or vision benefits, to waive all pre-existing condition exclusions and actively-at-work requirements of such Buyer Benefit Plan for such Continuing Employee and his or her covered dependents (except to the extent that such exclusions or requirements applied to the Continuing Employee under comparable Employee Plans); and (iii) any co-payments, deductibles and other eligible expenses incurred by such Continuing Employee and/or his or her covered dependents prior to the Effective Time during the plan year in which the Effective Time occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Continuing Employee and his or her covered dependents for the applicable plan year of each comparable Buyer Benefit Plan (to the extent such credit would have been given under comparable Employee Plans prior to the Effective Time).

(c)     Nothing contained in this Agreement shall, or shall be construed so as to, (i) constitute an amendment or modification of any Employee Plan or employee benefit plan; (ii) create any third party rights in any such current or former service provider of the Company (including any beneficiary or dependent thereof); or (iii) obligate Buyer to adopt or maintain any particular plan or program or other compensatory or benefits arrangement at any time except as

61

set forth in Section 6.2(d) or prevent Buyer from modifying or terminating any such plan, program or other compensatory or benefits arrangement at any time.

(d)     Buyer shall cause Parent to adopt an equity incentive compensation plan (the "Parent Plan") pursuant to which employees, consultants and directors of the Company and Inscape may participate, and under which the aggregate number of shares of Parent common stock which may be issued pursuant to awards under the Parent Plan will equal no less than 0.3% of Parent's fully-diluted capital stock as of the Effective Time.  Immediately following the Effective Time, Buyer shall cause Parent to grant, pursuant to the Parent Plan, to certain employees of the Company and Inscape, including to the individuals set forth on Schedule 6.2(d) a certain number of restricted stock units with respect to a number of shares of Parent's common stock, which shall represent in the aggregate, 0.3% of Parent's fully-diluted capital stock as of immediately following the Effective Time (the "Initial Parent Grants"); provided, that with respect to any such individual whose restricted stock units are forfeited pursuant to the terms of such restricted stock units, such forfeited restricted stock units shall be available for grant to employees of the Company who were hired after the Closing Date. The Initial Parent Grants shall vest in three substantially equal installments on December 31, 2017, December 31, 2018 and December 31, 2019, subject to the holder's continued service with the Company or its Affiliates (or in the case of William W. Wang, Inscape or its Affiliates), and each holder thereof shall be entitled to the rights and payments set forth on Schedule 6.2(d).

(e)     Buyer shall cause the Company to adopt an equity incentive compensation plan (the "Company Plan") pursuant to which employees, consultants and directors of the Company may participate, and under which the aggregate number of shares of Company common stock which may be issued pursuant to awards under the Company Plan will equal no less than 15% of the Company's fully-diluted capital stock as of the Effective Time.

6.3     Section 280G Approval.  To the extent applicable, prior to the Effective Time, the Company shall (a) take all necessary actions (including soliciting waivers or other consents from each "disqualified individual" within the meaning of the Treasury Regulations under Section 280G of the Code (each, a "Parachute Payment Waiver")) in order to solicit the approval and consent of all Persons entitled to vote (within the meaning of the Treasury Regulations of Section 280G of the Code) with respect to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement that could, in the absence of stockholder approval of such payments and/or benefits, be deemed to constitute "parachute payments" (within the meaning of Section 280G of the Code) (the "Waived 280G Benefits"), and (b) solicit the approval of the Company's stockholders in a manner intended to comply with Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of the Code of any Waived 280G Benefits and in form and substance reasonably satisfactory to Buyer and its counsel.  Buyer shall have the right to review and comment on the Parachute Payment Waivers and all documents and materials submitted to the Company's stockholders for approval of the Waived 280G Benefits and the stockholder approval thereof and the underlying calculations relating to the Waived 280G Benefits in advance of the solicitation of such approval.

6.4     Directors' and Officers' Liability.  For a period of six years after the Effective Time, Buyer shall, at no expense to the beneficiaries thereof, either (i) cause to be maintained in effect the policies of directors' and officers' liability insurance and fiduciary liability insurance

62

maintained by the Company and the Company Subsidiaries immediately prior to the Effective
Time or (ii) provide substitute policies with carriers having comparable or greater financial
resources to the current carriers or purchase, or cause the Surviving Corporation to purchase, a
"tail policy" in any case of at least the same coverage and amounts and containing other terms
and conditions that are not less advantageous in the aggregate than all such policies in effect
immediately prior to the Effective Time, with respect to matters arising on or before the
Effective Time; provided, that if the aggregate annual premiums for such policies at any time
during such period will exceed 300% of the per annum premium rate paid by the Company and
the Company Subsidiaries as of the date hereof for such policies, then Buyer and the Surviving
Corporation shall only be required to provide such coverage as will then be available at an
annual premium equal to 300% of such rate.  In addition, Buyer agrees that it shall honor all
existing indemnity agreements between the Company or any Company Subsidiary and the
directors and officers thereof in place as of the Effective Time and, for a period of six years after
the Effective Time, will not amend, modify or otherwise adversely impact the indemnification
provisions set forth in the Company's or any Company Subsidiary's organizational documents or
bylaws.

> (a)     The obligations under this Section 6.4 shall not be terminated or modified
in such a manner as to adversely affect any indemnified party to whom this Section 6.4 applies
without the consent of such affected indemnified party (it being expressly agreed that the
indemnified parties to whom this Section 6.4 applies shall be third party beneficiaries of this
Section 6.4 and shall be entitled to enforce the covenants contained herein).

> (b)     In the event Buyer or the Surviving Corporation or any of their respective
successors or assigns (i) consolidates with or merges into any other Person and shall not be the
continuing or surviving corporation or entity of such consolidation or merger, or (ii) transfers or
conveys all or substantially all of its properties and assets to any Person, then, and in each such
case, Buyer or the Surviving Corporation, as applicable, shall use commercially reasonable
efforts to ensure that proper provision shall be made so that the successors and assigns of Buyer
or the Surviving Corporation (or their respective successors or assigns), as the case may be, shall
assume the obligations set forth in this Section 6.4.

> (c)     To the fullest extent permitted by law, Buyer and Surviving Corporation
shall pay all expenses, including reasonable attorneys' fees, that may be incurred by the persons
referred to in this Section 6.4 in connection with their enforcement of their rights provided in this
Section 6.4.

6.5     Confidentiality of Terms of Transaction, Etc.  Except as required by any
Governmental Entity or as otherwise required to consummate the transactions contemplated by
the Transaction Documents, the parties hereto will keep confidential the terms and status of this
Agreement and the other Transaction Documents and the transactions contemplated hereby and
thereby; provided that each of Buyer, Merger Sub, the Shareholder Representative and the
Company shall have the right to communicate and discuss with, and provide to, its legal
advisors, representatives, officers or employees, directors, Equityholders, consultants and agents,
(and, in the case of the Shareholder Representative, to the Equityholders), any information
regarding the terms and status of this Agreement and the other Transaction Documents and the
transactions contemplated hereby and thereby solely for the purpose of evaluating, negotiating

and consummating the Merger (and, in the case of the Shareholder Representative, for the purposes of completing its post-Closing responsibilities in connection herewith).

6.6     Inscape Transactions.  At or prior to the Effective Time, Buyer and the Company agree to consummate and, as applicable, cause their respective Affiliates and Related Parties to consummate, the following transactions:

(a)     The Company shall contribute Twenty Million Dollars (U.S. $20,000,000) to Inscape for purposes of providing Inscape with working capital.

(b)     The Company enter into a capital contribution agreement, in form and substance reasonably agreeable to William W. Wang, unconditionally agreeing to contribute Thirty Million Dollars (U.S. $30,000,000) to Inscape on the six month anniversary of the Closing for purposes of providing Inscape with working capital, in exchange for no additional equity interests.

(c)     The Company shall cause Inscape to grant equity interests to the William W. Wang through a restricted stock grant agreement in the form attached hereto as Exhibit D, such that William W. Wang shall, following such grant, own fifty-one percent (51%) of the then-outstanding capital stock of Inscape.

(d)     The Company shall execute and deliver, and shall cause Inscape to execute and deliver, that certain ACR License Agreement between the Company and Inscape substantially in the form attached hereto as Exhibit E (the "License Agreement").

(e)     The Company shall cause Inscape to enter into a stockholders' agreement with William W. Wang and the other stockholders of Inscape (the "Inscape Stockholders' Agreement"), pursuant to which all such stockholders shall agree to vote their shares to maintain a board of directors having five members and electing three members designated by William W. Wang, substantially in the form attached hereto in Exhibit F.

(f)     The Company shall cause Inscape to adopt an equity incentive plan with a share reserve consisting of non-voting Common Stock equal to fifteen percent (15%) of the fully-diluted capital stock of Inscape.

(g)     The Company shall transfer to Inscape any assets, liabilities, employees, or Contracts listed on Section 6.6(g)(i) of the Company Disclosure Schedules to Inscape, and Inscape shall transfer to the Company any assets, liabilities, employees, or contracts listed on Section 6.6(g)(ii) of the Company Disclosure Schedules to the Company, in each case, on the terms and subject to the conditions set forth in Sections 6.6(g)(i) and (ii) of the Company Disclosure Schedules.

(h)     The Company shall cause Inscape to convert from a Delaware limited liability company to a Delaware corporation.

(i)     Concurrently with the execution and delivery with this agreement, the Company shall cause Inscape to enter into an employment agreement with William W. Wang in substantially the form attached hereto as Exhibit G.

64

(j)     The Company shall cause articles of incorporation of Inscape to be amended and restated in their entirety on terms that do not adversely impact the Company's rights under the Inscape Stockholders' Agreement.

(k)     The Company shall execute and deliver, and shall cause Inscape to execute and deliver, that certain Transition Services Agreement between the Company and Inscape on terms to be mutually agreed between the Company and Buyer (the "Transition Services Agreement").

(l)     The Company shall, and shall cause its Affiliates to, terminate all agreements or arrangements, written or unwritten, of any kind (other than the License Agreement, the Inscape Stockholders' Agreement and the Transition Services Agreement), between the Company or any of its Affiliates, on the one hand, and Inscape, on the other hand, without liability or cost to the Company or any of its Affiliates.

6.7     Acknowledgment by the Parties.

(a)     EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THE REPRESENTATIONS AND WARRANTIES BY THE OTHER PARTIES SET FORTH IN THIS AGREEMENT AND ANY CERTIFICATE DELIVERED HEREUNDER, CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE OTHER PARTIES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND EACH OF THE PARTIES HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE FINANCIAL CONDITION OR PROJECTIONS, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE COMPANY OR BUYER OR ANY OTHER PERSON) ARE SPECIFICALLY DISCLAIMED BY THE PARTIES.

(b)     Buyer and Merger Sub acknowledge and agree that they have made their own inquiry and investigation into, and, based thereon, have formed an independent judgment concerning the Company and the Company Subsidiaries and their businesses and operations. Buyer and Merger Sub acknowledge and agree that they have had an opportunity to ask all questions of and receive answers from the Company with respect to this Agreement and the transactions contemplated by the Transaction Documents.  Buyer and Merger Sub acknowledge and agree that, except as expressly set forth in this Agreement, neither the Company or any Company Subsidiary, nor any of their respective Shareholders or the Shareholder Representative, will have or be subject to any liability or indemnification obligation to Buyer, Merger Sub, any of their respective representatives, or any other person resulting from the delivery, dissemination or any other distribution to Buyer, Merger Sub, or any other person, or the use by Buyer, Merger Sub, or any other person, of any such information provided or made available to them by or on behalf of the Company or any Company Subsidiary, including any information, documents, projections, forecasts, estimates, or other forward-looking information, business plans, or other material provided for or made available to Buyer, Merger Sub or any of their representatives in any physical or on-line data rooms, confidential information memoranda or in-person presentations or teleconferences in connection with the transactions contemplated by this Agreement.

(c)      Without limiting the generality of the foregoing, in connection with the investigation by each party to this Agreement of the other parties, a party may have received certain projections from or on behalf of another party. Each party hereto acknowledges and agrees that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, and that the receiving parties are each familiar with such uncertainties. No party hereto makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

6.8      No Financing Contingency.  Buyer and Merger Sub acknowledge and agree that their obligations under this Agreement, including, but not limited to the obligation to pay the Merger Consideration, are not subject to any financing condition and are not contingent upon the results of efforts, if any, of Buyer, Merger Sub or any other Person to obtain financing in connection with the transactions contemplated by this Agreement.

6.9      Resignation of Officers and Directors. The Company shall cause each director of the Company and the Company Subsidiaries to execute a letter resigning from such directorship effective as of the Effective Time, except as Buyer may otherwise request.

6.10      Further Actions.  The Company acknowledges and agrees that from and after the Effective Time, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements and financial data of any sort relating to the Company or any Company Subsidiary. Buyer shall provide the Shareholder Representative full access to such materials reasonably required by the Shareholder Representative if any disputes arise or indemnification claims are made under this Agreement or any other Transaction Document; provided, however, that such access does not disrupt the normal operations of Buyer, the Surviving Corporation or its subsidiaries.

