# ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
dtarlow@ecjlaw.com
PH: 310.281.6372
FX: 310.859.2325
File 14676.8

August 24, 2018

**VIA E-MAIL AND U.S. MAIL**

Jeff Joyner, Esq.
Greenberg Traurig
1840 Century Park East, Suite 1900
Los Angeles, California 90067

Re:   VIZIO, Inc. v. LeEco V. Ltd., Case No.: 17-CV-1175

Dear Mr. Joyner:

I am in receipt of your letter dated August 13, 2018 that you sent shortly before midnight to further meet and confer regarding your client's untenable position with respect to both LeEco V. Ltd.'s ("LeEco") and LeLe Holding Ltd.'s ("LeLe") responses to Plaintiff's Requests for Production of Documents (Set One).

A.   **The Limited Guaranty Does Not Preclude VIZIO From Seeking Alter Ego Discovery.**

First, you make the spurious argument that the "Limited Guarantee Precludes Vizio From Seeking Alter Ego Discovery Concerning Non-Recourse Parties." In support of your argument, you make the disingenuous statement that "[p]ursuant to the Limited Guarantee, which was integral to the Merger Agreement, Vizio agreed not to pursue LeLe, Yueting Jia, LeEco Global Group Ltd., and their Affiliates for the $50,000,000 Buyer Termination Fee Remainder." Your statement is disingenuous because, among other things, VIZIO is *not* seeking to impose alter ego liability against LeLe, Yueting Jia ("Jia"), LeEco Global Group Ltd., and their "Affiliates" for the $50,000,000 Buyer Termination Fee Remainder *under or in connection with the Merger Agreement.* Rather, VIZIO is pursuing LeLe, Jia, LeEco Global Group Ltd., and their "Affiliates" for alter ego liability in connection with the separate breach of the much-later Framework Agreement and the fraudulent conduct that gave rise to it.[1] Pointedly, the Claim for Breach of the Merger Agreement is neither asserted against any alter egos, nor does it even incorporate

---

[1] It is undisputed that the Framework Agreement did not exist at the time Merger Agreement was negotiated. Nor was it executed even close to that time. Simply stated, the Framework Agreement was not even contemplated when the Merger Agreement was negotiated and signed.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 2

any alter ego allegations in the body of that cause of action. (See Judge Carter's July 27, 2018 Order ("the Order"), Dkt 99, p. 4).

The fact that alter-ego liability has not been sought on the Claim for Breach of the Merger Agreement was not a coincidence. That is because the so-called restrictive language in the Limited Guarantee is operative *only* with respect to *"liabilities or obligations arising under, or in connection with, the Merger Agreement or the transactions contemplated thereby."* (See, *e.g.,* Limited Guaranty ¶ 13).[2] The Framework Agreement, which was not even on the radar screen when the Merger Agreement was negotiated and signed, is none of the above. For the so-called restrictive language in the Limited Guarantee to go beyond what is written and encompass the much-later Framework Agreement, let alone the specific fraudulent conduct that gave rise to it, would be directly contrary to the public policy of California. *Pergerine Pharmaceuticals, supra,* *15 ("The cases uniformly hold that limitation of liability clauses are ineffective with respect to claims for fraud and misrepresentation, regardless of whether the public interest is implicated."). This rule applies "even where the clause amounts to a limitation on damages limitations as opposed to an outright exemption [because] 'contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated.'"). *Accord Health Net of California, Inc. v. Department of Health Services,* 113 Cal.App. 4th 224, 243, 247 (2003), *rev. den'd.* ("It is now settled – and in full accord with the language of [Civil Code § 1668] – that notwithstanding its different treatment of ordinary negligence, under Section 1668, 'a party [cannot] contract away liability for his fraudulent or intentional acts...regardless of whether the public interest is affected.") In fact, as Judge Carter explained at p. 19 of the Order: "While '[a] breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by a breach...'a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to the contract.")

Second, you mischaracterize VIZIO's theory. You describe this theory as being that "[VIZIO] is supposedly allowed to pursue its contractual remedies under the Merger Agreement, through the Framework Agreement...." Wrong. As the Order states on p. 15, "VIZIO alleges Defendants

---

[2] Interpreting the so-called restrictive language of the Limited Guarantee just as it is written - - to claims for breach made directly under, or in connection with the Merger Agreement itself, and the documents appended to it - - arguably comports with the public policy of California since "with respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy." *Peregrine Pharmaceuticals, Inc. v. Clinical Supplies,* 2014 WL 3791567 * 8 (C.D. Cal.) *See also, Cal. Civ. Code* § 1643, requiring that "a contract must receive such interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties." That is so even though "contractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the drafting party." (*Id.,* * 5).

