# EXHIBIT A

1  Jeff K. Joyner (SBN CA 180485)
   joynerj@gtlaw.com
2  Daniel Tyukody (SBN CA 123323)
   tyukodyd@gtlaw.com
3  GREENBERG TRAURIG, LLP
   1840 Century Park East, Suite 1900
4  Los Angeles, California 90067-2121
   Telephone: 310.586.7700
5  Facsimile: 310.586.7800

6  Attorneys for Defendant and Counter-Claimant
   LeECO V. LTD.

7

8

9                  **UNITED STATES DISTRICT COURT**

10            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12  VIZIO, INC., a California corporation,      CASE NO.  8:17-CV-01175-DOC-JDE

            Plaintiff,
13
                                               **DEFENDANT LeECO V. LTD.'S**
       v.                                      **REQUEST FOR ADMISSIONS, SET**
14                                             **ONE TO PLAINTIFF VIZIO, INC.**

15  LeECO V. LTD., an exempted company
    with limited liability incorporated under
16  the laws of the Cayman Islands; LeECO       JUDGE:  Hon. David O. Carter
    GLOBAL GROUP LTD., a corporation            Ctrm:  9D
    organized and existing under the laws of
17  the People's Republic of China; LELE
    HOLDING, LTD., a British Virgin
18  Islands Personal Holding Company;
    YUETING JIA, an individual; and
19  DOES 1 through 10,

20              Defendants.

21  _____

22  LeECO V. LTD.

23              Counter-Claimant,

24       vs.

25  VIZIO, a California corporation,

26              Counter-Defendant.

27

28

                                        CASE NO.  8:17-CV-01175-DOC-JDE

1  PROPOUNDING PARTY:          Defendant, LeEco V. Ltd.

2  RESPONDING PARTY:           Plaintiff, Vizio, Inc.

3  SET NUMBER:                 One

4          Pursuant to Federal Rules of Civil Procedure Rules 36, Defendant LeEco V. Ltd.

5  hereby requests that Plaintiff Vizio, Inc., respond to the following Requests for Admission

6  within 30 days from the date of service thereof.

7                                    **DEFINITIONS**

8          As used herein, and only for purposes of these discovery requests, the following

9  terms have the following meanings:

10         1.      As used herein, the term "LeEco" shall mean LeEco, and all agents and

11  representatives of LeEco, and all Persons acting or purporting to act on its behalf.

12         2.      "Vizio" shall mean and refer to Plaintiff Vizio, Inc., a California corporation,

13  and to all agents and representatives of Vizio, and to all Persons acting or purporting to act

14  on its behalf.

15         3.      As used herein, the terms "You" or "Your" shall mean Vizio, and all agents

16  and representatives of Vizio, and all Persons acting or purporting to act on its behalf.

17         5.      As used herein, the term "Framework Agreement" shall mean and refer to

18  that certain Framework, Termination and Mutual General Release Agreement entered into

19  as of April 5, 2017 by and among Vizio and LeEco.

20         6.      As used herein, the term "China JV" shall mean and refer to the proposed

21  enterprise referenced in the Framework Agreement related to the formation of a proposed

22  joint venture in the China.

23         7.      The words "Relating," "Relate," "Relate To," "Relating To" and "Referring"

24  as used herein shall mean all matters or things that in anyway discuss, are connected to,

25  arise from, consist of, reflect, summarize, evaluate, or comment on the subject or object of

26  the particular Request, or that have any logical or factual connection to the matter

27  discussed, and they shall include the common meanings of all those terms, and shall

28  include indirect as well as direct references to the subject matter or any aspect thereof.

## INSTRUCTIONS

1.      Each request for admission not only calls for your knowledge, but also for all knowledge that is available to you by reasonable inquiry and/or investigation, including inquiry of your representatives and attorneys.

2.      If you object to any request for admission, state the reason for your objection with particularity.

3.      If, in responding to the requests for admission, you claim that there is any ambiguity in either a particular request for admission or in a definition or an instruction applicable thereto, such claim shall not be used as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request for admission.

4.      A failure to respond to a request for admission within 30 days after service thereof shall result in the matter being deemed admitted.

5.      These requests for admission shall be deemed to be continuing, and you are obligated to supplement and amend your answers, as required by Federal Rule of Civil Procedure 26(e). You are requested to reasonably amend any response if you obtain information upon the basis of which you know that the prior response was incorrect or, though the response was correct when made, it is no longer correct.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that You drafted Section 1.1 of the Framework Agreement.

### REQUEST FOR ADMISSION NO. 2:

Admit that the terms of the Framework Agreement Relating To the release of the $10 million currently held in escrow are ambiguous.

//
//
//
//

**REQUEST FOR ADMISSION NO. 3:**

Admit that, as of at least June 9, 2017 when You sent the Demand for Immediate Payment to LeEco Global Group, You no longer had any interest in entering into the China JV.


DATED:  June 22, 2018                    GREENBERG TRAURIG, LLP


By _____

Jeff K. Joyner
Daniel Tyukody
Attorneys for Defendant and Counter-Claimant,
LeECO V. LTD.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

     I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 1840 Century Park East, 19th Floor, Los Angeles, CA 90067.

     On the date given below, I served the **DEFENDANT LeECO V. LTD.'S REQUEST FOR ADMISSIONS, SET ONE TO PLAINTIFF VIZIO, INC.** on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope addressed as follows:

Robert M. Waxman                       *Attorneys for Plaintiff Vizio, Inc.*
David N. Tarlow
Jason L. Haas
Ervin Cohen & Jessup LLP
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
Tel: 310-273-6333/Fax: 310-859-2325
rwaxman@ecjlaw.com
dtarlow@ecjlaw.com
jhaas@ecjlaw.com

☒    **(BY FIRST CLASS MAIL)**
I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of such business.

☐    **(BY OVERNIGHT DELIVERY)**
I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐    **(BY CM/ECF)**
Pursuant to CM/ECF System, registration as a CM/ECF user constitutes service through the Court's transmission facilities. The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record listed above who are registered with the Court's EC/ECF system.

☐    **(BY E-MAIL)**
Based on court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    **(BY FACSIMILE)**
I transmitted the foregoing document(s) by facsimile sending number. Pursuant to rule 2009(i)(4), I caused the machine to print a transmission record of the transmission, a true and correct copy of which is attached to this declaration.

☐   **(BY PERSONAL SERVICE)**
I caused such envelope to be delivered by hand to the offices listed above.

☒   **(FEDERAL)**       I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 22, 2018, at Los Angeles, California.

_____
Michael A. Fairfax

2
**PROOF OF SERVICE**

# EXHIBIT B

1  Robert M. Waxman (SBN 89754)
   rwaxman@ecjlaw.com
2  David N. Tarlow (SBN 214050)
   dtarlow@ecjlaw.com
3  Jason L. Haas (SBN 217290)
   jhaas@ecjlaw.com
4  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
6  Facsimile  (310) 859-2325

7  Attorneys for Plaintiff VIZIO, INC., a California corporation

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

10

| | |
|---|---|
| 11  VIZIO, INC., a California corporation, | Case No. 8:17-CV-01175-DOC-JDE |
| 12                 Plaintiff, | The Hon. David O. Carter |
| 13                 v. | **PLAINTIFF VIZIO, INC.'S RESPONSES TO LeECO V. LTD.'S FIRST SET OF REQUESTS FOR ADMISSIONS** |
| 14  LeECO V. LTD., an exempted company with limited liability incorporated under the laws of the | |
| 15  Cayman Islands; LeECO GLOBAL | **Ctrm: 9D** |
| 16  GROUP LTD., a corporation organized and existing under the laws of the | |
| 17  People's Republic of China; LELE HOLDING, LTD., a British Virgin | |
| 18  Islands Personal Holding Company; YUETING JIA, an individual; and | |
| 19  DOES 1 through 10, | |
| 20                 Defendant. | |
| 21  LeECO V. LTD., | |
| 22                 Counter-Claimant, | |
| 23                 vs. | |
| 24  VIZIO, INC., a California corporation, | |
| 25                 Counter-Defendant. | |
| 26 | |

27

28

ERVIN COHEN & JESSUP LLP

8:9306439.1

ERVIN COHEN & JESSUP LLP

1  PROPOUNDING PARTY:     Defendant, LeEco V. Ltd.

2  RESPONDING PARTY:      Plaintiff, VIZIO, Inc.

3  SET NUMBER:            One

4  Plaintiff VIZIO, Inc. ("Plaintiff" or "VIZIO") responds to Defendant LeEco

5  V Ltd.'s Request for Admissions, Set One to Plaintiff VIZIO, Inc. (hereinafter

6  referred to as the "RFAs", as follows:

7  **REQUEST FOR ADMISSION NO. 1:**

8  Admit that You drafted Section 1.1 of the Framework Agreement.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

10  VIZIO objects to Request No. 1 on the ground that it is vague, ambiguous and

11  unintelligible as presently framed in that VIZIO is presently unable to ascertain from

12  this Request, or from any other portion or portions of the RFAs, whether the

13  propounding party is asking if Section 1.1 of the Framework Agreement was drafted

14  by VIZIO, exclusively, as opposed to being the joint work product of VIZIO and

15  one or more of the Defendants, *i.e.,* was their joint work product.

16  Without waiving the foregoing objection, but for the additional information of

17  the propounding party, the Framework Agreement and the terms therein were

18  drafted by VIZIO and one or more of the Defendants.

19  **REQUEST FOR ADMISSION NO. 2:**

20  Admit that the terms of the Framework Agreement Relating To the release of

21  the $10 Million currently held in escrow are ambiguous.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

23  VIZIO objects to Request No. 2 on the ground that it is vague, ambiguous and

24  unintelligible as presently framed in that VIZIO is unable to ascertain from this

25  Request, or from any other portion or portions of the RFAs, the precise information

26  which the propounding party is asking VIZIO to admit.  The RFAs define the words

27  "Relating To" as meaning "all matters or things that in any way discuss, are

28  connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

ERVIN COHEN & JESSUP LLP

1   subject or object of the particular Request, or have any logical or factual connection

2   to the matter discussed, and they shall include the common meanings of all those

3   terms, and shall include indirect as well as direct references to the subject matter or

4   any aspect thereof." As such, VIZIO is unable to isolate, *inter alia*, whether a

5   specific term in the Framework Agreement that contains multiple paragraphs

6   interspersed throughout 10 separate pages of text, "relates indirectly" to at "any

7   aspect" of the release of the $10 Million currently held in escrow, as opposed to

8   "relating indirectly" to other portion or portions of the Framework Agreement.

9   Accordingly, VIZIO cannot determine the precise nature or scope of the inquiry that

10   is the subject of this Request.

11   Without waiving the foregoing objection, but for the additional information of

12   the propounding party, VIZIO admits that the language in Section 4 of the

13   Framework Agreement "relates to" the release of that $10 Million sum from escrow

14   and that such verbiage is ambiguous when viewed in isolation since it does not

15   specifically address the consequences of a failure by LeEco - - through no fault of

16   VIZIO - - to negotiate/execute the substantive terms of the China JV, within the 45

17   days mandated therein. But wholly apart from the fact that the law does not permit

18   defendants that have prevented the fulfillment of an alleged condition or

19   performance of a contractual term to defeat liability, when that language from

20   Section 4 of the Framework Agreement is nevertheless read together with the carve-

21   out in Section 1.1 of the Framework Agreement as to the Buyer Termination Fee

22   Deposit as well as the verbiage in Section 1.2.2 with respect to the release of the $10

23   Million from escrow, that contractual ambiguity disappears; *i.e.,* it is clear that under

24   the parties' agreements and LeEco's breach thereof, the $10 Million should have

25   been released from escrow when LeEco likewise failed to negotiate the substantive

26   terms of the China JV in good faith or otherwise within the specified contractual

27   period, let alone execute the China JV Agreement on or before the expiration of the

28   45 days from execution and payment of the $40 Million escrowed funds to VIZIO.

**REQUEST FOR ADMISSION NO. 3:**

Admit that, as of at least June 9, 2017 when You sent the Demand for Immediate Payment to LeEco Global Group, You no longer had any interest in entering into the China JV.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

VIZIO objects to this Request on the ground that it is an incomplete hypothetical inquiry which calls for speculation and in any event does not seek an admission that is relevant to the claims or defenses in the within action.

VIZIO further objects to Request No. 3 on the ground that it is vague, ambiguous and unintelligible as presently framed in that Plaintiff is presently unable to ascertain from this Request, or from any other portion or portions of the RFAs, the precise meaning which the propounding party ascribes to the words "no longer had any interest in entering into the China JV", as that verbiage is used therein; *i.e.,* without further explanation as to what the precise terms of the China JV were at that time, particularly in light of the utter failure and refusal of the Defendants to negotiate the substantive terms of the China JV in good faith - - let alone execute the China JV Agreement - - within the forty five day period of time mandated by the Framework Agreement. Accordingly, VIZIO cannot determine the precise nature or scope of the inquiry that is the subject of this Request.

DATED: July 25, 2018

ERVIN COHEN & JESSUP LLP
Robert M. Waxman
David N. Tarlow
Jason L. Haas

By: _____
Robert M. Waxman
Attorneys for Plaintiff VIZIO, INC., a
California corporation

ERVIN COHEN & JESSUP LLP

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 9401 Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

On July 25, 2018, I served true copies of the following document(s) described as **PLAINTIFF VIZIO, INC.'S RESPONSES TO LeECO V. LTD.'S FIRST SET OF REQUESTS FOR ADMISSIONS** on the interested parties in this action as follows:

Jeff K. Joyner, Esq.
Daniel Tyukody, Esq.
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
joynerj@gtlaw.com
tyukodyd@gtlaw.com
Telephone: (310) 586 - 7700
Facsimile: (310) 586 - 7800

*Attorneys for Defendant and Counter-Claimant LeECO V. LTD.*

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Ervin Cohen & Jessup LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 25, 2018, at Beverly Hills, California.



Joe Dirkx

14676 8:9306439.1                                                8:17-CV-01175-DOC-JDE

PLAINTIFF VIZIO, INC.'S RESPONSES TO LeECO V. LTD.'S FIRST SET OF REQUESTS FOR ADMISSION

EXHIBIT C

1  Jeff K. Joyner (SBN CA 180485)
2  joynerj@gtlaw.com
   Daniel Tyukody (SBN CA 123323)
3  tyukodyd@gtlaw.com
4  GREENBERG TRAURIG, LLP
   1840 Century Park East, Suite 1900
5  Los Angeles, California 90067-2121
6  Telephone:  310.586.7700
   Facsimile:   310.586.7800
7
8  Attorneys for Defendant,
   LeECO V. LTD.
9

10

11              UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  VIZIO, INC., a California corporation,    CASE NO.  8:17-CV-01175-DOC-JDE

14              Plaintiff,

15       v.                                   **DEFENDANT LeECO V. LTD.'S**
                                              **REQUESTS FOR PRODUCTION OF**
16  LeECO V. LTD., an exempted company        **DOCUMENTS, SET ONE TO**
    with limited liability incorporated under **PLAINTIFF VIZIO INC.**
17  the laws of the Cayman Islands; LeECO
    GLOBAL GROUP LTD., a corporation
18  organized and existing under the laws of   JUDGE:  Hon. David O. Carter
    the People's Republic of China; LELE       Ctrm:  9D
19  HOLDING, LTD., a British Virgin
    Islands Personal Holding Company;
20  YUETING JIA, an individual; and
    DOES 1 through 10,
21
                Defendants.
22

23  ─────────────────────────────

24  LeECO V. LTD.

25              Counter-Claimant,

26       vs.

27  VIZIO, a California corporation,

28              Counter-Defendant.

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

| | | |
|---|---|---|
| 1 | PROPOUNDING PARTY: | Defendant, LeEco V. Ltd. |
| 2 | RESPONDING PARTY: | Plaintiff Vizio, Inc. |
| 3 | SET NUMBER: | One |

4   Pursuant to Rule 34 of the Federal Rule of Civil Procedure, Defendant LeEco V.

5  Ltd. ("LeEco") hereby requests that Plaintiff, Vizio, Inc. ("Vizio" or "Plaintiff"), within

6  thirty (30) days of service hereof, respond to the following Requests for Production of

7  Documents and produce all responsive documents in its possession, custody or control at

8  Greenberg Traurig, LLP, 1840 Century Park East, Suite 1900, Los Angeles, California

9  90067.

## DEFINITIONS

11   As used herein, and only for purposes of these discovery requests, the following

12  terms have the following meanings:

13   1.   As used herein, the term "LeEco" shall mean LeEco, and all agents and

14  representatives of LeEco, and all Persons acting or purporting to act on its behalf.

15   2.   "Vizio" shall mean and refer to Plaintiff Vizio, Inc., a California

16  corporation, and to all agents and representatives of Vizio, and to all Persons acting or

17  purporting to act on its behalf.

18   3.   As used herein, the terms "You" or "Your" shall mean Vizio, and all agents

19  and representatives of Vizio, and all Persons acting or purporting to act on its behalf.

20   4.   The word "Complaint" shall mean and refer to the First Amended Complaint

21  filed by Vizio in the above-captioned action on November 6, 2017.

22   5.   As used herein, the term "Framework Agreement" shall mean and refer to

23  that certain Framework, Termination and Mutual General Release Agreement entered

24  into as of April 5, 2017 by and among Vizio and LeEco.

25   6.   As used herein, the term "Merger Agreement" shall mean and refer to that

26  certain Agreement and Plan of Merger, made as of July 6, 2016, by and among Vizio,

27  LeEco, Le V Merger Sub, Inc., and Shareholder Representative Services LLC.

28

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

7. As used herein, the term "China JV" shall mean and refer to the proposed enterprise referenced in the Framework Agreement related to the formation of a proposed joint venture in the China.

8. As used herein, the term "Communication" or "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including but not limited to, any meeting, conversation, discussion, conference, correspondence, message or other written or oral transmission, exchange, or transfer of information in any form between two or more Persons, including in person or by telephone, facsimile, telegraph, telex, e-mail or other tangible or electronic medium.

9. "Documents" shall be defined to the broadest extent permitted by Federal Rule of Civil Procedure 34, and includes any recordation of any information or Communication, including metadata, and including whether the information or Communication is handwritten, typed, printed, or otherwise reproduced, whether in "hard-copy" form or digital form, and including all non-final drafts of Documents. The term Documents includes all non-identical copies, such as those bearing marginal comments, postscripts, changes, amendments, addenda or other notations not present on the original document.

10. The terms "Any," "All," "Each," And "Every" should be understood in their most inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of their scope.

11. As used herein, the term "Including" shall mean including, but not limited to, and shall not be interpreted to exclude any information otherwise within the scope of these Requests.

12. As used herein, the term "Person" shall mean, without limitation, a natural person, corporation, limited liability company, partnership, trust, association, joint venture, firm, tenancy in common, or other business enterprise, governmental or legal entity and includes both the singular and plural as well as all representatives of such Person or Person(s).

2

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

13. The words "Relating," "Relate," "Relate To," "Relating To" and "Referring" as used herein shall mean all matters or things that in anyway discuss, are connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the subject or object of the particular Request, or that have any logical or factual connection to the matter discussed, and they shall include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter or any aspect thereof.

14. The singular shall include the plural and the plural shall include the singular.

## INSTRUCTIONS

1. Produce all responsive documents that are in Plaintiff's possession, custody, or control.

2. When a request for production requests certain documents or things to which Plaintiff claims any privilege or protection as a ground for nondisclosure, please state the identity of each person who participated in or had knowledge of the document or thing and provide the following:

    a. The privilege or protection that Plaintiff claims precludes disclosure;

    b. The subject matter of the document or thing (without revealing the content as to which the privilege or protection is claimed);

    c. The date(s), author(s), addressee(s), and copies; and

    d. Any additional facts on which Plaintiff bases its claim of privilege or protection.

3. If Plaintiff objects to any of the following requests for production, and the objectionable document or thing contains relevant non-objectionable matter, Plaintiff must produce such non-objectionable matter.

4. If Plaintiff objects to any part of a request for production and refuses to produce documents or things in response to that part, state the objection and produce documents or things in response to the remaining portion of that request for production. If Plaintiff objects to the scope of a request for production and refuses to produce

3

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

1  documents or things within that scope, Plaintiff must state the objection and produce
2  documents or things for the scope which Plaintiff believes is appropriate (including with
3  its production a specific statement as to why the broader scope is inappropriate).

4      5.    If, in responding to the requests for production, Plaintiff claims that there is
5  any ambiguity in either a particular request for production or in a definition or an
6  instruction applicable thereto, such claim shall not be used as a basis for refusing to
7  respond, but Plaintiff shall set forth as part of the response the language deemed to be
8  ambiguous and the interpretation chosen or used in responding to the particular request
9  for production.

10      6.    Identify any and all documents described in this request that have been
11  destroyed, including a description of the documents destroyed, the author of the
12  documents, as well as the date the documents were destroyed, the name of the person that
13  requested the destruction of the documents, and the reason why the documents were
14  destroyed.

15      7.    Produce each document pursuant to these requests as the document was kept
16  in the usual course of business, or identify the document according to the number of the
17  request to which it corresponds.

18      8.    Each document request propounded in the disjunctive shall also be read as if
19  propounded in the conjunctive and vice versa. Each document request propounded in the
20  singular shall also be read as if propounded in the plural and vice versa, whenever such a
21  construction results in a broader disclosure of information.  Each document request
22  propounded in the present tense shall also be read as if propounded in the past tense and
23  vice versa, whenever such construction results in a broader disclosure of information.
24  "Any" includes "all" and vice versa, whenever such construction results in a broader
25  disclosure of information.

26      9.    These requests for production shall be deemed to be continuing, and
27  Plaintiff shall be obligated to supplement and amend its answers, as required by Federal
28  Rule of Civil Procedure 26(e). Plaintiff is requested to seasonably amend any response if

4

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

1  Plaintiff obtains information upon the basis of which it knows that the prior response was
2  incorrect or, though the response was correct when made, it is no longer correct.

3        10.    Electronically Stored Information ("ESI"): ESI is information created,
4  manipulated, communicated, captured, and/or stored in digital form on or in any
5  electronic media, desktop or laptop computer, tablets, servers, networks, removable
6  media, "cloud" computing services, smart phones, tapes, databases and all backup media.
7  ESI includes, but is not limited to the original and any identical and/or non-identical
8  copies (whether different from the originals because of edits or notes made on such
9  copies or otherwise) of ESI of any kind or description, whether inscribed by mechanical,
10  facsimile, electronic, magnetic, digital, or other means.  Such data may include, but is not
11  limited to, all text based files (including word processing Documents), presentation files
12  (such as PowerPoint), spreadsheets (such as Excel), electronic mail files and information
13  concerning or related to electronic mail (such as electronic mail receipts, transmittals,
14  logs of electronic mail history and usage, header information, and deleted files),
15  graphical files in any format, databases, calendar and scheduling information, task lists,
16  telephone logs, contact managers, charts, graphs, outlines, all image files (pdf, tif, jpeg,
17  gif, etc.), internet or intranet messages (such as text, instant, and direct messages), voice
18  mail, chat logs, electronic bulletin board messages, website postings of any nature, blog
19  entries, all other methods by which messages may be transmitted by or through electronic
20  means, and any and all miscellaneous files and/or file fragments, regardless of the
21  medium or media on which they reside and regardless of whether such electronic data is
22  in an active file, deleted file, or file fragment.  ESI also includes the file, folder tabs,
23  and/or containers and labels appended to or associated with any physical storage device
24  associated with each such original and/or copy means information and/or Documents that
25  are stored in an Electronic medium.

26        11.    Production Images.  All Documents, not otherwise specified herein, shall be
27  produced as single-page, uniquely and sequentially-numbered Group 4 Tagged Image
28  Files ("TIFFs" or ".tif format") that reflect, without visual degradation, the full and

complete information contained on the original Document.  All images shall be in black-and-white format, except where the context requires color for reason of clarity.  For example, certain email exchanges between the parties leading up to the formulation of the Framework Agreement have comments in red on top of the original gray or black, on top of which another party adds comments in blue.  Such documents would be difficult to follow without color reproduction.   All images must be at least 300 dpi resolution.

12.   Bates Numbering:  All images shall be assigned a Bates number that must always:   (1) be legible and unique across the entire document production and if appropriate, provide a confidentiality designation at a location that does not obliterate, conceal or interfere with any information from the source Document; (2) maintain a constant length (0-padded) across the entire production; (3) be sequential within a given document; (4) be located in the lower right-hand corner as to not obstruct the view of any text or images on the document itself; (5) Plaintiff's Bates number prefix shall include a unique, logical abbreviation of the entity or individual's actual name, and shall not use generic terms referencing Plaintiff's role in the litigation (*e.g.* "Plaintiff", "PL", "etc.); (6) avoid using the letter "o" or "O" at the end of the prefix, as it can be difficult for all parties to discern between the number "0" and the letter "O"; (7) unless otherwise stated above, native format Documents will be produced with TIFF placeholders that contain the original file extension, the Bates Number range for the Document and any confidentiality designation.  If a Bates number or set of Bates numbers is skipped in a production, the Plaintiff will so note in a cover letter or production log accompanying the production.

13.   OCR and/or Extracted Text:  Plaintiff shall produce Document level OCR and/or Extracted Text files for all Documents produced.  The OCR and/or extracted text files shall be produced in ASCII text format and shall be labeled and produced on Production Media (as defined below). The text files will be named with the unique Bates Number of the first page of the corresponding Document followed by the extension ".txt."  The OCR and/or extracted text files shall be produced in a separate directory

6

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

titled "TEXT," in the manner suitable for importing the information into Relativity or Concordance, or in some other mutually acceptable manner. The text files will not contain any redacted portions of any redacted Documents.

14. Load Files: Plaintiff shall produce a "data load file" (i.e., .dat) or a load file in some other mutually agreeable industry standard format to accompany the image files. The data load file shall contain delimited text that will populate fields in a searchable database, such as Relativity or Concordance. The data load file shall contain the metadata associated with each coding field specified in Exhibit 1. In general, the load files shall be provided in the following format:

    i.     DAT file with standard Relativity or Concordance delimiters; ASCII 254 (QUOTE) ASCII 20 (COMMA);

    ii.     The fields should be consistent across all DAT files;

    iii.     Date fields should all be in mm/dd/yyyy format;

    iv.     PST Time Zone shall be applied to ESI without regard to the geographic location of the Custodians or data sets in order to enable de-duplication and uniform processing;

    v.     If there are links to native files, the hyperlink field should be in the DAT; and

    vi.     Document parent/child relationships should be maintained.

Plaintiff shall also produce an "image load file" (i.e., .opt) or a load file in some other mutually agreeable industry standard format to accompany the images. The image load file format is a delimited ASCII file that contains information about where each Document begins and ends to facilitate the use of the produced images through a document review platform, such as Relativity or Concordance or other litigation support software. The image load file consists of seven delimited entries (see viii below for an example):

    vii.     Alias/Image Key (usually BegDoc);

7

viii.   Volume name where documents/images reside;

ix.   Full path, including file name with extension, of the image;

x.   Document breaks, enter a Y to denote whether this image marks the beginning of a document;

xi.   Number of pages of the document or image;

xii.   Y indicates the first page of a document;

xiii.   Comma (,) indicates a page break or pages; and

xiv.   AB000001,VOL001,D:\DB\ABCASE\VOL001\IMAGES\001\AB00000 1.tif,Y,,,1

15.   Data Fields: To the extent available, the following fields should be included:

a. Beginning Bates

b. Ending Bates

c. Beginning Attachment Bates

d. Ending Attachment Bates

e. Page Count

f. Date and Time Sent

g. Date and Time Created

h. Date and Time Modified

i. From

j. To

k. CC

l. BCC

m. Subject

n. Author

o. FILENAME

p. File Extension

q. Source

r. Custodian

8

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

s.  Path to the Native

t.  Path to the Text File

16.  To the extent a file will not convert cleanly to image, You must produce a Native copy, with an image place holder and a relative path to the Native in the Load file. The file should be named after the First Bates Number.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All Documents and Communications that Relate To the Framework Agreement, Including those reflecting the negotiations that culminated in the Framework Agreement, the process that resulted in Vizio's decision to enter into it (Including Board of Directors' review and approval, based upon (among other things) the collection of relevant Documents from the personal computers of Your Directors), and the reasons why Vizio believes the Framework Agreement has been breached, as well as any damages Vizio contends resulted therefrom.