ARTICLE VII
CONDITIONS

7.1      Conditions to all Parties' Obligations.  The respective obligations of Buyer, Merger Sub and the Company to consummate the transactions to be performed by them in connection with the Merger is subject to the satisfaction of each of the following conditions as of the Effective Time:

(a)      Antitrust and Government Approvals.

(i)      Any waiting period (and extensions thereof) applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

(ii)      The CFIUS Clearance shall have been obtained.

(b)      No Prohibiting Laws or Injunctions.  No Governmental Entity of competent jurisdiction in the United States, the PRC or any other competent jurisdiction shall have (i) enacted, issued or promulgated any Law that is in effect and has the effect of making the Merger illegal or which has the effect of prohibiting or otherwise preventing the consummation

66

of the Merger, or (ii) issued or granted any Order that is in effect and has the effect of making the Merger illegal or which has the effect of prohibiting or otherwise preventing the consummation of the Merger.

(c)     No Governmental Litigation.  There shall not be pending or threatened in writing any Action in which a Governmental Entity in the United States, the PRC or any other competent jurisdiction is or is threatened to become a party seeking to prohibit the consummation of the Merger or any of the other transactions contemplated by this Agreement.

(d)     PRC Regulatory Approvals.  Buyer shall have obtained the PRC Overseas Investment Approvals and such PRC Overseas Investment Approvals shall be in full force and effect as of the Effective Time.

7.2     Conditions to Obligation of Buyer and Merger Sub.  The obligation of each of Buyer and Merger Sub to consummate the transactions to be performed by them in connection with the Merger is subject to the satisfaction of each of the following conditions as of the Effective Time:

(a)     Representations and Warranties.   Each of the Company Fundamental Representations of the Company set forth in Section 3.6(a) and (b) shall be true and correct in all respects (other than for such failures to be true and correct as would have a de minimis impact on the Merger Consideration) as of the date of this Agreement and on and as of the Effective Time with the same force and effect as if made on and as of the Effective Time (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties need only be true and correct in all respects on and as of such dates).  Each of the Company Fundamental Representations of the Company (other than those Company Fundamental Representations set forth in Section 3.6) that are qualified as to materiality shall be true and correct in all respects and those Company Fundamental Representations of the Company (other than those Company Fundamental Representations set forth in Section 3.6) not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and on and as of the Effective Time with the same force and effect as if made on and as of the Effective Time (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties need only be true and correct in all respects on and as of such dates).  Each of the representations and warranties of the Company contained herein other than the Company Fundamental Representation shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Effective Time (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties need only be true and correct in all respects on and as of such dates) except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect") does not constitute, and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     Performance of Covenants.  The Company shall have performed and complied in all material respects with all of their covenants and agreements required to be performed by it pursuant to this Agreement prior to the Effective Time.

67

(c)     Officer's Certificate.  The Company shall have caused to be delivered to Buyer and Merger Sub a certificate signed by an authorized officer of the Company, in form and substance reasonably satisfactory to Buyer, certifying as of the Effective Time:

(i)     the fulfillment of the conditions set forth in Sections 7.2(a) and 7.2(b);

(ii)     that there has not occurred any Company Material Adverse Effect (or any development that could reasonably be expected to result in any Company Material Adverse Effect); and

(iii)     that there are no Actions pending or, to the Knowledge of the Company, threatened against the Company or any Company Subsidiary, which question or challenge (A) the validity of this Agreement, (B) the right of the Company to enter into this Agreement or (C) which may have the effect of preventing delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement.

(d)     Company Material Adverse Effect.  There shall not have occurred any Company Material Adverse Effect (or any development that could reasonably be expected to result in any Company Material Adverse Effect).

(e)     Transaction Documents.  The Company shall have duly executed and delivered to Buyer and Merger Sub each of the Transaction Documents to which it is a party.

(f)     Shareholder Approval.  The approval of a majority of the holders of the Class A Common Stock and Class B Common Stock, voting together as a single class, the approval of a majority of the holders of the Preferred Stock, and the approval of a majority of disinterested holders of Class A Common Stock shall have been obtained and not withdrawn. The number of shares of Company Capital Stock that are held by Dissenting Shareholders shall be less than 10% of the number of shares of Company Class A Common Stock outstanding on an as-converted basis immediately prior to the Closing.

(g)     Agreement of Merger.  The Company shall have duly executed and delivered to Buyer and Merger Sub the Agreement of Merger.

(h)     FIRPTA Certificate and Notice.  The Company shall have provided Buyer with the properly executed FIRPTA Certificate and FIRPTA Notice pursuant to Section 6.1(g).

Buyer and Merger Sub may waive any condition specified in this Section 7.2 if it executes a writing so stating at or prior to the Effective Time; provided, however, that Buyer shall not be entitled to waive any PRC Overseas Investment Approvals that would, or would reasonably be expected to, adversely affect the delivery of the consideration payable in connection with the Merger in accordance with Article II.

7.3     Conditions to Obligation of the Company.  The obligation of the Company to consummate the transactions to be performed by them in connection with the Merger is subject to satisfaction of each of the following conditions as of the Effective Time:

(a)      Representations and Warranties.   Each of the Buyer Fundamental Representations of Buyer and Merger Sub that are qualified as to materiality shall be true and correct in all respects and those Buyer Fundamental Representations of Buyer and Merger Sub not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and on and as of the Effective Time with the same force and effect as if made on and as of the Effective Time (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties need only be true and correct in all respects on and as of such dates).   Each of the other representations and warranties of Buyer and Merger Sub contained herein shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Effective Time (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all respects on and as of such dates) except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect") does not, and would not reasonably be expected to, individually or in the aggregate, prevent or materially delay Buyer or Merger Sub from performing their respective obligations hereunder or to consummate the transactions contemplated hereby.

(b)      Performance of Covenants.   Each of Buyer and Merger Sub shall have performed in all material respects all of the covenants and agreements required to be performed by it pursuant to the Transaction Documents on or prior to the Effective Time.

(c)      Merger Consideration.   Each payment under Article II shall have been made to the parties specified therein (to the extent that such payment is required to be made at the Effective Time).

(d)      No Governmental Consents.     No required Consents from any Governmental Entity shall contain any conditions, limitations or obligations which would either reduce or limit the benefits to be received by William W. Wang set forth in Section 6.6(c).

(e)      Officer's Certificate.   Buyer shall have caused to be delivered to the Company a certificate signed by an authorized officer of Buyer, in form and substance reasonably satisfactory to the Company, certifying as of the Effective Time:

(i)      the fulfillment of the conditions set forth in Sections 7.3(a) and 7.3(b);

(ii)      that there are no Actions pending or, to the Knowledge of Buyer, threatened against Buyer or Merger Sub, which question or challenge (A) the validity of this Agreement, (B) the right of Buyer and Merger Sub to enter into this Agreement or (C) which may have the effect of preventing delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement.

(f)      Shareholder Approval. The approval of a majority of the holders of the Class A Common Stock and Class B Common Stock, voting together as a single class, the approval of a majority of the holders of the Preferred Stock, and the approval of a majority of disinterested holders of Class A Common Stock shall have been obtained and not withdrawn.

69

The Company may waive any condition specified in this Section 7.3 if it executes a writing so stating at or prior to the Effective Time.

ARTICLE VIII
INDEMNIFICATION

8.1     Survival Periods.  Subject to the limitations contained in this Article VIII, all representations and warranties contained herein shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby until the applicable Survival Date.  Notwithstanding anything herein to the contrary, the Equityholders will not be liable with respect to any claim for the breach or inaccuracy of any representation or warranty pursuant to Section 8.2(a)(i), and Buyer will not be liable with respect to any claim for the breach or inaccuracy of any representation or warranty pursuant to Section 8.3(a)(i), unless (x) written notice of a claim thereof is delivered to the Shareholder Representative or Buyer, as the case may be, and (y) if applicable, such notice is delivered prior to 5:00 p.m., Pacific time, on the applicable Survival Date.  For purposes of this Agreement, subject to Section 8.4, the term "Survival Date" shall mean December 31, 2017; provided that with respect to the representations and warranties set forth in Sections 3.12 (Intellectual Property and Privacy), 3.15 (Employee Plans), 3.16 (Labor Matters) and 3.18 (Environmental Matters), the Survival Date shall be the date that is 24 months after the Closing Date; provided further that with respect to the representations and warranties set forth in Section 3.14 (Tax Matters), the Survival Date shall be the date that is 6 months after the expiration of the applicable statute of limitations, taking into account any extensions or waivers thereof; provided further that with respect to the representations and warranties set forth in Sections 3.1 (Organization; Corporate Power), 3.2 (Authorization of the Transactions), 3.6 (Company Capitalization) and 3.24 (Brokers) (collectively, the "Company Fundamental Representations"), and with respect to the representations and warranties contained in Sections 4.1 (Organization; Good Standing), 4.2 (Corporate Power; Enforceability) but excluding the last sentence of Section 4.2 regarding enforceability, or 4.6 (Brokers) (the "Buyer Fundamental Representations"), the representations and warranties shall survive indefinitely.  For the avoidance of doubt, any covenant, agreement or obligation set forth in this Agreement shall survive beyond the Effective Time until the date that such covenant, agreement or obligation has been fully performed in all material respects in accordance with its terms.

8.2     Indemnification of the Buyer Indemnified Parties by Equityholders.

(a)     Obligation of Equityholders Generally.  Subject to the terms, limitations and conditions of this Agreement, the Equityholders hereby agree, severally (and not joint and severally) (determined in accordance with the last sentence of this Section 8.2(a)), to indemnify Buyer and its Affiliates (including the Surviving Corporation and each of its subsidiaries after the Effective Time) and each of their respective officers, directors, shareholders, managers, members, partners, employees, agents, representatives, successors and assigns (collectively, the "Buyer Indemnified Parties") and hold each of them harmless from and against any Loss which such Buyer Indemnified Party may suffer, sustain or become subject to, as a result of, arising out of, relating to or in connection with:

70

(i)     subject to the limitations in this <u>Article VIII</u>, the breach or inaccuracy of any representation or warranty of the Company contained in this Agreement, in each case, without giving effect to any limitation or qualification as to "materiality," "material," "Material Adverse Effect" or similar qualifiers set forth in such representation or warranty for purposes of (and solely for the purposes of) determining the amount of Losses resulting from, arising out of or relating to a breach;

(ii)     the breach, non-compliance or non-performance of any covenant, agreement or obligation of the Company contained in this Agreement;

(iii)     any Taxes of the Company or any Company Subsidiary with respect to (A) any Pre-Merger Tax Period or (B) the portion of any Straddle Period deemed to end on the close of business on the Closing Date;

(iv)     any Action made or brought by any of the current or former stockholders of the Company (on their own behalf or on behalf of the Company) against the Company relating to the Merger, this Agreement or any transactions contemplated under this Agreement; or

(v)     any fraud, to the extent committed as of or prior to the Closing, by or on behalf of the Company or any Company Subsidiary.

The Equityholders' several (and not joint and several) obligations under this <u>Section 8.2(a)</u> shall be based on the number of shares of the Company's Class A Common Stock held by each such Equityholder in proportion to the total number of shares of Class A Common Stock outstanding as of the Effective Time, in each case calculated on a Fully Diluted Basis.

(b)     <u>Limitations.</u>

(i)     No amount shall be payable to the Buyer Indemnified Parties in satisfaction of claims for indemnification pursuant to <u>Sections 8.2(a)(i)</u> for any individual claim or series of related individual claims for indemnification with respect to which the amount of indemnifiable Losses that may be recovered from the Equityholders does not exceed One Hundred Thousand Dollars (U.S. $100,000) (the "<u>Per Claim Minimum</u>"), and none of such Losses that fail to exceed the Per Claim Minimum shall count towards the satisfaction of the Deductible (defined below).

(ii)     No amount shall be payable to the Buyer Indemnified Parties in satisfaction of claims for indemnification pursuant to <u>Sections 8.2(a)(i)</u> unless and until the aggregate amount of all Losses of the Buyer Indemnified Parties arising from claims or series of related individual claims exceeding the Per Claim Minimum ("<u>Non-De Minimis Claims</u>") exceeds Seven Million Five Hundred Thousand Dollars (U.S. $7,500,000) (the "<u>Deductible</u>"), at which time the Equityholders shall indemnify the Buyer Indemnified Parties for the full amount of all such Non-De Minimis Claims in excess of the Deductible up to an amount equal to the Cap; <u>provided</u> that the Deductible shall not apply with respect to any Losses resulting from, arising out of or relating to breaches of (a) the Company Fundamental Representations or (b) the representations and

warranties set forth in Section 3.14 (Tax Matters), and none of such Losses shall count towards the satisfaction of the Deductible.