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 3

made the $2BB Financial Wherewithal Representations" - *i.e.*, that LeLe Holding and Global Group and various of their subsidiary or affiliated corporate entities, were financially healthy and they had the financial wherewithal to complete a $2BB merger transaction with VIZIO - - but that they "did not have the financial wherewithal to complete a $2BB merger with VIZIO" and then later, made the repeated misrepresentations with respect to the Framework Agreement that are identified on p. 16 of the Order to "induce VIZIO to jointly terminate the Merger Agreement [and] induce it to enter the Framework Agreement, from which "it can be inferred that the Framework Agreement was a subterfuge in order for Defendants to reduce the $100MM liability from the termination of the Merger Agreement to the $40MM that was disbursed to VIZIO". Specifically, the damages that VIZIO seeks are the "reliance and/or lost opportunity charges in the sum of $60MM". (Order, p. 17). These damages result directly from the breach of the Framework Agreement and the fraudulent conduct that gave rise to it; *i.e.*, are not the pursuit of contractual remedies under the Merger Agreement through the Framework Agreement.

Third, your clients' objections to the subject discovery make no mention of the wild notion that some sort of bar under the earlier Limited Guarantee now exists as to alter-ego liability under the much-later Framework Agreement and the specific fraudulent conduct that gave rise to it. Instead, they simply repeat the mantra that Judge Carter has already rejected, *i.e.*, that "the parties agreed to the Framework Agreement...which LeEco alleges had the effect of terminating the Merger Agreement...." (Order, at 4). *See also,* your clients' Responses to each RFP requesting documents related to alter-ego liability, Numbers 35 – 65. In fact, your clients took this position under oath. (Dkt 26-1, Hsieh Dec., ¶ 14, lns 6 – 10). Needless to say, that position is diametrically the opposite of your clients' new "claim" that the Limited Guarantee creates some sort of bar to alter ego liability with respect to the much-later Framework Agreement and the specific fraudulent conduct that gave rise to it. Stated differently, if the Merger was effectively dead due to the Framework Agreement, as your clients' claimed, then the same would necessarily be true for the Limited Guarantee. Your clients cannot have it both ways. In any event, their failure to raise this "new" objection in a timely fashion is a waiver of that specious claim. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well settled that failure to object to discovery requests within the time required constitutes a waiver of any objection.")

Finally, the Limited Guarantee was between VIZIO and Le Technology, Inc. The latter is not a party to this lawsuit and your clients have no standing to raise the Limited Guarantee as some sort of bar to alter ego liability as to the much-later Framework Agreement and the specific fraudulent conduct that gave rise to it. This is particularly true here, where the Order specifically makes alter ego liability a prime subject of the litigation (*See* pp. 28-30, 33 & 35). As Judge Carter explained "[the facts] show a commingling of funds and a disregard of corporate

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 4

formalities between the two companies. Throughout the parent and subsidiary companies, there is a connection and intermingling between the employees, assets and office locations. Thus, VIZIO sufficiently establishes facts in support of the proposition that LeLe Holdings and LeEco are interconnected in ownership (through Jia) and through a unity of interest (through similarities in offices, employees, and intermingling of assets)." Indeed, that "because Lele Holding and LeEco are intertwined in ownership and by assets, it would be unjust to allow the parent company to escape liability when it was a player in enabling the alleged fraud of the subsidiary [such that] VIZIO has...made a plausible case for finding that Lele Holding is the alter-ego of LeEco." (Order, pp. 29-30). Pointedly, and "perhaps more significantly, the actions of LeEco and Jia, who plausibly are alter egos of Lele Holding, warrant sufficient activity in California to extend specific jurisdiction." (*Id.*, at 35).

In short, alter ego liability and discovery on that subject are part and parcel of this lawsuit. The fact that Judge Carter was well aware of the Limited Guaranty when the Order was made (p. 29), only serves to compel this conclusion.