### REQUEST FOR PRODUCTION NO. 2:

All Documents and Communications Related To negotiating the proposed China JV, Including the "repeated efforts" referenced in ¶ 73 of the Complaint, and draft versions of the proposed China JV agreement Including but not limited to drafts preliminary and subsequent to the draft attached as Exhibit 6 to the Declaration of Ben Wong in Opposition to LeEco's Motion to Set Aside Entry of Default, and all Documents reflecting time spent in connection with Your purported repeated efforts.

### REQUEST FOR PRODUCTION NO. 3:

All Documents and Communications concerning Your decision to send a letter on June 9, 2017 to LeEco Global Group terminating negotiations Relating To the China JV and demanding immediate payment, purportedly pursuant to the terms of the Merger Agreement.

### REQUEST FOR PRODUCTION NO. 4:

9

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

1    All Documents and Communications Related To Your response to Charles Hsieh's

2    letter of June 22, 2017 to Messrs. Binder and Huang, wherein (among other things)

3    LeEco reiterated its desire to enter into the proposed China JV.

4    **REQUEST FOR PRODUCTION NO. 5:**

5    All Documents and Communications Relating To Your efforts to implement the

6    terms of the Framework Agreement Including:

7    (i)    all efforts to assist LeEco with developing and obtaining certification of the

8    "LeEco Le App" application on Vizio's smart televisions and displays in

9    North America, as referenced in Section 2.1.1 of the Framework Agreement,

10   and such "smart televisions and displays" You identified as potentially

11   appropriate for running this application;

12   (ii)   any efforts You made to make the LeEco Le App available on compatible

13   smart televisions and displays in North America on the second screen of the

14   Vizio SmartCast App for all Google Chromecast-enabled televisions and

15   displays as well as in the My Apps folder for VIA devices (referenced in the

16   Framework Agreement as the "App Processes") as referenced in Section

17   2.1.2 of the Framework Agreement;

18   (iii)  any "customary form agreement(s)" You identified internally and/or sent to

19   LeEco to accomplish the above;

20   (iv)   any efforts You made to "develop and obtain certification of a data client" to

21   be made available by LeEco as referenced in Section 2.2.1 of the

22   Framework Agreement;

23   (v)    all efforts to assist and cooperate with the "Data Client Processes"

24   referenced in Section 2.2.2 of the Framework Agreement, including any

25   Communication Related To whether the inclusion of "Inscape Data Client"

26   was consistent with "applicable law" within the jurisdiction(s) that Inscape

27   Data was anticipated to be sold as part of a product;

28

10

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

*LA 133603309v14*

(vi)   any analysis You did whether it was legally permissible for LeEco to have access to Inscape data derived from the Inscape Data Client installations, and then access to such information in connection with the proposed China JV data, as referenced in Section 2.2.4 of the Framework Agreement.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and Communications Relating To Your efforts to "negotiate in good faith and use reasonable efforts to form a commercial relationship" Related To the China JV as referenced in Section 3.1 of the Framework Agreement, Including

(i)   the conditions pursuant to which Vizio would grant the China JV the right to sell Vizio televisions in China, Including any agreements Related To branding and distribution as referenced in Section 3.1 of the Framework Agreement;

(ii)   efforts to preload EUI and Le contents on Vizio televisions and displays sold in China, as referenced in Section 3.1 of the Framework Agreement;

(iii)   all agreements (or attempts at reaching agreements) and negotiations on pricing on a per user/per television basis, as referenced in Section 2.2.3 of the Framework Agreement;

(iv)   any non-cash assets You identified as desirable or acceptable for LeEco's capital contribution to the proposed China JV as referenced in Section 3.2.1 of the Framework Agreement;

(v)   any negotiations or agreements You believe were reached on the "Initial JV Term" referenced in Section 3.2.2 of the Framework Agreement, as well as any agreements or negotiations pertaining to the "long-term partnership spirit" that is also referenced therein;

(vi)   any agreements or negotiations pertaining to the "Sales Target" referenced in Section 3.2.5 of the Framework Agreement;

(vii)   any negotiations or agreements on "reasonable competitive rates" that You believed occurred in connection with Section 3.2.5(a) of the Framework

11

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

*LA 133603309v14*

1    Agreement, or Your own contemporaneous internal evaluations of what

2    those rates might be;

3    (viii)   any agreement or negotiations You believe occurred in defining the amount

4    of the "Buyer Loan" referenced in Section 3.2.7 of the Framework

5    Agreement, Including to the conditions or Sales Target that would satisfy

6    the Buyer Loan being repaid in full;

7    (ix)   any Documents or Communications relating to the conditions pursuant to

8    which You would "consider participating in the China JV's financial

9    obligations" as set forth in Section 3.2.7(b) of the Framework Agreement, as

10   well as any Documents or Communications identifying an amount of Your

11   potential participation and the form Your participation would take (e.g., cash

12   vs. non-cash);

13   (x)   and any Documents or Communications relating to any and all "Formal

14   Agreements" as referenced in Section 4 of the Framework Agreement.

15   **REQUEST FOR PRODUCTION NO. 7:**

16   All Documents and Communications Relating To any damages You claim as a

17   result of a breach of the Framework Agreement.

18   **REQUEST FOR PRODUCTION NO. 8:**

19   All Documents and Communications that Relate To the benefits—financial,

20   operational or otherwise—that You expected to receive from the China JV.

21   **REQUEST FOR PRODUCTION NO. 9:**

22   All Documents and Communications sufficient to identify Your principal officers

23   who had a role in connection with negotiating or implementing the Framework

24   Agreement and All Your Directors since January 1, 2016.

25   **REQUEST FOR PRODUCTION NO. 10:**

26   All Documents and Communications concerning the aftermath of the decision to

27   terminate the Framework Agreement, Including communications between and among

28   Vizio's Board, its management, its shareholders, and the general public.

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and Communications Relating To how You accounted for any and all transactions involving LeEco in Your financial statements, including how revenue or income was booked, any analysis of loss contingencies (or recordings of loss contingencies), and the reversal or modification of any prior accounting entry related to the Merger Agreement or the Framework Agreement.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and Communications Relating To the due diligence and/or research You performed on LeEco Related To the Framework Agreement Including any assessments of LeEco's ability to comply with the terms of the Framework Agreement, and of LeEco's good faith or purported lack thereof.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents and Communications that You received from any Person regarding the Framework Agreement.


Dated: June 22, 2018                              GREENBERG TRAURIG LLP

                                                  By: _____
                                                      Jeffrey Joyner
                                                      Daniel Tyukody
                                                      Attorneys for Defendant and Counter-Claimant,
                                                      LeECO V. LTD.

---

13

DEFENDANT LEECO'S REQUESTS FOR PRODUCTION, SET ONE TO VIZIO

LA 133603309v14

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 1840 Century Park East, 19th Floor, Los Angeles, CA 90067.

      On the date given below, I served the **DEFENDANT LeECO V. LTD.'S REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF, VIZIO INC.** on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope addressed as follows:

Robert M. Waxman                 *Attorneys for Plaintiff Vizio, Inc.*
David N. Tarlow
Jason L. Haas
Ervin Cohen & Jessup LLP
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
Tel: 310-273-6333/Fax: 310-859-2325
rwaxman@ecjlaw.com
dtarlow@ecjlaw.com
jhaas@ecjlaw.com

☒  **(BY FIRST CLASS MAIL)**
I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of such business.

☐  **(BY OVERNIGHT DELIVERY)**
I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐  **(BY CM/ECF)**
Pursuant to CM/ECF System, registration as a CM/ECF user constitutes service through the Court's transmission facilities. The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record listed above who are registered with the Court's EC/ECF system.

☐  **(BY E-MAIL)**
Based on court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐  **(BY FACSIMILE)**

1

**PROOF OF SERVICE**

LA 133132130v1

1    I transmitted the foregoing document(s) by facsimile sending number.  Pursuant to rule
2    2009(i)(4), I caused the machine to print a transmission record of the transmission, a true and
     correct copy of which is attached to this declaration.

3    ☐    **(BY PERSONAL SERVICE)**
     I caused such envelope to be delivered by hand to the offices listed above.

4    ☒    **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct, and
5                          that I am employed at the office of a member of the bar of this Court at
                           whose direction the service was made.

6    Executed on June 22, 2018, at Los Angeles, California.

7

8                                                          Michael A. Fairfax

EXHIBIT D

1  Robert M. Waxman (SBN 89754)
     rwaxman@ecjlaw.com
2  David N. Tarlow (SBN 214050)
     dtarlow@ecjlaw.com
3  Jason L. Haas (SBN 217290)
     jhaas@ecjlaw.com
4  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
6  Facsimile  (310) 859-2325

7  Attorneys for Plaintiff VIZIO, INC., a California corporation

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

10

| | |
|---|---|
| 11  VIZIO, INC., a California corporation, | Case No. 8:17-CV-01175-DOC-JDE |
| 12              Plaintiff, | The Hon. David O. Carter |
| 13        v. | **RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.** |
| 14  LeECO V. LTD., an exempted company with limited liability incorporated under the laws of the | |
| 15  Cayman Islands; LeECO GLOBAL GROUP LTD., a corporation organized | |
| 16  and existing under the laws of the People's Republic of China; LELE | **Judge: Hon. David O. Carter** |
| 17  HOLDING, LTD., a British Virgin Islands Personal Holding Company; | **Ctrm:  9D** |
| 18  YUETING JIA, an individual; and DOES 1 through 10, | |
| 19 | |
| 20              Defendant. | |
| 21  LeECO V. LTD., | |
| 22              Counter-Claimant, | |
| 23        vs. | |
| 24  VIZIO, INC., a California corporation, | |
| 25              Counter-Defendant. | |
| 26 | |
| 27 | |
| 28 | |

ERVIN COHEN & JESSUP LLP

1    PROPOUNDING PARTY:        Defendant, LeEco V. Ltd.

2    RESPONDING PARTY:         Plaintiff, VIZIO, Inc.

3    SET NUMBER:               One

4        Plaintiff VIZIO, Inc. ("Plaintiff" or "VIZIO") responds to "Defendant LeEco

5    V Ltd.'s ("LeEco") Requests for Production of Documents, Set One to Plaintiff

6    VIZIO, Inc., ("Document Requests"), as follows:

7                                    **I.**

8                      **PRELIMINARY STATEMENT**

9        Plaintiff has responded to all Document Requests to the extent that

10   information has become known to it.  However, Plaintiff's discovery and internal

11   investigation and preparation for trial of this matter is not complete as of the date of

12   these responses and therefore Plaintiff does not purport to state anything more than

13   information presently known to or discovered by it.  It is anticipated that further

14   discovery, investigation, research and analysis will supply additional information,

15   evidence, documents and/or facts and add meaning to known facts, as well as

16   establish entirely new factual conclusions and legal contentions, all of it which may

17   lead to substantial additions, to changes in and variations from the responses set

18   forth herein.  Plaintiff reserves the right to continue discovery in this matter and to

19   continue its investigation for facts, witnesses and supporting data that may reveal

20   documents which, if they had presently been within Plaintiff's possession, custody

21   or control, would be included in these responses to the extent that same are not

22   objectionable.  Plaintiff is not precluded from introducing documents at trial

23   discovered after the date of these responses.

24       Unless specifically stated below in response to a particular request, the non-

25   objectionable documents responsive to these Document Requests will be produced

26   on a rolling basis over the next 90 days.

27   ///

28   ///

ERVIN COHEN & JESSUP LLP

## II.

## __DEFINITIONS OF CERTAIN OBJECTIONS__

The following definitions of objections are supplemental to, and are incorporated into each of Plaintiff's responses, as indicated below:

"ATTORNEY-CLIENT PRIVILEGE OBJECTION AND WORK-PRODUCT PRIVILEGE OBJECTION" means:

> "Plaintiff objects to this Request on the ground that it indiscriminately calls for the production of documents within the attorney-client privilege and/or the work-product doctrine." No such documents will be produced.

> 1.    Pursuant to Federal Rules of Civil Procedure, Rule 26(b)(5), these privileged materials consist of attorney-client communications and/or work product by, with or through the following counsel and pertaining to and/or with Plaintiff: R. Scott Shean and David C. Lee, the law firm of Latham & Watkins LLP ("Latham & Watkins"), Robert M. Waxman, David N. Tarlow, Jason L. Haas, the law firm of Ervin Cohen & Jessup LLP ("ECJ"), Anthony Pierce, Hyongsoon Kim, the law firm of Akin Gump Strauss LLP ("Akin Gump"), Jerry C. Huang, the Senior Vice President, General Counsel of VIZIO, Dennis Yeoh, the Senior Director of Legal Affairs of VIZIO and Christine Wessel, Corporate Counsel of VIZIO. All communications by these attorneys were with (a) Plaintiff and its employees, officers and/or directors while they were employed by or affiliated with Plaintiff, and/or

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1   (b) between the law offices of ECJ, Latham &

2   Watkins and/or Akin Gump.  These

3   communications consist of the following items to

4   the extent that they exist, are confidential and have

5   not been shown to anyone outside of the attorney-

6   client relationship and were for the purpose of

7   obtaining or providing legal advice and services:

8        (i)     Correspondence between Latham &

9        Watkins, ECJ and/or Akin Gump.

10       (ii)    Notes of oral communications between

11       Latham & Watkins, ECJ and/or Akin Gump.

12       (iii)   Legal memoranda prepared by ECJ for

13       the review of Latham & Watkins and/or Akin

14       Gump.

15       (iv)    Legal memoranda prepared by Latham

16       & Watkins for the review of ECJ and/or Akin

17       Gum.

18       (v)     Legal memoranda prepared by Akin

19       Gump for the review of ECJ and/or Latham &

20       Watkins.

21       (vi)    Drafts of pleadings, declarations and/or

22       motions prepared by ECJ for the review of

23       Latham & Watkins and/or Akin Gump.

24       (vii)   Drafts of pleadings, declarations and/or

25       motions prepared by Latham & Watkins for

26       the review of ECJ and/or Akin Gump.

27       (viii)  Drafts of pleadings, declarations and/or

28       motions prepared by Akin Gump for the

ERVIN COHEN & JESSUP LLP

1  review of ECJ and/or Latham & Watkins.

2  (ix)  Correspondence between ECJ and
3  VIZIO through its officers, directors and
4  employees while they were still employed by
5  or affiliated by VIZIO.

6  (x)  Notes of oral communications between
7  ECJ and VIZIO through its officers, directors
8  or employees while they were still employed
9  by or affiliated with VIZIO.

10  (xi)  Correspondence between Lathan &
11  Watkins and VIZIO through its officers,
12  directors and employees while they were still
13  employed by or affiliated with VIZIO.

14  (xii)  Notes of oral communications between
15  Latham & Watkins and VIZIO through its
16  officers, directors or employees while they
17  were still employed by or affiliated with
18  VIZIO.

19  (xiii)  Correspondence between Akin Gump
20  and VIZIO through its officers, directors or
21  employees while they were still employed by
22  or affiliated with VIZIO.

23  (xiv)  Notes of oral communications between
24  Akin Gump and VIZIO through its officers,
25  directors or employees while they were still
26  employed by or affiliated with VIZIO.

27  (xv)  Correspondence between Jerry Huang,
28  Esq., and VIZIO through its officers,

directors and employees while they were still employed by or affiliated with VIZIO.

(xvi)  Notes of oral communications between Jerry Huang, Esq., and VIZIO through its officers, directors or employees while they were still employed by or affiliated with VIZIO.

(xvii) Correspondence between Dennis Yeoh, Esq., and VIZIO through its officers, directors and employees while they were still employed by or affiliated with VIZIO.

(xviii)Notes of oral communications between Dennis Yeoh, Esq., and VIZIO through its officers, directors or employees while they were still employed by or affiliated with VIZIO.

(xix)  Correspondence between Christine Wessel, Esq., and VIZIO through its officers, directors and employees while they were still employed by or affiliated with VIZIO.

(xx)   Notes of oral communications between Christine Wessel, Esq., and VIZIO through its officers, directors or employees while they were still employed by or affiliated with VIZIO.

(xxi)  Legal Memoranda prepared by ECJ for VIZIO through its officers, directors or employees while they were still employed by

14676.8:9306136.1

5

Case No. 8:17-CV-01175-DOC-JDE

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1  or affiliated with VIZIO.

2  (xxii) Memoranda prepared for the review of

3  ECJ, Latham & Watkins and/or Akin Gump

4  by VIZIO through its officers, directors or

5  employees while they were still employed by

6  or affiliated with it.

7  (xxiii)Legal Memoranda prepared by Latham

8  & Watkins for VIZIO through its officers,

9  directors or employees while they were still

10 employed by or affiliated with VIZIO.

11 (xxiv)Legal Memoranda prepared by Akin

12 Gump for VIZIO through its officers,

13 directors or employees while they were still

14 employed by or affiliated with VIZIO.

15 (xxv) Memoranda prepared by Jerry Huang,

16 Esq., for VIZIO through its officers, directors

17 or employees while they were still employed

18 by or affiliated with VIZIO.

19 (xxvi)Memoranda prepared for Jerry Huang,

20 Esq., by VIZIO through its officers, directors

21 or employees while they were still employed

22 by or affiliated with it.

23 (xxvii)        Memoranda prepared by Dennis

24 Yeoh, Esq., for VIZIO through its officers,

25 directors or employees while they were still

26 employed by or affiliated with VIZIO.

27 (xxviii)        Memoranda prepared for Dennis

28 Yeoh, Esq., by VIZIO through its officers,

14676.8:9306136.1                                      6                    Case No. 8:17-CV-01175-DOC-JDE

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

1    directors or employees while they were still

2    employed by or affiliated with it.

3    (xxix) Memoranda prepared by Christine

4    Wessel, Esq., for VIZIO through its officers,

5    directors or employees while they were still

6    employed by or affiliated with VIZIO.

7    (xxx) Memoranda prepared for Christine

8    Wessel, Esq., by VIZIO through its officers,

9    directors or employees while they were still

10   employed by or affiliated with it.

11   (xxxi) Drafts of pleadings, correspondence,

12   law and motion filings, declarations and legal

13   research related to the Merger Agreement,

14   Framework Agreement, Guaranty and

15   Schedules or Exhibits thereto, prepared by

16   ECJ for the review of Latham & Watkins

17   and/or Akin Gump.

18   (xxxii)   Drafts of the Merger Agreement,

19   Framework Agreement, Guaranty and

20   Schedules or Exhibits thereto as well as

21   pleadings, correspondence, law and motion

22   filings, declarations and legal research related

23   thereto, prepared by Latham & Watkins for

24   the review of ECJ and/or Akin Gump.

25   (xxxiii)      Drafts of pleadings,

26   correspondence, law and motion filings,

27   declarations and legal research related to the

28   Merger Agreement, Framework Agreement,

14676.8:9306136.1                                                                   Case No. 8:17-CV-01175-DOC-JDE

7

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

1    Guaranty and Schedules or Exhibits thereto,

2    prepared by Akin Gump for the review of

3    ECJ and/or Latham & Watkins.

4    (xxxiv)      Drafts of pleadings,

5    correspondence, law and motion filings,

6    declarations and legal research related to the

7    Merger Agreement, Framework Agreement,

8    Guaranty and Schedules or Exhibits thereto,

9    prepared by ECJ for VIZIO through its

10   officers, directors or employees while they

11   were still employed by or affiliated with

12   VIZIO.

13   (xxxv)      Drafts of the Merger Agreement,

14   Framework Agreement, Guaranty and

15   Schedules or Exhibits thereto as well as

16   pleadings, correspondence, law and motion

17   filings, declarations and legal research related

18   thereto, prepared by Latham & Watkins for

19   VIZIO through its officers, directors or

20   employees while they were still employed by

21   or affiliated with VIZIO.

22   (xxxvi) Drafts of pleadings, correspondence,

23   law and motion filings, declarations and legal

24   research related to the Merger Agreement,

25   Framework Agreement, Guaranty and

26   Schedules or Exhibits thereto, prepared by

27   Akin Gump for VIZIO through its officers,

28   directors or employees while they were still

14676.8:9306136.1                              8                    Case No. 8:17-CV-01175-DOC-JDE

ERVIN COHEN & JESSUP LLP

1    employed by or affiliated with VIZIO.

2    (xxxvii)     Drafts of the Merger Agreement,

3    Framework Agreement, Guaranty and

4    Schedules or Exhibits thereto as well as

5    pleadings, correspondence, law and motion

6    filings, declarations and legal research related

7    thereto, prepared by VIZIO through its

8    officers, directors or employees while they

9    were still employed by or affiliated with

10   VIZIO and for the review of Latham &

11   Watkins.

12   (xxxviii)     Drafts of the Merger Agreement,

13   Framework Agreement, Guaranty and

14   Schedules or Exhibits thereto as well as

15   pleadings, correspondence, law and motion

16   filings, declarations and legal research related

17   thereto, prepared by VIZIO through its

18   officers, directors or employees while they

19   were still employed by or affiliated with

20   VIZIO and for the review of ECJ.

21   (xxxix)     Drafts of the Merger Agreement,

22   Framework Agreement, Guaranty and

23   Schedules or Exhibits thereto as well as

24   pleadings, correspondence, law and motion

25   filings, declarations and legal research related

26   thereto, prepared by VIZIO through its

27   officers, directors or employees while they

28   were still employed by or affiliated with

ERVIN COHEN & JESSUP LLP

1    VIZIO and for the review of Akin Gump.

2    (xl)    Drafts of the Merger Agreement,

3    Framework Agreement, Guaranty and

4    Schedules or Exhibits thereto as well as

5    pleadings, correspondence, law and motion

6    filings, declarations and legal research related

7    thereto, prepared by Jerry Huang, Esq., for

8    VIZIO through its officers, directors or

9    employees while they were still employed by

10   or affiliated with VIZIO.

11   (xli) Drafts of the Merger Agreement,

12   Framework Agreement, Guaranty and

13   Schedules or Exhibits thereto as well as

14   pleadings, correspondence, law and motion

15   filings, declarations and legal research related

16   thereto, prepared by VIZIO through its

17   officers, directors or employees while they

18   were still employed by or affiliated with it

19   and for the review of Jerry Huang, Esq.

20   (xlii) Drafts of the Merger Agreement,

21   Framework Agreement, Guaranty and

22   Schedules or Exhibits thereto as well as

23   pleadings, correspondence, law and motion

24   filings, declarations and legal research related

25   thereto, prepared by Dennis Yeoh, Esq., for

26   VIZIO through its officers, directors or

27   employees while they were still employed by

28   or affiliated with it.

14676.8:9306136.1

10

Case No. 8:17-CV-01175-DOC-JDE

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

1  (xliii)Drafts of the Merger Agreement,

2  Framework Agreement, Guaranty and

3  Schedules or Exhibits thereto as well as

4  pleadings, correspondence, law and motion

5  filings, declarations and legal research related

6  thereto, prepared by VIZIO through its

7  officers, directors or employees while they

8  were still employed by or affiliated with it

9  and for the review of Dennis Yeoh, Esq.

10  (xliv) Drafts of the Merger Agreement,

11  Framework Agreement, Guaranty and

12  Schedules or Exhibits thereto as well as

13  pleadings, correspondence, law and motion

14  filings, declarations and legal research related

15  thereto, prepared by Christine Wessel, Esq.,

16  for VIZIO through its officers, directors or

17  employees while they were still employed by

18  or affiliated with it.

19  (xlv)  Drafts of the Merger Agreement,

20  Framework Agreement, Guaranty and

21  Schedules or Exhibits thereto as well as

22  pleadings, correspondence, law and motion

23  filings, declarations and legal research related

24  thereto, prepared by VIZIO through its

25  officers, directors or employees while they

26  were still employed by or affiliated with it

27  and for the review of Christine Wessel, Esq.

28

"CONFIDENTIAL INFORMATION AND PRIVILEGED TRADE SECRET
DOCUMENTS" MEANS:

Plaintiff objects to this Request on the ground that it calls for the
production of confidential information and privileged trade
secret documents of VIZIO.

    1.    Without waiving any objections, but pursuant
to Rule 26(b)(5) of the *Federal Rules of Civil
Procedure*, Plaintiff states that confidential
information and privileged trade secret documents
include without limitation documents relating to
financing, financial and accounting records or
statements, general ledgers, income statements,
profit and loss statements, revenue records and
reports, income records and reports, accounting
records, loss contingency reports and records,
transaction reports and records, financial and
accounting ledgers and journal entries, supplies,
products, patent applications, consumer electronic
products, data, consumer electronic product
specifications, manufacturing and cost standards for
consumer electronic products, quality assurance
procedures for consumer electronic products, safety
sheets for consumer electronic products, test
procedures for consumer electronic products,
customer lists, supplier lists, customers, suppliers,
distributor lists, distributors, redistributors,
distribution networks, budgets, strategies, processes,
formulas, procedures, data collected or obtained in

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1   connection with consumer electronic products,

2   blueprint and/or machines used in connection with

3   the manufacture, distribution and/or sale of

4   consumer electronic products, including without

5   limitation, research, test results, reports,

6   compilations, market studies or analyses, board

7   minutes, shareholder minutes, correspondence,

8   offers to purchase, bills of sale, purchase orders,

9   deposit receipts, sales orders, contracts, partnership

10  agreements, purchase agreements, option

11  agreements, stock agreements, shares of stock,

12  certificates of stock, joint venture agreements,

13  memorandum agreements , operating agreements,

14  limited liability company agreements, escrow

15  agreements, escrow instructions, escrow statements,

16  consignment agreements, delivery agreements, bills

17  of lading, freight bills, shipping instructions,

18  manufacturing instructions, delivery instructions,

19  technical instructions, payment records, promissory

20  notes, deeds and deeds of trust.

21  ## III.

22  ## PARTICULAR RESPONSES

23  **REQUEST FOR PRODUCTION NO. 1**:

24      All Documents and Communications that Relate To the Framework

25  Agreement, Including those reflecting the negotiations that culminated in the

26  Framework Agreement, the process that resulted in VIZIO's decision to enter into it

27  (Including Board of Directors' review and approval, based upon (among other

28  things) the collection of relevant Documents from the personal computers of Your

14676.8:9306136.1                    13              Case No. 8:17-CV-01175-DOC-JDE

1  Directors), and the reasons why VIZIO believes the Framework Agreement has been

2  breached, as well as any damages VIZIO contends resulted therefrom.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

4  Plaintiff objects to this Request on the ground that it is vague, ambiguous and

5  unintelligible as presently framed in that VIZIO is unable to ascertain from this

6  Request, or from any other portion or portions of the Documents Requests, the

7  precise documents to which LeEco is referring.  The Document Requests define the

8  words "Relate To" as meaning "all matters or things that in any way discuss, are

9  connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

10  subject or object of the particular Request, or that have any logical or factual

11  connection to the matter discussed, and they shall include the common meanings of

12  all those terms, and shall include indirect as well as direct references to the subject

13  matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*,

14  whether a specific document "relates indirectly" to "any aspect" of the extremely

15  broad categories listed therein.  Accordingly, VIZIO cannot determine the precise

16  nature or scope of the documents that are the subject of this Request.  With the

17  exception of documents protected by the attorney-client privilege, the work product

18  doctrine, privileged tax related documents that contain confidential information

19  protected by, *inter alia*, VIZIO's constitutional right of privacy, confidential

20  information and privileged trade secret documents, and/or premature expert reports,

21  VIZIO will nevertheless produce the documents that it understands to fall within the

22  ambit of this Request.