(iii)    The aggregate amount of all payments made by the Equityholder in satisfaction of claims for indemnification pursuant to Sections 8.2(a)(i) shall not exceed Fifty Million Dollars (U.S. $50,000,000) (the "Cap"); provided that no payments made by the Equityholders with respect to Losses resulting from, arising out of or relating to breaches of any of (a) the Company Fundamental Representations or (b) the representations and warranties set forth in Section 3.14 (Tax Matters) shall be subject to the Cap.

(iv)    In no event shall the aggregate amount of all payments made by any Equityholder in satisfaction of claims for indemnification pursuant to this Article VIII exceed the aggregate amounts actually received by such Equityholder in respect of such Equityholder's shares of Company Capital Stock and Options, as applicable, pursuant to this Agreement or, in respect to Dissenting Shareholders, pursuant to applicable appraisal proceedings.

(v)    The Equityholders will not have any liability pursuant to this Section 8.2 with respect to any Tax or Losses (i) for Taxes of the Company or any Company Subsidiaries for any taxable period (or portion thereof) that begins after the Closing Date, (ii) that are due to the unavailability in any taxable period (or portion hereof) beginning after the Closing Date of any net operating losses, credits or other Tax attribute from a taxable period (or portion thereof) ending on or prior to the Closing Date or (iii) that result from the breach of the covenant in Section 6.1(f).

(vi)    The Equityholders will not have any liability pursuant to this Section 8.2 with respect to any Losses that are reflected in Final Working Capital or Final Indebtedness.

8.3    Indemnification of Equityholders by Buyer.

(a)    Obligation.    Subject to the terms, limitations and conditions of this Agreement, Buyer and the Surviving Corporation (after the Effective Time) agree to jointly and severally indemnify the Company (prior to the Effective Time) and the Equityholders, and their respective Affiliates and each of their respective officers, directors, shareholders, managers, members, partners, employees, agents, representatives, successors and assigns (collectively, the "Equityholder Indemnified Parties") and hold each of them harmless against any Losses which any of them may suffer, sustain or become subject to, as the result of, arising out of, relating to or in connection with:

(i)    subject to the limitations in this Article VIII, the breach or inaccuracy by Buyer of any representation or warranty made by Buyer in this Agreement, in each case, without giving effect to any limitation or qualification as to "materiality," "material," "Material Adverse Effect" or similar qualifiers set forth in such representation or warranty for purposes of (and solely for the purposes of) determining the amount of Losses resulting from, arising out of or relating to a breach; or

    (ii)  the breach, non-compliance or non-performance of any covenant, agreement or obligation of Buyer contained in this Agreement.

   (b)  <u>Limitations</u>.

    (i)  No amount shall be payable to the Equityholder Indemnified Parties in satisfaction of claims for indemnification pursuant to <u>Section 8.3(a)(i)</u> unless and until the aggregate amount of all Losses of the Equityholders Indemnified Parties arising therefrom exceeds the Deductible, at which time Buyer and Surviving Corporation shall indemnify the Equityholder Indemnified Parties for the full amount of all such Losses in excess of the Deductible, up to an amount equal to the Cap; <u>provided</u> that (A) the limitations set forth in this <u>Section 8.3(b)(i)</u> shall not apply with respect to any Losses resulting from, arising out of or relating to breaches of the Buyer Fundamental Representations, and (B) none of such Losses shall count towards the satisfaction of the Deductible.

    (ii)  The aggregate amount of all payments made by Buyer and Surviving Corporation in satisfaction of claims for indemnification pursuant to <u>Section 8.3(a)</u> shall not exceed the Cap; <u>provided</u> that no payments made by Buyer or Surviving Corporation with respect to Losses resulting from, arising out of or relating to breaches of any of the Buyer Fundamental Representations shall be subject to the Cap; and

    (iii)  In no event shall the aggregate amount of all payments made by the Buyer and Surviving Corporation in satisfaction of claims for indemnification pursuant to this <u>Article VIII</u> exceed the Merger Consideration.

  8.4  <u>Notice and Defense of Third-Party Claims</u>.

   (a)  If a party hereto seeks indemnification under this <u>Article VIII</u> with respect to any action, lawsuit, proceeding, investigation or other claim brought against it by a third party (a "<u>Third-Party Claim</u>"), such party (the "<u>Indemnified Party</u>") shall promptly give written notice to the Shareholder Representative, on behalf of the Equityholders, or to Buyer, as applicable (the Equityholder or the Buyer, as applicable, the "<u>Indemnifying Party</u>"), after receiving written notice of such Third-Party Claim, describing the Third-Party Claim, the amount thereof (if known and quantifiable), and the basis thereof; <u>provided</u> that any failure to provide such notice shall not relieve the Indemnifying Party of any obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure or delay.  With respect to any Third-Party Claim which, if adversely determined, would entitle the Indemnified Party to indemnification pursuant to this <u>Article VIII</u>, the Indemnifying Party shall be entitled, at its sole cost and expense, (i) to participate in the defense of such Third-Party Claim giving rise to the Indemnified Party's claim for indemnification or (ii) at its option (subject to the limitations set forth below), to assume control and appoint lead counsel of such defense and, after notice from the Indemnifying Party to the Indemnified Party of such election to so assume control of such defense thereof, the Indemnifying Party shall not be liable to the Indemnified Party for any legal expenses of other counsel or any other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof. Notwithstanding the foregoing, the Indemnifying Party

73

shall not have the right to assume control of such defense, and shall pay the fees and expenses of counsel retained by the Indemnified Party in accordance with and subject to the limitations set forth in this Article VIII, to the extent the Third-Party Claim (1) seeks non-monetary relief against the Indemnified Party which, if awarded, would be reasonably expected, in the good faith judgment of the Indemnified Party, to establish a precedent, custom or practice materially adverse to the continuing business interests or prospects of the Indemnified Party or (2) involves criminal or quasi-criminal allegations.  The Indemnified Party shall cooperate fully with the Indemnifying Party and its counsel in the defense against any such Third-Party Claim.

(b)     In the event that either the Indemnifying Party does not elect to assume the control of the defense of any Third-Party Claim pursuant to Section 8.4 or any of the conditions in Section 8.4 is or becomes unsatisfied, the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third-Party Claim in any manner it may deem appropriate in its good faith judgment; provided, however, that in settling any Third-Party Claim in respect of which indemnification is payable under this Article VIII, the Indemnified Party shall act reasonably and in good faith and shall not settle any such Third-Party claim without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

(c)     In the event the Indemnifying Party is controlling the defense of any Third-Party Claim in accordance with Section 8.4:

(i)     the Indemnified Party shall nonetheless have the right to participate in the defense of such Third-Party Claim giving rise to the Indemnified Party's claim for indemnification at the Indemnified Party's sole cost and expense; provided, however, that if outside counsel to the Indemnified Party advises that there may be one or more material legal defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party, or that there exists a material conflict of interest (as determined by the conflict-of-interest rules restricting attorney conduct in the applicable jurisdiction) which would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, and in either case such counsel determines that it is therefore advisable for the Indemnified Party to employ separate counsel, then the Indemnifying Party shall pay one-half of the fees and expenses of such separate counsel in accordance with and subject to the limitations set forth in this Article VIII; and

(ii)     the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to or cease to defend such Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be withheld unreasonably); provided that the Indemnified Party shall be deemed to consent to the entrance of any judgment or into any settlement unless such judgment or settlement (A) is for only money damages and (B) includes, as a condition thereof, an express, unconditional release of the Indemnified Party from any liability or obligation with respect to such Third-Party Claim.

(d)     Irrespective of who controls the defense of any Third-Party Claim, each party shall act in good faith in responding to, defending against, settling or otherwise dealing

74

with such claims, and cooperate in any such defense and give each other party reasonable access to and copies of information, records and documents relevant thereto.

8.5     Notice of Non-Third-Party Claims.  If an Indemnified Party seeks indemnification under this Article VIII with respect to any matter which does not involve a Third-Party Claim, the Indemnified Party shall give written notice to the Indemnifying Party promptly after discovering the liability, obligation or facts giving rise to such claim for indemnification, describing the nature of the claim in reasonable detail, the amount thereof (if known and quantifiable), and the basis thereof; provided that any failure to so notify or any delay in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its or his obligations hereunder except to the extent that the Indemnifying Party is prejudiced by such failure or delay. If the Indemnifying Party has delivered an indemnity dispute notice to the Indemnified Party, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution to such dispute.  If the Indemnifying Party and the Indemnified Party cannot resolve such dispute in 30 days after delivery of indemnity dispute notice, then such dispute may be resolved by bringing an Action in accordance with Section 11.8.

8.6     Manner of Payment.

(a)     Subject to Section 8.6(c), following the final determination of any amounts owed to a Buyer Indemnified Party pursuant to Section 8.2(a) hereof, each of Buyer and the Shareholder Representative shall instruct the Escrow Agent to promptly disburse such amounts to such Buyer Indemnified Party in accordance with the Escrow Agreement.

(b)     Within three (3) Business Days after December 31, 2017 (the "Escrow Termination Date"), Buyer and the Shareholder Representative shall, in accordance with the terms of the Escrow Agreement, direct the Escrow Agent to transfer the amount then held in the Indemnification Escrow Fund in excess of the aggregate amount of unsatisfied or disputed claims for Losses specified in claim notices properly and timely delivered in accordance with Section 8.4 to the Equityholders, pro rata based on each such Equityholder's Escrow Percentage. Following the resolution and full payment, if applicable, of each unsatisfied or disputed claim for Losses specified in a claim notice properly and timely delivered in accordance with Section 8.4, any remaining amounts relating to the claim left in the Indemnification Escrow Fund shall be disbursed in accordance with the preceding sentence.

(c)     Any indemnification pursuant to this Article VIII that is determined to be due from the Equityholders based on a final, non-appealable determination, settlement or agreement among the parties hereto, may be, at the option of the Buyer, offset against any portion of any Earnout Amount that is unpaid.

(d)     Following final determination of any amounts owed to a Buyer Indemnified Party pursuant to Section 8.2(a) hereof, in the event that (i) there are no funds available in the Indemnification Escrow Fund and (ii) Buyer elects not to offset such indemnification pursuant to Section 8.2(a) hereof against any portion of any Earnout Amount that is unpaid, the Equityholders shall be severally (and not joint and several) liable for the payment of such amounts to Buyer pro rata based on their respective Escrow Percentages, subject to the limits set forth in Section 8.2(b).

(e)     Any indemnification pursuant to this Article VIII by or on behalf of Buyer or Surviving Corporation shall be effected by wire transfer of immediately available funds to the Payments Administrator (for further distribution to the Equityholders).

(f)     Indemnification payments made by wire transfer shall be made to the applicable account within three Business Days after the determination of the amount thereof pursuant to a final judgment, settlement or agreement among the parties hereto.  In the case of indemnification payments to be satisfied by offset against any Earnout Amount, the Shareholder Representative and Buyer or Surviving Corporation shall, within three Business Days after the determination of the amount thereof, jointly execute an amendment to this Agreement reflecting the reduced amount of any Earnout Amount.

8.7     Determination of Loss Amount.

(a)     The amount of Losses subject to indemnification pursuant to Section 8.2(a) shall be reduced by (i) the net amount of the Tax benefits actually realized by Buyer by reason of the related Losses during the taxable year during which any such Loss was sustained, or during the taxable year succeeding such year; provided, however, that any deductions or credits resulting from such Losses shall be treated as the first deductions or credits taken on any Tax Return, and (ii) any insurance proceeds previously received by the Surviving Corporation with respect to such Losses (net of any deductible or co-payment, Buyer's reasonable estimate of any increase in insurance premiums attributable to such recovery and all out of pocket costs related to such recovery) from any insurance carrier pursuant to any insurance coverage in place with respect to such Losses.  Buyer shall use commercially reasonable efforts to claim and realize any Tax benefits in the earliest Tax year allowable by applicable Law. To the extent any such Tax benefit is actually realized in the taxable year succeeding the year in which the applicable Loss was sustained, Buyer shall make a payment to the the Payments Administrator (for further distribution to the Equityholders) equal to the amount of such Tax benefit.  If any insurance proceeds are subsequently recovered by the Surviving Corporation from an insurance carrier after payment has been made by the Equityholders to the Buyer Indemnified Parties in accordance with this Article VIII with respect to the Losses to which such insurance recoveries relate, then Buyer shall promptly cause the Surviving Corporation to remit such insurance recoveries (net of any deductible or co-payment, Buyer's reasonable estimate of any increase in insurance premiums attributable to such recovery and all out of pocket costs related to such recovery) to (i) if remitted prior to the Escrow Termination Date, the Escrow Agent to be held as part of the Indemnity Escrow Amount or (ii) if remitted on or after the Escrow Termination Date, the Equityholders pro rata based on their respective Escrow Percentages; provided that in no event shall Buyer have any obligation hereunder (x) to cause the Surviving Corporation to remit to the Equityholders any portion of such insurance recoveries in excess of the indemnification payment or payments actually received from the Equityholders with respect to such Losses or (y) to make, or to cause the Surviving Corporation or any subsidiary of the Surviving Corporation to make, any insurance claim or to pursue any recovery from any insurance carrier or third party with respect thereto.