**B.    VIZIO Is Entitled to The Production Of All Of The Relevant Documents.**

Your letter claims that the alter ego requests are irrelevant, overbroad, unduly burdensome and in violation of VIZIO's contractual obligation, which I take to mean the Limited Guarantee. This claim is specious.

First, for the reasons stated above, your reliance on the Limited Guarantee is misplaced. I will not address that issue again.

Second, the Court has already found that VIZIO has made a plausible case that LeLe Holding, LeEco Global Group and Jia are the alter egos of LeEco, such that they may be liable for the acts, liabilities and debts of LeEco. [Order, pp. 28-30, 33 & 35]. As such, VIZIO is plainly entitled to take discovery as to alter-ego issues to buttress the factual showing that is front and center in Judge Carter's Order.

The criteria to establish alter-ego liability is well established. Plaintiff is in entitled to the discovery requested to buttress the showing of alter-ego liability that it has already made. As Judge Carter wrote on p. 28 of the Order:

> "To establish a party as the alter ego of a corporation, the applicant must show '(1) that there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will

14676.8:9330120.2

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 5

> follow.'" *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 597 (N.D. Cal. 2012) *aff'd sub nom. Bank of Montreal v. Salyer*, 599 F. App'x 706 (9th Cir. 2015) (quoting *Automotriz del Golfo de California v. Resnick*, 47 Cal. 2d 792, 796 (1957)); see also *United States v. Boyce*, 38 F. Supp. 3d 1135, 1154–55 (C.D. Cal. 2014), appeal dismissed (Nov. 13, 2014) (quoting *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010)). Both factors are necessary for a Court to impose alter ego liability. *Bank of Montreal*, 476 B.R. at 597."

Judge Carter then explained on the same page of the Order:

> "In assessing the unity of interest prong, courts consider numerous factors, including "inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (citations omitted); see also *Bank of Montreal*, 476 B.R. at 597–98."

Judge Carter then observed on that same page of the Order that:

> "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th at 245. Further, "[c]ommon ownership alone is insufficient to disregard the corporate form." *Stewart v. Screen Gems-EM*, 81 F. Supp. 3d 938, 961 (quoting *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)) (internal quotation marks omitted)."

Accordingly, in order for VIZIO to meet its burden of proof as to the alter-ego liability, it must be able to buttress its evidence of factors, such as: the common ownership of the entities, inadequate capitalization of one or more of LeEco, LeEco Global Group, LeLe Holdings and their affiliates, commingling of funds between individuals and companies, shuffling of funds between individuals and companies, identical officers or directors, etc. These are exactly types of documents that have been sought in Categories 35 - 65 of the RFPs. Accordingly, contracts, financial statements, assets and liabilities, loan agreements, guarantees, transfers of monies, lists of employees, officers, directors, attorneys, as well as corporate governance records clearly must be produced. This is particularly true here, where the requested documents are plainly in the possession, custody, or control of your clients.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 6

Rule 26(b)(1) of the *Federal Rules of Civil Procedure* provides that parties may obtain discovery of any nonprivileged matter that is "relevant to any party's claim or defense and proportional to the needs of the case...." This Rule also states that "[i]information within the scope of discovery need not be admissible in evidence to be discoverable." (Id.) Accordingly, "a party may request the production of any document within the scope of Rule 26(b)." *San Diego Unified Port Dist. v. National Union Fire Insurance Company*, 2017 WL 3877730*2 (S.D. Cal.).

It is axiomatic that all of the requested documents are in the possession, custody or control of your clients. First, it is undisputed that "Lele Holding and the other corporate defendants are all under the common ownership and control of Jia". Order, p. 27. Indeed, LeEco admitted this was the case in the filing that it made with the Committee on Foreign Investment in the United States vis-à-vis the Merger Agreement (Dkt 78, Wessel Dec., Ex 2, pp. 4, 17, 18 and Ex 5 ; *i.e.*, Jia owns 100% of Lele Holding, Lele Holding owns 100% of LeEco Global Group, Ltd., LeEco Global Group, Ltd., owns 100% of LeEco.[3] Accordingly, the rule in the Ninth Circuit is crystal clear where, as here, the RFPs were specifically directed to the ultimate corporate parent; *i.e.*, "[the parent] must produce documents possessed by a subsidiary that the parent...owns or wholly controls." *U.S. v. International Union of Petroleum & Indus. Wks.*, 870 F.2d 1450, 1452 (9th Cir. 1989).[4]