23  VIZIO further objects to Request No. 1 on the ground that it indiscriminately

24  calls for the production of documents within the attorney-client privilege and/or the

25  work product doctrine.  VIZIO has such privileged and/or work product documents

26  in its possession, custody or control, but will not produce same on the basis of this

27  objection.

28  VIZIO further objects to Request No. 1 on the ground that it arguably and

ERVIN COHEN & JESSUP LLP

1 indiscriminately calls for the production of privileged tax related documents that

2 contain confidential financial information protected, by *inter alia*, its constitutional

3 right of privacy.  VIZIO has such privileged tax related documents that contain

4 confidential information protected by, among other things, its constitutional right of

5 privacy in its possession, custody or control, but will not produce same on the basis

6 of this objection.

7       VIZIO further objects to Request No. 1 on the ground that it arguably and

8 indiscriminately calls for the production of confidential information and privileged

9 trade secret documents of Plaintiff.  VIZIO has such confidential information and

10 privileged trade secret documents in its possession, custody or control, but will not

11 produce same on the basis of this objection.

12       VIZIO further objects to Request No. 1 on the ground that it arguably calls for

13 the premature disclosure of expert reports.  VIZIO will not produce any expert

14 reports until the time required by law on the basis of this objection.

15 **REQUEST FOR PRODUCTION NO. 2:**

16       All Documents and Communications Related To negotiating the proposed

17 China JV, Including the "repeated efforts" referenced in ¶ 73 of the Complaint, and

18 draft versions of the proposed China JV agreement Including but not limited to

19 drafts preliminary and subsequent to the draft attached as Exhibit 6 to the

20 Declaration of Ben Wong in Opposition to LeEco's Motion to Set Aside Entry of

21 Default, and all Documents reflecting time spent in connection with Your purported

22 repeated efforts.

23 **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

24       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

25 unintelligible as presently framed in that VIZIO is unable to ascertain from this

26 Request, or from any other portion or portions of the Documents Requests, the

27 precise documents to which LeEco is referring.  The Document Requests define the

28 words "Relate To" as meaning "all matters or things that in any way discuss, are

ERVIN COHEN & JESSUP LLP

1   connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

2   subject or object of the particular Request, or that have any logical or factual

3   connection to the matter discussed, and they shall include the common meanings of

4   all those terms, and shall include indirect as well as direct references to the subject

5   matter or any aspect thereof." As such, VIZIO is unable to ascertain, *inter alia*,

6   whether a specific document "relates indirectly" to "any aspect" of the categories

7   listed therein. Accordingly, VIZIO cannot determine the precise nature or scope of

8   the documents that are the subject of this Request. With the exception of documents

9   protected by the attorney-client privilege and/or the work product doctrine, VIZIO

10   will nevertheless produce the documents that it understands to fall within the ambit

11   of this Request.

12       VIZIO further objects to Request No. 2 on the ground that it indiscriminately

13   calls for the production of documents within the attorney-client privilege and/or the

14   work product doctrine. VIZIO has such privileged and/or work product documents

15   in its possession, custody or control, but will not produce same on the basis of this

16   objection.

17   **REQUEST FOR PRODUCTION NO. 3:**

18       All Documents and Communications concerning Your decision to send a

19   letter on June 9, 2017 to LeEco Global Group terminating negotiations Relating To

20   the China JV and demanding immediate payment, purportedly pursuant to the terms

21   of the Merger Agreement.

22   **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

23       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

24   unintelligible as presently framed in that VIZIO is unable to ascertain from this

25   Request, or from any other portion or portions of the Documents Requests, the

26   precise documents to which LeEco is referring. The Document Requests define the

27   words "Relate To" as meaning "all matters or things that in any way discuss, are

28   connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

ERVIN COHEN & JESSUP LLP

1  subject or object of the particular Request, or that have any logical or factual

2  connection to the matter discussed, and they shall include the common meanings of

3  all those terms, and shall include indirect as well as direct references to the subject

4  matter or any aspect thereof." As such, VIZIO is unable to ascertain, *inter alia*,

5  whether a specific document "relates indirectly" to "any aspect" of the categories

6  listed therein. Accordingly, VIZIO cannot determine the precise nature or scope of

7  the documents that are the subject of this Request. With the exception of documents

8  protected by the attorney-client privilege and/or the work product doctrine, VIZIO

9  will nevertheless produce the documents that it understands to fall within the ambit

10  of this Request.

11       VIZIO further objects to Request No. 3 on the ground that it indiscriminately

12  calls for the production of documents within the attorney-client privilege and/or the

13  work product doctrine. VIZIO has such privileged and/or work product documents

14  in its possession, custody or control, but will not produce same on the basis of this

15  objection.

16  **REQUEST FOR PRODUCTION NO. 4:**

17       All Documents and Communications Related To Your response to Charles

18  Hsieh's letter of June 22, 2017 to Messrs. Binder and Huang, wherein (among other

19  things) LeEco reiterated its desire to enter into the proposed China JV.

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

21       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

22  unintelligible as presently framed in that VIZIO is unable to ascertain from this

23  Request, or from any other portion or portions of the Documents Requests, the

24  precise documents to which LeEco is referring. The Document Requests define the

25  words "Relate To" as meaning "all matters or things that in any way discuss, are

26  connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

27  subject or object of the particular Request, or that have any logical or factual

28  connection to the matter discussed, and they shall include the common meanings of

ERVIN COHEN & JESSUP LLP

1  all those terms, and shall include indirect as well as direct references to the subject

2  matter or any aspect thereof." As such, VIZIO is unable to ascertain, *inter alia*,

3  whether a specific document "relates indirectly" to "any aspect" of the categories

4  listed therein. Accordingly, VIZIO cannot determine the precise nature or scope of

5  the documents that are the subject of this Request. With the exception of documents

6  protected by the attorney-client privilege and/or the work product doctrine, VIZIO

7  will nevertheless produce the documents that it understands to fall within the ambit

8  of this Request.

9       VIZIO further objects to Request No. 4 on the ground that it indiscriminately

10  calls for the production of documents within the attorney-client privilege and/or the

11  work product doctrine. VIZIO has such privileged and/or work product documents

12  in its possession, custody or control, but will not produce same on the basis of this

13  objection.

14  **REQUEST FOR PRODUCTION NO. 5:**

15       All Documents and Communications Relating To Your efforts to implement

16  the terms of the Framework Agreement Including:

17       (i)     all efforts to assist LeEco with developing and obtaining certification of

18  the "LeEco Le App" application on VIZIO's smart televisions and displays in North

19  America, as referenced in Section 2.1.1 of the Framework Agreement, and such

20  "smart televisions and displays" You identified as potentially appropriate for

21  running this application;

22       (ii)    any efforts You made to make the LeEco Le App available on

23  compatible smart televisions and displays in North America on the second screen of

24  the VIZIO SmartCast App for all Google Chromecast-enabled televisions and

25  displays as well as in the My Apps folder for VIA devices (referenced in the

26  Framework Agreement as the "App Processes") as referenced in Section 2.1.2 of the

27  Framework Agreement;

28       (iii)   any "customary form agreement(s)" You identified internally and/or

ERVIN COHEN & JESSUP LLP

1   sent to LeEco to accomplish the above;

2       (iv)   any efforts You made to "develop and obtain certification of a data

3   client" to be made available by LeEco as referenced in Section 2.2.1 of the

4   Framework Agreement;

5       (v)   all efforts to assist and cooperate with the "Data Client Processes"

6   referenced in Section 2.2.2 of the Framework Agreement, including any

7   Communication Related To whether the inclusion of "Inscape Data Client" was

8   consistent with "applicable law" within the jurisdiction(s) that Inscape Data was

9   anticipated to be sold as part of a product;

10       (vi)   any analysis You did whether it was legally permissible for LeEco to

11   have access to Inscape data derived from the Inscape Data Client installations, and

12   then access to such information in connection with the proposed China JV data, as

13   referenced in Section 2.2.4 of the Framework Agreement.

14   **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

15       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

16   unintelligible as presently framed in that VIZIO is unable to ascertain from this

17   Request, or from any other portion or portions of the Documents Requests, the

18   precise documents to which LeEco is referring.  The Document Requests define the

19   words "Relate To" as meaning "all matters or things that in any way discuss, are

20   connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

21   subject or object of the particular Request, or that have any logical or factual

22   connection to the matter discussed, and they shall include the common meanings of

23   all those terms, and shall include indirect as well as direct references to the subject

24   matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*,

25   whether a specific document "relates indirectly" to "any aspect" of the categories

26   listed therein.  Accordingly, VIZIO cannot determine the precise nature or scope of

27   the documents that are the subject of this Request.  With the exception of documents

28   protected by the attorney-client privilege and/or the work product doctrine, VIZIO

ERVIN COHEN & JESSUP LLP

1 will nevertheless produce the documents that it understands to fall within the ambit

2 of this Request.

3      VIZIO further objects to Request No. 5 on the ground that it indiscriminately

4 calls for the production of documents within the attorney-client privilege and/or the

5 work product doctrine.  VIZIO has such privileged and/or work product documents

6 in its possession, custody or control, but will not produce same on the basis of this

7 objection.

8 **REQUEST FOR PRODUCTION NO. 6:**

9      All Documents and Communications Relating To Your efforts to "negotiate

10 in good faith and use reasonable efforts to form a commercial relationship" Related

11 To the China JV as referenced in Section 3.1 of the Framework Agreement,

12 Including

13      (i)    the conditions pursuant to which VIZIO would grant the China JV the

14 right to sell VIZIO televisions in China, Including any agreements Related To

15 branding and distribution as referenced in Section 3.1 of the Framework Agreement;

16      (ii)    efforts to preload EUI and Le contents on VIZIO televisions and

17 displays sold in China, as referenced in Section 3.1 of the Framework Agreement;

18      (iii)   all agreements (or attempts at reaching agreements) and negotiations on

19 pricing on a per user/per television basis, as referenced in Section 2.2.3 of the

20 Framework Agreement;

21      (iv)   any non-cash assets You identified as desirable or acceptable for

22 LeEco's capital contribution to the proposed China JV as referenced in Section 3.2.1

23 of the Framework Agreement;

24      (v)    any negotiations or agreements You believe were reached on the

25 "Initial JV Term" referenced in Section 3.2.2 of the Framework Agreement, as well

26 as any agreements or negotiations pertaining to the "long-term partnership spirit"

27 that is also referenced therein;

28      (vi)   any agreements or negotiations pertaining to the "Sales Target"

ERVIN COHEN & JESSUP LLP

1    referenced in Section 3.2.5 of the Framework Agreement;

2        (vii)   any negotiations or agreements on "reasonable competitive rates" that

3    You believed occurred in connection with Section 3.2.5(a) of the Framework

4    Agreement, or Your own contemporaneous internal evaluations of what those rates

5    might be;

6        (viii)  any agreement or negotiations You believe occurred in defining the

7    amount of the "Buyer Loan" referenced in Section 3.2.7 of the Framework

8    Agreement, Including to the conditions or Sales Target that would satisfy the Buyer

9    Loan being repaid in full;

10       (ix)    any Documents or Communications relating to the conditions pursuant

11   to which You would "consider participating in the China JV's financial obligations"

12   as set forth in Section 3.2.7(b) of the Framework Agreement, as well as any

13   Documents or Communications identifying an amount of Your potential

14   participation and the form Your participation would take (e.g., cash vs. non-cash);

15       (x)     and any Documents or Communications relating to any and all "Formal

16   Agreements" as referenced in Section 4 of the Framework Agreement.

17   **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

18       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

19   unintelligible as presently framed in that VIZIO is unable to ascertain from this

20   Request, or from any other portion or portions of the Documents Requests, the

21   precise documents to which LeEco is referring.  The Document Requests define the

22   words "Relate To" as meaning "all matters or things that in any way discuss, are

23   connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

24   subject or object of the particular Request, or that have any logical or factual

25   connection to the matter discussed, and they shall include the common meanings of

26   all those terms, and shall include indirect as well as direct references to the subject

27   matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*,

28   whether a specific document "relates indirectly" to "any aspect" of the categories

ERVIN COHEN & JESSUP LLP

1   listed therein.  Accordingly, VIZIO cannot determine the precise nature or scope of

2   the documents that are the subject of this Request.  With the exception of documents

3   protected by the attorney-client privilege, the work product doctrine, privileged

4   documents that contain confidential information protected by, *inter alia*, VIZIO's

5   constitutional right of privacy, and/or confidential information and privileged trade

6   secret documents, VIZIO will nevertheless produce the documents that it

7   understands to fall within the ambit of this Request.

8        VIZIO further objects to Request No. 6 on the ground that it indiscriminately

9   calls for the production of documents within the attorney-client privilege and/or the

10   work product doctrine.  VIZIO has such privileged and/or work product documents

11   in its possession, custody or control, but will not produce same on the basis of this

12   objection.

13        VIZIO further objects to Request No. 6 on the ground that it arguably and

14   indiscriminately calls for the production of privileged tax related documents that

15   contain confidential financial information protected, by *inter alia*, its constitutional

16   right of privacy.  VIZIO has such privileged tax related documents that contain

17   confidential information protected by, among other things, its constitutional right of

18   privacy in its possession, custody or control, but will not produce same on the basis

19   of this objection.

20        VIZIO further objects to Request No. 6 on the ground that it arguably and

21   indiscriminately calls for the production of confidential information and privileged

22   trade secret documents of Plaintiff.  VIZIO has such confidential information and

23   privileged trade secret documents in its possession, custody or control, but will not

24   produce same on the basis of this objection.

25   **REQUEST FOR PRODUCTION NO. 7:**

26        All Documents and Communications Relating To any damages You claim as

27   a result of a breach of the Framework Agreement.

28

ERVIN COHEN & JESSUP LLP

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Plaintiff objects to this Request on the ground that it is vague, ambiguous and unintelligible as presently framed in that VIZIO is unable to ascertain from this Request, or from any other portion or portions of the Documents Requests, the precise documents to which LeEco is referring.  The Document Requests define the words "Relate To" as meaning "all matters or things that in any way discuss, are connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the subject or object of the particular Request, or that have any logical or factual connection to the matter discussed, and they shall include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*, whether a specific document "relates indirectly" to "any aspect" of the category listed therein.  Accordingly, VIZIO cannot determine the precise nature or scope of the documents that are the subject of this Request.  With the exception of documents protected by the attorney-client privilege, the work product doctrine, privileged tax related documents that contain confidential information protected by, *inter alia*, VIZIO's constitutional right of privacy, confidential information and privileged trade secret documents, and/or premature expert reports, VIZIO will nevertheless produce the documents that it understands to fall within the ambit of this Request.

VIZIO further objects to Request No. 7 on the ground that it indiscriminately calls for the production of documents within the attorney-client privilege and/or the work product doctrine.  VIZIO has such privileged and/or work product documents in its possession, custody or control, but will not produce same on the basis of this objection.

VIZIO further objects to Request No. 7 on the ground that it arguably calls for the production of privileged tax related documents that contain confidential financial information protected, by *inter alia*, its constitutional right of privacy.  VIZIO has such privileged tax related documents that contain confidential information

ERVIN COHEN & JESSUP LLP

1  protected by, among other things, its constitutional right of privacy in its possession,

2  custody or control, but will not produce same on the basis of this objection.

3      VIZIO further objects to Request No. 7 on the ground that it arguably and

4  indiscriminately calls for the production of confidential information and/or

5  privileged trade secret documents of Plaintiff.  VIZIO has such confidential

6  information and privileged trade secret documents in its possession, custody or

7  control, but will not produce same on the basis of this objection.

8      VIZIO further objects to Request No. 7 on the ground that it arguably and

9  indiscriminately calls for the premature disclosure of expert reports.  VIZIO will not

10  produce any expert reports until the time required by law on the basis of this

11  objection.

12  **REQUEST FOR PRODUCTION NO. 8:**

13      All Documents and Communications that Relate To the benefits—financial,

14  operational or otherwise—that You expected to receive from the China JV.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

16      Plaintiff objects to this Request on the ground that it is vague, ambiguous and

17  unintelligible as presently framed in that VIZIO is unable to ascertain from this

18  Request, or from any other portion or portions of the Documents Requests, the

19  precise documents to which LeEco is referring.  The Document Requests define the

20  words "Relate To" as meaning "all matters or things that in any way discuss, are

21  connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

22  subject or object of the particular Request, or that have any logical or factual

23  connection to the matter discussed, and they shall include the common meanings of

24  all those terms, and shall include indirect as well as direct references to the subject

25  matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*,

26  whether a specific document "relates indirectly" to "any aspect" of the categories

27  listed therein.  Accordingly, VIZIO cannot determine the precise nature or scope of

28  the documents that are the subject of this Request.  With the exception of documents

ERVIN COHEN & JESSUP LLP

1  protected by the attorney-client privilege and/or the work product doctrine, VIZIO

2  will nevertheless produce the documents that it understands to fall within the ambit

3  of this Request.

4      VIZIO further objects to Request No. 8 on the ground that it indiscriminately

5  calls for the production of documents within the attorney-client privilege and/or the

6  work product doctrine.  VIZIO has such privileged and/or work product documents

7  in its possession, custody or control, but will not produce same on the basis of this

8  objection.

9  **REQUEST FOR PRODUCTION NO. 9:**

10      All Documents and Communications sufficient to identify Your principal

11  officers who had a role in connection with negotiating or implementing the

12  Framework Agreement and All Your Directors since January 1, 2016.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

14      VIZIO objects to Request for Production No. 9 on the ground that it is

15  unreasonably overbroad in scope since it is unlimited as to time that it is germane to

16  the within action and requests that the Company identify "all [of its] Directors since

17  January 1, 2016.  VIZIO will only identify the identities of its directors from the

18  date that it commenced negotiations on the Merger Agreement with Defendants

19  through the filing of the Complaint in the within action.  VIZIO will also identify its

20  principal officers who had a role in connection with the negotiation or

21  implementation of the Framework Agreement.

22  **REQUEST FOR PRODUCTION NO. 10:**

23      All Documents and Communications concerning the aftermath of the decision

24  to terminate the Framework Agreement, Including communications between and

25  among VIZIO's Board, its management, its shareholders, and the general public.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

27      VIZIO objects to Request No. 10 on the ground that it is vague, ambiguous,

28  unintelligible and hopelessly incomprehensible as presently framed in that VIZIO is

ERVIN COHEN & JESSUP LLP

1  unable to ascertain from this Request, or from any other portion or portions of the

2  Document Requests, the precise documents to which LeEco is referring.  This

3  Request seeks all documents concerning "the aftermath of the decision to terminate

4  the Framework Agreement", but without specification as to any particular document

5  or categories of documents, let alone stating the identity of the authors, recipients

6  and/or the dates/subject matter thereof.  Accordingly, it is vague, ambiguous,

7  unintelligible and hopelessly incomprehensible.  As such, VIZIO will not produce

8  any documents that may somehow be the subject of this Request.

9       VIZIO further objects to Request No. 10 on the ground that it indiscriminately

10  calls for the production of documents within the attorney-client privilege and/or the

11  work product doctrine.  VIZIO has such privileged and/or work product documents

12  in its possession, custody or control, but will not produce same on the basis of this

13  objection.

14       VIZIO further objects to Request No. 10 on the ground that it arguably and

15  indiscriminately calls for the production of privileged tax related documents that

16  contain confidential financial information protected, by *inter alia*, its constitutional

17  right of privacy.  VIZIO has such privileged tax related documents that contain

18  confidential information protected by, among other things, its constitutional right of

19  privacy in its possession, custody or control, but will not produce same on the basis

20  of this objection.

21       VIZIO further objects to Request No. 10 on the ground that it arguably and

22  indiscriminately calls for the production of confidential information and privileged

23  trade secret documents of Plaintiff.  VIZIO has such confidential information and

24  privileged trade secret documents in its possession, custody or control, but will not

25  produce same on the basis of this objection.

26       VIZIO further objects to Request No. 10 on the ground that it calls for the

27  production of documents that are not relevant to the claims or defenses in the within

28  action.  VIZIO will not produce any documents that may somehow be the subject of

ERVIN COHEN & JESSUP LLP

1  this Request on the basis of that objection.

2      VIZIO further objects to Request No. 10 on the ground that it is unreasonably

3  overbroad in scope since it is unlimited as to any period of time that is germane to

4  the within action.  VIZIO will not produce any documents that may somehow be the

5  subject of this Request on the basis of that objection.

6  **REQUEST FOR PRODUCTION NO. 11:**

7      All Documents and Communications Relating To how You accounted for any

8  and all transactions involving LeEco in Your financial statements, including how

9  revenue or income was booked, any analysis of loss contingencies (or recordings of

10  loss contingencies), and the reversal or modification of any prior accounting entry

11  related to the Merger Agreement or the Framework Agreement.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

13      Plaintiff objects to this Request on the ground that it is vague, ambiguous and

14  unintelligible as presently framed in that VIZIO is unable to ascertain from this

15  Request, or from any other portion or portions of the Documents Requests, the

16  precise documents to which LeEco is referring.  The Document Requests define the

17  words "Relate To" as meaning "all matters or things that in any way discuss, are

18  connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the

19  subject or object of the particular Request, or that have any logical or factual

20  connection to the matter discussed, and they shall include the common meanings of

21  all those terms, and shall include indirect as well as direct references to the subject

22  matter or any aspect thereof."  As such, VIZIO is unable to ascertain, *inter alia*,

23  whether a specific document "relates indirectly" to "any aspect" of the category

24  listed therein.  Accordingly, VIZIO cannot determine the precise nature or scope of

25  the documents that are the subject of this Request.  No documents that fall within

26  the ambit of this Request are being withheld on the basis of that objection.

27      VIZIO further objects to Request No. 11 on the ground that it indiscriminately

28  calls for the production of documents within the attorney-client privilege and/or the

14676.8:9306136.1            27           Case No. 8:17-CV-01175-DOC-JDE

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

1   work product doctrine.  VIZIO has such privileged and/or work product documents

2   in its possession, custody or control, but will not produce same on the basis of this

3   objection.

4        VIZIO further objects to Request No. 11 on the ground that it indiscriminately

5   calls for the production of privileged tax related documents that contain confidential

6   financial information protected, by *inter alia*, its constitutional right of privacy.

7   VIZIO has such privileged tax related documents that contain confidential

8   information protected by, among other things, its constitutional right of privacy in

9   its possession, custody or control, but will not produce same on the basis of this

10  objection.

11       VIZIO further objects to Request No. 11 on the ground that it calls for the

12  production of confidential information and privileged trade secret documents of

13  Plaintiff.  VIZIO has such confidential information and privileged trade secret

14  documents in its possession, custody or control, but will not produce same on the

15  basis of this objection.

16       VIZIO further objects to Request No. 11 on the ground that it arguably calls

17  for the premature disclosure of expert reports.  VIZIO will not produce any expert

18  reports until the time required by law on the basis of this objection.

19  **REQUEST FOR PRODUCTION NO. 12:**

20       All Documents and Communications Relating To the due diligence and/or

21  research You performed on LeEco Related To the Framework Agreement Including

22  any assessments of LeEco's ability to comply with the terms of the Framework

23  Agreement, and of LeEco's good faith or purported lack thereof.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

25       Plaintiff objects to this Request on the ground that it is vague, ambiguous and

26  unintelligible as presently framed in that VIZIO is unable to ascertain from this

27  Request, or from any other portion or portions of the Documents Requests, the

28  precise documents to which LeEco is referring.  The Document Requests define the

ERVIN COHEN & JESSUP LLP

words "Relate To" as meaning "all matters or things that in any way discuss, are connected to, arise from, consist of, reflect, summarize, evaluate, or comment on the subject or object of the particular Request, or that have any logical or factual connection to the matter discussed, and they shall include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter or any aspect thereof." As such, VIZIO is unable to ascertain, *inter alia*, whether a specific document "relates indirectly" to "any aspect" of the categories listed therein. Accordingly, VIZIO cannot determine the precise nature or scope of the documents that are the subject of this Request. With the exception of documents protected by the attorney-client privilege and/or the work product doctrine, VIZIO will nevertheless produce the documents that it understands to fall within the ambit of this Request.

VIZIO further objects to Request No. 12 on the ground that it indiscriminately calls for the production of documents within the attorney-client privilege and/or the work product doctrine. VIZIO has such privileged and/or work product documents in its possession, custody or control, but will not produce same on the basis of this objection.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents and Communications that You received from any Person regarding the Framework Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

VIZIO objects to Request No. 13 on the ground that it indiscriminately calls for the production of documents within the attorney-client privilege and/or the work product doctrine. VIZIO has such privileged and/or work product documents in its possession, custody or control, but will not produce same on the basis of this objection.

VIZIO further objects to Request No. 13 on the ground that it arguably and indiscriminately calls for the production of privileged tax related documents that

ERVIN COHEN & JESSUP LLP

1   contain confidential financial information protected, by *inter alia*, its constitutional

2   right of privacy.  VIZIO has such privileged tax related documents that contain

3   confidential information protected by, among other things, its constitutional right of

4   privacy in its possession, custody or control, but will not produce same on the basis

5   of this objection.

6   VIZIO further objects to Request No. 13 on the ground that it arguably and

7   indiscriminately calls for the production of confidential information and privileged

8   trade secret documents of Plaintiff.  VIZIO has such confidential information and/or

9   privileged trade secret documents in its possession, custody or control, but will not

10  produce same on the basis of this objection.

11  VIZIO further objects to Request No. 13 on the ground that it arguably calls

12  for the premature disclosure of expert reports.  VIZIO will not produce any expert

13  reports until the time required by law on the basis of this objection.

14  VIZIO further objects to Request No. 13 on the ground that it indiscriminately

15  calls for the production of documents that are not relevant to the claims or defenses

16  in the within action.  VIZIO has documents in its possession, custody or control that

17  have been received by it from various Persons throughout the world subsequent to

18  the filing of the lawsuit in the within action and that arguably relate to the

19  Framework Agreement.  VIZIO will not produce any such post-filing documents

20  received from any Persons or entities on the planet that are unrelated to the parties

21  or their counsel in the within action.

22  VIZIO further objects to Request No. 13 on the ground that it is unreasonably

23  overbroad in scope since it is not limited to time that is germane to this dispute.

24  VIZIO has documents in its possession, custody or control that have been received

25  from any Person on the entire planet by it subsequent to the filing of the lawsuit in

26  the within action and that arguably relate to the Framework Agreement.  VIZIO will

27  not produce any such post-filing documents received from any Persons or entities on

28  the planet that are unrelated to the parties or their counsel in the within action.

ERVIN COHEN & JESSUP LLP

14676.8:9306136.1                                    30                    Case No. 8:17-CV-01175-DOC-JDE

DATED: July 25, 2018

ERVIN COHEN & JESSUP LLP
Robert M. Waxman
David N. Tarlow
Jason L. Haas


By: _____
Robert M. Waxman
Attorneys for Plaintiff VIZIO, INC., a
California corporation

31

Case No. 8:17-CV-01175-DOC-JDE

RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V. LTD.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.