(b)     Upon and after becoming aware of any event which is reasonably likely to give rise to Losses subject to indemnification hereunder, the parties hereto shall use, and, following the Effective Time, the Buyer shall cause the Surviving Corporation to use,

76

commercially reasonable efforts to mitigate their respective Losses arising from such events, in each case, to the extent required by applicable Law.

8.8     Exclusive Remedy.  Absent fraud, except for the Shareholder Representative's rights to indemnification from the Equityholders under Section 11.17, the parties hereto hereby agree that, from and after the Effective Time, the indemnification provisions set forth in this Article VIII are the exclusive provisions in this Agreement with respect to the liability of the Equityholders or Buyer or Surviving Corporation for the breach, inaccuracy or nonfulfillment of any representation or warranty or any covenants, agreements or other obligations contained in this Agreement and the sole remedy of the Buyer Indemnified Parties and the Equityholder Indemnified Parties for any claims for breach of representation or warranty or covenants, agreements or other obligations arising out of this Agreement; provided that nothing herein shall preclude any party from enforcing its right to specific performance of post-Merger covenants, agreements or other post-Merger obligations pursuant to Section 11.12.

ARTICLE IX
TERMINATION

9.1     Termination.  At any time prior to the Effective Time, this Agreement may be terminated only pursuant to any of the following:

(a)     Mutual Consent.  By mutual written consent of Buyer and the Company;

(b)     Breach of Representations or Warranties.

(i)     By Buyer upon delivery of written notice to the Company if (A) the Company shall have breached any of its representations or warranties in this Agreement, or any such representation or warranty otherwise shall have become untrue, (B) such breach(es) or failure(s) of representations and warranties to be true (1) are not capable of cure prior to the End Date or (2) if capable of cure prior to the End Date, are not cured within 20 Business Days of delivery of written notice thereof from Buyer (and if not cured by such date, such breach(es) or failure(s) shall be deemed incurable) and (C) whether considered individually or in the aggregate, such uncured breach(es) or failure(s) of representations and warranties to be true would result in a failure of the condition set forth in Section 7.2(a);

(ii)     By the Company upon delivery of written notice to Buyer if (A) Buyer or Merger Sub shall have breached any of their respective representations or warranties in this Agreement, or any such representation or warranty otherwise shall have become untrue in any material respect, (B) such breach(es) or failure(s) of representations and warranties to be true (1) are not capable of cure prior to the End Date or (2) if capable of cure prior to the End Date, are not cured within 20 Business Days of delivery of written notice thereof from the Company (and if not cured by such date, such breach(es) or failure(s) shall be deemed incurable) and (C) whether considered individually or in the aggregate, such uncured breach(es) or failure(s) of representations and warranties to be true would result in a failure of the condition set forth in Section 7.3(a);

(c)    <u>Breach of Covenants or Agreements</u>.

(i)    By Buyer upon delivery of written notice to the Company if (A) the Company shall have breached any of its covenants or agreements in this Agreement or any other Transaction Document, (B) such breach(es) (1) are not capable of cure prior to the End Date or (2) if capable of cure prior to the End Date, are not cured within 20 Business Days of delivery of written notice thereof from Buyer (and if not cured by such date, such breach(es) shall be deemed incurable) and (C) whether considered individually or in the aggregate, such uncured breach(es) would result in a failure of the condition set forth in <u>Section 7.2(b)</u>;

(ii)    By the Company upon delivery of written notice to Buyer if (i) Buyer or Merger Sub shall have breached any of their respective covenants or agreements in this Agreement or any other Transaction Document, (ii) such breach(es) (A) are not capable of cure prior to the End Date or (B) if capable of cure prior to the End Date, are not cured within 20 Business Days of delivery of written notice thereof from the Company (and if not cured by such date, such breach(es) shall be deemed incurable) and (iii) whether considered individually or in the aggregate, such uncured breach(es) would result in a failure of the condition set forth in <u>Section 7.3(b)</u>;

(d)    <u>End Date</u>.  By either Buyer or the Company upon delivery of written notice to the other if the consummation of the Merger has not occurred on or before 5:00 p.m., Pacific time, on the date which is six (6) months from the date of this Agreement, subject to extension by the mutual written agreement of the parties hereto (as it may be extended pursuant to this <u>Section 9.1(d)</u>, the "<u>End Date</u>"); <u>provided</u>, that if, on the initial End Date, all of the conditions set forth in <u>Article VII</u> have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Effective Time), except for the conditions set forth in <u>Section 7.1(a)</u> or <u>Section 7.1(d)</u>, then either the Company or Buyer may, in its sole discretion, extend the End Date for a period of three (3) months; <u>provided</u>, <u>further</u>, that neither Buyer nor the Company will be entitled to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> if such Person's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Transaction Document has been a primary cause of the failure of the Merger to occur on or prior to such time on the End Date;

(e)    <u>Orders; Laws</u>.  By either Buyer or the Company upon delivery of written notice to the other if any Governmental Entity shall have issued or entered any Order, enacted any Law or taken any other Action which, in any such case, (i) permanently restrains, enjoins or otherwise prohibits the Merger, (ii) would prevent the Merger from occurring as contemplated by this Agreement on or prior to the applicable time on the End Date or (iii) has had or would reasonably be expected to have a Company Material Adverse Effect with respect to Inscape; <u>provided</u>, that Buyer will not be entitled to terminate this agreement pursuant to clauses (i) and (ii) of this <u>Section 9.1(e)</u> if such Order, Law or Action forming the basis for such termination was issued, entered, enacted or taken, as applicable, primarily due to Buyer's and Merger Sub's failure to have available sufficient cash on hand, together with Committed Financing, to consummate the Merger and the other transactions contemplated by this Agreement, and to perform their respective obligations under this Agreement; or

(f)     Buyer's Failure to Close.  By the Company if (i) all the conditions set forth in Section 7.1 and Section 7.2 have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Effective Time), (ii) the Company has thereafter confirmed in writing to Buyer and Merger Sub that it is ready and able to consummate the Merger, and (iii) Buyer and Merger Sub fail to consummate the Merger within three (3) Business Days following the satisfaction of the foregoing clauses (i) and (ii).

9.2     Buyer Termination Fee; Escrow.

(a)     In the event that this Agreement is terminated by the Company pursuant to any of (i) Section 9.1(b)(ii) (Buyer's or Merger Sub's Breach of Representations and Warranties), (ii) Section 9.1(c)(ii) (Buyer's or Merger Sub's Breach of Covenants or Agreements), (iii) Section 9.1(d) (End Date), and immediately prior to such termination, the conditions in Section 7.1(d) (PRC Regulatory Approvals) have not been satisfied primarily due to Buyer's and Merger Sub's failure to have available sufficient cash on hand, together with Committed Financing, to consummate the Merger and the other transactions contemplated by this Agreement, and to perform their respective obligations under this Agreement, or (iv) Section 9.1(f) (Buyer's Failure to Close) (each a "Qualifying Buyer Termination"), then Buyer shall pay, or cause to be paid, the Buyer Termination Fee to the Company.

(b)     Prior to the execution and delivery of this Agreement, Buyer has deposited the Buyer Termination Fee Deposit into an escrow account held by the Escrow Agent, pursuant to the terms of the Escrow Agreement to secure Buyer's obligations under Section 9.2(a).  At all times prior to the occurrence of the Closing or a valid termination of this Agreement pursuant to Section 9.1, Buyer agrees that the Buyer Termination Fee Deposit shall be maintained in the escrow account pursuant to the terms of the Escrow Agreement, and Buyer and the Company agree that no instructions to the Escrow Agent shall be issued except in accordance with this Section 9.2.  In the event that the Closing occurs, or in the event that this Agreement is terminated in the absence of a Qualifying Buyer Termination, then Buyer and the Company shall, within three Business Days thereof, direct the Escrow Agent to transfer the Buyer Termination Fee Deposit from the escrow account to Buyer pursuant to the terms of the Escrow Agreement.  In the event of a Qualifying Buyer Termination, (i) pursuant to the terms of the Escrow Agreement and written notice thereof from the Company, the Escrow Agent shall automatically pay the Buyer Termination Fee Deposit to the Company, unless the Escrow Agent has received an Order issued by a Governmental Entity of competent jurisdiction, or has received joint instructions from Buyer and the Company, instructing it to do otherwise and (ii) Buyer shall pay the Buyer Termination Fee Remainder to the Company by wire transfer or delivery of other immediately available U.S. dollar funds to the account designated by the Company within three (3) Business Days following such termination.  If payable under the terms of this Section 9.2, any part of the Buyer Termination Fee shall be paid by wire transfer of immediately available funds to one or more accounts specified in the Escrow Agreement, and shall be paid by the third Business Day following the occurrence of the Closing or a valid termination of this Agreement pursuant to Section 9.1.  Each of Buyer and the Company agrees that it will act in good faith and cooperate with one another to execute and deliver such joint written instructions, including with respect to any distributions, to the Escrow Agent as are required to implement the intent of this Agreement and the Escrow Agreement.

(c)     Notwithstanding anything to the contrary in this Agreement but subject to Section 11.12 and except in the event of (i) any intentional or willful breach of this Agreement by the Buyer or Merger Sub or (ii) the termination of this Agreement by the Company under Section 9.1(f), the sole and exclusive remedies of the Company, any Company Party or any Person claiming by, through or for the benefit of the Company against any Buyer Party for any loss, damage, liability, claim, obligation or Action (whether in law or in equity and whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement, the Financing or the Commitment Letters (including any breach or alleged breach hereof or thereof), the negotiation, execution or performance hereof or thereof or the transactions contemplated hereby or thereby or in respect of any other document or theory of law or equity or in respect of any oral or written representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise shall be receipt of the Buyer Termination Fee from Buyer in the event this Agreement has been terminated and the Buyer Termination Fee is payable to the Company pursuant to this Section 9.2. The parties acknowledge and agree that in no event will Buyer be required to pay the Buyer Termination Fee on more than one occasion and in no event shall the Company be entitled to collect the Buyer Termination Fee on more than one occasion. Without limitation of the generality of the foregoing or of any other provision of this Agreement, subject to Section 11.12 and except in the event of (i) any intentional or willful breach of this Agreement by the Buyer or Merger Sub or (ii) the termination of this Agreement by the Company under Section 9.1(f), (A) in no event shall the Buyer Parties be liable to the Company, any Company Party or any Person claiming by, through or for the benefit of the Company in excess of an aggregate amount equal to the Buyer Termination Fee for any loss, damage, liability, claim, obligation or Action (whether in law or in equity and whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement, the Financing or the Commitment Letters (including any breach or alleged breach hereof or thereof), the negotiation, execution or performance hereof or thereof or the transactions contemplated hereby or thereby or in respect of any other document or theory of law or equity or in respect of any oral or written representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise, (B) upon payment of the Buyer Termination Fee, none of the Company, any Company Party or any Person claiming by, through or for the benefit of the Company shall have any rights or claims against any Buyer Party under this Agreement, the Financing, the Commitment Letters or any of the transactions contemplated hereby or thereby (whether in law or in equity and whether based on contract, tort or otherwise) or for any breach or alleged breach hereof or thereof and (C) none of the Company, any Company Party or any Person claiming by, through or for the benefit of the Company shall have any rights or claims against any Buyer Party under or in connection with this Agreement, the Financing, the Commitment Letters or any of the transactions contemplated hereby or thereby (whether in law or in equity and whether based on contract, tort or otherwise) or for any breach or alleged breach hereof or thereof for any damages of any kind or nature or for any other monetary amounts.

9.3     Effect of Termination.  In the event of (i) any intentional or willful breach of this Agreement by the Company, Buyer or Merger Sub or (ii) the termination of this Agreement by the Company under Section 9.1(f) the rights of termination set forth above shall be in addition to any other rights a terminating party may have under this Agreement, and the exercise of a right of termination will not be an election of remedies. Notwithstanding the foregoing sentence, in the event of any termination of this Agreement by either Buyer or the Company as provided in

768801.20-LACSR01A - MSW

<u>Section 9.1</u>, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party or any of its or their Affiliates to any other Person by virtue of, arising out of or otherwise in connection with this Agreement or any other Transaction Document except (a) as otherwise provided in this <u>Article IX</u> or <u>Article XI</u>, (b) that nothing in this Agreement or any other Transaction Document will relieve any party from any material breach of this Agreement or any other Transaction Document prior to such termination or for fraud and (c) that the provisions of <u>Section 9.2</u> (Buyer Termination Fee; Escrow) and <u>Article XI</u> (Miscellaneous) shall survive termination.