Second, the same rule also applies in reverse where, as here, the fraudulent misrepresentations were made by Jia and other top executives of the enterprise on his and their behalf, *e.g.*, the $2BB Financial Wherewithal Misrepresentations as well as the false representations that led to the Framework Agreement (Order, pp. 15-16. *See also,* Dkt 23-2, Wong Dec., ¶¶ 13 – 15 & Dkt 23-2, Wang Dec., ¶¶ 7 – 9), since the requisite control of documents "may [also] be established by the existence of a principal – agent relationship." *St. Jude Medical S.C., Inc. v. Janssen-Counotle*, 305 F.R.D. 630, 638-639 (D. Ore.) ("The fact-specific question presented here is whether documents and ESI held by Biotronik...sister company...their common parent...or another related...entity were within the effective control of Biotronik [the subsidiary]...St. Jude...has presented evidence that...Janssen negotiated with and received her job offer from Max Schaldach, the beneficial owner of the entire Biotronik Group....It is reasonable to infer

---

[3] The Order specifically references this governmental filing by LeEco in its discussion of the facts demonstrating alter-ego liability on p. 29.
[4] None of the three unpublished district cases that you cite stand for the proposition that "parent companies do not have control over [subsidiary] documents absent a contractual or statutory right." First, each such case involved document requests directed to subsidiary or sister corporations, not the corporate parent. *Ehrlich v. BMW of North America, LLC,* 2011 WL 3489105 (C.D. Cal) (subsidiary); *Micron Technology v. Tessera, Inc.,* 2006 WL 1646143 (N.D. Cal.) (subsidiary); *Beilstein-Institut Zur Forderung Der Chemischen,* 2006 WL 3742244 (N.D. Cal.) (sister corporation). Second, they cannot contravene the Ninth Circuit's holding in *International Union, supra,* that corporate control exists as a matter of law when the document request is directed to the corporate parent.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 7

that the persons associated with Biotronik…European affiliates, including…Schaldach…who negotiated [the] hiring…were acting as agents for Biotronik [which] is sufficient indication of effective control to require the European affiliates of Biotronik…namely the Biotronik Group…to conduct a reasonable and diligent search for documents…responsive to…subpoena served on Biotronik….")[5] This reasoning applies in spades here, where Judge Carter likewise described "the *Lele Group*" on p. 34 of the Order.

In short, there is no foundation for the assertion that requested documents are somehow not subject to your clients' possession, custody, or control.

C.     **A Look Back Period to 2012 For Alter Ego Documents Is Reasonable.**

In Plaintiff's alter-ego RFPs, VIZIO has largely requested documents going back to January 1, 2012. A five-year look-back period is reasonable under the circumstances. Pointedly, one of the allegations made by VIZIO in this matter is that Jia made the $2BB Financial Wherewithal Representations on his own behalf and for LeLe, LeEco Global Group Ltd. and various other subsidiary or affiliated corporate entities (Order, p. 15). A five-year look back at the financial condition of LeEco, LeLe, and their parents, subsidiaries and sister companies is plainly required to determine whether those representations were true or false when made. *See U.S. v. Ruiz*, 665 F. Appx. 607, 610 (9th Cir. 2016). (Court allowed evidence that Defendant failed to file tax returns for a period of five years since it was probative as to intent, knowledge, lack of good faith and absence of mistake in later tax fraud). *C.f., U.S. v. Jenkins*, 785 F2d 1387, 1395 (9th Cir.), *cert. den'd*, 479 U.S. 889 (1986) ("The fact that Jenkins used fraudulent means to secure conventional loans [in the past] is probative on issues of intent, knowledge, good faith and absence of mistake in dealing with the [later] FHA transactions.") *Accord, Rocha v. Metropolitan Life Ins. Co.*, 2005 WL 8156353 *2 (W.D. Tx) ("The basis of Rocha's action…is her allegation Seguros Genesis acted as an alter ego, joint enterprise, or single business enterprise of MLIC…The limited [6 year lookback before subject policy purchase]…is not overbroad since it allows Rocha to seek documents pertinent to (1) Seguros Genesis' relationship to MLIC; (2) MLIC's ownership interest in Seguros Genesis and other subsidiaries and affiliates; and (3) the way in which the insurance policy was marketed to Rocha's sister.") This is particularly true here, where one alter-ego factor to be weighed by the Court is the capitalization or undercapitalization of LeLe, Global Group, LeEco and their corporate affiliates, at inception and thereafter. Since Global Group and LeLe were both formed prior to December 2015 when the