ERVIN COHEN & JESSUP LLP

**ERVIN COHEN & JESSUP** LLP

1 | **PROOF OF SERVICE**

2 | **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3 |     At the time of service, I was over 18 years of age and **not a party to this**

4 | **action.** I am employed in the County of Los Angeles, State of California. My business address is 9401 Wilshire Boulevard, Ninth Floor, Beverly Hills, CA 90212-2974.

5 |

6 |     On July 25, 2018, I served true copies of the following document(s) described as **RESPONSE OF PLAINTIFF VIZIO, INC., TO DEFENDANT LeECO V.**

7 | **LTD.'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE TO PLAINTIFF VIZIO INC.** on the interested parties in this action as follows:

8 | Jeff K. Joyner, Esq.
Daniel Tyukody, Esq.

9 | GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900

10 | Los Angeles, California 90067-2121
joynerj@gtlaw.com

11 | tyukodyd@gtlaw.com
Telephone: (310) 586 - 7700

12 | Facsimile: (310) 586 - 7800

13 | *Attorneys for Defendant and Counter-Claimant LeECO V. LTD.*

14 |

15 |     **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the

16 | envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Ervin Cohen & Jessup LLP's practice for collecting and

17 | processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business

18 | with the United States Postal Service, in a sealed envelope with postage fully prepaid.

19 |     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office

20 | of a member of the bar of this Court at whose direction the service was made.

21 |     Executed on July 25, 2018, at Beverly Hills, California.

22 |

23 |

24 | Joe Dirkx

25 |

26 |

27 |

28 |

Hasler
07/26/2018
US POSTAGE $002.47⁹

ZIP 90212
011D11552960



# ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974

TO:

Jeff K. Joyner, Esq.
Daniel Tyukody, Esq.
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121

EXHIBIT E

FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT

THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "Agreement") is entered into as of April 5, 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Buyer"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("Merger Sub"), and VIZIO, Inc., a California corporation (the "Company" or "VIZIO"). Buyer, Merger Sub and the Company are sometimes referred to herein collectively as the "Parties" and individually as a "Party". Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

WHEREAS, Buyer, Merger Sub, the Company and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the representative of the holders of Company capital stock or options ("Shareholder Representative"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "Merger Agreement") pursuant to which it was proposed that Merger Sub would merge with and into the Company, with the Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "Merger");

WHEREAS, Buyer and the Company now desire to terminate the Merger Agreement and enter into the Agreement contained herein on the terms and conditions set forth herein; and

WHEREAS, concurrently with the execution and delivery of this Agreement and in accordance with the terms and conditions of this Agreement, as a material inducement to each Party's willingness to enter into this Agreement and as consideration for terminating the Merger Agreement, the Parties will make the payments and take the actions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties, intending to be legally bound, hereby agree to the following:

1.      Termination of Merger Agreement and Release of Buyer Termination Fee Deposit.

1.1      Termination. Effective upon receipt by the Company of US$40,000,000 of the Buyer Termination Fee Deposit pursuant to Section 1.2 hereof (the "Effective Time"), Buyer and the Company hereby terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement (the "Termination"). From and after the Effective Time, the Merger Agreement shall become null and void, and the rights and obligations of each applicable Party or any of its or their Affiliates to any other Party under the Merger Agreement shall terminate, except for Section 6.5 (Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the Merger Agreement and the terms governing the release of the remaining Buyer Termination Fee Deposit.

1.2      Release of Buyer Termination Fee Deposit. In connection with and as full consideration for the Termination and the releases set forth in Section 6 hereof, concurrently with the execution and delivery of this Agreement by the Company to Buyer, Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

1.2.1    Buyer agrees to concurrently with the execution of this Agreement issue with the Company a Joint Release Instruction (as defined in the Escrow Agreement), in the form as attached as Exhibit "A" herewith, releasing US$40,000,000 from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to the Company.

1.2.2    Buyer agrees to concurrently with the execution of the JV Agreement (as defined below) issue with the Company a Joint Release Instruction, in the form as attached as Exhibit "B" herewith, releasing the remaining US$10,000,000 from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to the Company.

2.    <u>Commercial Relationships</u>.

2.1    <u>LeEco Le App</u>.

2.1.1    Buyer shall develop and obtain certification of an application to be made available by the Company on all of the Company's smart televisions and displays in North America (the "<u>LeEco Le App</u>").

2.1.2    Subject to applicable law, the Company shall make the LeEco Le App available on all its compatible smart televisions and displays in North America on the second screen of the VIZIO SmartCast App for all Google Chromecast-enabled televisions and displays as well as in the My Apps folder for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "<u>App Processes</u>"). The Company and Buyer shall enter into the Company's customary form agreement(s) for such arrangements. The Company shall use reasonable efforts to assist in the App Processes; <u>provided</u> that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development, certification and operation of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development, certification and operation of the LeEco Le App.

2.2    <u>Inscape Data</u>.

2.2.1    The Company shall develop and obtain certification of a data client to be made available by Buyer on all of Buyer's smart televisions and displays (the "<u>Inscape Data Client</u>")

2.2.2    Subject to applicable law, Buyer shall include the Inscape Data Client on all its smart televisions and displays for a period of three (3) years from the date that the Inscape Data Client obtains certification, subject to customary engineering and certification processes (the "<u>Data Client Processes</u>"). Buyer will use reasonable efforts to assist with the Data Client Processes; <u>provided</u> that Company shall be solely responsible for all expenses related to and arising from (a) engineering, development, certification and operation of the Inscape Data Client and (b) taking the necessary measures to comply with applicable Laws in the engineering, development, certification and operation of the Inscape Data Client.

2.2.3    The Company and Buyer shall negotiate in good faith on pricing on a per user/per television basis.

2.2.4    Subject to applicable law, (i) Buyer shall have access to Inscape data derived from the Inscape Data Client installed on Buyer's smart televisions and displays and (ii) each of the Company and Buyer shall have access to Inscape data derived from smart televisions and displays sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV.

3.    <u>Formation of a Joint Venture</u>.

3.1    Following the Effective Time, the Parties shall negotiate in good faith and use reasonable efforts to form a commercial relationship between the Company and Buyer for expansion efforts in the People's Republic of China ("China").  The proposed commercial relationship would provide for (i) the Company granting the China JV the right to sell Company televisions in China subject to the mutual consent of the Company and Buyer on branding and distribution; (ii) the Company preloading EUI and Le contents on Company televisions and displays sold in China; and (iii) the Company and Buyer entering into the joint venture in China as described in this Section 3 (the "<u>China JV</u>").

3.2    The proposed terms of the China JV are as follows:

3.2.1    In connection therewith, Buyer will contribute non-cash assets with a fair market value equal to US$50,000,000 as a capital contribution to the China JV (the "<u>Buyer Contribution</u>").  The fair market valuation shall be audited and verified by an independent, internationally recognized accounting firm reasonably acceptable to the Parties.

3.2.2    Buyer and the Company will enter into a formal joint venture agreement (the "<u>JV Agreement</u>") between Buyer and the Company (the "<u>Initial JV Term</u>") with a long-term partnership spirit to expand the VIZIO branded products.

3.2.3    The China JV will be owned and controlled 50% by the Company and 50% by Buyer.

3.2.4    The China JV will promote and market Company-branded devices (televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in China.

3.2.5    Buyer and the Company will mutually agree on a target number of Company-branded televisions and displays that the China JV will deploy in China during the Initial JV Term (the "<u>Sales Target</u>").  The China JV will operate with the goal of achieving such Sales Target.

(a)    The Company shall sell units to the China JV at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV.

(b)    The profit on units sold by the China JV, i.e. through advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the China JV's equity holders on a quarterly basis.

(c)     Upon achievement of the Sales Target during the Initial JV Term, Buyer and the Company will negotiate in good faith to extend the Initial JV Term.

3.2.6   During the Initial JV Term, Company-branded devices will be distributed in China exclusively through the China JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming platform.

3.2.7   The JV Agreement will provide that Buyer will lend up to a maximum amount to be agreed upon in the JV Agreement to the China JV for working capital purposes over the Initial JV Term (the "Buyer Loan").

(a)     If the China JV achieves the Sales Target in the Initial JV Term and the parties agree to continue the China JV operations, then the Buyer Loan shall be repaid in full.

(b)     Notwithstanding the foregoing, the Company will consider participating in the China JV's financial obligations only after the China JV receives the full US$50,000,000, in cash or value equivalents, from Buyer, such value equivalents to include assets contributed to the China JV by Buyer and its Affiliates at fair market value.

4.     Formal Agreements.  Buyer and the Company shall negotiate in good faith and execute one or more agreements to document the China JV and the other commercial arrangements set forth in Sections 2 and 3 hereof with the terms specified therein within forty-five (45) days of the date hereof.

5.     Publicity; Confidentiality and Mutual Non-Disparagement.

5.1     Except for a mutually agreed press release stating that the parties to the Merger Agreement have determined to terminate the Merger Agreement due to failure to obtain PRC regulatory approvals, the Parties will keep confidential the terms and status of this Agreement and the transactions contemplated hereby and thereby and none of the Parties shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by applicable law, in which case the other Party shall be advised and the Parties shall use their reasonable commercial efforts to cause a mutually agreeable release or announcement to be issued.

5.2     The Parties shall each refrain from making, and shall cause their respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors, assigns, officers, key employees or directors not to make, any public statement or announcement that (i) states or implies that any Party or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or is reasonably likely to damage the business or reputation of, (x) in the case of statements or announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or (y) in the case of

statements or announcements by the Buyer or Merger Sub, the Company or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of the Company or any of its Affiliates or subsidiaries.  The foregoing shall not restrict the ability of any person to comply with any subpoena or other legal process or respond to a request for information from any governmental authority with jurisdiction over the Party from whom information is sought.

6. <u>Release and Waiver</u>.

6.1 <u>Release By Buyer and Merger Sub</u>.  Effective as of the Effective Time, except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "<u>Buyer Party Releasor</u>" and collectively, the "<u>Buyer Party Releasors</u>") hereby generally releases, remises and forever discharges the Company and the Company's past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "<u>Company Released Party</u>" and collectively, the "<u>Company Released Parties</u>") from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations, rights, duties, contracts, agreements, undertakings, accounts, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "<u>Claims</u>") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub or any of their Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by the Company, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "<u>Buyer Party Released Claims</u>"); <u>provided,</u> however, the Buyer Party Released Claims shall not include any Claims arising from any breach by the Company of its obligations under this Agreement.

6.2 <u>Release By Company</u>.  Effective as of the Effective Time, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "<u>Company Releasor</u>" and collectively, the "<u>Company Releasors</u>") hereby generally releases, remises and forever discharges Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "<u>Buyer Released Party</u>" and collectively, the "<u>Buyer Released Parties</u>") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act

whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "Company Released Claims"); provided, however, the Company Released Claims shall not include any Claims arising from any breach by Buyer or Merger Sub of its obligations under this Agreement.

       6.3     Covenant Not To Sue.  Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim.  The Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither the Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Buyer Released Party in respect of any Company Released Claim.

       6.4     Waiver.  The Parties acknowledge that (a) Section 1542 of the California Civil Code provides, and (b) certain other states have provisions substantially as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist.  Nonetheless, each Party agrees that the waiver of such provisions is a material portion of the releases intended by this Agreement, and each Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have under Section 1542 of the California Civil Code and any similar such provisions of any jurisdiction.  In connection with such waiver and relinquishment, the Parties hereby acknowledge that they or their attorneys may hereafter discover claims or facts in addition to, or different from, those which he now knows or believes to exist, but that they expressly agree to fully, finally and forever settle and release any and all Claims, known or unknown, suspected or unsuspected, which exist or may exist on their behalf against the Company Released Parties and the Buyer Released Parties at the time of execution of this Agreement.

       EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE MATTERS RELEASED HEREIN.  NEVERTHELESS, IT IS THE INTENTION OF EACH PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY EXIST, OR

HERETOFORE HAVE EXISTED BETWEEN THEM.  IN FURTHERANCE OF SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS, NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

      7.    <u>Representations and Warranties</u>.  Each Party represents and warrants and agrees as follows:

      7.1    Such Party has all requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement (including, without limitation, the releases set forth herein) have, to the extent required, been duly and validly authorized by all corporate proceedings of such Party.

      7.2    No authorization, approval or other action, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and/or performance of this Agreement by such Party.

      7.3    Such Party or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents.  In executing this Agreement, such Party, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

      7.4    Such Party has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

      7.5    Such Party has received independent legal advice with respect to the matters set forth in this Agreement, the Claims released in <u>Sections 1.1</u> and <u>6</u> hereof and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

      7.6    Such Party does not rely upon any statement, representation or promise of another Party (or of any officer, agent, employee, representative, or attorney for another Party), in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

      7.7    Such Party knows of no other Person that may claim an interest in any of the Claims disposed of by such Party and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

      7.8    Such Party has made such investigation of the facts pertaining to this settlement and <u>Sections 1.1</u> and <u>6</u> hereof, and of all the matters pertaining thereto, as it deemed necessary.

      7.9    Such Party will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.      Indemnification.  The agreements contained in Sections 1.1 and 6 hereof may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.      Miscellaneous.

9.1      Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof. This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.

9.2      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.  Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties.  The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 hereof, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 hereof.

9.4      Governing Law.  This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5      Notices.  All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage

prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall
be sent to:

        If to Company:

        VIZIO, Inc.
        39 Tesla
        Irvine, California 92618
        Attention:  Kurtis J. Binder and Jerry C. Huang
        Email:  kurtis.binder@vizio.com and jerry.huang@vizio.com

        with a copy (which shall not constitute notice) to:

        Latham & Watkins LLP
        650 Town Center Drive, Suite 2000
        Costa Mesa, CA 92626
        Attention:  R. Scott Shean and David C. Lee
        Email:  scott.shean@lw.com and david.lee@lw.com

        If to Buyer or Merger Sub:

        LeEco Global Group Ltd.
        16/F, LeEco Building, 105 Yaojiayuan Road
        Chaoyang District, Beijing 100025, PRC
        Attention:  Charles Hsieh
        Email:  charles.hsieh@le.com

        with a copy (which shall not constitute notice) to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        300 South Grand Avenue, Suite 3400
        Los Angeles, CA 90071
        Attention:  Michael V. Gisser and Michael J. Mies
        Email:  michael.gisser@skadden.com and michael.mies@skadden.com

      Any Party may send any notice, request, demand, claim or other communication hereunder
to the intended recipient at the address set forth above using any other means, but no such notice,
request, demand, claim or other communication shall be deemed to have been duly given unless
and until it actually is received by the intended recipient.  Any Party may change the address or
facsimile number to which notices, requests, demands, claims, and other communications
hereunder are to be delivered by giving each other Party notice in the manner herein set forth.

      9.6    <u>Consent to Jurisdiction</u>.  Each Party hereby irrevocably and unconditionally
submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California
located in Santa Ana, California, or Federal court of the United States of America, sitting in the
Central District of California, Southern Division, and any appellate court from any thereof, in any
action or proceeding arising out of or relating to this Agreement, and each of the parties hereby
irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except

in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court.  Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each Party irrevocably consents to service of process in the manner provided for notices in Section 9.5 hereof.  Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by law.

        9.7     Severability of Provisions.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

        9.8     Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the Parties in accordance with their specific terms.  It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement.  Any such injunction(s) or action seeking specific performance shall be subject to Section 9.6 hereof.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____

Name: _____

Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____

Name: _____

Title: _____

COMPANY

VIZIO, INC.

By: _____

Name: _____

Title: _____

*Signature Page to Framework, Termination and Mutual General Release Agreement*

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____


LEECO V LTD.

By: _____
Name: _WINSTON CHENG_____
Title: _SVP_____

由 扫描全能王 扫描创建

IN  WITNESS  WHEREOF,  the  undersigned  have  executed  these  Joint  Written
Instructions on the date first written above.

VIZIO, INC.

By:      _____
Name:    William Wang
Title:   Chairman and  CEO

LEECO V LTD.

By:      _____
Name:    _____
Title:   _____

EXHIBIT F

Message

| | |
|---|---|
| **From:** | YT Jia(贾跃亭) [/O=LETV/OU=LETV/CN=RECIPIENTS/CN=LETVJIA] |
| **Sent:** | 5/24/2017 5:18:14 PM |
| **To:** | Amu(阿不力克木.阿不力米提) [/O=LETV/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Ablikim.ablimit1c1]; Davick Zhang（张志伟）[/O=LETV/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Userf2e8912d] |
| **Subject:** | 转发: Re: 回复: Re: partnership/China JV |

发自我的超级手机

---------- 转发的邮件 ----------
发件人：Ben Wong <Ben.Wong@vizio.com>
日期：2017年5月24日 22:25
主题：Re: 回复: Re: partnership/China JV
收件人："YT Jia(贾跃亭)" <letvjia@le.com>,"Jun LIANG(梁军)" <liangjun@le.com>,Winston Cheng <winstonsmc@yahoo.com>
抄送：William Wang <William.Wang@vizio.com>,Kurtis Binder <Kurtis.Binder@vizio.com>,Matt Mcrae <Matt.Mcrae@vizio.com>,"Jerry C. Huang" <Jerry.Huang@vizio.com>

Good morning YT/Liang Jun,

Noticed there's org change at LeTV, wish you both the best!

We haven't heard back from either Richard or 阿木 on the next steps. Understand it might take time to sync internally for you on the priorities, yet please don't drag us again (timeline wise, we were supposed to work on the Joint Venture agreement right after signing the "settlement" agreement in early April, and aligned contractually within 45 days). Please release the remaining $10M fund in the escrow and schedule a strategic meeting in either Beijing or LA in the near future. William, myself and Kurt would love to meet and have an amicable resolution with you. Thanks YT/梁軍.

Ben

**From:** Ben Wong <Ben.Wong@vizio.com>
**Date:** Friday, May 12, 2017 at 3:40 AM
**To:** Ablikim Ablimit 阿木 <Ablikim.Ablimit@le.com>, Richard Ren 任宏亮 <richard@le.com>, "YT Jia(贾跃亭)" <letvjia@le.com>, Winston Cheng <winstonsmc@yahoo.com>
**Cc:** Kurtis Binder <Kurtis.Binder@vizio.com>, Officers <Officers@vizio.com>, Matt McRae <Matt.McRae@vizio.com>, Jerry Huang <Jerry.Huang@vizio.com>, Jun Liang 梁军 <liangjun@le.com>, William Off Wang <William.Wang@vizio.com>
**Subject:** Re: 回复: Re: partnership/China JV

LEECO0001147

阿木/Richard, as "committed" in my earlier email (below), enclosed please find a Joint Venture Agreement draft. Please share with us your comments. Looking forward to your feedbacks and working with you on T&C (haven't heard from you for long, hope you're doing well). Thanks.

Ben

**From:** "YT Jia(贾跃亭)" <letvjia@le.com>
**Date:** Sunday, April 23, 2017 at 2:09 AM
**To:** Winston Cheng <winstonsmc@yahoo.com>
**Cc:** Ben Wong <Ben.Wong@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>, Richard Ren 任宏亮 <richard@le.com>, Ablikim Ablimit 阿木 <Ablikim.Ablimit@le.com>, Officers <Officers@vizio.com>, Matt McRae <Matt.McRae@vizio.com>, Jerry Huang <Jerry.Huang@vizio.com>, Jun Liang 梁军 <liangjun@le.com>, William Off Wang <William.Wang@vizio.com>
**Subject:** 回复：Re: partnership/China JV

阿木及大家，请尽快推进

发自我的超级手机

2017年4月23日 03:47于 Winston Cheng <winstonsmc@yahoo.com>写道：
大家好，昨天我在美国也跟Ben见了。Vizio的产品做的越来越好。他们还是比较希望这次国内合作可以谈好。他们在等待乐视这边的回复。

Sent from my iPhone

On 20 Apr 2017, at 4:15 PM, Ben Wong <Ben.Wong@vizio.com> wrote:

Good morning LeEco Team,

阿木/Richard, haven't heard back from you how we'd move forward on the China JV agreement, you guys must have been busy. Instead of waiting, we'd want to take the lead and start drafting the agreement. We'll circle it back to you in couple of weeks. Please confirm if it's agreeable with you. Time flies by fast, only got 30+ days left to finalize it ☺. Thanks.

Ben

**From:** Ben Wong <Ben.Wong@vizio.com>
**Date:** Friday, April 14, 2017 at 2:34 AM

LEECO0001148

**To:** "YT Jia(贾跃亭)" <letvjia@le.com>, Jun Liang 梁军 <liangjun@le.com>, Ablikim Ablimit 阿木
<Ablikim.Ablimit@le.com>, Richard Ren 任宏亮 <richard@le.com>, Winston Cheng
<winstonsmc@yahoo.com>
**Cc:** William Off Wang <William.Wang@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>,
Matt McRae <Matt.McRae@vizio.com>, Officers <Officers@vizio.com>, Jerry Huang
<Jerry.Huang@vizio.com>
**Subject:** Re: partnership/China JV

Good evening LeEco Team,

Ablikim, got the WeChat message from Winston that you would be in charge on the China JV
contract/related matters. Looking forward to hearing from you soon. Thanks.

Ben

Sent from my iPhone

On Apr 11, 2017, at 12:02, Ben Wong <Ben.Wong@vizio.com> wrote:

> Dear YT, Liang Jun, Ablikim Ablimit, Richard and Winston,
>
> It's disappointing that the deal didn't go through as we both
> anticipated. Nonetheless, given our brands/market positions
> in China and North America respectively and, the strategic
> collaborative spirit of YT and William, it's great we've
> amicably resolved the "deposit", reached the agreement,
> and will partner both in States and China.
>
> From VIZIO side, Kurt Binder, our CFO, and myself will lead
> the effort in working with you on terms and conditions
> (which "broadly" defined in our "settlement" agreement) of
> China JV. Who would be the contact executive(s) from LeEco
> side? Would like to get on it immediately so VIZIO could
> have a presence in China soon. Looking forward to having a
> successful partnership this time around ☺! Thanks!

BEN WONG
VIZIO // PRESIDENT & COO
O 949.428.2543   C 714.336.8828
39 TESLA, IRVINE, CA 92618

Make Some Noise!
Earn Points. Win
Prizes.
VIZIOFanZone.com

Confidentiality Notice: This e-mail contained with any attachments is VIZIO Inc. proprietary that may be confidential, privileged, or otherwise exempt from disclosure under applicable laws. You may only use,
distribute, print, retain or copy it with the author's permission on a need to know basis. This e-mail is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient
that you have received this e-mail in error, you are hereby advised that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. You are further requested to alert

LEECO0001149

and to return to the sender at the wrong delivery so that VPDQ Inc. can arrange for proper delivery. Thank you

LEECO0001150

EXHIBIT G

| From: | Jerry C. Huang <jerry.huang@vizio.com> |
|---|---|
| Sent: | Friday, June 09, 2017 4:11 PM |
| To: | Winston.CHENG（郑孝明）; duanwei3@le.com; Charles Hsieh; deals@srsacquiom.com |
| Cc: | YT Jia(贾跃亭); Jun LIANG(梁军); Winston Cheng; Mies, Michael J; Gisser, Michael V; ablikim.ablimit@le.com; Robert Waxman; William Wang; Ben Wong; Kurtis Binder; Matt Mcrae |
| Subject: | Demand Letter and Escrow Release Instructions |
| Attachments: | VIZIO Demand Letter 060917.pdf; Joint Written Instructions to Escrow Agent rev.docx |

Gentlemen:

You are hereby notified of your default and breach.  The demand for prompt actions/payments are set forth in the attached letter.  VIZIO reserves all rights and will be taking further actions accordingly.  Your immediate attention and cooperation are appreciated.

Best,

Jerry



Jerry C. Huang
VIZIO // Senior Vice President, General Counsel
O 949.777.0785   C 949.945.8260
39 TESLA, IRVINE, CA 92618



Make Some Noise!
Earn Points. Win Prizes.
VIZIOFanZone.com

Confidentiality Notice: This e-mail combined with any attachments is VIZIO Inc. proprietary that may be confidential, privileged, or otherwise exempt from disclosure under applicable laws. You may only use, disseminate, distribute, or copy it with the author's permission on a need to know basis. This e-mail is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient or believe that you have received this e-mail i. are hereby advised that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. You are further requested to destroy this e-mail and to respond to the sender of the wrong delivery so that can arrange for proper delivery. Thank you.

1



June 9, 2017

LeEco Global Group Ltd.                          Shareholder Representative Services LLC
16/F LeEco Building, 105 Yaojiayuan Road          1614 15th Street, Suite 200
Chaoyang District, Beijing 100025, PRC            Denver, CO 80202
Attention: Winston Chang, Wei Duan, and          Attention: Managing Director
Charles Hsieh                                     deals@srsacquiom.com
winston.cheng@le.com, duanwei3@le.com,
and charles.hsieh@le.com

Re:      **Demand for Immediate Payment**

Dear Sirs:

Reference is made to the Framework, Termination and Mutual General Release Agreement
("the Framework Agreement") by and among VIZIO, INC. ("VIZIO"), LeEco V Ltd. ("LeEco") and
Le V Merger Sub Inc. ("Merger Sub") dated April 5, 2017, and to the Agreement and Plan of
Merger, dated July 6, 2016 (the "Merger Agreement"), by and among VIZIO, LeEco, Merger Sub
and Shareholder Representative Services LLC (the "Shareholder Representative"). Capitalized
undefined terms used in this letter have the meanings ascribed to them in the Formation
Agreement and/or the Merger Agreement. Section references used in this letter and
designated as "Framework Section" refer to sections contained in the Framework Agreement.
Section references used in this letter and designated as "Merger Section" refer to sections
contained in the Merger Agreement. Reference is also made to Kurt Binder's letter of March
30, 2017 ("Binder Letter") terminating the Merger Agreement as of the dates set forth therein.

VIZIO terminated the Merger Agreement under the terms thereof as of the dates set forth in
the Binder Letter. The Binder Letter explained the grounds for that termination in detail,
specifying that they constituted a Qualifying Buyer Termination which triggered the
$100,000,000 Buyer Termination Fee and that sum was then due and payable to VIZIO; i.e., the
Escrow Agent was to automatically pay the $50,000,000 Buyer Termination Fee Deposit to
VIZIO, while LeEco was to pay the $50,000,000 Buyer Termination Fee Remainder to VIZIO, by
wire transfer or delivery of other immediately available U.S. Dollar funds to the account
designated by VIZIO in the Binder Letter.





Shortly after delivery of the Binder Letter, VIZIO, LeEco and Merger Sub entered into the Framework Agreement.  Framework Section 1.1 specifies that "the terms governing the release of the remaining Buyer Termination Fee Deposit, i.e., the remaining $10,000,000 in escrow, are to remain in effect, while Framework Section 4 imposes a 45 day time limit upon the commercial arrangement and joint venture distributorship documentation described in Sections 2 and 3 of the Framework Agreement.

That 45 day period has come and gone without the required commercial arrangement and joint venture documentation having been executed, through no fault of VIZIO.  VIZIO has made repeated efforts both orally and in writing to negotiate and memorialize the commercial arrangement and joint venture terms with LeEco, to no avail.  Instead, VIZIO has been met with practical radio silence.  Since the terms of the Buyer Termination Fee Deposit remain in effect and in any event LeEco has prevented performance, the remaining $10,000,000 Buyer Termination Fee Deposit must be released from escrow and paid to VIZIO forthwith.