ARTICLE X<br>DEFINITIONS

10.1   <u>Interpretation</u>.  Where specific language is used to clarify by example a general statement contained herein (such as by using the word "including"), such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The words "include" and "including," and other words of similar import when used herein shall not be deemed to be terms of limitation but rather shall be deemed to be followed in each case by the words "without limitation."  The word "if" and other words of similar import when used herein shall be deemed in each case to be followed by the phrase "and only if."  The words "herein," "hereto," and "hereby" and other words of similar import in this Agreement shall be deemed in each case to refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Any reference herein to "dollars", "$" or "cents" shall mean United States dollars and cents, the currency of the United States, and any reference to "RMB" shall mean the renminbi, the currency of the PRC.  The words "as of the date of this Agreement" and words of similar import shall be deemed in each case to refer to the date this Agreement was first signed. The term "or" shall be deemed to mean "and/or."  Any reference to any particular Code section or any other Law will be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified and any reference herein to a Governmental Entity shall be deemed to include reference to any successor thereto.

10.2   <u>Certain Definitions</u>.

"<u>2017 Earnout Period</u>" means the period commencing on January 1, 2017 and ending December 31, 2017.

"<u>2018 Earnout Period</u>" means the period commencing on January 1, 2018 and ending December 31, 2018.

"<u>2019 Earnout Period</u>" means the period commencing on January 1, 2019 and ending December 31, 2019.

"<u>Action</u>" means any action, litigation, arbitration, charge, claim, complaint, demand, grievance, hearing, inquiry, investigation, proceeding (including civil, criminal, administrative or

81

appellate proceedings) or lawsuit or appeal by or before any court or other Governmental Entity or any arbitrator or arbitration panel.

"Actual Merger Consideration" means the Closing Date Merger Consideration, as adjusted pursuant to Section 2.5(b).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, (including, but not limited to, all directors and officers of such Person) controlled by, or under common control with, such Person.

"Aggregate Exercise Price" means the aggregate exercise price of all outstanding, unexercised Options.

"Aggregate Liquidation Preference" means the Per Share Liquidation Preference multiplied by the aggregate number of shares of outstanding Preferred Stock.

"Antitrust Laws" means the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the HSR Act, the Federal Trade Commission Act and all other federal, state, local, foreign or international Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or significant impediments or lessening of competition or the creation or strengthening of a dominant position through merger or acquisition, in any case that are applicable to the transactions contemplated by this Agreement.

"Articles of Incorporation" means the Amended and Restated Articles of Incorporation of the Company, as filed with the Secretary of State of the State of California on July 24, 2015.

"Base Purchase Price" means Two Billion Dollars ($2,000,000,000).

"Business Day" means each day of the week except Saturdays, Sundays and days on which banking institutions are authorized by Law to close in the State of California.

"Buyer Party" means, collectively, Buyer, Parent, the Debt Financing Sources and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, shareholders, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, shareholder, Affiliate or assignee of any of the foregoing.

"Buyer Termination Fee" means the Buyer Termination Fee Deposit plus the Buyer Termination Fee Remainder.

"Buyer Termination Fee Deposit" means the amount of Fifty Million Dollars ($50,000,000).

"Buyer Termination Fee Remainder" means the amount of Fifty Million Dollars ($50,000,000).

"Bylaws" means the Bylaws of the Company in effect as of the date hereof.

"CFIUS" means the Committee on Foreign Investment in the United States, and each member agency thereof, acting in such capacity.

"CFIUS Clearance" means that either (i) CFIUS has concluded that the transactions contemplated by this Agreement do not constitute a "covered transaction" and are not subject to review under Section 721 of the U.S. Defense Production Act of 1950, (ii) a written notice shall have been issued by CFIUS stating that it has determined that there are no unresolved national security concerns with respect to the transactions contemplated by this Agreement, and has concluded all action under FINSA or (iii) if CFIUS has sent a report to the President of the United States requesting the President's decision pursuant to FINSA with respect to the transactions contemplated by this Agreement, then (x) the President shall have announced a decision not to take any action to suspend or prohibit the transactions contemplated by this Agreement or (y) the President shall have not taken any action after fifteen (15) days from the date the President received such report from CFIUS.

"Change in Control Payments" means any change in control payments, severance payments or transaction bonuses paid, or to be paid, by the Company or any Company Subsidiary solely as a result of the Merger (and not as a result of any combination of other events, such as termination of employment) pursuant to an arrangement in effect prior to the Closing and that are unpaid at Closing.  For the avoidance of doubt, the definition of "Change in Control Payments" does not include the accelerated vesting and payout of any of Options or Restricted Stock pursuant to the Merger as set forth in Article II.

"Closing Date Merger Consideration" means the Base Purchase Price minus the Aggregate Liquidation Preference plus the Aggregate Exercise Price plus Estimated Cash minus Target Cash plus Estimated Working Capital minus Target Working Capital minus the Estimated Indebtedness plus the Target Indebtedness minus any Estimated Transaction Costs.

"Closing Date Payments" means (a) the payment in full, in cash, of the Merger Consideration, (b) the repayment in full of all Existing Company Debt pursuant to its terms, and (c) the payment of all costs, fees and expenses in connection therewith.

"Closing Payment Escrow Amount" means Two Million Five Hundred Thousand Dollars ($2,500,000).

"Code" means the Internal Revenue Code of 1986, as amended.

"Committed Financing" means one or more debt or equity commitment letters, each between Buyer and the Debt Financing Source or Equity Financing Source that is a party thereto, which irrevocably commit, on a legally binding basis, each such Debt Financing Source and Equity Financing Source to lend U.S. Dollars to, or invest U.S. Dollar in, Buyer, subject only to the conditions set forth in Article VII.

"Company Capital Stock" means the Company's Class A Common Stock, Class B Common Stock and Preferred Stock.

"Company Cash" means all cash, cash equivalents, restricted cash, and investments of the Company and the Company Subsidiaries, as determined on a consolidated basis in accordance

with GAAP.  For clarity, the general ledger accounts that comprised Company Cash as of September 30, 2015 are set forth on Schedule B attached hereto.

"Company EBITDA" means, for any Earnout Period, the Company's net income before interest, income Taxes, depreciation, amortization (including capitalized software amortization) and non-cash stock-based components of employee compensation, as derived from the financial statements of the Company for such Earnout Period prepared in accordance with GAAP consistently applied in accordance with the Company's past practice prior to the date of the Closing and without regard to any amendments or modification to GAAP after the Closing; provided, however, that the calculation of Company EBITDA shall exclude income or expense related to a change in accounting policy, and non-recurring, prior period adjustments and gains or losses, in each case that are not considered part of the normal operations of the business; provided, further, that the calculation of Company EBITDA shall exclude any severance costs related to Senior Executives; provided, further, that in calculating Company EBITDA, the gross margin on sales of non-VIZIO-branded televisions and sound bars, shall be replaced with the gross margin on sales of VIZIO-branded televisions and sound bars as calculated and determined using the gross profit percentage of comparable VIZIO products of similar class and size.

"Company EBITDA Percentage" means, for any Earnout Period, the quotient of (x) the Company EBITDA for such Earnout Period, divided by (y) Company Revenue for such Earnout Period.

"Company Indebtedness" means the sum of (i) Indebtedness (including Existing Company Debt), (ii) (one minus the marginal state, federal and local income Tax rate of the Company) times any accrual for Liability relating to Intellectual Property claims of any third Person with respect to the Company's Blu-Ray players, and (iii) employee deferred compensation liabilities and employee deferred compensation assets, in each case as of the close of business on the Business Day immediately preceding the Closing Date of the Company and the Company Subsidiaries, as determined on a consolidated basis in accordance with GAAP.  For clarity, the general ledger accounts that comprised Company Indebtedness as of September 30, 2015 are set forth on Schedule B attached hereto.

"Company Intellectual Property" means all rights owned by the Company or any Company Subsidiary in all Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued by, filed with, or recorded by, any Governmental Entity in any jurisdiction.

"Company Material Adverse Effect" means any change, event, occurrence or circumstance that, individually or in the aggregate with all other changes, events occurrences and circumstances, results in, or would reasonably be expected to result in, a material adverse effect (i) on the business, results of operations or financial condition of the Company and each Company Subsidiary, taken as a whole, or (ii) on the ability of the Company to perform its obligations hereunder or to consummate the transactions contemplated hereby except, to the extent resulting from any of the following, (A) changes or developments in general, local, domestic, foreign or international economic conditions, to the extent that such changes do not have a disproportionate impact on the Company as compared to other participants in the industries in which the Company participates, (B) changes or developments affecting generally

84

the television or data analytics industries or markets in which Company and the Company Subsidiaries operate, to the extent that such changes do not have a disproportionate impact on the Company as compared to other participants in in the industries in which the Company participates, (C) political conditions (or changes in such conditions) in the United States or any other country or region in the world, to the extent that such conditions or changes do not have a disproportionate impact on the Company as compared to other participants in in the industries in which the Company participates, (D) acts of war, sabotage or terrorism (including any worsening of any such acts of war, sabotage or terrorism, military actions or the escalation thereof) in the United States or any other country or region in the world, (E) any changes in applicable laws, regulatory conditions or accounting rules or principles, including changes in GAAP, to the extent that such changes do not have a disproportionate impact on the Company as compared to other participants in the industries in which the Company participates, (F) any actions required by this Agreement, (G) any actions taken by the Company pursuant to this Agreement with the express written consent of Buyer, (H) the announcement of the transactions contemplated by the Transaction Documents or (I) any failure by the Company to meet any estimates or outlook of revenues or earnings or other financial projections, provided that the underlying causes of such failure may be considered in determining whether there was a Company Material Adverse Effect.

"Company Owned IP" means Intellectual Property owned by the Company.

"Company Party" means, collectively, the Company and the Company Subsidiaries and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, shareholders, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, shareholder, Affiliate or assignee of any of the foregoing.

"Company Revenue" means, for any Earnout Period, the net revenue of the Company as derived from the financial statements of the Company for such Earnout Period prepared in accordance with GAAP consistently applied in accordance with the Company's past practice prior to the date of the Closing and without regard to any amendments or modification to GAAP after the Closing; provided, however, that the calculation of Company Revenue shall exclude income or expense related to a change in accounting policy, and non-recurring, prior period adjustments and gains or losses, in each case that are not considered part of the normal operations of the business. For clarity, the calculation of Company Revenue shall be done net of all customary sales incentives, discounts, allowances, price protection, returns, rebates and co-op advertising which are required to be deducted from revenue in accordance with GAAP.

"Company Subsidiary" means, with respect to the Company, any entity of which securities (or other ownership interest having ordinary voting power) to elect a majority of the Board of Directors (or other persons performing similar functions) are at any time directly or indirectly owned by the Company.

"Consents" means all notices, reports, filings, consents, clearances, ratifications, authorizations, waivers, licenses, exemptions, orders, actions or non-actions or similar approvals.

"Contract" means any agreement, contract, instrument, commitment, lease, guaranty, indenture, license, option or other arrangement or understanding (and all amendments, side

letters, modifications and supplements thereto) between parties or by one party in favor of another party, whether written or oral.

"Debt Financing Documents" means the agreements, documents and certificates contemplated by the Debt Financing, including without limitation: (a) all commitment letter, credit agreements, loan documents, purchase agreements, underwriting agreements, indentures, debentures, notes, intercreditor agreements and security documents pursuant to which the Debt Financing will be governed or contemplated; (b) officer, secretary, solvency and perfection certificates, legal opinions, corporate organizational documents, good standing certificates, lien searches and resolutions contemplated by the Debt Financing or requested by Buyer or its Debt Financing Sources; (c) documents requested by Buyer or its Debt Financing Sources relating to the repayment of the Existing Company Debt and the release of related liens, including customary payoff letters and (to the extent required) evidence that notice of such repayment has been timely delivered to the holders of such debt; (d) all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act; and (e) agreements, documents or certificates that facilitate the creation, perfection or enforcement of liens securing the Debt Financing (including original copies of all certificated securities (with transfer powers executed in blank), control agreements, surveys, title insurance, landlord consent and access letters) as are requested by Buyer, Merger Sub or its Debt Financing Sources.

"Debt Financing Sources" means the entities that have committed to provide or arrange or otherwise entered into agreements in connection with all or any part of the Debt Financing or other financings (other than the Equity Financing) in connection with the transactions contemplated hereby, including the parties to any joinder agreements, indentures or credit agreements entered pursuant thereto or relating thereto, together with their respective affiliates, and their respective affiliates' officers, directors, employees, agents and representatives and their respective successors and assigns.

"DOJ" means the United States Department of Justice.

"Earnout Amount" shall mean each of the Revenue Earnout Amounts and the EBITDA Earnout Amounts.

"Earnout Percentage" means, as to any Equityholder at any given time of determination, the quotient of (x) the product of (A) the applicable Per Share Earnout Amount multiplied by (B) the number of shares of Class A Common Stock held by such Equityholder at the Effective Time on a Fully Diluted Basis, divided by (y) the applicable Earnout Amount.

"Earnout Period" means the 2017 Earnout Period, 2018 Earnout Period or the 2019 Earnout Period, as applicable.

"Environmental Claim" means any Action by any Person alleging Liability (including Liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release of, or exposure to any Hazardous Substances; (b) circumstances forming the basis of any violation, or alleged violation,

of any Environmental Law; or (c) any other matters covered or regulated by, or for which liability is imposed under, Environmental Laws.