---

[5] None of the three unpublished and earlier district court cases that you cited contravenes the holding of *St. Jude, supra*. Unlike *St. Jude*, and here, there were no enterprise wide misrepresentations made by the top of the chain owners/executives acting for themselves and as agents for affiliated entities. Nor did those courts find that a plausible case of alter-ego liability already existed as Judge Carter has already ruled.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 8

parties began to negotiate the merger, it cannot be reasonably be disputed that the look back period necessarily would have to extend beyond December 2015, for capitalization and other similar determinations (*e.g.*, transfer of funds, etc.) to be made in meaningful fashion.

The two cases which you cite for the proposition that a five (5) year look back period is somehow too long are *Del Campo v. Am Corrective Counseling Servs., Inc.*, 2008 WL 4858502 (N.D. Cal,. 2008) and *Benchmark Design, Inc. v. BDC, Inc.*, 1989 WL 81618 (D. Or July 5, 1989). Neither is on point. In *Del Campo*, the court reduced the look back period from 1997 to 2001-2004 because the alter ego companies were not formed until 2001. Thus, going back to 1997 was entirely unnecessary. In *Benchmark Design*, the court granted a 4 year look back from 1989 to 1985. However, the case does not indicate what period of time was being sought by the requesting party. Simply put, *Benchmark Design* is of no help whatsoever, as it does not indicate over what period alter ego discovery would be appropriate.

**D.  LeEco and Lele Have Waived Any Claim That VIZIO's Requests Violate Privacy Laws, As They Did Not Assert Any Such Objections In Response To VIZIO's RFPs.**

*Fed. R. Civ. P.* 34(b)(2)(B) requires: "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. In short, general and boilerplate objections are useless. *M2 Software, Inc. v. M2 Communications, LLC*, 217 F.R.D. 499, 500 (C.D. Cal.) ("M2 Software's responses were preceded by two pages of boilerplate 'General Objections."....General objections are not sufficient to raise any substantial, meaningful or enforceable objections to any particular discovery request."). *Accord Springer v. General Atomics Aeronautical Systems, Inc.*, 2018 WL 290745 * 1-2 (S.D. Cal.) (general objections found in introductory sections overruled as improper); *Bright v. Dennis Garberg and Associates, Inc.*, 2011 WL 13150146 * 5 (C.D. Cal. 2011) ("[D]efendants' general and boilerplate objections which have been incorporated into each discovery response are overruled because such general and boilerplate objections are improper.... Such general objections do not explain or analyze on a particularized basis, why each particular document request is objectionable, and thus are inadequate.").

In LeEco and LeLe's responses to RFPs, they never asserted any privacy or confidentiality objections, let alone the tax return or trade secret privileges. In fact, the only place where any objection on the basis of confidential, personal or proprietary information was attempted to be made was in the boilerplate introductory general objections. These general objections are tantamount to making no objections at all. In short, they are "not enforceable objections to any particular discovery request."

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 9

Finally, even assuming, *arguendo*, that these general, boilerplate objections are somehow viable, VIZIO is plainly entitled to production at bar. The Court has already ruled that VIZIO has stated a plausible case for alter ego liability. Accordingly, the alter ego discovery sought is both relevant and necessary to Plaintiff's case, even if it would constitute trade secret information or otherwise be protected by some sort of privacy rights. That is because a party seeking trade secret discovery must show "that the information sought is relevant and necessary to proof of or defense against, a material element of one or more causes of action presented in the case, [such] that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit, [the burden then shifts to] the holder of the [trade secret] to demonstrate any claimed disadvantages of a protective order [and to show]that an alternative to disclosure will not be unduly burdensome to the opposing side, [but rather], will maintain the same fair balance in the litigation that would have been achieved by disclosure." *Bridgestone/Firestone, Inc. v. Superior Court*, 7 Cal.App.4th 1384, 1393 (2011). (Emphasis added).

In summary, your clients do not have any enforceable privacy or confidentiality objections at bar, but even if they did, those objections are insufficient to prevent the production of documents that are critical to establishing the existence of alter-ego liability. Equally important, the notion that they can assert trade secret or tax return privileges when no such objections were made, is not the rule in the Ninth Circuit. R*ichmark, supra,* 959 F.2d 1473.