In order to facilitate that payment, I have enclosed Joint Written Instructions for the immediate release of those funds.  Please date, sign and return these Joint Written Instructions to me within 48 hours of your receipt of this letter so that we can submit them to the Escrow Agent for immediate handling.  Failure to do so will further compound LeEco's breaches of both the Merger Agreement and the Formation Agreement.

LeEco's breaches are not remedied with its payment of the $10,000,000 remainder of the Buyer Termination Fee Deposit alone.  LeEco has neither paid the $50,000,000 Buyer Termination Fee Remainder to VIZIO nor has it bothered to execute the joint venture distributorship agreement that is the subject of Framework Sections 3-4, let alone fund that joint venture with $50,000,000 in verified non-cash assets as required by Framework Section 3.2.1.  Rather than participate in the negotiations for further or additional terms described in Framework Sections 3 and 4, LeEco has simply ignored a plethora of oral and written communications from VIZIO urging LeEco to do so, including the provision of a draft joint venture agreement.

LeEco's conduct does not come close to the "good faith" mandated by Framework Sections 3 and 4.  Worse still, it is crystal clear that at the time LeEco entered into the Framework Agreement, it had no intention to pay VIZIO the $10,000,000 remaining portion of the Buyer Termination Fee Deposit, let alone execute a joint venture distribution agreement with VIZIO and fund that joint venture with the required $50,000,000 in verified non-cash assets.  Instead, LeEco merely engaged in a subterfuge to try to  reduce its liability from the $100,000,000 Buyer Termination Fee to the $40,000,000 sum that was released from escrow and paid directly to VIZIO at or about the execution of the Formation Agreement.  This is fraud.





Accordingly, VIZIO demands that LeEco further wire or pay directly to VIZIO the $50,000,000 Buyer Termination Fee Remainder and confirm that it will do so in writing forthwith.  In the meantime, the contents of this letter are without prejudice to any rights which VIZIO may have pursuant to the Formation Agreement and/or the Merger Agreement or otherwise, which are hereby expressly reserved.  Nothing herein is intended to limit or waive any rights of VIZIO related to either the facts surrounding the Formation Agreement and/or the Merger Agreement or any other facts or circumstances, whether known or unknown.

VIZIO, Inc.

By: _____

Name: Jerry C. Huang

Title: SVP, General Counsel


cc:   Robert M. Waxman, Esq.
      Michael V. Gisser (michael.gisser@skadden.com)
      Michael J. Mies (michael.mies@skadden.com)
      Y.T. Jia (letvjia@le.com)
      Liang Jun (liangjun@le.com)
      Ablikim Ablimit (Ablikim.Ablimit@le.com)
      Winston Cheng (winstonsmc@yahoo.com)



## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
## FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

June 9, 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(iii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

1.    The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$10,000,000, which amount represents the remaining portion of the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: REDACTED
Bank Name: East West Bank
ABA Number: REDACTED
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$10,000,000.00

2.    No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____


LEECO V LTD.

By: _____
Name: _____
Title: _____

VIZIO0000680

EXHIBIT H

| Message | |
|---|---|
| **From:** | Charles Hsieh [/O=LETV/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CHARLES HSIEH4DA] |
| **Sent:** | 6/22/2017 8:48:17 AM |
| **To:** | Jerry C. Huang [Jerry.Huang@vizio.com]; Kurtis Binder [Kurtis.Binder@vizio.com] |
| **CC:** | William Wang [William.Wang@vizio.com]; Ben Wong [Ben.Wong@vizio.com]; Matt Mcrae [Matt.McRae@vizio.com]; Robert Waxman [rwaxman@ECJLAW.COM]; SCOTT.SHEAN@LW.com; David.Lee@lw.com; Semenova, Luda [luda.semenova@citi.com]; Gao, Z. Julie [Julie.Gao@skadden.com]; Mies, Michael J [Michael.Mies@skadden.com]; Gisser, Michael V [Michael.Gisser@skadden.com]; Richard [/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Richardeb6]; Amu(阿不力克木.阿不力米提) [/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ablimit1c1]; Jun LIANG(梁军) [/o=LETV/ou=LETV/cn=Recipients/cn=liangjun] |
| **Subject:** | Response to Demand |
| **Attachments:** | LeEco Response Letter.pdf |

Messiers Huang and Binder,

Please see the attached response to your letter dated June 9.  As described in the letter and in my conversation with Ben, we continue to wish to negotiate the JV agreement as contemplated in the framework agreement both parties executed.  We believe this is a win-win relationship with both parties being the beneficiaries.

Kind Regards,
Charles

**Charles Hsieh**
Director of Corporate Finance and Development



2236 Barrington Ave
Los Angeles, CA 90064
www.leeco.com
(m): 213.369.6499
WeChat: charleschsieh

LEECO0000305



June 22, 2017

VIZIO, Inc.
39 Tesla
Irvine, California 92618
Attention:  Kurtis J. Binder and Jerry C. Huang

Re:     Demand for Immediate Payment

Dear Messrs. Binder and Huang:

     I write in response to Mr. Huang's letter addressed to LeEco Global Group Ltd. ("LeEco Global") dated June 9, 2017 (the "June 9 Letter").  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Agreement and Plan of Merger (the "Merger Agreement"), by and among LeEco V Ltd. ("LeEco"), Le V Merger Sub Inc. ("Merger Sub"), VIZIO, Inc. ("VIZIO") and Shareholder Representative Services LLC, dated as of July 6, 2016 and/or the Framework, Termination and Mutual General Release Agreement (the "Framework Agreement"), by and among LeEco, Merger Sub and VIZIO, dated as of April 5, 2017.

     LeEco Global unequivocally denies (i) that VIZIO validly terminated the Merger Agreement with the letter of March 30, 2017 from Mr. Binder, (ii) any suggestion that the Merger Agreement was terminated other than pursuant to the Framework Agreement, (iii) all claims of breach of the Merger Agreement and the Framework Agreement made in the June 9 Letter, and (iv) VIZIO's allegations of fraud in connection with LeEco Global's entry into the Framework Agreement and purported lack of good faith or prevention of performance thereafter. LeEco Global also disagrees that failure to deliver the joint written instructions as demanded in the June 9 Letter is a breach by LeEco Global of the Merger Agreement or the Framework Agreement or that any Buyer Termination Fee is now due.[1] While LeEco is disappointed by the inaccuracies in VIZIO's June 9 Letter, we see little benefit to arguing about history and the record, which speak for themselves. Despite our differences, LeEco Global remains committed to working with VIZIO toward our companies' mutual benefit.

     In that regard, as I communicated to Ben Wong at VIZIO on June 13, LeEco Global still wishes to enter into a joint venture agreement as contemplated by the Framework Agreement and is ready, willing and able to negotiate such agreement with VIZIO.  LeEco Global looks forward

---

[1] For the reasons set forth herein, LeEco also categorically denies the assertions in the June 13, 2017 letter from Robert M. Waxman to the Escrow Agent and Shareholder Representative Services, and opposes the release of the escrowed amounts demanded therein.



3553 North 1st St
San Jose, CA 95134

LEECO0000306

to a mutually beneficial partnership with VIZIO and would like to begin discussions as soon as possible with me as the point of contact.

LeEco Global hopes that VIZIO will join LeEco Global in negotiating in good faith and executing the one or more agreements necessary to document the China JV and other commercial arrangements set forth in Sections 2 and 3 of the Framework Agreement. If you have any questions, please contact me at charles.hsieh@le.com or (213)369-6499 to discuss.

Yours sincerely,

Charles Hsieh
of LEECO GLOBAL GROUP LTD.

Cc:   William Wang and Ben Wong, VIZIO, Inc.
      Board of Directors of VIZIO, Inc.
      Managing Director, Shareholder Representative Services LLC
      R. Scott Shean, Latham & Watkins LLP
      David C. Lee, Latham & Watkins LLP
      Robert M. Waxman, Esq.
      Luda Semenova, Citibank, N.A.
      Julie Z. Gao, Skadden, Arps, Slate, Meagher & Flom LLP
      Michael J. Mies, Skadden, Arps, Slate, Meagher & Flom LLP



3553 North 1st St
San Jose, CA 95134

LEECO0000307

EXHIBIT I

Message
| | |
|---|---|
| **From**: | Ben Wong [Ben.Wong@vizio.com] |
| **Sent**: | 4/4/2017 5:59:22 AM |
| **To**: | Winston.CHENG（郑孝明） [/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Winston.CHENG768] |
| **Subject**: | Fwd: revised agreement |
| **Attachments**: | image001.png; ATT00001.htm; image002.png; ATT00002.htm; Framework__Termination_and_Mutual_General_Release_VIZIO redline 040317.docx; ATT00003.htm; VIZIO revised agreement - clean 040317.docx; ATT00004.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Jerry C. Huang" <Jerry.Huang@vizio.com>
> **Date:** April 4, 2017 at 00:05:35 PDT
> **To:** "winston.cheng@le.com" <winston.cheng@le.com>
> **Cc:** Ben Wong <Ben.Wong@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>
> **Subject: revised agreement**
>
> Hello Winston,
>
> Per Ben's request, I am forwarding a redline and a clean version of our response to Skadden's earlier draft. There are some stylistic changes and clean ups. The substantive changes should track pretty closely to your discussions/agreement with Ben. Thanks.
>
> Best,
>
> Jerry

LEECO0002017

Jerry C. Huang
VIZIO // Vice President, General Counsel
O 949.777.0785   C 949.945.8260
39 TESLA, IRVINE, CA 92618

Make Some Noise!
Earn Points. Win Prizes.
VIZIOFanZone.com

LEECO0002018

LEECO0002019

SASMF Draft 4/2/17

FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT

**Style Definition: Header**
**Style Definition: Footer**

THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "Agreement") is entered into as of April [3], 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Buyer"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("Merger Sub"),") and VIZIO, Inc., a California corporation (the "Company" or "VIZIO"). Buyer, Merger Sub and Company are sometimes referred to herein collectively as the "Parties" and individually as a "Party". Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

WHEREAS, Buyer, Merger Sub, the Company and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the representative of the holders of Company capital stock or options ("Shareholder Representative"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "Merger Agreement") pursuant to which it wasis proposed that Merger Sub wouldwill merge with and into the Company, with the Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "Merger"); and

WHEREAS, Buyer and the Company now desire to terminate the Merger Agreement and enter into the Aagreements contained herein on the terms and conditions set forth herein; and-

WHEREAS, concurrently with the execution and delivery of this Agreement and in accordance with the terms and conditions of this Agreement, as a material inducement to each Party's willingness to enter into this Agreement and as consideration for terminating the Merger Agreement: (i) Buyer will pay US$100,000,000 as follows: (x) Buyer shall direct the Escrow Agent to pay the US$40,000,000 of Buyer Termination Fee Deposit to the Company concurrent with execution of this Agreement, (y) Buyer shall direct the Escrow Agent to pay the remaining US$10,000,000 of Buyer Termination Fee Deposit to the Company upon execution of the JV Agreement, and (z) Buyer shall contribute, or cause to be contributed, assets with a fair market value equal to US$50,000,000, as a capital contribution to the China JV (as defined below); (ii) the Company shall make the LeEco Le App (as defined below) available on its compatible televisions and displays; and (iii) Buyer shall make Inscape Data Client (as defined below) available on its compatible televisions and displays.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Pparties, intending to be legally bound, do hereby agree to the following:

1.     Termination of Merger Agreement and Release of Buyer Termination Fee Deposit.

1.1     Termination.   Effective upon receipt by the Company of the Buyer the $40,000,000 of Termination Fee Deposit pursuant to Section 1.2 hereof (the "Effective Time"), Buyer and the Company hereby terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement (the "Termination").   From and after the Effective Time, the Merger

**Formatted: Justified**

-1-

791436.01C-LACSR01A - MSW

LEECO0002020

Agreement shall become null and void, and the rights and obligations of each applicable Party or any of its or their Affiliates to any other Party under the Merger Agreement shall terminate, except for Section 6.5 (Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the Merger Agreement and the terms governing the release of the remaining Termination Fee Deposit. ~~Buyer and Company agree to terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement, effective as of the date hereof (the "Termination").~~

1.2   Release of Buyer Termination Fee Deposit.  In connection with and as full consideration for the Termination and, the releases set forth in Section 6 hereof, concurrently with~~below~~, the execution and delivery of this Agreement by~~entry into~~ the Company to Buyer~~commercial arrangements contemplated in Section 2 below and the entry into a joint venture as contemplated in Section 3 below~~, Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

Formatted: Underline

1.2.1   Buyer agrees to concurrently with the execution of this Agreement to~~immediately~~ issue a Joint Release Instruction, in the form as attached as Exhibit "A" herewith, (as such term is defined in the Escrow Agreement, dated as of July 6, 2016, by and among Buyer, Company, Shareholder Representative and the Escrow Agent (the "Escrow Agreement")) with Company releasing forty~~twenty~~ million dollars ($40~~20~~,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

1.2.2   Concurrenlty with the~~Upon~~ consummation of the JV Agreement (as defined below), Buyer agrees to issue a Joint Release Instruction, ~~(as defined~~ in the form as attached as Exhibit "B" herewith,~~Escrow Agreement)~~ with Company releasing the remaining ten~~thirty~~ million dollars ($10~~30~~,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company~~within three (3) business days of the date of consummation of the JV Agreement~~.

2.   Commercial Relationships.

2.1   LeEco Le App.

2.1.1   Buyer shall develop and obtain certification of an application to be made available by the Company on all of the Company's smart televisions and displays in North America (the "LeEco Le App").

Formatted: Justified

2.1.2   Company shall make the LeEco Le App available on all its compatible smart televisions and displays in North America ~~on the first screen of the Company app~~ for all Google Chromecast-enabled televisions and displays as well as for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "App Processes").  The Company and Buyer shall enter into the Company's customary form agreement(s) for such arrangements.  The Company shall use reasonable efforts to assist in the App Processes; provided that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the LeEco Le App.

-2-

LEECO0002021

2.2    Inscape Data.

2.2.1    The Company shall develop and obtain certification of a data client
to be made available by Buyer on all of Buyer's smart televisions and displays (the "Inscape
Data Client")

Formatted: Justified

2.2.2    Buyer shall include the Inscape Data Client on all its smart
televisions and displays for a period of three (3) years from the date that the Inscape Data Client
obtains certification, subject to customary engineering and certification processes (the "Data
Client Processes"). Buyer will use reasonable efforts to assist with the Data Client Processes;
provided that Company shall be solely responsible for all expenses related to and arising from (a)
engineering, development and certification of the Inscape Data Client and (b) taking the
necessary measures to comply with applicable Laws in the engineering, development and
certification of the Inscape Data Client.

2.2.3    Subject to applicable law, each of the Company and Buyer shall
come to an agreement on pricing on a per user/per television basis.

2.2.42.2.3    Company shall have access to Inscape data sold by the
China JV so long as it holds at least 50% of the ownership interests in the China JV. Buyer shall
also have access to Inscape data sold by the China JV so long as it holds at least 50% of the
ownership interests in the China JV.

Formatted: Justified

3.    Formation of a Joint Venture.

Formatted: Keep with next

3.1    Following the Effective Time, the The Parties shallagree to negotiate in
good faith and use reasonable efforts to form a commercial relationship between the Company
and Buyer for expansion efforts in the People's Republic of China ("China"). . The proposed
commercial relationship would provide for (i) the Company granting the China JV (as defined
below) the right to sell Company televisions in China subject to the mutual consent of the
Company and Buyer onto branding and distribution; (ii) the Company preloading EUI and Le
contents on Company televisions and displays sold in China; and (iii) the Company and Buyer
entering into the joint venture in China as described in this Section 3below (the "China JV").

Formatted: Keep with next

Formatted: Justified, Keep with next

3.2    The proposed terms of the China JV are as follows:

Formatted: Justified

3.2.1    In connection therewith, Buyer will contribute non-cash assets
with a fair market value equal to US$50,000,000 as a capital contribution to the China JV (the
"Buyer Contribution"). The fair market valuation shall be audited and verified by an
independent, internationally recognized accounting firm.

3.2.2    The China JV will have an operational life of three (3) years from
the effective date of a formal joint venture agreement (the "JV Agreement") between Buyer and
the Company (the "Initial JV TermAgreement").

3.2.3    The China JV will be owned and controlled 50% by the Company
and 50% by Buyer.

-2-

791436.01C-LACSR01A - MSW

3.2.4    The China JV will promote and /market Company-branded devices
(televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in
China.

3.2.5    The China JV will operate with the goal of deploying a mutually
agreed upon number by Buyer and the Company of an aggregate of [1.5 million] Company-
branded televisions and displays in China within the Initial three (3) years from the effective date
of the JV Term and achieving such unit sales volume target for the China JV (the "Sales
Target"). Agreement.

(a)    The If the China JV does not reach the [1.5 million] units within
such three (3) year period, the JV Agreement will provide that Buyer will pay Company
US$[•] (in cash or value equivalent) per unit for the difference between [1.5 million]
minus the actual units sold through retail, mass and/or direct channels.  Company shall
sell units to the China JV at reasonable competitive rates that allow a reasonable margin
of profit per unit sold by the China JV.

(b)    Buyer and Company will negotiate in good faith to extend the
initial three-year operational life of the China JV if the above deployment goal is reached.

(c)(b)  The profit on sold through units sold by the China JV, i.e. through
advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the
China JV's equity holders on a quarterly basis.

(c)    Upon achievement of the Sales Target during the Initial JV Term,
Buyer and the Company will negotiate in good faith to extend the Initial JV Term.

3.2.6    During the Initial JV Term initial 3-year operational life of the
China JV, Company-branded devices will be distributed in China exclusively through the China
JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming
platform.

3.2.7    The JV Agreement will provide that Buyer will lend up to an
aggregate of [XXXXXXXX] to the China JV for working capital purposes over the Initial JV
Term (the "Buyer Loan"). its initial three-year operational life.

(a)    Company and Buyer shall agree upon a three-year Sales Target unit
sales volume target for the China JV. (the "Target").  If the China JV achieves the Sales
Target in the Initial JV Term initial three-year operational life and the parties agree to
continue the China JV operations, then the loan shall be repaid in full.

(b)    Notwithstanding the foregoing, Company will consider
participating in the China JV's financial obligations only after it receives full
US$50,000,000, in cash or value equivalents, such value equivalents to include assets
contributed to the China JV by Buyer and its Affiliates at fair market value.

4.    Formal Agreements.  Buyer and the Company The parties shall negotiate in good
faith and execute one or more agreements to document the China JV and the other commercial

-2-

791436.01C-LACSR01A - MSW

LEECO0002023

Formatted: Justified

Formatted: Justified

Formatted: Justified

Formatted: Justified

arrangements set forth in Sections 2 and 3 hereofabove with the terms specified therein within
forty-five (45) days of the date hereof.

**Formatted: Underline**

**Formatted: Underline**

5.     Publicity; Confidentiality and Mutual Non-Disparagement.

5.1     Except for a mutually agreed press release stating that the parties to the
Merger Agreement have determined to terminate the Merger Agreement due to failure to obtain
PRC regulatory approvals, the Partiesforce majeure, the parties hereto will keep confidential the
terms and status of this Agreement and the transactions contemplated hereby and thereby and
none of the Parties shall, without the approval of the other, make any press release or other
announcement concerning the existence of this Agreement or the terms of the transactions
contemplated by this Agreement, except as and to the extent that any such Party shall be so
obligated by applicable law, in which case the other Party shall be advised and the Parties shall
use their reasonable commercial efforts to cause a mutually agreeable release or announcement
to be issued.

**Formatted: Justified**

5.2     The Parties shall each refrain from making, and shall cause their
respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors,
assigns, officers, key employees or directors not to make, any public statement or announcement
that (i) states or implies that any Pparty or its Affiliates or subsidiaries or any of its or their
respective officers or directors or any person who has served as an officer or director of Buyer,
Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger
Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or
is reasonably likely to damage the business or reputation of, (x) in the case of statements or
announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or
subsidiaries or any of its or their respective officers or directors or any person who has served as
an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or
(y) in the case of statements or announcements by the Buyer or Merger Sub, the Company or its
Affiliates or subsidiaries or any of its or their respective officers or directors or any person who
has served as an officer or director of the Company or any of its Affiliates or subsidiaries.   The
foregoing shall not restrict the ability of any person to comply with any subpoena or other legal
process or respond to a request for information from any governmental authority with
jurisdiction over the Pparty from whom information is sought.

6.     Release and Waiver.

6.1     Release By Buyer and Merger Sub.  Effective as of the Effective Timedate
hereof, except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and
its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors,
successors, officers, directors, managers, members, shareholders, agents, employees and assigns
(individually, each a "Buyer Party Releasor" and collectively, the "Buyer Party Releasors") "),
agrees to, and hereby does, generally releases, remisesrelease, remise and forever discharges
thedischarge Company and the Company's past, present and future Affiliates, divisions, parents
and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents,
officers, directors, managers, employees, assigns, heirs and successors in interest, and each of
them (each a "Company Released Party" and collectively, the "Company Released Parties")
from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations,

**Formatted: Justified**

-2-

LEECO0002024

rights, duties, contracts, agreements, undertakings, accounts, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "Claims") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub or any of their Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by the Company, (c) the termination of the Merger Agreement or (de) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(de), the "Buyer Party Released Claims"); provided, however, the Buyer Party Released Claims shall not include any Claims arising from any breach by the Company of its obligations under this Agreement.").

6.2    Release By Company. Effective as of the full release of the Buyer Termination Fee Deposit of $50,000,000date hereof, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Company Releasor" and collectively, the "Company Releasors") "), agrees to, and hereby does generally releases, remisesrelease, remise and forever discharges Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Buyer Released Party" and collectively, the "Buyer Released Parties") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d or (c) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(de), the "Company Released Claims"); provided, however, the Company Released Claims shall not include any Claims arising from any breach by Buyer or Merger Sub of its obligations under this Agreement.").

6.3    Covenant Not To Sue. Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim. The Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither the Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any

-2-

LEECO0002025

way, or cause to be commenced or instituted any proceeding of any kind against any Buyer Released Party in respect of any Company Released Claim.

6.4 <u>Waiver</u>. The Parties acknowledge that (a) Section 1542 of the California Civil Code provides, and (b) certain other states have provisions substantially as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, each Party agrees that the waiver of such provisions is a material portion of the releases intended by this Agreement, and each Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have under Section 1542 of the California Civil Code and any similar such provisions of any jurisdiction. In connection with such waiver and relinquishment, the Parties hereby acknowledge that they or their attorneys may hereafter discover claims or facts in addition to, or different from, those which he now knows or believes to exist, but that they expressly agree to fully, finally and forever settle and release any and all Claims, known or unknown, suspected or unsuspected, which exist or may exist on their behalf against the Company Released Parties and the Buyer Released Parties at the time of execution of this Agreement.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE MATTERS RELEASED HEREIN. NEVERTHELESS, IT IS THE INTENTION OF EACH PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY EXIST, OR HERETOFORE HAVE EXISTED BETWEEN THEM. IN FURTHERANCE OF SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS, NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

7. <u>Representations and Warranties</u>. Each ~~Party~~ <u>party to the Agreement</u> ~~r~~represents and warrants and agrees as follows:

7.1 <u>Such Party</u>~~It~~ has all requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement (including, without limitation, the releases set forth herein) have, to the extent required, been duly and validly authorized by all corporate proceedings <u>of such Party</u>.

[Formatted: Justified]

7.2 No authorization, approval or other action, and no notice to or filing with, any governmental authority or *regulatory body* is required for the due execution, delivery and/or performance of this Agreement <u>by such Party</u>.

-2-

~~791436.01C-LACSR01A - MSW~~

7.3     Such Pparty or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents. In executing this Agreement, such Pparty, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

7.4     Such PartyIt has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

7.5     Such PartyIt has received independent legal advice with respect to the matters set forth in this Agreement,and the Claims released in Sections 1.1 and 6 hereofof this Agreement and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

7.6     Such PartyIt does not rely upon any statement, representation or promise of another Pparty (or of any officer, agent, employee, representative, or attorney for another Pparty), in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

7.7     Such PartyIt knows of no other Person that may claim an interest in any of the Claims disposed of by such Pparty and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

7.8     Such PartyIt has made such investigation of the facts pertaining to this settlement and Sections 1.1 and 6 hereofof this Agreement, and of all the matters pertaining thereto, as it deemed necessary.

7.9     Such PartyIt will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.     Indemnification.  The agreements contained in Sections 1.1 and 6 hereofof this Agreement may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.     Miscellaneous.

9.1     Entire Agreement.  This Agreement constitutes the entire agreement between the Partiesparties hereto and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.  This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Partyparty hereto to be bound thereby.

-2-

791436.01C LACSR01A  MSW

LEECO0002027

9.2     Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3     Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.   Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties.   The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 hereof this Agreement, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 hereof this Agreement.

9.4     Governing Law.   This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5     Notices.   All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.   In each case notice shall be sent to:

-2-

791436.01C-LACSR01A - MSW

LEECO0002028

If to Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618

Attention:  Kurtis J. Binder and Jerry C. Huang
Email: ~~No.:~~ kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email: ~~No.:~~ scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention:  Charles Hsieh
Email:  charles.hsieh@le.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention:  Michael V. Gisser and Michael J. Mies
Email:  michael.gisser@skadden.com and michael.mies@skadden.com

Any Party~~party hereto~~ may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party~~party hereto~~ may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other Pparty notice in the manner herein set forth.

9.6    <u>Consent to Jurisdiction</u>.    Each Pparty hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action

-2-

~~791436.01C-LACSR01A - MSW~~

or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court.  Each of the ~~Parties~~parties ~~hereto~~ agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each ~~Party~~ party ~~to this Agreement~~ irrevocably consents to service of process in the manner provided for notices in Section 9.5 hereof.  Nothing in this Agreement will affect the right of any ~~Party~~party ~~to this Agreement~~ to serve process in any other manner permitted by law.

       9.7   <u>Severability of Provisions</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any ~~P~~party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the ~~Parties~~parties ~~hereto~~ shall negotiate in good faith to modify this Agreement so as to effect the original intent of the ~~P~~parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

       9.8   <u>Specific Performance</u>.  The ~~Parties~~parties ~~to this Agreement~~ agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the ~~P~~parties in accordance with their specific terms.  It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement.  Any such injunction(s) or action seeking specific performance shall be <u>subject to Section 9.6 hereof</u>~~sought in California State court~~.

*[signature page follows]*

Formatted: BodyText 1

~~791436.01C-LACSR01A - MSW~~

LEECO0002030

**Formatted:** Normal, Justified

LEECO0002031

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____
Name: _____
Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____
Name: _____
Title: _____

**Formatted:** Underline

**Formatted:** Indent: Before:  0"

[signatures continued on next page]

US-DOCS\83351417.10

<u>COMPANY</u>

VIZIO, INC.


By: _____
Name: _____
Title: _____

US-DOCS\83351417.10

LEECO0002033

Exhibit A

**JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS**

April [  ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

1.     The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$40,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$40,000,000.00

2.     No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

LEECO0002034

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____

LEECO V LTD.

By: _____
Name: _____
Title: _____

US-DOCS\83351417.10

LEECO0002035

Exhibit B

### JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

[ ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

3.      The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$10,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$10,000,000.00

4.      No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

LEECO0002036

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____

LEECO V LTD.