"Environmental Law" means any applicable Laws (including common law), statutes, regulations, ordinances, rules and enforceable governmental guidance, policies or orders relating to pollution or protection of the environment, human health and safety or natural resources, including Laws relating to: (i) the exposure to, or Releases or threatened Releases of, Hazardous Substances; (ii) the generation, management, manufacture, processing, distribution, use, treatment, containment, disposal, storage, transport, recycling or handling of Hazardous Substances; or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances.

"Equityholders" means all holders of Company Capital Stock or Options as of the Effective Time.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder, as amended, supplemented or substituted therefor from time to time.

"Escrow Percentage" means, as to any Equityholder at any given time of determination, the quotient of (x) the product of (A) the Per Share Escrow Amount multiplied by (B) the number of shares of Class A Common Stock held by such Equityholder at the Effective Time on a Fully Diluted Basis, divided by (y) the Total Escrow Amount.

"Existing Company Debt" means that certain (i) Credit Agreement dated as of August 14, 2014 by and between the Company and Citibank, N.A., as amended by the First Amendment to Credit Agreement dated as of July 17, 2015 and (ii) Loan and Security Agreement, dated April 6, 2016, by and between the Company and Bank of America, N.A.

"FCPA" means the Foreign Corrupt Practices Act of 1977 and any other comparable Laws governing corruption of foreign officials.

"Financing Deliverables" means the following documents to be delivered in connection with the Debt Financing: (a) a customary solvency certificate and customary perfection certificates required in connection with the Debt Financing, corporate organizational documents and good standing certificates reasonably requested by Buyer or its Debt Financing Sources; (b) customary pay-off letters relating to the repayment at Closing of the Existing Company Debt and the release of related liens, including the related filings and return of collateral upon the full payment thereof; (c) documentation and other information reasonably requested by Buyer to evidence compliance with laws including (i) as may be required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations and (ii) OFAC, FCPA and the Investment Company Act; (d) customary evidence of property and liability insurance of the Company with customary endorsements in favor of secured Debt Financing Sources; (e) customary authorization letters, confirmations and undertakings in connection with the Marketing Material (including with respect to presence or absence of material non-public information and accuracy of the information contained therein); and (f) agreements, documents or certificates that facilitate the creation, perfection or enforcement, in

each case as of the Closing, of liens securing such Debt Financing (including original copies of all certificated securities (with transfer powers executed in blank), control agreements, surveys and title insurance) as are reasonably requested by Buyer or its Debt Financing Sources.

"Financing Failure Event" shall mean any of the following (a) the commitments with respect to all or any portion of the Equity Financing expiring or being terminated, (b) for any reason, all or any portion of the Financing becoming unavailable, (c) a breach or repudiation by any party to the Equity Commitment Letters, (d) it becoming reasonably foreseeable that any of the events set forth in clauses (a) through (c) shall occur, or (e) any party to the Equity Commitment Letters or any Affiliate or agent of such Person shall allege that any of the events set forth in clauses (a) through (c) has occurred.

"Financing Information" means all information with respect to the business, operations, financial condition, projections and prospects of the Company as may be reasonably requested by Buyer or its Debt Financing Sources that is required to be delivered in order to satisfy a condition precedent to the funding of the Debt Financing, including such information relating to the Company and the Company Subsidiaries as is reasonably requested in connection with Debt Financing.

"FINSA" means the Foreign Investment and National Security Act of 2007, and all rules and regulations thereunder, including 31 C.F.R. Part 800 *et seq.*

"Force Majeure Event" means war, terrorist act, fire, explosion, natural disaster, strike, riot, labor dispute, act of Governmental Entity, act of God or other cause similar to any of the foregoing and beyond the reasonable control of the Company.

"FTC" means the United States Federal Trade Commission.

"Fully Diluted Basis" means the number of shares of the Company's Class A Common Stock issued and outstanding assuming (i) the conversion of all shares of Class B Common Stock and Preferred Stock pursuant to the terms of the Company's Articles of Incorporation and (ii) the full exercise of all Options outstanding pursuant to the terms of the 2007 Plan.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means any government, any governmental or regulatory entity or body, department, commission, board, agency, instrumentality, taxing authority, political subdivision, bureau, official or other institution (including, without limitation, any designated foreign exchange bank in China that is authorized and supervised by SAFE, but solely to the extent of such authorization and supervision and excluding any other capacity in which such banks act) and any self-regulatory organization and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign. For clarity, none of the Equity Financing Sources or Financing Sources, acting in their capacity as such, shall be considered a Governmental Entity.

"Hazardous Substances" means those hazardous or toxic materials, substances, chemicals, wastes, pollutants, contaminants, and terms of similar import defined, classified in or

regulated under any Environmental Law, including without limitation toxic mold, natural gas, radioactive substances, petroleum products or petroleum derivatives and other substances that may have an adverse effect on human health or the environment.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or any successor statute, as amended and in effect from time to time.

"Indebtedness" means, at any specified time, any of the following indebtedness of any Person (whether or not contingent and including, without limitation, any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable in connection therewith): (a) any obligations of such Person for borrowed money or in respect of loans or advances (whether or not evidenced by bonds, debentures, notes, or other similar instruments or debt securities); (b) any obligations of such Person as lessee under any lease or similar arrangement required to be recorded as a capital lease in accordance with GAAP; (c) all liabilities of such Person under or in connection with letters of credit or bankers' acceptances, performance bonds, sureties or similar obligations that have been drawn down, in each case, to the extent of such draw; (d) any obligations of such Person to pay the deferred purchase price of property, goods or services other than those trade payables incurred in the Ordinary Course of Business; (e) all liabilities of such Person arising from cash/book overdrafts; (f) all liabilities of such Person under conditional sale or other title retention agreements; and (g) any liability or obligation of others guaranteed by, or secured by any Lien on the assets of, such Person; provided that with respect to the Company and the Company Subsidiaries, Indebtedness shall not include (w) any Unpaid Transaction Costs, (x) any trade payables accumulated in the Ordinary Course of Business, (y) any payables or loans of any kind or nature between the Company and any Company Subsidiary, or (z) any amounts described on Section 10.2 of the Company Disclosure Schedules.

"Indemnification Escrow Amount" means Fifty Million Dollars ($50,000,000).

"Insurance Policy" means any policy of insurance covering the Company, the Company Subsidiaries or any of their respective employees, properties or assets, including policies of life, property, fire, workers' compensation, products liability, directors' and officers' liability and other casualty and liability insurance.

"Intellectual Property" means (a) any trademark, service mark, design, logo, slogan, trade dress or other indicator that identifies and distinguishes the source of a good or service, corporate names, and all translations, adaptations, derivations and combinations of the foregoing, together with all goodwill associated with each of the foregoing, (b) patents and patent applications, inventions (whether or not patentable or whether or not reduced to practice), (c) invention disclosures, trade secrets, technology, discoveries, improvements, specifications, designs, formulae, techniques, technical data and manuals, research and development information, know how, methods and processes, (d) copyrights and copyrightable works (including, without limitation, computer software, source code, executable code, data, databases and documentation), (e) domain names, (f) rights of privacy, rights of publicity, proprietary information and data, and (g) all other intellectual property and registrations and applications for any of the foregoing, in any applicable jurisdiction throughout the world.

89

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Knowledge" means with respect to any Person the actual knowledge after reasonable inquiry of any director or executive officer of such Person; provided that, in the case of the Company, "Knowledge" means the actual knowledge, after reasonable inquiry, of the Persons set forth on Schedule 10.2.

"Law" means any requirement arising under any constitution, law, statute, code, treaty, decree, rule, ordinance or regulation or any determination or direction of any arbitrator or any Governmental Entity, including any environmental and safety requirements and including any of the foregoing that relate to data use, privacy or protection.

"Liability" means any liability, debt, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other loss, cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or become due and regardless of when asserted.

"Lien" means any security interest, pledge, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention agreement (including any lease in the nature thereof), charge, encumbrance or other similar arrangement or interest in real or personal property or Intellectual Property.

"Losses" means any and all losses, Liabilities, actions, causes of action, costs, damages or expenses, whether or not arising from or in connection with any Third-Party Claims (including, without limitation, interest, penalties, reasonable attorneys', consultants' and experts' fees and, in connection with any Third-Party Claim, expenses and all amounts paid in investigation, defense or settlement of any of the foregoing); provided, however, that Losses shall not include punitive, exemplary, lost profits, diminution of value, consequential damages, unforeseen damages, speculative contract damages or special damages, except to the extent payable to a third party in connection with a Third-Party Claim.

"Marketing Efforts" means all activity undertaken (or proposed to be undertaken) in connection with the syndication or other marketing of the Debt Financing, including (a) the direct participation by the Company's senior management team in (i) the preparation of the Marketing Material and due diligence sessions related thereto and (ii) road shows and meetings with prospective lenders and debt investors and (b) the delivery of customary authorization letters, confirmations and undertakings in connection with the Marketing Material (including with respect to presence or absence of material non-public information and accuracy of the information contained therein); provided that (i) the Company and its Affiliates shall not have any liability of any kind or nature resulting from the use of information contained in the Marketing Material or otherwise in the Marketing Efforts except for liability under the Debt Financing Documents executed at Closing and (ii) the recipient of such letters of authorizations agrees that it shall be entitled to rely only on the representations and warranties contained in Debt Financing Documents.

"Marketing Material" means each of the following: (a) customary bank books, information memoranda and other information packages regarding the business, operations, financial condition, projections and prospects of the Company, including all information relating to the transactions contemplated hereunder; and (b) all other marketing material reasonably requested by Buyer or its Debt Financing Sources in connection with the syndication or other marketing of the Debt Financing.

"MOEA" means the Ministry of Economic Affairs of Taiwan.

"MOFCOM" means the Ministry of Commerce of the PRC or its competent local counterparts.

"NDRC" means the National Development and Reform Commission of the PRC or its competent local counterparts.

"OFAC" means the Office of Foreign Assets Control of the United States Department of Treasury.

"Open Source Materials" means any software licensed, distributed, or otherwise made available under any license that requires (or purports to require), as a condition of use, modification or distribution of such software or other software incorporated into, derived from, used or distributed with such software or technology subject to the license(i) be made available or distributed in a form other than binary (e.g., source code form), (ii) be licensed for the purpose of allowing the making of derivative works; (iii) be licensed under terms that allow the Company products or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than to the extent permitted under Law).  Open Source Materials include, for the avoidance of doubt, software licensed under the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, and the Apache License.

"Order" means any order, judgment, decision, decree, injunction, ruling, award, settlement, stipulation, or writ of any Governmental Entity of competent jurisdiction (whether temporary, preliminary or permanent) that is binding on any Person or its property under applicable Law.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice, including as to frequency and amount.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended.

"Payments Administrator" means Acquiom Clearinghouse LLC, a Delaware limited liability company.

"Payments Agreement" means the Acquiom Payments Administration Agreement to be entered into at or prior to Closing among the Payments Administrator, Buyer and the Shareholder Representative, in a form to be reasonably agreed among the parties thereto.

91

"Per Share Earnout Amount" means, with respect to each Earnout Amount, (a) the amount of such Earnout Amount divided by (b) the number of shares of Class A Common Stock outstanding at the Effective Time, calculated on a Fully Diluted Basis.

"Per Share Escrow Amount" means (a) the Total Escrow Amount divided by (b) the number of shares of Class A Common Stock outstanding at the Effective Time, calculated on a Fully Diluted Basis.

"Per Share Liquidation Preference" means Fourteen and Eighty-Four Thousand Three Hundred Eighty-Four Hundred-Thousandths Dollars ($14.84384).

"Per Share Merger Consideration" means the quotient of (x) the Closing Date Merger Consideration divided by (y) the total number of shares of Class A Common Stock outstanding at the Closing on a Fully Diluted Basis.

"Permitted Lien" means (a) any restriction on transfer arising under applicable securities law; (b) any Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP; (c) mechanics', carriers', workers', repairers', landlords' and similar Liens arising or incurred in the Ordinary Course of Business with respect to amounts that are not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP; (d) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (e) pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the Ordinary Course of Business consistent with past practice; (f) zoning, entitlement, building and other land use regulations imposed by Governmental Entities having jurisdiction over any Company Property which are not violated by the current use and operation of such Company Property; (g) survey exceptions, imperfections of title, covenants, conditions, restrictions, easements and other similar matters of record affecting title to any of the Company Property that are disclosed in policies of title insurance made available to Buyer prior to the date hereof, and which, individually or in the aggregate, do not materially impair the occupancy or use of such Company Property for the purposes for which it is currently used or proposed to be used in connection with the relevant Person's business; (h) Liens that do not materially and adversely affect the use, operation or value of the property subject thereto; (i) Liens securing Indebtedness to be paid off or discharged at the Closing and (j) those Liens set forth on Schedule 10.2.

"Person" means an individual, a partnership, a corporation, an association, a limited liability company a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity.