E.   **VIZIO'S Responses to RFA Nos. 1 and 3, and RFP No. 10.**

VIZIO has properly responded to RFA Nos. 1 and 3. Specifically, RFA No. 1 is vague and ambiguous as to whether LeEco is asking VIZIO to admit that it drafted Section 1.1 of the Framework Agreement, to the exclusion of any other party. VIZIO objected on that basis. Then, without waiving the objection, VIZIO specifically admitted that the Framework Agreement and its terms were drafted by it and one or more of the Defendants. That admission was an entirely appropriate response since VIZIO has provided details as to why it could not admit or deny the request as stated, but then responded to the substance of the request as required by Fed. R. Civ. P. 36(a)(4).

VIZIO's response to RFA No. 3 is likewise proper. That Request asks VIZIO to admit that as of June 9, 2017, it no longer had any interest in entering into the China JV.

First, the term "China JV" is not defined. Nor does the RFA even specify with whom the undefined China JV was to be entered. Wholly apart from these ambiguities, your clients have asserted that "none of the essential terms regarding the proposed China JV were agreed upon as of the date of the Framework Agreement." (Order, p. 19). Without in any way acquiescing in

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 10

your clients' assertion, VIZIO properly objected to that RFA on the ground that it called for speculation and was vague, ambiguous and unintelligible without further explanation as to what the precise terms of the "China JV" were as of June 9, 2017 - - especially in light of the utter refusal and failure of Defendants to negotiate the substantive terms of the "China JV" in good faith, let alone within the 45 day period mandated by the Framework Agreement. This was, therefore, entirely appropriate.

Second, the RFA plainly seeks information that is not relevant to any claim or defense. It is undisputed that the Framework Agreement was made on April 3, 2017. It is likewise crystal clear that Section 4 of the Framework Agreement specifically states that "Buyer and the Company shall…execute one or more agreements to document the China JV…within 45 days of the date hereof." Since June 9 was well outside of this 45 day window, whether VIZIO had any intent in entering into the "China JV" at that later date is not relevant to any claim or defense as required by Rule 26 (b) of the *Federal Rules of Civil Procedure*.

Finally, your assertion that VIZIO's response to RFA No. 10 is somehow inappropriate, is incorrect. That RFP seeks all documents and communications "concerning the aftermath of the decision to terminate the Framework Agreement…." First, this RFP is incomprehensible. VIZIO properly objected on that basis. Nowhere does it define "the aftermath", let alone specify any particular document or categories of documents or otherwise identify authors, recipients, dates/subject matter. Second, the RFP is unreasonably overbroad on its face since it is unlimited as to time. Again, VIZIO properly objected on this basis. Third, the RFP arguably seeks VIZIO's tax returns and confidential, private, trade secret financial documents as well as board and shareholder minutes; *i.e.*, documents which VIZIO closely guards and keeps confidential.

VIZIO specifically defined its confidential and trade secret objection as including those specific items and it expressly objected on that basis. Your letter admits on pp. 5 – 6, that (a) "the California Supreme Court has held that Revenue and Taxation Code section 1982, which prohibits the disclosure of tax returns, implicitly creates a privilege against the disclosure of income tax returns", and (b) "state law governs privilege claims." Pointedly, California law also recognizes a trade secret privilege to withhold trade secret information from discovery. *Evid. Code* § 1060. This privilege can only be overcome where the party seeking same "makes a prima facie, particularized showing that the information sought is relevant and *necessary* to the proof of, or defense against, a material element of one or more causes of action presented in the case…." *Bridgestone, supra,* 7 Cal.App. 4th at 1393.

You have made no such showing. Nor can you. The damages that VIZIO is seeking at bar are specified reliance and lost opportunity sums resulting directly from the breach of the

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 11

Framework Agreement and the fraud that gave rise to it; *i.e.,* $60MM (Order, pp. 17 – 18). These sums are calculable from the contract. Thus, any suggestion that additional financial information is relevant - - it is not, which is another objection made by VIZIO - - but even if relevant, that information is certainly not "necessary."

Simply stated, RFP No. 10 fails on its face.

Very truly yours,

Robert M. Waxman

DNT:jd

14676.8:9330120.2