By: _____
Name: _____
Title: _____

LEECO0002037

LEECO0002038

<u>FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT</u>

THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "<u>Agreement</u>") is entered into as of April [3], 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("<u>Buyer</u>"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("<u>Merger Sub</u>"), and VIZIO, Inc., a California corporation (the "<u>Company</u>" or "VIZIO"). Buyer, Merger Sub and Company are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>". Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

WHEREAS, Buyer, Merger Sub, the Company and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the representative of the holders of Company capital stock or options ("<u>Shareholder Representative</u>"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "<u>Merger Agreement</u>") pursuant to which it was proposed that Merger Sub would merge with and into the Company, with the Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "<u>Merger</u>");

WHEREAS, Buyer and the Company now desire to terminate the Merger Agreement and enter into the Agreement contained herein on the terms and conditions set forth herein; and

WHEREAS, concurrently with the execution and delivery of this Agreement and in accordance with the terms and conditions of this Agreement, as a material inducement to each Party's willingness to enter into this Agreement and as consideration for terminating the Merger Agreement: (i) Buyer will pay US$100,000,000 as follows: (x) Buyer shall direct the Escrow Agent to pay the US$40,000,000 of Buyer Termination Fee Deposit to the Company concurrent with execution of this Agreement, (y) Buyer shall direct the Escrow Agent to pay the remaining US$10,000,000 of Buyer Termination Fee Deposit to the Company upon execution of the JV Agreement, and (z) Buyer shall contribute, or cause to be contributed, assets with a fair market value equal to US$50,000,000, as a capital contribution to the China JV (as defined below); (ii) the Company shall make the LeEco Le App (as defined below) available on its compatible televisions and displays; and (iii) Buyer shall make Inscape Data Client (as defined below) available on its compatible televisions and displays.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties, intending to be legally bound, hereby agree to the following:

1.      <u>Termination of Merger Agreement and Release of Buyer Termination Fee Deposit</u>.

1.1     <u>Termination</u>. Effective upon receipt by the Company of the Buyer the $40,000,000 of Termination Fee Deposit pursuant to <u>Section 1.2</u> hereof (the "<u>Effective Time</u>"), Buyer and the Company hereby terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement (the "<u>Termination</u>"). From and after the Effective Time, the Merger

Agreement shall become null and void, and the rights and obligations of each applicable Party or any of its or their Affiliates to any other Party under the Merger Agreement shall terminate, except for Section 6.5 (Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the Merger Agreement and the terms governing the release of the remaining Termination Fee Deposit.

      1.2    <u>Release of Buyer Termination Fee Deposit</u>.  In connection with and as full consideration for the Termination and the releases set forth in <u>Section 6</u> hereof, concurrently with the execution and delivery of this Agreement by the Company to Buyer, Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

      1.2.1    Buyer agrees to concurrently with the execution of this Agreement to issue a Joint Release Instruction, in the form as attached as Exhibit "A" herewith, (as such term is defined in the Escrow Agreement, dated as of July 6, 2016, by and among Buyer, Company, Shareholder Representative and the Escrow Agent (the "<u>Escrow Agreement</u>")) with Company releasing forty million dollars ($40,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

      1.2.2    Concurrenlty with the consummation of the JV Agreement (as defined below), Buyer agrees to issue a Joint Release Instruction, in the form as attached as Exhibit "B" herewith, with Company releasing the remaining ten million dollars ($10,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

      2.    <u>Commercial Relationships</u>.

      2.1    <u>LeEco Le App</u>.

      2.1.1    Buyer shall develop and obtain certification of an application to be made available by the Company on all of the Company's smart televisions and displays in North America (the "<u>LeEco Le App</u>").

      2.1.2    Company shall make the LeEco Le App available on all its compatible smart televisions and displays in North America for all Google Chromecast-enabled televisions and displays as well as for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "<u>App Processes</u>").  The Company and Buyer shall enter into the Company's customary form agreement(s) for such arrangements.  The Company shall use reasonable efforts to assist in the App Processes; <u>provided</u> that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the LeEco Le App.

      2.2    <u>Inscape Data</u>.

2.2.1    The Company shall develop and obtain certification[1] of a data client to be made available by Buyer on all of Buyer's smart televisions and displays (the "Inscape Data Client")

2.2.2    Buyer shall include the Inscape Data Client on all its smart televisions and displays for a period of three (3) years from the date that the Inscape Data Client obtains certification, subject to customary engineering and certification processes (the "Data Client Processes").   Buyer will use reasonable efforts to assist with the Data Client Processes; provided that Company shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the Inscape Data Client and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the Inscape Data Client.

2.2.3    Subject to applicable law, each of the Company and Buyer shall have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV.

3.    Formation of a Joint Venture.

3.1    Following the Effective Time, the Parties shall negotiate in good faith and use reasonable efforts to form a commercial relationship between the Company and Buyer for expansion efforts in the People's Republic of China ("China").   The proposed commercial relationship would provide for (i) the Company granting the China JV the right to sell Company televisions in China subject to the mutual consent of the Company and Buyer on branding and distribution; (ii) the Company preloading EUI and Le contents on Company televisions and displays sold in China; and (iii) the Company and Buyer entering into the joint venture in China as described in this Section 3 (the "China JV").

3.2    The proposed terms of the China JV are as follows:

3.2.1    In connection therewith, Buyer will contribute non-cash assets with a fair market value equal to US$50,000,000 as a capital contribution to the China JV (the "Buyer Contribution").   The fair market valuation shall be audited and verified by an independent, internationally recognized accounting firm.

3.2.2    The China JV will have an operational life of three (3) years from the effective date of a formal joint venture agreement (the "JV Agreement") between Buyer and the Company (the "Initial JV Term").

3.2.3    The China JV will be owned and controlled 50% by the Company and 50% by Buyer.

3.2.4    The China JV will promote and market Company-branded devices (televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in China.

_____

3.2.5    The China JV will operate with the goal of deploying a mutually agreed upon number by Buyer and the Company of Company-branded televisions and displays in China within the Initial JV Term and achieving such unit sales volume target for the China JV (the "Sales Target").

(a)    The Company shall sell units to the China JV at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV.

(b)    The profit on units sold by the China JV, i.e. through advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the China JV's equity holders on a quarterly basis.

(c)    Upon achievement of the Sales Target during the Initial JV Term, Buyer and the Company will negotiate in good faith to extend the Initial JV Term.

3.2.6    During the Initial JV Term, Company-branded devices will be distributed in China exclusively through the China JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming platform.

3.2.7    The JV Agreement will provide that Buyer will lend up to an aggregate of [XXXXXXXX] to the China JV for working capital purposes over the Initial JV Term (the "Buyer Loan").

(a)    Company and Buyer shall agree upon a three-year Sales Target for the China JV.  If the China JV achieves the Sales Target in the Initial JV Term and the parties agree to continue the China JV operations, then the loan shall be repaid in full.

(b)    Notwithstanding the foregoing, Company will consider participating in the China JV's financial obligations only after it receives full US$50,000,000, in cash or value equivalents, such value equivalents to include assets contributed to the China JV by Buyer and its Affiliates at fair market value.

4.    Formal Agreements.  Buyer and the Company shall negotiate in good faith and execute one or more agreements to document the China JV and the other commercial arrangements set forth in Sections 2 and 3 hereof with the terms specified therein within forty-five (45) days of the date hereof.

5.    Publicity; Confidentiality and Mutual Non-Disparagement.

5.1    Except for a mutually agreed press release stating that the parties to the Merger Agreement have determined to terminate the Merger Agreement due to failure to obtain PRC regulatory approvals, the Parties will keep confidential the terms and status of this Agreement and the transactions contemplated hereby and thereby and none of the Parties shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by applicable law, in which case the other Party shall be advised and the Parties shall use their reasonable commercial efforts to cause a mutually agreeable release or announcement to be issued.

5.2     The Parties shall each refrain from making, and shall cause their respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors, assigns, officers, key employees or directors not to make, any public statement or announcement that (i) states or implies that any Party or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or is reasonably likely to damage the business or reputation of, (x) in the case of statements or announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or (y) in the case of statements or announcements by the Buyer or Merger Sub, the Company or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of the Company or any of its Affiliates or subsidiaries.  The foregoing shall not restrict the ability of any person to comply with any subpoena or other legal process or respond to a request for information from any governmental authority with jurisdiction over the Party from whom information is sought.

6.      Release and Waiver.

6.1     Release By Buyer and Merger Sub.  Effective as of the Effective Time, except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Buyer Party Releasor" and collectively, the "Buyer Party Releasors") hereby generally releases, remises and forever discharges the Company and the Company's past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Company Released Party" and collectively, the "Company Released Parties") from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations, rights, duties, contracts, agreements, undertakings, accounts, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "Claims") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub or any of their Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by the Company, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "Buyer Party Released Claims"); provided, however, the Buyer Party Released Claims shall not include any Claims arising from any breach by the Company of its obligations under this Agreement.

LEECO0002043

6.2   Release By Company.   Effective as of the full release of the Buyer Termination Fee Deposit of $50,000,000, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Company Releasor" and collectively, the "Company Releasors") hereby generally releases, remises and forever discharges Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Buyer Released Party" and collectively, the "Buyer Released Parties") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "Company Released Claims"); provided, however, the Company Released Claims shall not include any Claims arising from any breach by Buyer or Merger Sub of its obligations under this Agreement.

6.3   Covenant Not To Sue.   Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim.   The Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither the Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Buyer Released Party in respect of any Company Released Claim.

6.4   Waiver.   The Parties acknowledge that (a) Section 1542 of the California Civil Code provides, and (b) certain other states have provisions substantially as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist.   Nonetheless, each Party agrees that the waiver of such provisions is a material portion of the releases intended by this Agreement, and each Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have

LEECO0002044

under Section 1542 of the California Civil Code and any similar such provisions of any jurisdiction. In connection with such waiver and relinquishment, the Parties hereby acknowledge that they or their attorneys may hereafter discover claims or facts in addition to, or different from, those which he now knows or believes to exist, but that they expressly agree to fully, finally and forever settle and release any and all Claims, known or unknown, suspected or unsuspected, which exist or may exist on their behalf against the Company Released Parties and the Buyer Released Parties at the time of execution of this Agreement.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE MATTERS RELEASED HEREIN. NEVERTHELESS, IT IS THE INTENTION OF EACH PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY EXIST, OR HERETOFORE HAVE EXISTED BETWEEN THEM. IN FURTHERANCE OF SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS, NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

7. <u>Representations and Warranties</u>. Each Party represents and warrants and agrees as follows:

7.1 Such Party has all requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement (including, without limitation, the releases set forth herein) have, to the extent required, been duly and validly authorized by all corporate proceedings of such Party.

7.2 No authorization, approval or other action, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and/or performance of this Agreement by such Party.

7.3 Such Party or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents. In executing this Agreement, such Party, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

7.4 Such Party has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

7.5 Such Party has received independent legal advice with respect to the matters set forth in this Agreement, the Claims released in <u>Sections 1.1</u> and <u>6</u> hereof and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

7.6 Such Party does not rely upon any statement, representation or promise of another Party (or of any officer, agent, employee, representative, or attorney for another Party),

LEECO0002045

in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

7.7     Such Party knows of no other Person that may claim an interest in any of the Claims disposed of by such Party and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

7.8     Such Party has made such investigation of the facts pertaining to this settlement and Sections 1.1 and 6 hereof, and of all the matters pertaining thereto, as it deemed necessary.

7.9     Such Party will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.     Indemnification.  The agreements contained in Sections 1.1 and 6 hereof may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.     Miscellaneous.

9.1     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.  This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.

9.2     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.  Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties.  The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 hereof, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 hereof.

9.4     Governing Law.  This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5     Notices.  All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

If to Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618
Attention:  Kurtis J. Binder and Jerry C. Huang
Email:  kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email:  scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention:  Charles Hsieh
Email:  charles.hsieh@le.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention:  Michael V. Gisser and Michael J. Mies
Email:  michael.gisser@skadden.com and michael.mies@skadden.com

Any Party may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other Party notice in the manner herein set forth.

      9.6    <u>Consent to Jurisdiction</u>.    Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court. Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party irrevocably consents to service of process in the manner provided for notices in <u>Section 9.5</u> hereof. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by law.

      9.7    <u>Severability of Provisions</u>.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

      9.8    <u>Specific Performance</u>.    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the Parties in accordance with their specific terms. It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement. Any such injunction(s) or action seeking specific performance shall be subject to <u>Section 9.6</u> hereof.

[*signature page follows*]

LEECO0002049

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____

Name: _____

Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____

Name: _____

Title: _____

COMPANY

VIZIO, INC.

By: _____

Name: _____

Title: _____

US-DOCS\83351417.10

Exhibit A

## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
## FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

April [  ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

1.      The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$40,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$40,000,000.00

2.      No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____


LEECO V LTD.

By: _____
Name: _____
Title: _____

LEECO0002052

Exhibit B

**JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS**

[ ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

3.      The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$10,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$10,000,000.00

4.      No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____

Name: _____

Title: _____

LEECO V LTD.

By: _____

Name: _____

Title: _____

LEECO0002054

LEECO0002055

EXHIBIT J

Message
_____

| | |
|---|---|
| **From:** | Ben Wong [Ben.Wong@vizio.com] |
| **Sent:** | 3/28/2017 6:18:25 PM |
| **To:** | Winston.CHENG（郑孝明） [/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Winston.CHENG768]; Richard [/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Richardeb6] |
| **CC:** | YT Jia(贾跃亭) [/o=LETV/ou=LETV/cn=RECIPIENTS/cn=LETVJIA]; William Wang [William.Wang@vizio.com]; Kurtis Binder [Kurtis.Binder@vizio.com]; Matt Mcrae [Matt.McRae@vizio.com] |
| **Subject:** | Re: 答复: our discussion; thanks!! |

Good morning Winston,

Thank you so much for the midnight con call! Here is the recap (which I'd reiterate the same position as communicated in previous emails and incorporating the steps **in red/bold**):

- VIZIO is requiring that LeEco pay the sum of $100 million to VIZIO through two installments.
- The first installment represents the release of $50 million from escrow immediately upon the execution of the release and termination agreement. This installment will be consideration paid for both parties agreeing to a (i) mutual release and covenant not to sue, (ii) termination of the merger agreement effective immediately, (iv) a mutual agreement to execute a commercial arrangement between VIZIO and LeEco in US, and (iii) joint approval on announcements or public communication regarding the termination of the transaction.
    - **LeEco shall direct the Escrow Agent to pay to VIZIO on _____;**
    - **VIZIO shall make the LeEco Le App available on its compatible VIA-enabled televisions in North America for a period up to three years as of the Effective Date subject to customary engineering and certification processes;**
- The second installment payment of $50 million (in US$ equivalent) will be used to fund a commercial / strategic relationship between VIZIO and LeShi/LeEco for expansion efforts in China. The proposed commercial relationship would provide for (i) VIZIO granting LeEco right to sell VIZIO televisions in China subject to our mutual consent to branding and distribution; (ii) VIZIO preloading the Le contents on VIZIO televisions and displays sold in China. (If I am not mistaken, YT suggested to William he'd

LEECO0000830

need another "low spec" brand to expand in China TV market). (iii) Vizio and LeShi/LeEco will form a joint venture in China;

- **LeEco shall contribute, cash denominated in *renminbi*, or other assets with a fair market value equal to US$50,000,000, as a capital contribution to a newly formed joint venture (the "China JV") between Vizio and LeEco;**
- **China JV will be owned and controlled 50% by VIZIO and 50% by LeEco;**
- **Vizio and LeEco will negotiate in good faith and execute one or more agreements with the China JV to document the commercial arrangements within 45 days of the effective date;**
- **China JV will promote/market Vizio branded devices (TVs, Sound Bars, etc.) through LeEco's current distributing/omni channels in China;**

- **If there was no agreement reached within 45 days, LeEco will pay Vizio in renminbi or other assets with a fair market value equal to US$50,000,000 within 90 days of the effective data;** (Winston, I added it in here; and I sure hope we don't have to "call it"; we should be able to reach an agreement with you within 45 days given our well-earned integrity/credibility;)

Winston, as said, we'd want to reach an agreement with you this week and maintain the "future collaborating potentials" between the YT and William. Looking forward to talking to you tonight. Thanks.

Ben

---

**From:** Ben Wong <Ben.Wong@vizio.com>
**Date:** Monday, March 27, 2017 at 6:15 PM
**To:** Richard Ren 任宏亮 <richard@le.com>
**Cc:** "YT Jia(贾跃亭)" <letvjia@le.com>, William Off Wang <William.Wang@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>, Matt McRae <Matt.McRae@vizio.com>, "Winston.CHENG（郑孝明）" <winston.cheng@le.com>, 王佳伟1 <jerry.wang@le.com>, Charles Hsieh <charles.hsieh@le.com>
**Subject:** Re: 答复: our discussion; thanks!!

Noted, thanks Richard. There were countless communications between the teams in relation to funding sources since the July, 2016 DA signing. Based on our

LEECO0000831

understanding of the collaborative intentions of both YT and William, it'd be the last debate we'd have, which I think we'd both try to avoid, why the deal didn't fall through.

Richard, I'd like to reiterate that our position would be the same as depicted in my last email to you:

- VIZIO is requiring that LeEco pay the sum of $100 million to VIZIO through two installments.
- The first installment represents the release of $50 million from escrow immediately upon the execution of the release and termination agreement. This installment will be consideration paid for both parties agreeing to a (i) mutual release and covenant not to sue, (ii) termination of the merger agreement effective immediately, **(iv) a mutual agreement to execute a commercial arrangement between VIZIO and LeEco in US, and** (iii) joint approval on announcements or public communication regarding the termination of the transaction.
- **The second installment payment of $50 million (in US$ equivalent) will be used to fund a commercial / strategic relationship between VIZIO and LeShi/LeEco for expansion efforts in China.** The proposed commercial relationship would provide for (i) VIZIO granting LeEco right to sell VIZIO televisions in China subject to our mutual consent to branding and distribution; (ii) VIZIO preloading the Le contents on VIZIO televisions and displays sold in China. (If I am not mistaken, YT suggested to William he'd need another "low spec" brand to expand in China TV market). (iii) Vizio and LeShi/LeEco will form a joint venture in China

In order to reach alignment, and confirm our understanding, please see comment below in **red**.

- LeEco will invest $50 million into a joint venture between LeEco and VIZIO.  This amount will come from the $50 million held in escrow currently. **(once Vizio receives the first US$50M, I'd assume we'd enter a commercial agreement in the States, please refer to** 2 **above, we'd communicate how we'd term it).**

- LeEco will assist in integrating VIZIO's televisions into the China market and LeEco's ecosystem generally **(this effort will be related to for second instalment of $50M in China, please refer to** 3 **above)**.
- The parties will mutually agree to terminate the merger agreement and agree to a release all claims and a covenant not to sue.

Please give me a ring if you needed further clarifications. Thanks.

Ben

---

**From:** Richard Ren 任宏亮 <richard@le.com>
**Date:** Sunday, March 26, 2017 at 8:11 PM
**To:** Ben Wong <Ben.Wong@vizio.com>
**Cc:** "YT Jia(贾跃亭)" <letvjia@le.com>, William Off Wang <William.Wang@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>, Matt McRae <Matt.McRae@vizio.com>, "Winston.CHENG（郑孝明）" <winston.cheng@le.com>, 王佳伟1 <jerry.wang@le.com>, Charles Hsieh <charles.hsieh@le.com>
**Subject:** 答复: our discussion; thanks!!

Hello Ben,

As we've mentioned previously and in our meeting with William, despite any rumors you may have heard to the contrary, funding sources for the acquisition have been and continue to remain available.  Additionally, with Rong Chuang China's 融创中国 RMB16.8Bn ($2.6bn) investment in LeShi, LeEco's interest in pursuing the complete acquisition of VIZIO remains extremely high.  However, given China's tightening regulatory policies regarding the transfer of funds offshore, completing the acquisition of VIZIO at the moment is not realistic.

As we wait for these regulatory policies to relax (which we believe will inevitably occur), we are interested in pursuing a strategic partnership with VIZIO in the meantime that we believe will benefit all parties greatly.  We propose the following next steps in building such partnership between LeEco and VIZIO:

1.  LeEco will invest $50 million into a joint venture between LeEco and VIZIO.  This amount will come from the $50 million held in escrow currently.
2.  LeEco will assist in integrating VIZIO's televisions into the China market and LeEco's ecosystem generally.
3.  The parties will mutually agree to terminate the merger agreement and agree to a release all claims and a covenant not to sue.

Please let us know your thoughts as we believe these terms align with the matters discussed between YT and William.

Thanks,
Richard

---

**发件人:** Ben Wong [mailto:Ben.Wong@vizio.com]
**发送时间:** 2017年3月23日 8:47
**收件人:** Richard <richard@le.com>
**抄送:** YT Jia(贾跃亭) <letvjia@le.com>; William Wang <William.Wang@vizio.com>; Kurtis Binder

<Kurtis.Binder@vizio.com>; Matt Mcrae <Matt.McRae@vizio.com>
主题: our discussion; thanks!!

Hello Richard,

Thank you for calling me this afternoon as I think we are both anxious to amicably address this matter between our two companies. In order to summarize our position consistent with the conversation that William held with YT on Sunday, March 19th, we believe that VIZIO is entitled to the full termination fee ("break fee") which is $100 million as stated in the Definitive Agreement. As William explained to YT, both ODMs and channel customers have been constantly voicing their worries/concerns over LeEco's financials, its US market strategies since July 6 deal announcement, which reflected in their subpar supports for Vizio in the past quarters.

Anyway, as I told you, William has instructed me/Vizio team to work with you/LeEco to keep the relationship going (he's pretty sure YT would want the same too). The terms of our proposal are summarized as follows:

- VIZIO is requiring that LeEco pay the sum of $100 million to VIZIO through two installments.
- The first installment represents the release of $50 million from escrow immediately upon the execution of the release and termination agreement. This installment will be consideration paid for both parties agreeing to a (i) mutual release and covenant not to sue, (ii) termination of the merger agreement effective immediately, (iv) a mutual agreement to execute a commercial arrangement between VIZIO and LeEco in US, and (iii) joint approval on announcements or public communication regarding the termination of the transaction.
- The second installment payment of $50 million (in US$ equivalent) will be used to fund a commercial / strategic relationship between VIZIO and LeShi/LeEco for expansion efforts in China. The proposed commercial relationship would provide for (i) VIZIO granting LeEco right to sell VIZIO televisions in China subject to our mutual consent to branding and distribution; (ii) VIZIO preloading the Le contents on VIZIO televisions and displays sold in China. (If I am not mistaken, YT suggested to William he'd need another "low spec" brand to expand in China TV market). (iii) Vizio and LeShi/LeEco will form a joint venture in China.

We believe these terms are consistent with the collaborating spirit between William and YT (I understand you'd need to clarify the 2nd US$50M which you weren't present). We have already started drafting the documents with our legal counsel. Once we receive your feedbacks that these terms are acceptable to YT, we can finalize everything as soon as possible.

Please let me know when you are prepared to meet or discuss as I am available at your convenience. Thanks.

BTW, you probably met the copied individuals: Kurt is our CFO, Matt is our CTO; both of them have been involving the deal from the very beginning and they could work on the agreement (both financially and commercially) immediately. Thanks.

**BEN WONG**
VIZIO // PRESIDENT & COO
O 949.428.2543  C 714.336.8828
39 TESLA, IRVINE, CA 92618

Make Some Noise!
Earn Points. Win
Prizes.
VIZIOFanZone.com

# EXHIBIT K

| | |
|---|---|
| **From:** | Safari, Attashin (Assoc-LA-LT) |
| **Sent:** | Monday, August 13, 2018 11:44 PM |
| **To:** | David Tarlow; Robert Waxman; Jason Haas |
| **Cc:** | Srour, Alana C. (Assoc-LA-LT); Tyukody, Daniel J. (Shld-LA-LT); Fraser, Colin (Assoc-OC-LT); Cox, Johnice (Secy-LA-LT); Joyner, Jeff K. (Shld-LA-IP-Tech) |
| **Subject:** | RE: Vizio v. LeEco- Meet and Confer Follow Up |
| **Attachments:** | 8-13-2018 Ltr to Vizio re MC Discovery Issues.pdf |

Counsel:

Please see the attached letter.

**From:** David Tarlow [mailto:dtarlow@ecjlaw.com]
**Sent:** Monday, August 13, 2018 4:44 PM
**To:** Joyner, Jeff K. (Shld-LA-IP-Tech) <joynerj@gtlaw.com>
**Cc:** Robert Waxman <rwaxman@ecjlaw.com>; Srour, Alana C. (Assoc-LA-LT) <sroura@gtlaw.com>; Tyukody, Daniel J. (Shld-LA-LT) <tyukodyd@gtlaw.com>; Jason Haas <jhaas@ecjlaw.com>; Safari, Attashin (Assoc-LA-LT) <safaria@gtlaw.com>; Fraser, Colin (Assoc-OC-LT) <frasercw@gtlaw.com>; Cox, Johnice (Secy-LA-LT) <coxj@gtlaw.com>
**Subject:** RE: Vizio v. LeEco- Meet and Confer Follow Up

We look forward to your letter and 3 dates.

**David N. Tarlow, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor   Beverly Hills, CA 90212-2974
(310) 281-6372 *(t)*   (310) 859-2325 *(f)*
www.ecjlaw.com ǀ dtarlow@ecjlaw.com ǀ About me

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

**From:** joynerj@gtlaw.com [mailto:joynerj@gtlaw.com]
**Sent:** Monday, August 13, 2018 4:43 PM
**To:** David Tarlow
**Cc:** Robert Waxman; sroura@gtlaw.com; tyukodyd@gtlaw.com; Jason Haas; safaria@gtlaw.com; frasercw@gtlaw.com; coxj@gtlaw.com
**Subject:** RE: Vizio v. LeEco- Meet and Confer Follow Up

Hi Dan,

During the meet-and-confer on August 7, 2018, Vizio and LeEco agreed that LeEco would send a letter to you and your colleague Bob Waxman **today, August 13, 2018** setting out why Vizio's requests related to finances and alter ego are improper.

1

With respect to the time frame covered by such requests, Bob stated during the April 7th meeting that Vizio relies on the two cases citied in Vizio's portion of its recent joint stipulation. In your email of today, almost a week after the meet-and-confer, you provided us with two additional cases. After we have reviewed the new cases, we will include a discussion regarding the same in the letter we had been finalizing and send it to you and Bob tonight.

In your email of today you suggest that any issues not resolved after Vizio has considered our letter will be discussed by the parties with the Magistrate Judge tomorrow. To clarify, if a dispute remains tomorrow, the parties are required to "provide at least three mutually agreeable dates and times for a telephonic pre-discovery motion conference" with the Magistrate Judge. So, there would not be a discussion with the Magistrate Judge tomorrow but, instead, the parties would jointly submit tomorrow three dates on which they are available for a telephonic conference.