"Personally Identifiable Information" means any information held or collected by the Company or a Company Subsidiary that alone or in combination with other information held or collected by the Company or any of Company Subsidiary can be used to specifically identify an individual.

"PRC" means the People's Republic of China excluding, for the purposes of this Agreement only, the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan.

"PRC Overseas Investment Approvals" means the filings and registrations with, and approvals by, PRC Governmental Entities with respect to the transactions contemplated hereby, including (A) the filings and registrations with, and/or confirmations or approvals of, NDRC, MOFCOM and other competent PRC Governmental Entities (if applicable) with respect to the consummation of the transactions contemplated hereby, by Buyer and Merger Sub; and (B) foreign exchange registration conducted by authorized banks and supervised by SAFE in connection with the transactions contemplated hereby, including registration and/or approvals for conversion of RMB funds into dollar funds and transfer of dollar funds out of the PRC (to the extent that funding in dollars is required thereunder).  For clarity, no approval of, filing with, registration with, or confirmation by any Equity Financing Source or Debt Financing Source, acting in their capacity as such, shall be considered a PRC Overseas Investment Approval.

"Pre-Merger Tax Period" means any Tax period ending on or before the Closing Date.

"Property Taxes" mean all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Release" means any release, spill, leak, emission, discharge, leach, dumping, escape or disposal.

"Representative" means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

"Restricted Stock" means each unvested share of Class A Common Stock subject to forfeiture restrictions, repurchase rights or other restrictions under the 2007 Plan.

"Revenue Target" means (i) with respect to the 2017 Earnout Period, $3,624,560,000, (ii) with respect to the 2018 Earnout Period, $3,758,260,000, and (iii) with respect to the 2019 Earnout Period, $3,916,320,000.

"SAFE" means the State Administration of Foreign Exchange of the PRC or its competent local counterparts.

"Shareholder Representative Escrow Amount" means Five Hundred Thousand Dollars ($500,000).

"Shareholders" means all holders of Company Capital Stock as of the Effective Time.

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Taiwan" means the Taiwan, the Republic of China.

"Taiwan Application" means the filing of an application with the MOEA to change the status of the Taiwan Subsidiary from a branch of a foreign investor to a branch of a PRC investor under the Act Governing Relations between the People of the Taiwan Area and the Mainland Area, and relevant regulations.

"Taiwan Approvals" means the filings, approvals or clearances with or by the Governmental Entities in Taiwan with respect to the transactions contemplated hereby, including the submission and approval of the Taiwan Application and/or any other filings, approvals or clearances for foreign/PRC investments.

"Taiwan Subsidiary" means the Taiwan Branch of Vizio Asia Procurement Limited, with Taiwan registration number of 24809783.

"Target Cash" means and amount equal to Two Hundred Forty-Eight Million dollars ($248,000,000).

"Target Indebtedness" means and amount equal to Fifty Million dollars ($50,000,000).

"Target Working Capital" means and amount equal to negative Two Hundred Fifty-Seven Million, Four Hundred Five Thousand, Five Hundred Eighty-Five dollars ($-257,405,585).

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, branch, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, goods and services, alternative or add on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto.

"Tax Authority" shall mean any Governmental Entity, having or purporting to exercise jurisdiction with respect to any Tax.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, filed or required to be filed in connection with the determination, assessment or collection of Taxes or the administration of any Laws, regulations or administrative requirements relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Tax Sharing Agreement" means any Tax sharing, indemnification or allocation agreement, other than any such agreement with service providers, customers, vendors, creditors or lessors the principal purpose of which is not to address Tax matters.

"Total Escrow Amount" means (a) the Closing Payment Escrow Amount plus (b) the Indemnification Escrow Amount plus (c) the Shareholder Representative Escrow Amount.

"Transaction Documents" means this Agreement, the Escrow Agreement, the Letters of Transmittal, the License Agreement, the Transition Services Agreement and other documents contemplated to be delivered or executed in connection herewith.

"Transaction Tax Deductions" means, without duplication, any deduction permitted for income Tax purposes attributable to the Transaction Tax Expenses. The amount of the Transaction Tax Deductions shall be computed assuming that an election was made under Revenue Procedure 2011-29 to deduct seventy percent (70%) of any Transaction Tax Deductions that are success-based fees as defined in Revenue Procedure 2011-29.

"Transaction Tax Expenses" means (i) Unpaid Transaction Costs, (ii) the payment of any Company Indebtedness (including deductions attributable to capitalized fees, interest (including amounts treated as interest for U.S. federal income Tax purposes), and original issue discount), (iii) all stay bonuses, sale bonuses, change in control payments, retention payments, synthetic equity or Option Payments or any similar payments made or to be made by the Company in connection with or resulting from the Closing, including the amount of any employment Taxes, and (iv) any other portion of the payment to the Equityholders pursuant to this Agreement that is in the nature of compensation for U.S. federal income Tax purposes (the items described in clauses (i) through (iv), collectively, the "Transaction Tax Expenses").

"Unpaid Transaction Costs" means (i) all third party fees and expenses incurred by the Company and the Company Subsidiaries in connection with the Merger and this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby and the repayment in full of all Existing Company Debt (but, for clarity, excluding the amount of the Existing Company Debt itself, which shall be treated as Company Indebtedness) pursuant to its terms (in each case, including any success-based fees, fees and expenses of legal counsel, accountants and tax advisors, the maximum amount of fees and expenses payable to financial and tax advisors, investment bankers and brokers of the Company notwithstanding any contingencies for escrows, etc., and any such fees and expenses incurred by the Equityholders or Company employees, paid for or to be paid for by the Company) and (ii) all Change in Control Payments, in each case which remain unpaid as of the close of business on the Business Day immediately preceding the Closing Date.

"Working Capital" means current assets of the Company and the Company Subsidiaries minus current liabilities of the Company and the Company Subsidiaries, as determined on a consolidated basis in accordance with GAAP; provided, that "Working Capital" shall not include any Company Indebtedness, Company Cash, Unpaid Transaction Costs, income tax accounts (including income taxes payable, income taxes receivable, deferred income tax assets, deferred income tax liabilities, FIN 48 taxes payable and FIN 48 taxes receivable). For clarity, the general ledger accounts that comprised Working Capital as of September 30, 2015 are set forth on Schedule B attached hereto.

10.3    Additional Definitions.

| Term | Section |
| --- | --- |
| 2007 Plan | 2.1(b) |
| Acceleration Event | 2.3(e) |

| Term | Section |
|------|---------|
| Accounting Firm | 2.3(c)(v) |
| Agreement | Preamble |
| Agreement of Merger | 1.2(b) |
| Buyer | Preamble |
| Buyer Benefit Plans | 6.2(b) |
| Buyer Fundamental Representations | 8.1 |
| Buyer Indemnified Parties | 8.2(a) |
| California Law | 1.1 |
| Cap | 8.2(b)(iii) |
| Capitalization Date | 3.6(a) |
| Certificates | 2.2(a)(i) |
| Class A Common Stock | Recitals |
| Class B Common Stock | Recitals |
| Closing | 1.2(a) |
| Closing Balance Sheet | 2.5(a)(ii) |
| Closing Cash | 2.5(a)(ii) |
| Closing Date | 1.2(b) |
| Closing Over-Payment | 2.5(c)(i) |
| Closing Payment Escrow Fund | 2.2(f) |
| Closing Under-Payment | 2.5(c)(ii) |
| Closing Working Capital | 2.5(a)(ii) |
| Collective Bargaining Agreement | 3.16(a) |
| Commitment Letters | 4.10(a) |
| Company | Preamble |
| Company Disclosure Schedules | Article III |
| Company Fundamental Representations | 8.1 |
| Company IP Agreements | 3.12(c) |
| Company Inbound IP Agreements | 3.12(c) |
| Company Outbound IP Agreements | 3.12(b) |
| Company Plan | 6.2(e) |
| Company Property | 3.13(c) |
| Contingent Worker | 8.6(b) |
| Continuing Employee | 6.2(a) |
| Debt Financing | 5.8 |
| Debt Financing Documents | 5.8 |
| Deductible | 8.2(b)(ii) |
| Dissenting Shareholders | 2.1(a) |
| Earnout Dispute Notice | 2.3(c)(ii) |
| Earnout Position Statement | 2.3(c)(vi) |
| Earnout Statement | 2.3(c) |
| EBITDA Earnout Amounts | 2.3(a)(ii) |
| Effective Time | 1.2(b) |
| Employee Optionholder | 2.1(b) |
| Employee Plans | 3.15(a) |
| Employee Restricted Stockholder | 2.1(a) |

96

| **Term** | **Section** |
|---|---|
| Employment Agreements | Recitals |
| End Date | 9.1(d) |
| Enforceability Limitation | 3.2(b) |
| Equity Award | 3.6(b)(ii) |
| Equity Commitment Letters | 4.10(a) |
| Equity Financing | 4.10(a) |
| Equity Financing Conditions | 5.8 |
| Equity Financing Source | 4.10(a) |
| Equityholder Indemnified Parties | 8.3(a) |
| Escrow Agent | Recitals |
| Escrow Agreement | Recitals |
| Estimated Cash | 2.5(a)(i) |
| Estimated Closing Balance Sheet | 2.5(a)(i) |
| Estimated Indebtedness | 2.5(a)(i) |
| Estimated Transaction Costs | 2.5(a)(i) |
| Estimated Working Capital | 2.5(a)(i) |
| Final Cash | 2.5(a)(v) |
| Final Closing Balance Sheet | 2.5(a)(v) |
| Final Indebtedness | 2.5(a)(v) |
| Final Transaction Costs | 2.5(a)(v) |
| Final Working Capital | 2.5(a)(v) |
| Financial Statements | 3.8 |
| Financing | 4.10(a) |
| FIRPTA Certificate | 6.1(g) |
| FIRPTA Notice | 6.1(g) |
| Grant Date | 3.6(c) |
| Government Contract | 3.23 |
| Indemnification Escrow Fund | 2.2(f) |
| Indemnified Party | 8.4(a) |
| Indemnifying Party | 8.4(a) |
| Inscape | Recitals |
| Inscape Stockholders' Agreement | 6.6(e) |
| Joint Notice | 3.5(d) |
| Lease | 3.13(c) |
| Leased Real Property | 3.13(b) |
| Letter of Transmittal | 2.2(a)(i) |
| License Agreement | 6.6(d) |
| Material Contract | 3.11(b) |
| Merger | Recitals |
| Merger Consideration | 2.2(b)(iv) |
| Merger Sub | Preamble |
| Methodologies | 2.5(a)(i) |
| MidCo | 4.1 |
| Non-De Minimis Claims | 8.2(b)(ii) |
| Objection Notice | 2.5(a)(iii) |

97

| Term | Section |
|------|---------|
| Objection Period | 2.5(a)(iii) |
| Option | 2.1(b) |
| Option Payment | 2.1(b) |
| Owned Real Property | 3.13(a) |
| Parachute Payment Waiver | 6.3 |
| Parent | 4.10(b) |
| Parent Plan | 6.2(d) |
| Per Claim Minimum | 8.2(b)(i) |
| Preferred Closing Payment | 2.1(a) |
| Preferred Stock | Recitals |
| Pre-Merger Tax Matter | 6.1(b)(i) |
| Qualifying Buyer Termination | 9.2(a) |
| Reference Balance Sheet | 3.8 |
| Remaining Earnout Disputes | 2.3(c)(v) |
| Revenue Earnout Amounts | 2.3(a)(i) |
| Senior Executives | 2.3(d)(viii) |
| Shareholder Representative | Preamble |
| Shareholder Representative Escrow Fund | 2.2(f) |
| Significant Customers | 3.22 |
| Significant Suppliers | 3.22 |
| Straddle Period Tax Matter | 6.1(b)(iii) |
| Surviving Corporation | 1.1 |
| Survival Date | 8.1 |
| Third-Party Claim | 8.4(a) |
| Transfer Taxes | 6.1(e) |
| Waived 280G Benefits | 6.3 |
| WARN Act | 3.16(e) |

## ARTICLE XI
## MISCELLANEOUS

11.1   No Third-Party Beneficiaries.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement other than Section 11.8, Section 11.11 and this Section 11.1, which shall be for the benefit of, and enforceable by, the Debt Financing Sources; provided that any Person that (i) by the terms of Article VIII, is entitled to indemnification, and (ii) with respect to Section 6.3, constitutes the Company's current and former officers, directors and other indemnified agents under the Company's Articles of Incorporation or Bylaws or beneficiaries under any insurance policies of the Company, shall be considered a third-party beneficiary of this Agreement, with full rights of enforcement as though such Person was a signatory to this Agreement.

11.2   Entire Agreement.  This Agreement, including the exhibits hereto and the Company Disclosure Schedules, and the other Transaction Documents, constitute the entire

98

agreement between the parties hereto and supersede any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.

11.3    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by the Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.