Best, Jeff

**Jeff Joyner** | v-Card + Bio
**Greenberg Traurig LLP | T:** 310.586.3877 | **F:** 310.586.0577 | joynerj@gtlaw.com | **WeChat ID:** jjoyner | www.gtlaw.com

**From:** David Tarlow [mailto:dtarlow@ecjlaw.com]
**Sent:** Monday, August 13, 2018 3:11 PM
**To:** Joyner, Jeff K. (Shld-LA-IP-Tech) <joynerj@gtlaw.com>
**Cc:** Robert Waxman <rwaxman@ecjlaw.com>; Srour, Alana C. (Assoc-LA-LT) <sroura@gtlaw.com>; Tyukody, Daniel J. (Shld-LA-LT) <tyukodyd@gtlaw.com>; Jason Haas <jhaas@ecjlaw.com>; Safari, Attashin (Assoc-LA-LT) <safaria@gtlaw.com>
**Subject:** Vizio v. LeEco- Meet and Confer Follow Up

Mr. Joyner:

At our meet and confer last week, you and your team had promised to provide us with adequate authority to support of your position that the 5 year look back period for which Plaintiff requested alter ego discovery in its RFPs was somehow overbroad. The purpose of providing us with such authority was an attempt to limit the issues which are to be discussed with the Magistrate Judge tomorrow. Needless to say, it is now nearly a week later and we have not received any authority from you to support your assertion that a 5 year look back period is overbroad. In fact, the case law which I have found indicates that it is entirely appropriate to look back to the formation of the company when determining alter ego liability. See *Stowers v. Wells Fargo Bank, N.A.*, 2014 WL 1245070 * 7 (N.D. Cal.). ("Generally, the corporate veil will only be pierced when the plaintiff can show that the company was intentionally set up to avoid liability or was intentionally undercapitalized when formed".) *See Sea-Land, Inc. v. Petter Source*, 993 F.2d 1309, 1311-12 (7th Cir.). If you contend that we are wrong on the law, you need to let us know at once.

Further, I am going to arrange for a conference call with the Court. Please let me know what time tomorrow one of you can be available to be on the call with the Court so we can dispose of these issues.

Thanks for your immediate attention to this email.

David

**David N. Tarlow, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor   Beverly Hills, CA 90212-2974
(310) 281-6372 *(t)*   (310) 859-2325 *(f)*
www.ecjlaw.com | dtarlow@ecjlaw.com | About me

2

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information.



Jeff Joyner
Tel 310.586.3877
Fax 310.586.7800
joynerj@gtlaw.com

August 13, 2018

**VIA EMAIL**

**Ervin Cohen & Jessup LLP**
Robert Waxman, Esq.
David N. Tarlow, Esq.
9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90210-2974

Re:   *Vizio, Inc. v. LeEco V. Ltd., Case No.: 17-CV-1175*

Dear Messrs. Waxman and Tarlow:

This letter follows our meeting on August 7, 2018 (the "Meeting") to further meet and confer regarding the First Set of Requests for Production of Documents (the "Requests") that Plaintiff Vizio, Inc. ("Vizio") has propounded on LeEco V. Ltd. ("LeEco") and LeLe Holding, Ltd. ("LeLe") (collectively "Responding Defendants") in the above-referenced matter.  During our Meeting and pursuant to the Magistrate's Order dated July 30, 2018, Vizio agreed that Responding Defendants would send a letter to you today explaining why the Requests for documents related to alter ego allegations are improper.

In this regard, the following memorializes Responding Defendants' positions that we asserted at the Meeting that Vizio is not entitled to seek certain discovery because the Limited Guarantee entered into between Vizio and Le Technology, Inc. prevents Vizio from doing so.  This letter further sets out that, even if Vizio was not precluded from seeking such discovery (which it is), the Requests at issue improperly seek documents (1) of third-parties, (2) not in Responding Defendants' possession, custody or control, (3) in violation of privacy laws, and (4) outside the time frame that is appropriate for such requests.  Finally, this letter sets out the deficiencies in Vizio's responses to LeEco's requests for admissions ("Vizio's RFA Responses") and requests for production of documents (Vizio's RFP Responses).

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN¬
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY⁺
MIAMI
MILAN**
NEW JERSEY
NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME**
SACRAMENTO
SAN FRANCISCO
SEOUL
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV^
TOKYO¤
WARSAW~
WASHINGTON, D.C.
WESTCHESTER COUNTY
WEST PALM BEACH

¬ OPERATES AS
  GREENBERG TRAURIG GERMANY, LLP
* OPERATES AS A
  SEPARATE UK REGISTERED LEGAL ENTITY
⁺ OPERATES AS
  GREENBERG TRAURIG, S.C.
^ STRATEGIC ALLIANCE
** OPERATES AS
  GREENBERG TRAURIG LLP
  FOREIGN LEGAL CONSULTANT OFFICE
^ A BRANCH OF
  GREENBERG TRAURIG, P.A.
  FLORIDA, USA
¤ OPERATES AS
  GT TOKYO HORITSU JIMUSHO
~ OPERATES AS
  GREENBERG TRAURIG GRZESIAK SP.K.

*LA 133774881v7*

August 13, 2018
Page 2

### A.  The Limited Guarantee Precludes Vizio From Seeking Alter Ego Discovery Concerning Non-Recourse Parties.

You stated at the Meeting that Vizio's discovery related to alter ego is limited to Vizio's claim for breach of the Framework Agreement.[1]  However, Vizio's alter ego discovery in reality seeks to reap all of the benefits of the Merger Agreement[2], without accepting any of its burdens. Requests Nos. 36 through 62 (the "Alter Ego Requests") pertain to the claims and legal theories that Vizio expressly agreed to forego when executing the Limited Guarantee.  Thus, insofar as the Requests seek discovery from the Non-Recourse Parties under the Limited Guarantee, the Alter Ego Requests are precluded.

Pursuant to the Limited Guarantee, which was integral to the Merger Agreement, Vizio agreed not to pursue LeLe, Yueting Jia ("Mr. Jia"), LeEco Global Group Ltd. ("Global Group"), and their "Affiliates" for the $50,000,000 Buyer Termination Fee Remainder.  (*See* Exhibit H to the Merger Agreement).  Both Mr. Jia and LeLe are Non-Recourse Parties, as defined in Section 13 of the Limited Guarantee, under which Vizio obligated itself that "[n]otwithstanding anything that may be expressed or implied in this Guarantee *or any document or instrument delivered concurrently herewith* [*i.e.*, the Merger Agreement], by its acceptance of the benefits of this Guarantee, the Company acknowledges and agrees that it has no right of recovery against [a broad range of Non-Recourse Parties, including "Affiliates"] *through the Buyer or otherwise*, whether *by or through attempted piercing of the corporate veil."*  The Limited Guarantee continues, "[t]he Company . . . acknowledges and agrees that recourse against the Guarantor . . . shall be the sole and exclusive remedy of the Company . . . in respect of *any liabilities* or obligations arising under, or in connection with, the *Merger Agreement* ... including by *piercing of the corporate veil by or through a claim by or on behalf of the Buyer.*"

So clearly, as to anything connected with the Merger Agreement, neither Mr. Jia nor LeLe are proper parties.  Vizio acknowledged this by naming only LeEco in its fifth cause of action for the breach of the Merger Agreement.  You further committed to this position by your statements, at our meet and confer on August 7, 2018, that Vizio was only pursuing alter ego liability for breach of the Framework Agreement, not the Merger Agreement.  Yet, the damages that Vizio seeks—supposedly pursuant to the Framework Agreement—consist of the damages available under the Merger Agreement.  *See* SAC,¶ 64 (alleging "reliance and/or lost opportunity damages in the sum of $10,000,000 (i.e., the remaining of the Buyer Termination Fee Deposit and the $50,000,000 Buyer Termination Fee Remainder)" in Vizio's claim for breach of the Framework Agreement); *see also* ¶¶ 77 (fraud underlying the Framework Agreement), 93 (negligent misrepresentation under the Framework Agreement), 106 (promissory estoppel). Vizio's theory is that it is supposedly allowed to pursue its contractual remedies under the

---

[1] The "Framework Agreement" refers to the Framework, Termination and Mutual General Release Agreement entered into as of April 5, 2015 among LeEco and Vizio.

[2] The "Merger Agreement" refers to the Agreement and Plan of Merger dated July 6, 2016 between LeEco and Vizio.

*LA 133774881v7*

August 13, 2018
Page 3

Merger Agreement, through the Framework Agreement, without having to be bound by the other
terms in the Merger Agreement, namely the limitations on who it can sue pursuant to the Limited
Guarantee. This cannot be, and is not, the law.

Vizio cannot argue that it is entitled to the contractual benefits of the Merger Agreement,
without also acknowledging the Merger Agreement's contractual proscription against bringing
claims (and discovery related to those claims) against Mr. Jia, LeLe, and others defined as Non-
Recourse Parties in the Limited Guarantee.  Put another way, Vizio may not do indirectly what it
is clearly proscribed from doing directly.  Thus, the Alter Ego Requests are improper insofar as
they seek discovery related to Non-Recourse Parties that Vizio released under the Limited
Guarantee.

     **B.**     **Vizio Cannot Demand Discovery Concerning Third-Parties That Are Not
Alleged Alter Egos Of Responding Defendants.**

The Alter Ego Requests are irrelevant, overbroad, unduly burdensome, and in violation of
Vizio's contractual obligations insofar as they demand discovery relating to "Affiliates" against
which Vizio makes no alter ego allegations in the operative Second Amended Complaint
("SAC") and agreed not to sue in the Limited Guarantee. *See* FAC, ¶¶ 56-57.  This defect affects
Requests Nos. 36-39, 43-49, 51-54, 58 & 60-65.

The Alter Ego Requests broadly define the term "Affiliates" to mean any entity in which
the Person referenced in the Request owns at least a 20% interest.  This definition not only
sweeps a vast number of entities with no connection to this case into Plaintiff's discovery, but
violates Vizio's obligation not to sue Non-Recourse Parties.  By way of example, if this
definition were applied, LeLe and LeEco would be required to produce documents of Non-
Recourse Parties related to *all contracts of any kind* (RFP 43), *all financial statements* (RFP 51),
*all assets* in excess of $100,000 (RFP 53), *all liabilities* in excess of $100,000 (RFP 54), *any
monies transferred* (RFP 47), *all loan agreements* (RFP 49), all documents related to *the
capitalization* of any of these companies (RFP 50), *all corporate minutes*, board agendas and
resolutions (RFPs 39-42), and the identities and *contact information* of *all employees* (RFP 45-
46) for their Affiliates.  Given Vizio's agreement that it is limiting its alter ego allegations to the
Framework Agreement, this discovery represents "not merely a 'fishing expedition,' but . . . an
effort to 'drain the pond and collect the fish from the bottom.'" *Amcast Indus. Corp. v. Detrex
Corp.*, 138 F.R.D. 115, 121 (N.D. Ind. 1991) (quoting *In re IBM Peripheral EDP Devices Anti–
Trust Litigation,* 77 F.R.D. 39, 41–42 (N.D. Cal. 1977)).

     **C.**     **The Requests Improperly Demand That Responding Defendants Produce
Documents Outside Their Possession, Custody, and Control.**

The Alter Ego Requests and Requests Nos. 7, 9-10, 12, 14-15, 20, 29, and 31-33 are
improper and exceed the scope of the Federal Rules of Civil Procedure insofar as they demand
documents outside LeLe's and LeEco's possession, custody, or control.

August 13, 2018
Page 4

Under the Federal Rules of Civil Procedure, Rule 34, documents are within a discovery target's control if the target has "the legal right to obtain the documents on demand." *In re Citric Acid Litigation*, 191 F.3d 1090, 1107 (9th Cir. 1999) ("It is not enough that a party may have a practical ability to obtain the requested documents from an affiliated organization, because the other entity could legally—and without breaching any contract—continue to refuse to turn over such documents."). "A party seeking production of documents bears the burden of establishing the opposing party's control over those documents." *Micron Tech., Inc. v. Tessera, Inc.*, 2006 WL 1646133, *1 (N.D. Cal. Jun. 4, 2006).

Affiliated corporate entities—including subsidiaries, sister companies, and parent companies—do not have control over each other's documents absent a contractual or statutory right. *See e.g., Ehrlich v. BMW of North America, LLC*, 2011 WL 3489105, *1 (C.D. Cal. May 2, 2011) ("Plaintiff has not established that Defendant BMW NA has legal control over documents in BMW AG's files. BMW NA is owned by a company that is owned by BMW AG. Nothing about this relationship suggests that BMW NA has the power to order BMW AG to turn over documents to BMW NA. Nor has Plaintiff presented any evidence that BMW AG is under a contractual obligation to turn over documents requested by BMW NA"); *Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften v. MDL Info. Sys., Inc.*, 2006 WL 3742244, at *3 (N.D. Cal. Dec. 19, 2006) (denying motion to compel documents in sister corporation's possession where plaintiff showed the entities were "closely affiliated; that employees of one report to the other, that the companies are involved in each other's budget decisions, and do in fact share a great deal of information" because "[t]hese facts, however, even if wholly true, are insufficient to establish that MDL Inc. has the legal right to obtain documents in possession of MDL GmbH on demand."); *See Micron Tech., Inc.*, 2006 WL 1646133 at *2 (denying motion to compel party SPIL to produce documents under the control of non-party SUI even though "SUI is 100% owned [indirectly] by SPIL, ... SUI would in the ordinary course of business have access to the documents," "SPIL created SUI to engage as SPIL's sales agent in North America," and "SUI and SPIL have overlapping management teams.").

Here, Vizio's definition of "Affiliates" includes numerous parent, sister, and subsidiary entities from which LeLe and LeEco do not have the legal right to obtain documents on demand. Additionally, Vizio has failed to meet its burden of showing otherwise. This renders the Alter Ego Requests seeking Affiliates' documents improper under Rule 34.

### D.   The Alter Ego Requests Must Be Narrowed Insofar As They Seek Documents To Support Vizio's Alter Ego Allegations Reaching Back To 2012.

In light of Vizio's position that the alter ego claims are limited to the Framework Agreement, the Alter Ego Requests are irrelevant and overbroad as to time insofar as they demand documents created prior to Vizio and LeEco entering into the Framework Agreement. If Vizio's position is accepted, the discovery timeframe would begin no earlier than November of 2016 when the parties began negotiating the Framework Agreement.

*LA 133774881v7*

August 13, 2018
Page 5

Courts routinely limit discovery related to alter ego theories to the time frame that is directly relevant to the claim that includes alter ego allegations. *See e.g. Del Campo v. Am. Corrective Counseling Servs, Inc.*, 2008 WL 4858502, *1-2 (N.D. Cal. Nov. 10, 2008) (reducing the scope of plaintiff's discovery to 2001 to 2004, rather than the demanded time frame of 1997 to 2008, because the reduced scope represented the period that defendants' alter ego corporations allegedly were operating a check diversion program in violation of the FDCPA); *Benchmark Design, Inc. v. BDC, Inc.*, No. CIV. 88-1007-FR, 1989 WL 81618, at *2 (D. Or. July 5, 1989) (limiting discovery of defendants' potentially co-owned assets to the four-year period relevant to plaintiff's alter ego allegations).

The cases you have provided to us in your email of this afternoon and Vizio's portion of a recent joint stipulation are inapposite because they do not concern the permissible scope of alter ego discovery. *See U.S. v. Jenkins*, 785 F.2d 1387, 1396-97 (9th Cir. 1986) (ruling that evidence of criminal defendant's prior bad acts were probative "other-acts" evidence under FRE 404(b) in upholding fraud conviction involving no alter ego allegations); *U.S. v. Ruiz*, 665 Fed. Appx. 607, 610 (9th Cir. 2016) (ruling that trial court's admission of evidence of criminal defendant's prior bad acts was not an abuse of discretion); *Stowers v. Wells Fargo Bank, N.A.*, 2014 WL 1245070, *8 (N.D. Cal. Mar. 25, 2014) (deciding the sufficiency of alter ego allegations on a motion to dismiss); *Sea-Land, Inc. v. Petter Source,* 993 F.2d 1309, 1311-12 (7th Cir. 1993) (applying the Seventh Circuit's veil piercing test to determine sufficiency of evidence after trial).

Here, the Alter Ego Requests demand information beginning in 2012 even though the parties did not enter into the Framework Agreement until 2017.  Accordingly, Vizio must narrowly tailor its discovery to the specific time period when the parties negotiated and entered the Framework Agreement.

### E.     The Alter Ego Requests Improperly Demand Documents Protected Under Privacy Laws

The Alter Ego Requests demand numerous categories of documents that are shielded from discovery because disclosure would invade privileges protected by the right to privacy, the tax return privilege, and Responding Defendants' and Affiliates' third-party employees' rights to maintain their privacy.

In this diversity action, state law governs privilege claims. Fed. R. Evid. 501.  In California, the right to privacy is an "inalienable right" secured by Article I, Section I of the California Constitution.  *Hooser v. Superior Court*, 84 Cal. App. 4th 997, 1004 (2000).  It protects against the unwarranted, compelled disclosure of private or sensitive information regarding financial affairs and employment records.  *Valley Bank of Nevada v. Superior Court,* 15 Cal.3d 652, 656 (1975) (holding that a person has a reasonable expectation of privacy in financial records); *Board of Trustees v. Leach,* 258 Cal. App. 2d 281 (1968) ("[I]t is common knowledge that [employee personnel files] are among the most confidential and sensitive records

*LA 133774881v7*

August 13, 2018
Page 6

kept by a private or public employer, and their use remains effective only so long as the confidence of the records, and the confidences of those who contribute to those records, are maintained."). Factors to consider in balancing the right of a civil litigant to discover relevant facts with a party's right to maintain reasonable privacy in sensitive affairs include "the purpose of the information sought, the effect that disclosure will have on the affected persons and parties, the nature of the objections urged by the party resisting disclosure and availability of alternative, less intrusive means for obtaining the requested information." *Hooser*, 84 Cal. App. 4th at 1004.

In addition, the California Supreme Court has held that Revenue and Taxation Code section 19282, which prohibits disclosure of tax returns, implicitly creates a privilege against the disclosure of income tax returns.  *Webb v. Standard Oil Co.*, 49 Cal. 2d 509, 513 (1957).  This privilege against forced disclosure of tax returns has been reaffirmed in a variety of situations. *See Sav-On Drugs v. Superior Court*, 15 Cal. 3d 1, 3, 6-7 (1975) (sales tax returns); *Crest Catering Co. v. Superior Court*, 62 Cal. 2d 274 (1965) (employment tax returns); *Rifkind v. Superior Court*, 123 Cal. App. 3d 1045, 1048-1049 (corporate income tax returns); *Brown v. Superior Court*, 71 Cal. App. 3d 141 (1977) (W-2 forms); *Fortunato v. Sup. Court*, 114 Cal. App. 4th 475, 482 (2003) (income tax returns).  Further, Vizio raised the tax return privilege in objecting to Responding Defendants' discovery.

Here, the Alter Ego Requests demand that LeLe and LeEco produce privileged information and Vizio has not shown that the relevant factors favor production.  This is particularly true for the Non-Recourse Parties which Vizio cannot pursue claims against arising out of the Merger Agreement.

### F.    Deficiencies In Vizio's Responses To LeEco's First Set of Requests For Admissions And Requests For Production.

We discussed during the Meeting that Vizio has not produced a single document in response to LeEco's RFPs, and the following deficiencies in Vizio's RFA and RFP Responses.

**RFA No. 1**: RFA No. 1 states, "Admit that You drafted Section 1.1 of the Framework Agreement." Vizio avoids answering this question by stating that, "the Framework Agreement and the terms therein were drafted by Vizio and one or more of the Defendants." That is in no way responsive to the question presented. RFA No. 1 specifically asks whether Section 1.1 was drafted by Vizio, which Defendants believe the evidence will inevitably establish. There is a presumption under California law that when the language of a contract is ambiguous, the ambiguity is interpreted against the drafter. *S. California Reg'l Rail Auth. v. Hyundai Rotem Co.*, No. LACV1608042JAKJEMX, 2017 WL 2989178, at *8 (C.D. Cal. July 13, 2017). That fundamental principal is what RFA No. 1 is directed towards, and is precisely what Vizio has blatantly refused to answer. Vizio must amend its response to either admit or deny that it drafted Section 1.1 of the Framework Agreement.

GREENBERG TRAURIG, LLP ▪ Attorneys at Law ▪ www.gtlaw.com

August 13, 2018
Page 7

**RFA No. 3:** RFA No. 3 states, "Admit that, as of at least June 9, 2017 when You sent the Demand for Immediate Payment to LeEco Global Group, You no longer had any interest in entering into the China JV." There is a dispute between the parties as to whether each party exercised good faith in connection with the obligation under Section 3.1 of the Framework Agreement that the Parties negotiate in good faith and use reasonable efforts to form a joint venture in China. Vizio's "response" to this RFA is specifically designed *not* to answer the question presented, and instead, merely consists of arguments. It is well established that, "[i]n responding to a request for admission, a party must either admit the matter, specifically deny it, or state in detail why the answering party cannot truthfully admit or deny it." *Bretana v. Int'l Collection Corp.*, No. C07-05934 JF (HRL), 2008 WL 4334710, at *2 (N.D. Cal. Sept. 22, 2008). Accordingly, Vizio must amend its deficient response.

**RFP No. 10:** RFP No. 10 seeks "All Documents and Communications concerning the aftermath of the decision to terminate the Framework Agreement, including communications between and among Vizio's Board, its management, its shareholders, and the general public." Vizio has refused to produce any documents responsive to RFP No. 10. Discovering how Vizio was affected by the decision to terminate the Framework Agreement is directly relevant to the claims at issue in this litigation, including Defendants' defense to the alleged damages in this litigation. Accordingly, Vizio must produce documents responsive to RFP No. 10.

If Vizio disagrees with any of the Responding Defendants' positions regarding Vizio's Requests or LeEco's RFAs and RFPs, please let us know Vizio's position with respect to those issues that remain in dispute. If the parties are not able to resolve any such dispute by tomorrow, please provide us with three dates and times you are available so that we can coordinate our schedules and jointly submit three dates for a telephonic pre-discovery motion conference pursuant to the Magistrate Judge's Order dated July 30, 2018. We are available from August 15 to 21 and August 27 to 30.

Sincerely,

*/s/ Jeff Joyner*

Jeff Joyner

EXHIBIT L

| | |
|---|---|
| **From:** | Joe Dirkx <jdirkx@ecjlaw.com> |
| **Sent:** | Friday, August 24, 2018 2:27 PM |
| **To:** | Joyner, Jeff K. (Shld-LA-IP-Tech); Safari, Attashin (Assoc-LA-LT); Srour, Alana C. (Assoc-LA-LT); Tyukody, Daniel J. (Shld-LA-LT); Fraser, Colin (Assoc-OC-LT); Cox, Johnice (Secy-LA-LT) |
| **Cc:** | Robert Waxman; David Tarlow; Jason Haas; BJOHNSEN@SIDLEY.COM |
| **Subject:** | VIZIO, Inc. v. LeEco V. Ltd., et al [Case 8:17-cv-01175-DOC-JDE] |
| **Attachments:** | RMW Letter to Greenberg Traurig 08.24.2018.PDF |

Dear counsel,

Please see attached letter sent to y on behalf of Robert M. Waxman, Es                    q.

---

**Joe Dirkx**
**Legal Secretary**

Ervin Cohen & Jessup LLP

9401 Wilshire Boulevard, 9th Floor   Beverly Hills, CA 90212-2974
(310) 273-6333 x 662 *(t)*   (310) 859-2325 *(f)*
www.ecjlaw.com | jdirkx@ecjlaw.com

---

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

# ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
dtarlow@ecjlaw.com
PH: 310.281.6372
FX: 310.859.2325
File 14676.8

August 24, 2018

**VIA E-MAIL AND U.S. MAIL**

Jeff Joyner, Esq.
Greenberg Traurig
1840 Century Park East, Suite 1900
Los Angeles, California 90067

Re:   **VIZIO, Inc. v. LeEco V. Ltd., Case No.: 17-CV-1175**

Dear Mr. Joyner:

I am in receipt of your letter dated August 13, 2018 that you sent shortly before midnight to further meet and confer regarding your client's untenable position with respect to both LeEco V. Ltd.'s ("LeEco") and LeLe Holding Ltd.'s ("LeLe") responses to Plaintiff's Requests for Production of Documents (Set One).

## A.    The Limited Guaranty Does Not Preclude VIZIO From Seeking Alter Ego Discovery.

First, you make the spurious argument that the "Limited Guarantee Precludes Vizio From Seeking Alter Ego Discovery Concerning Non-Recourse Parties."  In support of your argument, you make the disingenuous statement that "[p]ursuant to the Limited Guarantee, which was integral to the Merger Agreement, Vizio agreed not to pursue LeLe, Yueting Jia, LeEco Global Group Ltd., and their Affiliates for the $50,000,000 Buyer Termination Fee Remainder."  Your statement is disingenuous because, among other things, VIZIO is *not* seeking to impose alter ego liability against LeLe, Yueting Jia ("Jia"), LeEco Global Group Ltd., and their "Affiliates" for the $50,000,000 Buyer Termination Fee Remainder *under or in connection with the Merger Agreement*.  Rather, VIZIO is pursuing LeLe, Jia, LeEco Global Group Ltd., and their "Affiliates" for alter ego liability in connection with the separate breach of the much-later Framework Agreement and the fraudulent conduct that gave rise to it.[1]  Pointedly, the Claim for Breach of the Merger Agreement is neither asserted against any alter egos, nor does it even incorporate

---

[1] It is undisputed that the Framework Agreement did not exist at the time Merger Agreement was negotiated.  Nor was it executed even close to that time.  Simply stated, the Framework Agreement was not even contemplated when the Merger Agreement was negotiated and signed.

Jeff Joyner, Esq.
August 24, 2018
Page 2

any alter ego allegations in the body of that cause of action.  (See Judge Carter's July 27, 2018 Order ("the Order"), Dkt 99, p. 4).

The fact that alter-ego liability has not been sought on the Claim for Breach of the Merger Agreement was not a coincidence.  That is because the so-called restrictive language in the Limited Guarantee is operative *only* with respect to "*liabilities or obligations arising under, or in connection with,* the Merger Agreement or the transactions *contemplated thereby.*"  (See, *e.g.,* Limited Guaranty ¶ 13).[2]  The Framework Agreement, which was not even on the radar screen when the Merger Agreement was negotiated and signed, is none of the above.  For the so-called restrictive language in the Limited Guarantee to go beyond what is written and encompass the much-later Framework Agreement, let alone the specific fraudulent conduct that gave rise to it, would be directly contrary to the public policy of California.  *Pergerine Pharmaceuticals, supra,* *15 ("The cases uniformly hold that limitation of liability clauses are ineffective with respect to claims for fraud and misrepresentation, regardless of whether the public interest is implicated.").  This rule applies "even where the clause amounts to a limitation on damages limitations as opposed to an outright exemption [because] 'contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated.'").  *Accord Health Net of California, Inc. v. Department of Health Services,* 113 Cal.App. 4th 224, 243, 247 (2003), *rev. den'd.*  ("It is now settled – and in full accord with the language of [Civil Code § 1668] – that notwithstanding its different treatment of ordinary negligence, under Section 1668, 'a party [cannot] contract away liability for his fraudulent or intentional acts...regardless of whether the public interest is affected.")  In fact, as Judge Carter explained at p. 19 of the Order:  "While '[a] breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by a breach...'a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to the contract.")

Second, you mischaracterize VIZIO's theory.  You describe this theory as being that "[VIZIO] is supposedly allowed to pursue its contractual remedies under the Merger Agreement, through the Framework Agreement…."  Wrong.  As the Order states on p. 15, "VIZIO alleges Defendants

---

[2] Interpreting the so-called restrictive language of the Limited Guarantee just as it is written - - to claims for breach made directly under, or in connection with the Merger Agreement itself, and the documents appended to it - - arguably comports with the public policy of California since "with respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy."  *Peregrine Pharmaceuticals, Inc. v. Clinical Supplies,* 2014 WL 3791567 * 8 (C.D. Cal.)  *See also, Cal. Civ. Code* § 1643, requiring that "a contract must receive such interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties."  That is so even though "contractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the drafting party."  (*Id.,* * 5).