11.4    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

11.5    Titles.  The titles, captions or headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

11.6    Notices.  All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

If to the Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618

Attention:  Kurtis J. Binder and Jerry C. Huang
Email No.:  kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email No.:  scott.shean@lw.com and david.lee@lw.com

If to the Shareholder Representative:

Shareholder Representative Services LLC
1614 15th Street, Suite 200
Denver, CO 80202
Attention: Managing Director
Email: deals@srsacquiom.com
Telephone: (303) 648-4085
Facsimile: (303) 623-0294

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email No.:  scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub or, after the Effective Time, the Surviving Corporation:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention:  Wei DUAN
Email:  duanwei3@le.com
Telephone:  +86-10-5928-2610
Facsimile:  +86-10-5928-3480

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention: Michael V. Gisser and Michael J. Mies
Email: michael.gisser@skadden.com and michael.mies@skadden.com

Any party hereto may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any party hereto may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other party notice in the manner herein set forth.

11.7    Governing Law.  This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or

rule that would cause the application of the Laws of any jurisdiction other than the State of California.

11.8    Consent to Jurisdiction.   Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the agreements delivered in connection herewith or the transactions contemplated hereby or thereby or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.6. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law. Notwithstanding anything herein to the contrary, each of the parties agrees that it will not bring or support any proceeding involving the Debt Financing Sources or their respective affiliates and representatives in any way relating to this Agreement or any of the transactions contemplated hereby (or the abandonment or termination thereof), including but not limited to any dispute arising out of or relating in any way to the Debt Financing or the Debt Financing Documents (and the termination hereof and thereof) or in respect of any oral representations made or alleged to be made in connection herewith or therewith, in any forum other than the Supreme Court of the State of New York, County of New York, Borough of Manhattan or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York (and appellate courts thereof), County of New York, Borough of Manhattan.

11.9    Amendment or Modification.   This Agreement may not be amended except in a written instrument executed by Buyer, the Company and the Shareholder Representative.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party hereto to be bound thereby.

11.10    Waivers.   Except where a specific period for action or inaction is provided herein, neither the failure nor any delay on the part of any party hereto in exercising any right, power or privilege under this Agreement or any Transaction Document shall operate as a waiver thereof, nor shall any waiver on the part of any party hereto of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.  The failure of a party hereto to exercise any right conferred herein within the time required shall cause such right to

768801.20-LACSR01A - MSW

terminate with respect to the transaction or circumstances giving rise to such right, but not to any such right arising as a result of any other transactions or circumstances.

11.11   <u>Financing Sources</u>.  Notwithstanding anything herein to the contrary, except for the third-party beneficiary rights of the Company under each of the Equity Commitment Letters, subject to the terms and conditions thereunder and under this Agreement, no Company Party shall have any rights or claims against any Equity Financing Source or any Debt Financing Source in connection with this Agreement, the Financing, the Equity Commitment Letters or any transaction contemplated hereby or thereby, whether at law or equity, in contract, in tort or otherwise.  In furtherance of the foregoing, the Company (on its behalf and on behalf of each other Company Party) agrees not to commence (and if commenced agrees to dismiss or otherwise terminate) any action or proceeding against any Equity Financing Source (other than in connection with any action expressly permitted in accordance with the preceding sentence) or any Debt Financing Source in connection with this Agreement, the Financing, the Equity Financing Commitment Letters or any transaction contemplated hereby or thereby.

11.12   <u>Specific Performance</u>.

(a)      The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the parties in accordance with their specific terms.  It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the Company and/or the Equityholders and to enforce specifically the terms and provisions of this Agreement, and (y) the Company, prior to the Effective Time, or the Shareholder Representative, after the Effective Time, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement.  Any such injunction(s) or action seeking specific performance shall be sought in California State court.  Notwithstanding the foregoing, the parties agree that, in order to facilitate expedient adjudication of any disputes under this Agreement, it is their express mutual intent that any injunctions or specific performance actions on behalf of the Company (prior to the Effective Time) or the Equityholders be sought solely by the Company or the Shareholder Representative in accordance with this <u>Section 11.12</u>; accordingly, the parties agree that other than as set forth in this <u>Section 11.12</u>, no Shareholder shall be entitled to seek or obtain an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub or to enforce specifically the terms and provisions of this Agreement.

(b)      Notwithstanding anything to the contrary in this Agreement, it is explicitly agreed that the right of the Company to seek specific performance, injunctive relief or other equitable remedies in connection with enforcing Buyer's obligation to cause the Equity Financing to be funded in order to cause the Closing shall be subject to the requirements that (i) all of the conditions in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied (and continue to be satisfied) or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) at the time when the Closing would have been required to occur pursuant to <u>Section 1.2</u> but for the failure of the Equity Financing to be funded, (ii) the Debt Financing has been funded in accordance with the terms thereof or would be funded in accordance with the terms thereof at the Closing upon

delivery of a drawdown notice by Buyer or Merger Sub and/or notice from Buyer that the Equity Financing will be funded at such date and (iii) the Company has irrevocably confirmed in writing that if the Financing is funded, then it would take all actions that are within its control to cause the Closing to occur.

(c)     The provisions of this Section 11.12 are subject to Section 11.11 in all respects.

11.13   Expenses.  Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

11.14   Construction.

(a)     Each party hereto agrees that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The parties hereto intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any party hereto has breached any representation, warranty, or covenant contained herein (or is otherwise entitled to indemnification) in any respect, the fact that there exists another representation, warranty, or covenant (including any indemnification provision) relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached (or is not otherwise entitled to indemnification with respect thereto) shall not detract from or mitigate the fact that such party is in breach of the first representation, warranty, or covenant (or is otherwise entitled to indemnification pursuant to a different provision).

(b)     The section headings contained herein are for reference purposes only and do not broaden or otherwise affect any of the provisions of the Agreement.

11.15   Severability of Provisions.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

11.16   Representation by Counsel.  Each party hereto represents and agrees with each other that it has been represented by or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired, it availed itself of this right and opportunity, that it or its authorized officers (as the case may be) have carefully read and fully

103

understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence.

11.17   Shareholder Representative.

(a)   Each Equityholder irrevocably constitutes and appoints Shareholder Representative Services LLC as the Shareholder Representative, such Equityholder's true and lawful attorney-in-fact and agent and authorizes it acting for such Equityholder and in such Equityholder's name, place and stead, in any and all capacities to do and perform every act and thing required, permitted, necessary or desirable to be done in connection with the transactions contemplated by the Transaction Documents, as fully to all intents and purposes as such Equityholder might or could do in person, including to:

(i)   take any and all actions (including, without limitation, executing and delivering any documents, incurring any costs and expenses on behalf of the Equityholders) and make any and all determinations which may be required or permitted in connection with the post-Merger implementation of this Agreement and related agreements and the transactions contemplated hereby and thereby;

(ii)   give and receive notices and communications thereunder;

(iii)   negotiate, defend, settle, compromise and otherwise handle and resolve any and all claims and disputes with Buyer and Merger Sub and any other Buyer Indemnified Party arising out of or in respect of the Transaction Documents, including, without limitation, claims and disputes pursuant to Article VIII of this Agreement;

(iv)   receive all notices under the Transaction Documents;

(v)   retain legal counsel, accountants, consultants and other experts, and incur any other reasonable expenses, in connection with all matters and things set forth or necessary with respect to the Transaction Documents and the transactions contemplated hereby and thereby;

(vi)   authorize deliveries of cash to Buyer and/or the Company from the Indemnification Escrow Fund (including by means of not objecting to claims) and to the Shareholder Representative from the Shareholder Representative Escrow Fund; and

(vii)   to make any other decision or election or exercise such rights, power and authority as are incidental to the foregoing.

(b)   Each of the Equityholders acknowledges and agrees that upon execution of this Agreement, upon any delivery by the Shareholder Representative of any waiver, amendment, agreement, opinion, certificate or other document executed by the Shareholder Representative, such Equityholder shall be bound by such documents as fully as if such Equityholder had executed and delivered such documents.

(c)     The Shareholder Representative may resign at any time; provided that it must provide the Equityholders who held a majority of shares of Company Capital Stock held by the Equityholders immediately prior to the Effective Time 30 days' prior written notice of such decision to resign.

(d)     In the event of the resignation of the Shareholder Representative, the Equityholders shall promptly elect a replacement Shareholder Representative. Such replacement Shareholder Representative shall be elected by majority vote of the Equityholders (with each Equityholder receiving a single vote) and such election shall be binding on all Equityholders in accordance with the terms of this Section 11.17.

(e)     Any and all actions taken or not taken, exercises of rights, power or authority and any decision or determination made by the Shareholder Representative in connection herewith shall be absolutely and irrevocably binding upon the Equityholders as if such Person had taken such action, exercised such rights, power or authority or made such decision or determination in its individual capacity, and the Escrow Agent, Buyer and the Surviving Corporation may rely upon such action, exercise of right, power, or authority or such decision or determination of the Shareholder Representative as the action, exercise, right, power, or authority, or decision or determination of such Person, and no Equityholder shall have the right to object, dissent, protest or otherwise contest the same.  Buyer and the Surviving Corporation is hereby relieved from any liability to any Person for any acts done by the Shareholder Representative and any acts done by Buyer or the Surviving Corporation in accordance with any decision, act, consent or instruction of the Shareholder Representative.

(f)     The Shareholder Representative shall not be liable to the Buyer or the Equityholders in its capacity as the Shareholder Representative for any error of judgment, or any act done or step taken or omitted by it, believed by it to be in good faith or for any mistake in fact or law, or for anything which it may do or refrain from doing in connection with this Agreement, the Escrow Agreement, the Payments Agreement  or any other Transaction Document except in the case of gross negligence or willful misconduct by it.  The Shareholder Representative may seek the advice of reputable legal counsel (at no expense to Buyer, Merger Sub or their Affiliates (other than any such Affiliates that are also Equityholders, solely in their capacity as such) in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability in its capacity as Shareholder Representative to the Buyer or the Equityholders and shall be fully protected with respect to any action taken, omitted or suffered by it in good faith in accordance with the advice of such counsel.

(g)     The Equityholders will indemnify, defend and hold harmless the Shareholder Representative from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Shareholder Representative's execution and performance of this Agreement and the agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Shareholder Representative, the Shareholder

105

Representative will reimburse the Equityholders the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. If not paid directly to the Shareholder Representative by the Equityholders, any such Representative Losses may be recovered by the Shareholder Representative from (i) the funds in the Shareholder Representative Escrow Fund, (ii) the amounts in the Closing Payment Escrow Fund and the Indemnification Escrow Fund solely with respect to any amounts that would otherwise be distributable to the Equityholders, and (iii) from any Earnout Amounts at such time as any such amounts would otherwise be distributable to the Equityholders; provided, that while this section allows the Shareholder Representative to be paid from the Shareholder Representative Escrow Fund, the Closing Payment Escrow Fund, the Indemnification Escrow Fund and the Earnout Amounts, this does not relieve the Equityholders from their obligation to promptly pay such Representative Losses as they are suffered or incurred, nor does it prevent the Shareholder Representative from seeking any remedies available to it at law or otherwise. In no event will the Shareholder Representative be required to advance its own funds on behalf of the Equityholders or otherwise. Any restrictions or limitations on indemnity contained elsewhere in this Agreement are not intended to be applicable to the indemnities provided to the Shareholder Representative in this Section 11.17(g). The foregoing indemnities will survive the Closing, the resignation or removal of the Shareholder Representative or the termination of this Agreement.

(h)     The Shareholder Representative Escrow Fund shall be available solely to reimburse the Shareholder Representative for, or pay directly, any costs and expenses reasonably and actually incurred by the Shareholder Representative in connection with the administration of its duties and fulfillment of its obligations hereunder, under the Escrow Agreement and under the Payments Agreement, and shall be released to the Payments Administrator (for further distribution to the Equityholders) and the Shareholder Representative, as the case may be, pursuant to the terms of this Section 11.17(h) and the Escrow Agreement.  On the later of (i) the expiration of survival periods with respect to the representations and warranties and covenants of the Equityholders and the Company, (ii) the final settlement of all payments and/or disputes with respect to Earnout Amounts in accordance with Section 2.3 and (iii) the final settlement of all outstanding claims for indemnification pursuant to Section 8.2(a), the Shareholder Representative shall instruct the Escrow Agent in writing to deliver to the Payments Administrator or the Surviving Corporation, for payment to Equityholders, the remaining amount, if any, of the Shareholder Representative Escrow Fund, to be distributed to Equityholders, pro rata based on their respective Escrow Percentages.

*     *     *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY**

VIZIO, INC.

By: _____

Name: William W. Wang

Its:    Chief Executive Officer

**SHAREHOLDER REPRESENTATIVE**

SHAREHOLDER REPRESENTATIVE SERVICES LLC,  solely in its capacity as the Shareholder Representative

By: _____

Name:  Mark B. Vogel

Its:    Managing Director

**BUYER**

LEECO V LTD.

By: _____吴勇_____

Name: Meng WU

Its:    Director

**MERGER SUB**

LE V MERGER SUB INC.

By: _____吴勇_____

Name: Meng WU

Its:    President, Secretary and Treasurer