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 3

made the $2BB Financial Wherewithal Representations" - *i.e.,* that LeLe Holding and Global
Group and various of their subsidiary or affiliated corporate entities, were financially healthy
and they had the financial wherewithal to complete a $2BB merger transaction with VIZIO - -
but that they "did not have the financial wherewithal to complete a $2BB merger with VIZIO"
and then later, made the repeated misrepresentations with respect to the Framework
Agreement that are identified on p. 16 of the Order to "induce VIZIO to jointly terminate the
Merger Agreement [and] induce it to enter the Framework Agreement, from which "it can be
inferred that the Framework Agreement was a subterfuge in order for Defendants to reduce
the $100MM liability from the termination of the Merger Agreement to the $40MM that was
disbursed to VIZIO". Specifically, the damages that VIZIO seeks are the "reliance and/or lost
opportunity charges in the sum of $60MM". (Order, p. 17). These damages result directly from
the breach of the Framework Agreement and the fraudulent conduct that gave rise to it; *i.e.,*
are not the pursuit of contractual remedies under the Merger Agreement through the
Framework Agreement.

Third, your clients' objections to the subject discovery make no mention of the wild notion that
some sort of bar under the earlier Limited Guarantee now exists as to alter-ego liability under
the much-later Framework Agreement and the specific fraudulent conduct that gave rise to it.
Instead, they simply repeat the mantra that Judge Carter has already rejected, *i.e.,* that "the
parties agreed to the Framework Agreement…which LeEco alleges had the effect of terminating
the Merger Agreement…." (Order, at 4). *See also,* your clients' Responses to each RFP
requesting documents related to alter-ego liability, Numbers 35 – 65. In fact, your clients took
this position under oath. (Dkt 26-1, Hsieh Dec., ¶ 14, lns 6 – 10). Needless to say, that position
is diametrically the opposite of your clients' new "claim" that the Limited Guarantee creates
some sort of bar to alter ego liability with respect to the much-later Framework Agreement and
the specific fraudulent conduct that gave rise to it. Stated differently, if the Merger was
effectively dead due to the Framework Agreement, as your clients' claimed, then the same
would necessarily be true for the Limited Guarantee. Your clients cannot have it both ways. In
any event, their failure to raise this "new" objection in a timely fashion is a waiver of that
specious claim. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir.
1992) ("It is well settled that failure to object to discovery requests within the time required
constitutes a waiver of any objection.")

Finally, the Limited Guarantee was between VIZIO and Le Technology, Inc. The latter is not a
party to this lawsuit and your clients have no standing to raise the Limited Guarantee as some
sort of bar to alter ego liability as to the much-later Framework Agreement and the specific
fraudulent conduct that gave rise to it. This is particularly true here, where the Order
specifically makes alter ego liability a prime subject of the litigation (*See* pp. 28-30, 33 & 35). As
Judge Carter explained "[the facts] show a commingling of funds and a disregard of corporate

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 4

formalities between the two companies.  Throughout the parent and subsidiary companies,
there is a connection and intermingling between the employees, assets and office locations.
Thus, VIZIO sufficiently establishes facts in support of the proposition that LeLe Holdings and
LeEco are interconnected in ownership (through Jia) and through a unity of interest (through
similarities in offices, employees, and intermingling of assets)."  Indeed, that "because Lele
Holding and LeEco are intertwined in ownership and by assets, it would be unjust to allow the
parent company to escape liability when it was a player in enabling the alleged fraud of the
subsidiary [such that] VIZIO has…made a plausible case for finding that Lele Holding is the alter-
ego of LeEco." (Order, pp. 29-30).  Pointedly, and "perhaps more significantly, the actions of
LeEco and Jia, who plausibly are alter egos of Lele Holding, warrant sufficient activity in
California to extend specific jurisdiction." (*Id.*, at 35).

In short, alter ego liability and discovery on that subject are part and parcel of this lawsuit.  The
fact that Judge Carter was well aware of the Limited Guaranty when the Order was made (p.
29), only serves to compel this conclusion.

**B.     VIZIO Is Entitled to The Production Of All Of The Relevant Documents.**

Your letter claims that the alter ego requests are irrelevant, overbroad, unduly burdensome
and in violation of VIZIO's contractual obligation, which I take to mean the Limited Guarantee.
This claim is specious.

First, for the reasons stated above, your reliance on the Limited Guarantee is misplaced.  I will
not address that issue again.

Second, the Court has already found that VIZIO has made a plausible case that LeLe Holding,
LeEco Global Group and Jia are the alter egos of LeEco, such that they may be liable for the acts,
liabilities and debts of LeEco.  [Order, pp. 28-30, 33 & 35].  As such, VIZIO is plainly entitled to
take discovery as to alter-ego issues to buttress the factual showing that is front and center in
Judge Carter's Order.

The criteria to establish alter-ego liability is well established.  Plaintiff is in entitled to the
discovery requested to buttress the showing of alter-ego liability that it has already made.  As
Judge Carter wrote on p. 28 of the Order:

> "To establish a party as the alter ego of a corporation, the applicant must show
> '(1) that there [is] such unity of interest and ownership that the separate
> personalities of the corporation and the individual no longer exist and (2) that, if
> the acts are treated as those of the corporation alone, an inequitable result will

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 5

follow.'" *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 597 (N.D. Cal. 2012) *aff'd sub nom. Bank of Montreal v. Salyer*, 599 F. App'x 706 (9th Cir. 2015) (quoting *Automotriz del Golfo de California v. Resnick*, 47 Cal. 2d 792, 796 (1957)); see also *United States v. Boyce*, 38 F. Supp. 3d 1135, 1154–55 (C.D. Cal. 2014), appeal dismissed (Nov. 13, 2014) (quoting *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010)). Both factors are necessary for a Court to impose alter ego liability. *Bank of Montreal*, 476 B.R. at 597."

Judge Carter then explained on the same page of the Order:

"In assessing the unity of interest prong, courts consider numerous factors, including "inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (citations omitted); *see also Bank of Montreal*, 476 B.R. at 597–98."

Judge Carter then observed on that same page of the Order that:

"No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th at 245. Further, "[c]ommon ownership alone is insufficient to disregard the corporate form." *Stewart v. Screen Gems-EM*, 81 F. Supp. 3d 938, 961 (quoting *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)) (internal quotation marks omitted)."

Accordingly, in order for VIZIO to meet its burden of proof as to the alter-ego liability, it must be able to buttress its evidence of factors, such as: the common ownership of the entities, inadequate capitalization of one or more of LeEco, LeEco Global Group, LeLe Holdings and their affiliates, commingling of funds between individuals and companies, shuffling of funds between individuals and companies, identical officers or directors, etc. These are exactly types of documents that have been sought in Categories 35 - 65 of the RFPs. Accordingly, contracts, financial statements, assets and liabilities, loan agreements, guarantees, transfers of monies, lists of employees, officers, directors, attorneys, as well as corporate governance records clearly must be produced. This is particularly true here, where the requested documents are plainly in the possession , custody, or control of your clients.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 6

Rule 26(b)(1) of the *Federal Rules of Civil Procedure* provides that parties may obtain discovery of any nonprivileged matter that is "relevant to any party's claim or defense and proportional to the needs of the case…." This Rule also states that "[i]information within the scope of discovery need not be admissible in evidence to be discoverable." (Id.) Accordingly, "a party may request the production of any document within the scope of Rule 26(b)." *San Diego Unified Port Dist. v. National Union Fire Insurance Company*, 2017 WL 3877730*2 (S.D. Cal.).

It is axiomatic that all of the requested documents are in the possession, custody or control of your clients. First, it is undisputed that "Lele Holding and the other corporate defendants are all under the common ownership and control of Jia". Order, p. 27. Indeed, LeEco admitted this was the case in the filing that it made with the Committee on Foreign Investment in the United States vis-à-vis the Merger Agreement (Dkt 78, Wessel Dec., Ex 2, pp. 4, 17, 18 and Ex 5 ; *i.e.*, Jia owns 100% of Lele Holding, Lele Holding owns 100% of LeEco Global Group, Ltd., LeEco Global Group, Ltd., owns 100% of LeEco.[3] Accordingly, the rule in the Ninth Circuit is crystal clear where, as here, the RFPs were specifically directed to the ultimate corporate parent; *i.e.*, "[the parent] must produce documents possessed by a subsidiary that the parent…owns or wholly controls." *U.S. v. International Union of Petroleum & Indus. Wks.*, 870 F.2d 1450, 1452 (9th Cir. 1989).[4]

Second, the same rule also applies in reverse where, as here, the fraudulent misrepresentations were made by Jia and other top executives of the enterprise on his and their behalf, *e.g.*, the $2BB Financial Wherewithal Misrepresentations as well as the false representations that led to the Framework Agreement (Order, pp. 15-16. *See also*, Dkt 23-2, Wong Dec., ¶¶ 13 – 15 & Dkt 23-2, Wang Dec., ¶¶ 7 – 9), since the requisite control of documents "may [also] be established by the existence of a principal – agent relationship." *St. Jude Medical S.C., Inc. v. Janssen-Counotle*, 305 F.R.D. 630, 638-639 (D. Ore.) ("The fact-specific question presented here is whether documents and ESI held by Biotronik…sister company…their common parent…or another related…entity were within the effective control of Biotronik [the subsidiary]…St. Jude…has presented evidence that…Janssen negotiated with and received her job offer from Max Schaldach, the beneficial owner of the entire Biotronik Group….It is reasonable to infer

---

[3] The Order specifically references this governmental filing by LeEco in its discussion of the facts demonstrating alter-ego liability on p. 29.
[4] None of the three unpublished district cases that you cite stand for the proposition that "parent companies do not have control over [subsidiary] documents absent a contractual or statutory right." First, each such case involved document requests directed to subsidiary or sister corporations, not the corporate parent. *Ehrlich v. BMW of North America, LLC,* 2011 WL 3489105 (C.D. Cal) (subsidiary); *Micron Technology v. Tessera, Inc.,* 2006 WL 1646143 (N.D. Cal.) (subsidiary); *Beilstein-Institut Zur Forderung Der Chemischen,* 2006 WL 3742244 (N.D. Cal.) (sister corporation). Second, they cannot contravene the Ninth Circuit's holding in *International Union, supra,* that corporate control exists as a matter of law when the document request is directed to the corporate parent.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 7

that the persons associated with Biotronik...European affiliates, including...Schaldach...who
negotiated [the] hiring...were acting as agents for Biotronik [which] is sufficient indication of
effective control to require the European affiliates of Biotronik...namely the Biotronik Group...to
conduct a reasonable and diligent search for documents...responsive to...subpoena served on
Biotronik....")[5]  This reasoning applies in spades here, where Judge Carter likewise described
"the *Lele Group*" on p. 34 of the Order.

In short, there is no foundation for the assertion that requested documents are somehow not
subject to your clients' possession, custody, or control.

**C.     A Look Back Period to 2012 For Alter Ego Documents Is Reasonable.**

In Plaintiff's alter-ego RFPs, VIZIO has largely requested documents going back to January 1,
2012.  A five-year look-back period is reasonable under the circumstances.  Pointedly, one of
the allegations made by VIZIO in this matter is that Jia made the $2BB Financial Wherewithal
Representations on his own behalf and for LeLe, LeEco Global Group Ltd. and various other
subsidiary or affiliated corporate entities (Order, p. 15).  A five-year look back at the financial
condition of LeEco, LeLe, and their parents, subsidiaries and sister companies is plainly required
to determine whether those representations were true or false when made.  *See U.S. v. Ruiz,*
665 F. Appx. 607, 610 (9th Cir. 2016).  (Court allowed evidence that Defendant failed to file tax
returns for a period of five years since it was probative as to intent, knowledge, lack of good
faith and absence of mistake in later tax fraud).  *Cf., U.S. v. Jenkins,* 785 F2d 1387, 1395 (9th
Cir.), *cert. den'd,* 479 U.S. 889 (1986) ("The fact that Jenkins used fraudulent means to secure
conventional loans [in the past] is probative on issues of intent, knowledge, good faith and
absence of mistake in dealing with the [later] FHA transactions.")  *Accord, Rocha v.
Metropolitan Life Ins. Co.,* 2005 WL 8156353 *2 (W.D. Tx) ("The basis of Rocha's action...is her
allegation Seguros Genesis acted as an alter ego, joint enterprise, or single business enterprise
of MLIC...The limited [6 year lookback before subject policy purchase]...is not overbroad since it
allows Rocha to seek documents pertinent to (1) Seguros Genesis' relationship to MLIC; (2)
MLIC's ownership interest in Seguros Genesis and other subsidiaries and affiliates; and (3) the
way in which the insurance policy was marketed to Rocha's sister.")  This is particularly true
here, where one alter-ego factor to be weighed by the Court is the capitalization or
undercapitalization of LeLe, Global Group, LeEco and their corporate affiliates, at inception and
thereafter.  Since Global Group and LeLe were both formed prior to December 2015 when the

---

[5] None of the three unpublished and earlier district court cases that you cited contravenes the holding of *St. Jude,
supra.*  Unlike *St. Jude,* and here, there were no enterprise wide misrepresentations made by the top of the chain
owners/executives acting for themselves and as agents for affiliated entities.  Nor did those courts find that a
plausible case of alter-ego liability already existed as Judge Carter has already ruled.

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 8

parties began to negotiate the merger, it cannot be reasonably be disputed that the look back period necessarily would have to extend beyond December 2015, for capitalization and other similar determinations (*e.g.,* transfer of funds, etc.) to be made in meaningful fashion.

The two cases which you cite for the proposition that a five (5) year look back period is somehow too long are *Del Campo v. Am Corrective Counseling Servs., Inc.,* 2008 WL 4858502 (N.D. Cal,. 2008) and *Benchmark Design, Inc. v. BDC, Inc.,* 1989 WL 81618 (D. Or July 5, 1989). Neither is on point. In *Del Campo,* the court reduced the look back period from 1997 to 2001-2004 because the alter ego companies were not formed until 2001. Thus, going back to 1997 was entirely unnecessary. In *Benchmark Design,* the court granted a 4 year look back from 1989 to 1985. However, the case does not indicate what period of time was being sought by the requesting party. Simply put, *Benchmark Design* is of no help whatsoever, as it does not indicate over what period alter ego discovery would be appropriate.

D.    **LeEco and Lele Have Waived Any Claim That VIZIO's Requests Violate Privacy Laws, As They Did Not Assert Any Such Objections In Response To VIZIO's RFPs.**

*Fed. R. Civ. P.* 34(b)(2)(B) requires: "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. In short, general and boilerplate objections are useless. *M2 Software, Inc. v. M2 Communications, LLC,* 217 F.R.D. 499, 500 (C.D. Cal.) ("M2 Software's responses were preceded by two pages of boilerplate 'General Objections.'....General objections are not sufficient to raise any substantial, meaningful or enforceable objections to any particular discovery request."). *Accord Springer v. General Atomics Aeronautical Systems, Inc.,* 2018 WL 290745 * 1-2 (S.D. Cal.) (general objections found in introductory sections overruled as improper); *Bright v. Dennis Garberg and Associates, Inc.,* 2011 WL 13150146 * 5 (C.D. Cal. 2011) ("[D]efendants' general and boilerplate objections which have been incorporated into each discovery response are overruled because such general and boilerplate objections are improper.... Such general objections do not explain or analyze on a particularized basis, why each particular document request is objectionable, and thus are inadequate.").

In LeEco and LeLe's responses to RFPs, they never asserted any privacy or confidentiality objections, let alone the tax return or trade secret privileges. In fact, the only place where any objection on the basis of confidential, personal or proprietary information was attempted to be made was in the boilerplate introductory general objections. These general objections are tantamount to making no objections at all. In short, they are "not enforceable objections to any particular discovery request."

Jeff Joyner, Esq.
August 24, 2018
Page 9

Finally, even assuming, *arguendo*, that these general, boilerplate objections are somehow viable, VIZIO is plainly entitled to production at bar.  The Court has already ruled that VIZIO has stated a plausible case for alter ego liability.  Accordingly, the alter ego discovery sought is both relevant and necessary to Plaintiff's case, even if it would constitute trade secret information or otherwise be protected by some sort of privacy rights.  That is because a party seeking trade secret discovery must show "that the information sought is relevant and necessary to proof of or defense against, a material element of one or more causes of action presented in the case, [such] that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit, [the burden then shifts to] the holder of the [trade secret] to demonstrate any claimed disadvantages of a protective order [and to show]that an alternative to disclosure will not be unduly burdensome to the opposing side, [but rather], will maintain the same fair balance in the litigation that would have been achieved by disclosure."  *Bridgestone/Firestone, Inc. v. Superior Court*, 7 Cal.App.4th 1384, 1393 (2011).  (Emphasis added).

In summary, your clients do not have any enforceable privacy or confidentiality objections at bar, but even if they did, those objections are insufficient to prevent the production of documents that are critical to establishing the existence of alter-ego liability.  Equally important, the notion that they can assert trade secret or tax return privileges when no such objections were made, is not the rule in the Ninth Circuit.  *Richmark, supra,* 959 F.2d 1473.

**E.     VIZIO'S Responses to RFA Nos. 1 and 3, and RFP No. 10.**

VIZIO has properly responded to RFA Nos. 1 and 3.  Specifically, RFA No. 1 is vague and ambiguous as to whether LeEco is asking VIZIO to admit that it drafted Section 1.1 of the Framework Agreement, to the exclusion of any other party.  VIZIO objected on that basis.  Then, without waiving the objection, VIZIO specifically admitted that the Framework Agreement and its terms were drafted by it and one or more of the Defendants.  That admission was an entirely appropriate response since VIZIO has provided details as to why it could not admit or deny the request as stated, but then responded to the substance of the request as required by Fed. R. Civ. P. 36(a)(4).

VIZIO's response to RFA No. 3 is likewise proper.  That Request asks VIZIO to admit that as of June 9, 2017, it no longer had any interest in entering into the China JV.

First, the term "China JV" is not defined.  Nor does the RFA even specify with whom the undefined China JV was to be entered.  Wholly apart from these ambiguities, your clients have asserted that "none of the essential terms regarding the proposed China JV were agreed upon as of the date of the Framework Agreement." (Order, p. 19).  Without in any way acquiescing in

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 10

your clients' assertion, VIZIO properly objected to that RFA on the ground that it called for
speculation and was vague, ambiguous and unintelligible without further explanation as to
what the precise terms of the "China JV" were as of June 9, 2017 - - especially in light of the
utter refusal and failure of Defendants to negotiate the substantive terms of the "China JV" in
good faith, let alone within the 45 day period mandated by the Framework Agreement. This
was, therefore, entirely appropriate.

Second, the RFA plainly seeks information that is not relevant to any claim or defense. It is
undisputed that the Framework Agreement was made on April 3, 2017. It is likewise crystal
clear that Section 4 of the Framework Agreement specifically states that "Buyer and the
Company shall…execute one or more agreements to document the China JV…within 45 days of
the date hereof." Since June 9 was well outside of this 45 day window, whether VIZIO had any
intent in entering into the "China JV" at that later date is not relevant to any claim or defense as
required by Rule 26 (b) of the *Federal Rules of Civil Procedure*.

Finally, your assertion that VIZIO's response to RFA No. 10 is somehow inappropriate, is
incorrect. That RFP seeks all documents and communications "concerning the aftermath of the
decision to terminate the Framework Agreement…." First, this RFP is incomprehensible. VIZIO
properly objected on that basis. Nowhere does it define "the aftermath", let alone specify any
particular document or categories of documents or otherwise identify authors, recipients,
dates/subject matter. Second, the RFP is unreasonably overbroad on its face since it is
unlimited as to time. Again, VIZIO properly objected on this basis. Third, the RFP arguably
seeks VIZIO's tax returns and confidential, private, trade secret financial documents as well as
board and shareholder minutes; *i.e.,* documents which VIZIO closely guards and keeps
confidential.

VIZIO specifically defined its confidential and trade secret objection as including those specific
items and it expressly objected on that basis. Your letter admits on pp. 5 – 6, that (a) "the
California Supreme Court has held that Revenue and Taxation Code section 1982, which
prohibits the disclosure of tax returns, implicitly creates a privilege against the disclosure of
income tax returns", and (b) "state law governs privilege claims." Pointedly, California law also
recognizes a trade secret privilege to withhold trade secret information from discovery. *Evid.
Code* § 1060. This privilege can only be overcome where the party seeking same "makes a
prima facie, particularized showing that the information sought is relevant and *necessary* to the
proof of, or defense against, a material element of one or more causes of action presented in
the case…." *Bridgestone, supra,* 7 Cal.App. 4th at 1393.

You have made no such showing. Nor can you. The damages that VIZIO is seeking at bar are
specified reliance and lost opportunity sums resulting directly from the breach of the

ERVIN COHEN & JESSUP LLP

Jeff Joyner, Esq.
August 24, 2018
Page 11

Framework Agreement and the fraud that gave rise to it; *i.e.,* $60MM (Order, pp. 17 – 18). These sums are calculable from the contract.  Thus, any suggestion that additional financial information is relevant - - it is not, which is another objection made by VIZIO - - but even if relevant, that information is certainly not "necessary."

Simply stated, RFP No. 10 fails on its face.

Very truly yours,

Robert M. Waxman

DNT:jd

14676.8:9330120.2

# EXHIBIT M

**Srour, Alana C. (Assoc-LA-LT)**

| | |
|---|---|
| **From:** | David Tarlow <dtarlow@ecjlaw.com> |
| **Sent:** | Monday, August 13, 2018 3:11 PM |
| **To:** | Joyner, Jeff K. (Shld-LA-IP-Tech) |
| **Cc:** | Robert Waxman; Srour, Alana C. (Assoc-LA-LT); Tyukody, Daniel J. (Shld-LA-LT); Jason Haas; Safari, Attashin (Assoc-LA-LT) |
| **Subject:** | Vizio v. LeEco- Meet and Confer Follow Up |

Mr. Joyner:

At our meet and confer last week, you and your team had promised to provide us with adequate authority to support of your position that the 5 year look back period for which Plaintiff requested alter ego discovery in its RFPs was somehow overbroad.  The purpose of providing us with such authority was an attempt to limit the issues which are to be discussed with the Magistrate Judge tomorrow.  Needless to say, it is now nearly a week later and we have not received any authority from you to support your assertion that a 5 year look back period is overbroad.  In fact, the case law which I have found indicates that it is entirely appropriate to look back to the formation of the company when determining alter ego liability.  See Stowers v. Wells Fargo Bank, N.A., 2014 WL 1245070 * 7 (N.D. Cal.).  ("Generally, the corporate veil will only be pierced where the plaintiff can show that the company was intentionally set up to avoid liability or was intentionally undercapitalized when formed".)  See Sea-Land, Inc. v. Petter Source, 993 F.2d 1309, 1311-12 (7th Cir.).  If you contend that we are wrong on the law, you need to let us know at once.

Further, I am going to arrange for a conference call with the Court.  Please let me know what time tomorrow one of you can be available to be on the call with the Court so we can dispose of these issues.

Thanks for your immediate attention to this email.

David

‗‗‗‗‗‗

David N. Tarlow, Esq.

Ervin Cohen & Jessup LLP

9401 Wilshire Boulevard, 9th Floor | Beverly Hills, CA 90212-2974

1

(310) 281-6372 (t) | (310) 859-2325 (f)

<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.ecjlaw.com_&d=DwMGaQ&c=2s2mvbfY0UoSKkl6_Ol9wg&r=lU3yn8LqsoHs8UL6liQtmCioghy5W2E38PtQuwS
3MeE&m=v8MkvvccDTScech8xqatoZfazXTcK8UET5297Z30PrU&s=djtDYi30voSeiLmUnE7PiiwRQU0RzKgwGdf2htxs8H4&e
=> www.ecjlaw.com |  <mailto:dtarlow@ecjlaw.com> dtarlow@ecjlaw.com |
<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ecjlaw.com_attorneys_david-2Dn-
2Dtarlow_&d=DwMGaQ&c=2s2mvbfY0UoSKkl6_Ol9wg&r=lU3yn8LqsoHs8UL6liQtmCioghy5W2E38PtQuwS3MeE&m=v8
MkvvccDTScech8xqatoZfazXTcK8UET5297Z30PrU&s=nhfMVjGUI2DlyU53TF5NSrN49JjmQ6NJC4Xeg9y7-g8&e=> About
me

———

The information contained herein is confidential and privileged attorney-client information or work product intended
only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

EXHIBIT N

**Srour, Alana C. (Assoc-LA-LT)**

| | |
|---|---|
| **From:** | Safari, Attashin (Assoc-LA-LT) |
| **Sent:** | Friday, August 31, 2018 11:59 AM |
| **To:** | David Tarlow; Tyukody, Daniel J. (Shld-LA-LT); Joyner, Jeff K. (Shld-LA-IP-Tech); Srour, Alana C. (Assoc-LA-LT) |
| **Cc:** | Robert Waxman; Jason Haas; Catherine Veeneman |
| **Subject:** | RE: Vizio v. LeEco- Motion Conference Follow Up |

Counsel:

Vizio's agreement to amend the time period for its request for production of documents related to alter ego to start on December 1, 2013 is not acceptable to our clients for the reasons set forth in the joint report.

The format for the joint stipulation you suggest in your email is what Judge Early suggested at the pre-motion discovery conference and, therefore, is amenable to our clients with the clarification that our clients' portion of the joint stipulation will also include LeEco's motion to compel responses to LeEco's request for admissions and request for production of documents ("RFPs").   This is to let you know that our clients will also include in their motion to compel a request that the Court order Vizio to produce documents in response to LeEco's RFPs.  At the August 7, 2018 meet-and-confer we raised the issue that Vizio had not yet produced a single document in response to the RFPs and you agreed that Vizio would begin producing documents last week.  Despite this, we have not yet received any documents from Vizio.

Sincerely,

Attashin

From: David Tarlow [mailto:dtarlow@ecjlaw.com]
Sent: Wednesday, August 29, 2018 6:58 AM
To: Safari, Attashin (Assoc-LA-LT) <safaria@gtlaw.com>; Tyukody, Daniel J. (Shld-LA-LT) <tyukodyd@gtlaw.com>; Joyner, Jeff K. (Shld-LA-IP-Tech) <joynerj@gtlaw.com>; Srour, Alana C. (Assoc-LA-LT) <sroura@gtlaw.com>
Cc: Robert Waxman <rwaxman@ecjlaw.com>; Jason Haas <jhaas@ecjlaw.com>; Catherine Veeneman <cveeneman@ecjlaw.com>
Subject: Vizio v. LeEco- Motion Conference Follow Up

Counsel:

It was a pleasure speaking with you and Judge Early yesterday at the conference.  After considering Judge Early's thoughts on a reasonable time period for alter ego discovery, we would be amenable to limiting the time period to the

December 1, 2013 to present time period for alter ego discovery.  This period of time commences approximately 2 years prior the parties' negotiation of the Merger Agreement.

Further, we are also amenable to the format of the motion being that of a discovery motion under Rule 37 for a Protective Order and a Motion to Compel, whereby you, as the moving party, provide us with your portion stating your justification for moving for a protective order.  You may, but certainly do not have to, cite to each and every document request and response thereto.   Within 14 days of providing us with your portion, we will provide you with our response, so that the stipulation can be filed.  Both parties will then have the right to file a 5 page supplemental brief 14 days after the filing of the motion and Joint Stipulation.  Please let us know if you are amenable to this format.

Thanks for your prompt attention to this email.

Sincerely,

David N. Tarlow

Ervin Cohen & Jessup LLP

Tel. (310)281-6372

Sent from my iPad