# DECLARATION OF JERRY HUANG

I, JERRY HUANG, declare as follows:

1.      I am a the Senior Vice President- General Counsel and Corporate Secretary for VIZIO, Inc., a party in the above-entitled action.  I have personal knowledge of the facts herein stated, except as to those stated on information and belief.  As to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      I make this declaration in support of VIZIO Inc.'s position in the Joint Stipulation Re Motion To Compel Further Responses To Requests For Admissions And Requests For Production Of Documents.

3.      This declaration is submitted in (a) Support of VIZIO's Motion to Compel Production of Documents, (b) Opposition to Defendants Lele Holding, Ltd., and Yueting Jia's Joint Motion for a Protective Order to Bifurcate Alter Ego Allegations and Stay Related Discovery or, in the Alternative, to Limit Discovery, and (c) Support of VIZIO's position Re Motion to Compel Responses to Requests for Admissions and Requests for Production of Documents.  Prior to making this declaration, I read and reviewed (a) the Declaration of William Wang along with the exhibits attached thereto (collectively, the "Wang Dec.") that was filed as Dkt No. 23-2 in Opposition to Defendant LeEco V. Ltd.'s Motion to Set Aside Entry of Default (the "Set Aside Motion"), and (b) the Declaration of Christine Wessel along with the exhibits attached thereto (collectively, the "Wessel Dec.") that was filed as Dkt Nos. 71-1 and 78 in Support of VIZIO's Opposition to Motion to Dismiss for Insufficient Service of Process and Lack of Personal Jurisdiction and VIZIO's Application for Leave to File Under Seal.

4.      Attached hereto as Exhibit "A" is a true and correct copy of an email which I sent to Winston Cheng dated April 4, 2017, attaching redline changes to the Framework Agreement which I typed into the document.  I understand that Mr. Cheng is an Officer of Defendant/Counter-Claimant LeEco V. Ltd., a Defendant in this case.  The information which I included in my email is true and correct and is based upon the information which I

**JOINT STIPULATION MOTION TO COMPEL**

1    had been provided at the time.  Such information stated in Exhibit A is the basis of the

2    redline changes which I had made to the attached draft of the Framework Agreement.

3         5.    I understand that LeEco has sought the production from VIZIO of "All

4    Documents and Communications concerning the aftermath of the decision to terminate the

5    Framework Agreement, Including communications between and among VIZIO's Board,

6    its management, its shareholders, and the general public."  Notwithstanding the fact that

7    this request for documents is incredibly broad and seeks to obtain all corporate and

8    business documents of VIZIO, Inc. from May 20, 2017 (the deadline for VIZIO and

9    LeEco to consummate the China joint venture agreement and execute the relevant

10   documents under the Framework Agreement) to present, to comply with same would

11   arguably require VIZIO to produce its tax returns for the year 2017, which are privileged

12   and of which VIZIO objects to producing, as well as documents containing trade secret

13   and confidential company information that is limited in distribution to employees with a

14   need to know, such as VIZIO's customer list with contact information, its employee list,

15   its payroll information, its financial and accounting documents as well as directors'

16   minutes, its business process information, its business strategy information and its sales

17   information.  This information is trade secret and is information which VIZIO takes

18   reasonable efforts to maintain its secrecy.  The information is found on VIZIO's computer

19   servers, and access to VIZIO's computer servers are limited to those who work for VIZIO,

20   and are password protected.  Access to these servers are limited to employees of VIZIO

21   on a need to know basis.  VIZIO has very unique business processes and strategies which

22   have allowed a company of approximately 400 employees become one of the largest

23   sellers of televisions and electronic products in the United States.  If these confidential and

24   trade secret business strategies and processes were to become known to the public, it may

25   allow competitors to copy VIZIO's business model, and usurp its market share.

26   Moreover, while it is generally not a secret which companies sell VIZIO products, the

27   identity of those at companies responsible for arranging for the purchase and sale of

28   VIZIO products is secret, as is the contact person(s) with whom VIZIO deals as to pricing,

volume, discounts, marketing and the like.  If VIZIO's competitors were privy to such information, again, they could use same to usurp VIZIO's market share.  Accordingly, VIZIO should not be compelled to provide the confidential trade secret information sought by LeEco in RFP No. 10.

6.      VIZIO entered into a $2.25BB Merger Agreement with LeEco, its subsidiary, and a representative of VIZIO's stockholders, dated as of July 6, 2016.  A true and complete copy of the Merger Agreement (without its exhibits) is attached as Ex "1" to the Wang Dec., Dkt No. 23-2.  I was a key member of the VIZIO team that negotiated the Merger Agreement as well as its planned implementation - - an implementation that never occurred due to the actions and omissions of LeEco.  I have read and reviewed the Merger Agreement a number of times and am familiar with its terms.  In fact, I was present when the Merger Agreement was signed by our CEO, William Wang, at Irvine, California.

7.      At the time that VIZIO became party to the Merger Agreement, it also entered into a Limited Guarantee with Le Technology, Inc., a California corporation.  This Limited Guarantee was negotiated concurrently with the Merger Agreement in identical fashion and by the same persons on both sides as was the case for the Merger Agreement. I was a key member of the VIZIO team that negotiated the Limited Guarantee.  I have read and reviewed the Limited Guarantee a number of times and am familiar with its terms.  I was also present when the Limited Guarantee was signed by our then CFO, Kurt Binder, at Irvine, CA.  The Limited Guarantee is attached as Exhibit "1" to the Wessel Dec., Dkt Nos. 71-1 & 78

///
///
///
///
///
///
///

1       I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct.

3       Executed October 10, 2018, at Irvine, California.

4

5

6

7  JERRY HUANG

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14676.8:9366673.1

LA 133815691v29

**JOINT STIPULATIONS MOTION TO COMPEL**

# EXHIBIT A

**From:** Jerry C. Huang <Jerry.Huang@vizio.com>
**Sent:** Monday, April 3, 2017 5:40 AM
**To:** David.Lee@lw.com; Amro.Suboh@lw.com; SCOTT.SHEAN@LW.com; Kurtis Binder
**Subject:** Fwd: Vizio: our discussion; thanks!!
**Attachments:** image002.jpg; ATT00001.htm;
Framework__Termination_and_Mutual_General_Release_(SASMF 4-2-17 Revised
Evening) (002).docx; ATT00002.htm; Redline - Response to LeEco 0401 (4-2-17 Changes
Revised).pdf; ATT00003.htm

# REDACTED

**From:** Ben Wong <Ben.Wong@vizio.com>
**Date:** April 3, 2017 at 5:04:30 AM PDT
**To:** "Jerry C. Huang" <Jerry.Huang@vizio.com>
**Subject:** Fwd: Vizio: our discussion; thanks!!

Sent from my iPhone

Begin forwarded message:

> **From:** Charles Hsieh <charles.hsieh@le.com>
> **Date:** April 3, 2017 at 01:27:19 PDT
> **To:** Ben Wong <Ben.Wong@vizio.com>
> **Cc:** YT Jia(贾跃亭) <letvjia@le.com>, Winston.CHENG（郑孝明）
> <winston.cheng@le.com>, Richard <richard@le.com>, William Wang
> <William.Wang@vizio.com>, "Kurtis Binder" <Kurtis.Binder@vizio.com>, Matt Mcrae
> <Matt.McRae@vizio.com>
> **Subject:** RE: Vizio: our discussion; thanks!!
>
> Ben,
>
> Thank you again for having a call with me and Winston last night to discuss the final
> main points. As you know from our conversation, we have sincere desire to get this
> agreement consummated ASAP. Hence, we had our lawyers put the points we've been
> discussing over email form into a more formal document. Please see the attached,
> along with a redline version comparing to our email exchange.
>
> Please let me know your thoughts.
>
> Look forward to getting this wrapped up soon.

1

Kind Regards,
Charles

**Charles Hsieh**
**Director of Corporate Finance and Development**

SASMF Draft 4/2/17

<u>FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT</u>

THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "<u>Agreement</u>") is entered into as of April [3], 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("<u>Buyer</u>"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("<u>Merger Sub</u>") and VIZIO, Inc., a California corporation (the "<u>Company</u>"). Buyer, Merger Sub and Company are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>".  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

WHEREAS, Buyer, Merger Sub, Company and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the representative of the holders of Company capital stock or options ("<u>Shareholder Representative</u>"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "<u>Merger Agreement</u>") pursuant to which it is proposed that Merger Sub will merge with and into Company, with Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "<u>Merger</u>"); and

WHEREAS, Buyer and Company now desire to terminate the Merger Agreement and enter into the agreements contained herein on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, do hereby agree to the following:

1.    <u>Termination of Merger Agreement and Release of Buyer Termination Fee Deposit</u>.

1.1    <u>Termination</u>.  Buyer and Company agree to terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement, effective as of the date hereof (the "<u>Termination</u>").

1.2    <u>Release of Buyer Termination Fee Deposit</u>.  In connection with and as full consideration for the Termination, the releases set forth in Section 6 below, the entry into the commercial arrangements contemplated in Section 2 below and the entry into a joint venture as contemplated in Section 3 below, Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

1.2.1    Buyer agrees to immediately issue a Joint Release Instruction (as such term is defined in the Escrow Agreement, dated as of July 6, 2016, by and among Buyer, Company, Shareholder Representative and the Escrow Agent (the "<u>Escrow Agreement</u>")) with Company releasing twenty million dollars ($20,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

1.2.2    Upon consummation of the JV Agreement (as defined below), Buyer agrees to issue a Joint Release Instruction (as defined in the Escrow Agreement) with

Company releasing the remaining thirty million dollars ($30,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company within three (3) business days of the date of consummation of the JV Agreement.

2.      Commercial Relationships.

2.1      LeEco Le App.

2.1.1    Buyer shall develop and obtain certification of an application to be made available by Company on all of Company's smart televisions and displays in North America (the "LeEco Le App").

2.1.2    Company shall make the LeEco Le App available on all its smart televisions and displays in North America on the first screen of the Company app for all Google Chromecast-enabled televisions and displays as well as for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "App Processes"). Company shall use reasonable efforts to assist in the App Processes; provided that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the LeEco Le App.

2.2      Inscape Data.

2.2.1    Company shall develop and obtain certification of a data client to be made available by Buyer on all of Buyer's smart televisions and displays (the "Inscape Data Client")

2.2.2    Buyer shall include the Inscape Data Client on all its smart televisions and displays for a period of three (3) years from the date that the Inscape Data Client obtains certification, subject to customary engineering and certification processes (the "Data Client Processes"). Buyer will use reasonable efforts to assist with the Data Client Processes; provided that Company shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the Inscape Data Client and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the Inscape Data Client.

2.2.3    Company and Buyer shall come to an agreement on pricing on a per user/per television basis.

2.2.4    Company shall have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV. Buyer shall also have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV.

3.      Formation of a Joint Venture.

3.1     The Parties agree to negotiate in good faith to form a commercial relationship between Company and Buyer for expansion efforts in China. The proposed commercial relationship would provide for (i) Company granting the China JV (as defined below) the right to sell Company televisions in China subject to the mutual consent of Company and Buyer to branding and distribution; (ii) Company preloading EUI and Le contents on Company televisions and displays sold in China; and (iii) Company and Buyer entering into the joint venture in China as described below (the "China JV").

3.2     The proposed terms of the China JV are as follows:

3.2.1   In connection therewith, Buyer will contribute non-cash assets with a fair market value equal to US$50,000,000 as a capital contribution to the China JV.

3.2.2   The China JV will have an operational life of three (3) years from the effective date of a formal joint venture agreement between Buyer and Company (the "JV Agreement").

3.2.3   The China JV will be owned and controlled 50% by Company and 50% by Buyer.

3.2.4   The China JV will promote/market Company-branded devices (televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in China.

3.2.5   The China JV will operate with the goal of deploying an aggregate of [1.5 million] Company-branded televisions and displays in China within three (3) years from the effective date of the JV Agreement.

(a)     If the China JV does not reach the [1.5 million] units within such three (3) year period, the JV Agreement will provide that Buyer will pay Company US$[•] (in cash or value equivalent) per unit for the difference between [1.5 million] minus the actual units sold through retail, mass and/or direct channels. Company shall sell units to the China JV at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV.

(b)     Buyer and Company will negotiate in good faith to extend the initial three-year operational life of the China JV if the above deployment goal is reached.

(c)     The profit on sold through units, i.e. through advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the China JV's equity holders on a quarterly basis.

3.2.6   During the initial 3-year operational life of the China JV, Company-branded devices will be distributed exclusively through the China JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming platform.

3.2.7   The JV Agreement will provide that Buyer will lend up to an aggregate of [XXXXXXXX] to the China JV for working capital purposes over its initial three-year operational life.

(a)   Company and Buyer shall agree upon a three-year unit sales volume target for the China JV (the "Target").  If the China JV achieves the Target in the initial three-year operational life and the parties agree to continue the China JV operations, then the loan shall be repaid in full.

(b)   Company will consider participating in the China JV's financial obligations after it receives full US$50,000,000, in cash or value equivalents, such value equivalents to include assets contributed to the China JV by Buyer and its Affiliates at fair market value.

4.   Formal Agreements.  The parties shall negotiate in good faith and execute one or more agreements to document the China JV and the other commercial arrangements set forth in Sections 2 and 3 above with the terms specified therein within forty-five (45) days of the date hereof.

5.   Publicity; Confidentiality and Mutual Non-Disparagement.

5.1   Except for a mutually agreed press release stating that the parties have determined to terminate the Merger Agreement due to force majeure, the parties hereto will keep confidential the terms and status of this Agreement and the transactions contemplated hereby and thereby and none of the Parties shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by applicable law, in which case the other Party shall be advised and the Parties shall use their reasonable commercial efforts to cause a mutually agreeable release or announcement to be issued.

5.2   The Parties shall each refrain from making, and shall cause their respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors, assigns, officers, key employees or directors not to make, any public statement or announcement that (i) states or implies that any party or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or is reasonably likely to damage the business or reputation of, (x) in the case of statements or announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or (y) in the case of statements or announcements by the Buyer or Merger Sub, Company or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Company or any of its Affiliates or subsidiaries. The foregoing shall not restrict the ability of any person to comply with any subpoena or other legal

-4-

process or respond to a request for information from any governmental authority with jurisdiction over the party from whom information is sought.

6.   Release and Waiver.

6.1   Release By Buyer and Merger Sub.  Effective as of the date hereof, except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Buyer Party Releasor" and collectively, the "Buyer Party Releasors"), agrees to, and hereby does, generally release, remise and forever discharge Company and Company's past, present and future Affiliates, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Company Released Party" and collectively, the "Company Released Parties") from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "Claims") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub of breach) of the Merger Agreement or any of the agreements ancillary thereto by Company or (c) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, (a)-(c), the "Buyer Party Released Claims").

6.2   Release By Company.  Effective as of the date hereof, except as expressly set forth herein, Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Company Releasor" and collectively, the "Company Releasors"), agrees to, and hereby does, generally release, remise and forever discharge Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Buyer Released Party" and collectively, the "Buyer Released Parties") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub or (c) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, (a)-(c), the "Company Released Claims").

6.3     Covenant Not To Sue.  Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim.  Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Buyer Released Party in respect of any Company Released Claim.

6.4     Waiver.  The Parties acknowledge that (a) Section 1542 of the California Civil Code provides, and (b) certain other states have provisions substantially as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist.  Nonetheless, each Party agrees that the waiver of such provisions is a material portion of the releases intended by this Agreement, and each Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have under Section 1542 of the California Civil Code and any similar such provisions of any jurisdiction.  In connection with such waiver and relinquishment, the Parties hereby acknowledge that they or their attorneys may hereafter discover claims or facts in addition to, or different from, those which he now knows or believes to exist, but that they expressly agree to fully, finally and forever settle and release any and all Claims, known or unknown, suspected or unsuspected, which exist or may exist on their behalf against the Company Released Parties and the Buyer Released Parties at the time of execution of this Agreement.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE MATTERS RELEASED HEREIN.  NEVERTHELESS, IT IS THE INTENTION OF EACH PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY EXIST, OR HERETOFORE HAVE EXISTED BETWEEN THEM.  IN FURTHERANCE OF SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS, NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

7.      Representations and Warranties.   Each party to the Agreement represents and warrants and agrees as follows:

7.1      It has all requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement (including, without limitation, the releases set forth herein) have, to the extent required, been duly and validly authorized by all corporate proceedings.

7.2      No authorization, approval or other action, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and/or performance of this Agreement.

7.3      Such party or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents. In executing this Agreement, such party, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

7.4      It has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

7.5      It has received independent legal advice with respect to the matters set forth and the Claims released Sections 1.1 and 6 of this Agreement and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

7.6      It does not rely upon any statement, representation or promise of another party (or of any officer, agent, employee, representative, or attorney for another party), in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

7.7      It knows of no other Person that may claim an interest in any of the Claims disposed of by such party and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

7.8      It has made such investigation of the facts pertaining to this settlement and Sections 1.1 and 6 of this Agreement, and of all the matters pertaining thereto, as it deemed necessary.

7.9      It will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.      Indemnification.   The agreements contained in Sections 1.1 and 6 of this Agreement may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation

-7-

of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.      Miscellaneous.

9.1      Entire Agreement.   This Agreement constitutes the entire agreement between the parties hereto and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.  This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party hereto to be bound thereby.

9.2      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of Company.  Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties. The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 of this Agreement, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 of this Agreement.

9.4      Governing Law.  This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5      Notices.  All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

-8-

If to Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618

Attention: Kurtis J. Binder and Jerry C. Huang
Email No.: kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention: R. Scott Shean and David C. Lee
Email No.: scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention: Charles Hsieh
Email: charles.hsieh@le.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention: Michael V. Gisser and Michael J. Mies
Email: michael.gisser@skadden.com and michael.mies@skadden.com

Any party hereto may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party hereto may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other party notice in the manner herein set forth.

9.6     Consent to Jurisdiction. Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action

or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.5</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

       9.7    <u>Severability of Provisions</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

       9.8    <u>Specific Performance</u>. The parties to this Agreement agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the parties in accordance with their specific terms. It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement. Any such injunction(s) or action seeking specific performance shall be sought in California State court.

[<em>signature page follows</em>]

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____
Name: _____
Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____
Name: _____
Title: _____

*[signatures continued on next page]*

<u>COMPANY</u>

VIZIO, INC.


By: _____

Name: _____

Title: _____

**EXHIBIT B**

## Message

| | |
|---|---|
| **From:** | Ben Wong [Ben.Wong@vizio.com] |
| **Sent:** | 4/4/2017 5:59:22 AM |
| **To:** | Winston.CHENG（郑孝明）[/o=LETV/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Winston.CHENG768] |
| **Subject:** | Fwd: revised agreement |
| **Attachments:** | image001.png; ATT00001.htm; image002.png; ATT00002.htm; Framework__Termination_and_Mutual_General_Release_VIZIO redline 040317.docx; ATT00003.htm; VIZIO revised agreement - clean 040317.docx; ATT00004.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Jerry C. Huang" <Jerry.Huang@vizio.com>
> **Date:** April 4, 2017 at 00:05:35 PDT
> **To:** "winston.cheng@le.com" <winston.cheng@le.com>
> **Cc:** Ben Wong <Ben.Wong@vizio.com>, Kurtis Binder <Kurtis.Binder@vizio.com>
> **Subject: revised agreement**
>
> Hello Winston,
>
> Per Ben's request, I am forwarding a redline and a clean version of our response to Skadden's earlier draft. There are some stylistic changes and clean ups. The substantive changes should track pretty closely to your discussions/agreement with Ben. Thanks.
>
> Best,
>
> Jerry

LEECO0002017

Jerry C. Huang
VIZIO // Vice President, General Counsel
O 949.777.0785  C 949.945.8260
39 TESLA, IRVINE, CA 92618

Make Some Noise!
Earn Points. Win Prizes.
VIZIOFanZone.com

LEECO0002018

LEECO0002019

SASMF Draft 4/2/17

FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT

Style Definition: Header

Style Definition: Footer

THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "Agreement") is entered into as of April [3], 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Buyer"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("Merger Sub").~) and VIZIO, Inc., a California corporation (the "Company" or "VIZIO"). Buyer, Merger Sub and Company are sometimes referred to herein collectively as the "Parties" and individually as a "Party". Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

WHEREAS, Buyer, Merger Sub, the Company and Shareholder Representative Services LLC, a Colorado limited liability company in its capacity as the representative of the holders of Company capital stock or options ("Shareholder Representative"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "Merger Agreement") pursuant to which it wasis proposed that Merger Sub wouldwill merge with and into the Company, with the Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "Merger"); and

WHEREAS, Buyer and the Company now desire to terminate the Merger Agreement and enter into the Aagreements contained herein on the terms and conditions set forth herein; and.

WHEREAS, concurrently with the execution and delivery of this Agreement and in accordance with the terms and conditions of this Agreement, as a material inducement to each Party's willingness to enter into this Agreement and as consideration for terminating the Merger Agreement: (i) Buyer will pay US$100,000,000 as follows: (x) Buyer shall direct the Escrow Agent to pay the US$40,000,000 of Buyer Termination Fee Deposit to the Company concurrent with execution of this Agreement, (y) Buyer shall direct the Escrow Agent to pay the remaining US$10,000,000 of Buyer Termination Fee Deposit to the Company upon execution of the JV Agreement, and (z) Buyer shall contribute, or cause to be contributed, assets with a fair market value equal to US$50,000,000, as a capital contribution to the China JV (as defined below); (ii) the Company shall make the LeEco Le App (as defined below) available on its compatible televisions and displays; and (iii) Buyer shall make Inscape Data Client (as defined below) available on its compatible televisions and displays.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Pparties, intending to be legally bound, do hereby agree to the following:

1.    Termination of Merger Agreement and Release of Buyer Termination Fee Deposit.

1.1    Termination.  Effective upon receipt by the Company of the Buyer the $40,000,000 of Termination Fee Deposit pursuant to Section 1.2 hereof (the "Effective Time"), Buyer and the Company hereby terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement (the "Termination").  From and after the Effective Time, the Merger

Formatted: Justified

-1-

LEECO0002020

Agreement shall become null and void, and the rights and obligations of each applicable Party or any of its or their Affiliates to any other Party under the Merger Agreement shall terminate, except for Section 6.5 (Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the Merger Agreement and the terms governing the release of the remaining Termination Fee Deposit. ~~Buyer and Company agree to terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement, effective as of the date hereof (the "Termination").~~

1.2   Release of Buyer Termination Fee Deposit.  In connection with and as full consideration for the Termination and~~,~~ the releases set forth in Section 6 hereof, concurrently with~~below,~~ the execution and delivery of this Agreement by~~entry into~~ the Company to Buyer~~commercial arrangements contemplated in Section 2 below and the entry into a joint venture as contemplated in Section 3 below,~~ Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

Formatted: Underline

1.2.1   Buyer agrees to concurrently with the execution of this Agreement to~~immediately~~ issue a Joint Release Instruction, in the form as attached as Exhibit "A" herewith, (as such term is defined in the Escrow Agreement, dated as of July 6, 2016, by and among Buyer, Company, Shareholder Representative and the Escrow Agent (the "Escrow Agreement")) with Company releasing forty~~twenty~~ million dollars ($40~~20~~,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

1.2.2   Concurren~~l~~tly with the~~Upon~~ consummation of the JV Agreement (as defined below), Buyer agrees to issue a Joint Release Instruction, ~~(as defined~~ in the form as attached as Exhibit "B" herewith,~~Escrow Agreement)~~ with Company releasing the remaining ten~~thirty~~ million dollars ($10~~30~~,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company ~~within three (3) business days of the date of consummation of the JV Agreement~~.

2.   Commercial Relationships.

2.1   LeEco Le App.

2.1.1   Buyer shall develop and obtain certification of an application to be made available by the Company on all of the Company's smart televisions and displays in North America (the "LeEco Le App").

Formatted: Justified

2.1.2   Company shall make the LeEco Le App available on all its compatible smart televisions and displays in North America ~~on the first screen of the Company app~~ for all Google Chromecast-enabled televisions and displays as well as for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "App Processes").  The Company and Buyer shall enter into the Company's customary form agreement(s) for such arrangements.  The Company shall use reasonable efforts to assist in the App Processes; provided that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the LeEco Le App.

-2-

LEECO0002021

2.2     Inscape Data.

2.2.1    The Company shall develop and obtain certification of a data client to be made available by Buyer on all of Buyer's smart televisions and displays (the "Inscape Data Client")

*Formatted: Justified*

2.2.2    Buyer shall include the Inscape Data Client on all its smart televisions and displays for a period of three (3) years from the date that the Inscape Data Client obtains certification, subject to customary engineering and certification processes (the "Data Client Processes"). Buyer will use reasonable efforts to assist with the Data Client Processes, provided that Company shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the Inscape Data Client and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the Inscape Data Client.

2.2.3    Subject to applicable law, each of the Company and Buyer ~~shall come to an agreement on pricing on a per user/per television basis.~~

2.2.1 2.2.3    ~~Company~~ shall have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV. ~~Buyer shall also have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV.~~

*Formatted: Justified*

3.      Formation of a Joint Venture.

*Formatted: Keep with next*

3.1     Following the Effective Time, the ~~The~~ Parties shall~~agree to~~ negotiate in good faith and use reasonable efforts to form a commercial relationship between the Company and Buyer for expansion efforts in the People's Republic of China ("China") . The proposed commercial relationship would provide for (i) the Company granting the China JV ~~(as defined below)~~ the right to sell Company televisions in China subject to the mutual consent of the Company and Buyer on~~to~~ branding and distribution; (ii) the Company preloading EUI and Le contents on Company televisions and displays sold in China; and (iii) the Company and Buyer entering into the joint venture in China as described in this Section 3~~below~~ (the "China JV").

*Formatted: Justified, Keep with next*

3.2     The proposed terms of the China JV are as follows:

*Formatted: Justified*

3.2.1    In connection therewith, Buyer will contribute non-cash assets with a fair market value equal to US$50,000,000 as a capital contribution to the China JV (the "Buyer Contribution"). The fair market valuation shall be audited and verified by an independent, internationally recognized accounting firm.

3.2.2    The China JV will have an operational life of three (3) years from the effective date of a formal joint venture agreement (the "JV Agreement") between Buyer and the Company (the "Initial JV Term~~Agreement~~").

3.2.3    The China JV will be owned and controlled 50% by the Company and 50% by Buyer.

791436.01C LACSR01A  MSW

LEECO0002022

3.2.4    The China JV will promote and /market Company-branded devices (televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in China.

3.2.5    The China JV will operate with the goal of deploying a mutually agreed upon number by Buyer and the Company of~~an aggregate of [1.5 million]~~ Company-branded televisions and displays in China within the Initial ~~three (3) years from the effective date of the~~ JV Term and achieving such unit sales volume target for the China JV (the "Sales Target").~~Agreement.~~

       (a)    The~~If the China JV does not reach the [1.5 million] units within such three (3) year period, the JV Agreement will provide that Buyer will pay Company US$[•] (in cash or value equivalent) per unit for the difference between [1.5 million] minus the actual units sold through retail, mass and/or direct channels.~~ Company shall sell units to the China JV at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV.

       ~~(b)    Buyer and Company will negotiate in good faith to extend the initial three-year operational life of the China JV if the above deployment goal is reached.~~

       (~~a~~b)    The profit on ~~sold through~~ units sold by the China JV, i.e. through advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the China JV's equity holders on a quarterly basis. Formatted: Justified

       (c)    Upon achievement of the Sales Target during the Initial JV Term, Buyer and the Company will negotiate in good faith to extend the Initial JV Term.

3.2.6    During the Initial JV Term~~initial 3-year operational life of the China JV~~, Company-branded devices will be distributed in China exclusively through the China JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming platform.

3.2.7    The JV Agreement will provide that Buyer will lend up to an~~ aggregate of [XXXXXXXX] to the China JV for working capital purposes over the Initial JV Term (the "Buyer Loan").~~its initial three-year operational life.~~ Formatted: Justified

       (a)    Company and Buyer shall agree upon a three-year Sales Target~~unit sales volume target~~ for the China JV, ~~(the "Target")~~. If the China JV achieves the Sales Target in the Initial JV Term~~initial three-year operational life~~ and the parties agree to continue the China JV operations, then the loan shall be repaid in full.

       (b)    Notwithstanding the foregoing, Company will consider participating in the China JV's financial obligations only after it receives full US$50,000,000, in cash or value equivalents, such value equivalents to include assets contributed to the China JV by Buyer and its Affiliates at fair market value.

4.    Formal Agreements.  Buyer and the Company~~The parties~~ shall negotiate in good faith and execute one or more agreements to document the China JV and the other commercial Formatted: Justified

-2-

LEECO0002023

arrangements set forth in Sections 2 and 3 hereof~~above~~ with the terms specified therein within forty-five (45) days of the date hereof.

**Formatted: Underline**
**Formatted: Underline**

5.   Publicity; Confidentiality and Mutual Non-Disparagement.

5.1   Except for a mutually agreed press release stating that the parties to the Merger Agreement have determined to terminate the Merger Agreement due to failure to obtain PRC regulatory approvals, the Parties~~force majeure, the parties hereto~~ will keep confidential the terms and status of this Agreement and the transactions contemplated hereby and thereby and none of the Parties shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by applicable law, in which case the other Party shall be advised and the Parties shall use their reasonable commercial efforts to cause a mutually agreeable release or announcement to be issued.

**Formatted: Justified**

5.2   The Parties shall each refrain from making, and shall cause their respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors, assigns, officers, key employees or directors not to make, any public statement or announcement that (i) states or implies that any ~~P~~party or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or is reasonably likely to damage the business or reputation of, (x) in the case of statements or announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or (y) in the case of statements or announcements by the Buyer or Merger Sub, the Company or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of the Company or any of its Affiliates or subsidiaries. The foregoing shall not restrict the ability of any person to comply with any subpoena or other legal process or respond to a request for information from any governmental authority with jurisdiction over the ~~P~~party from whom information is sought.

6.   Release and Waiver.

6.1   Release By Buyer and Merger Sub.   Effective as of the Effective Time~~date~~ ~~hereof,~~ except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Buyer Party Releasor" and collectively, the "Buyer Party Releasors") ~~"),~~ ~~agrees to, and~~ hereby ~~does,~~ generally releases, remises~~release, remise~~ and forever discharges ~~the~~discharge Company and the Company's past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Company Released Party" and collectively, the "Company Released Parties") from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations,

**Formatted: Justified**

-2-

rights, duties, contracts, agreements, undertakings, accounts, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "Claims") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub or any of their Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by the Company, (c) the termination of the Merger Agreement or (d̶e̶) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d̶e̶), the "Buyer Party Released Claims"); provided, however, the Buyer Party Released Claims shall not include any Claims arising from any breach by the Company of its obligations under this Agreement.").

      6.2    Release By Company.  Effective as of the full release of the Buyer Termination Fee Deposit of $50,000,000d̶a̶t̶e̶ ̶h̶e̶r̶e̶o̶f̶, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Company Releasor" and collectively, the "Company Releasors") "̶)̶, ̶a̶g̶r̶e̶e̶s̶ ̶t̶o̶, ̶a̶n̶d̶ hereby d̶o̶e̶s̶, generally releases, remisesr̶e̶l̶e̶a̶s̶e̶, ̶r̶e̶m̶i̶s̶e̶ and forever discharges Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Buyer Released Party" and collectively, the "Buyer Released Parties") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d̶ ̶o̶r̶ ̶(̶c̶) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, the "Company Released Claims"); provided, however, the Company Released Claims shall not include any Claims arising from any breach by Buyer or Merger Sub of its obligations under this Agreement.").

      6.3    Covenant Not To Sue.  Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim.  The Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither the Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any

-2-

LEECO0002025

way, or cause to be commenced or instituted any proceeding of any kind against any Buyer
Released Party in respect of any Company Released Claim.

6.4    Waiver. The Parties acknowledge that (a) Section 1542 of the California
Civil Code provides, and (b) certain other states have provisions substantially as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR
AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH
THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving
claims which it does not know exist or may exist. Nonetheless, each Party agrees that the waiver
of such provisions is a material portion of the releases intended by this Agreement, and each
Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have
under Section 1542 of the California Civil Code and any similar such provisions of any
jurisdiction. In connection with such waiver and relinquishment, the Parties hereby acknowledge
that they or their attorneys may hereafter discover claims or facts in addition to, or different
from, those which he now knows or believes to exist, but that they expressly agree to fully,
finally and forever settle and release any and all Claims, known or unknown, suspected or
unsuspected, which exist or may exist on their behalf against the Company Released Parties and
the Buyer Released Parties at the time of execution of this Agreement.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY
HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM
THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE
MATTERS RELEASED HEREIN. NEVERTHELESS, IT IS THE INTENTION OF EACH
PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH
MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY
EXIST, OR HERETOFORE HAVE EXISTED BETWEEN THEM. IN FURTHERANCE OF
SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN
EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS,
NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR
DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

7.    Representations and Warranties. Each Party~~party to the Agreement~~ represents
and warrants and agrees as follows:

7.1    Such Party~~It~~ has all requisite power and authority to execute, deliver and
perform this Agreement. The execution, delivery and performance of this Agreement (including,
without limitation, the releases set forth herein) have, to the extent required, been duly and
validly authorized by all corporate proceedings of such Party.

7.2    No authorization, approval or other action, and no notice to or filing with,
any governmental authority or regulatory body is required for the due execution, delivery and/or
performance of this Agreement by such Party.

-2-

LEECO0002026

7.3     Such Pparty or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents. In executing this Agreement, such Pparty, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

7.4     Such PartyIt has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

7.5     Such PartyIt has received independent legal advice with respect to the matters set forth in this Agreement,and the Claims released in Sections 1.1 and 6 hereofof this Agreement and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

7.6     Such PartyIt does not rely upon any statement, representation or promise of another Pparty (or of any officer, agent, employee, representative, or attorney for another Pparty), in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

7.7     Such PartyIt knows of no other Person that may claim an interest in any of the Claims disposed of by such Pparty and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

7.8     Such PartyIt has made such investigation of the facts pertaining to this settlement and Sections 1.1 and 6 hereofof this Agreement, and of all the matters pertaining thereto, as it deemed necessary.

7.9     Such PartyIt will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.     Indemnification.  The agreements contained in Sections 1.1 and 6 hereofof this Agreement may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.     Miscellaneous.

9.1     Entire Agreement.  This Agreement constitutes the entire agreement between the Partiesparties hereto and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.  This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Partyparty hereto to be bound thereby.

-2-

791436.01C LACSR01A  MSW

LEECO0002027

9.2     Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3     Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.   Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties.  The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 hereof this Agreement, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 hereof this Agreement.

9.4     Governing Law.   This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5     Notices.   All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.   In each case notice shall be sent to:

-2-

LEECO0002028

If to Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618

Attention:  Kurtis J. Binder and Jerry C. Huang
Email: ~~No.:~~ kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email: ~~No.:~~ scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention:  Charles Hsieh
Email:  charles.hsieh@le.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention:  Michael V. Gisser and Michael J. Mies
Email:  michael.gisser@skadden.com and michael.mies@skadden.com

Any Party ~~party hereto~~ may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party ~~party hereto~~ may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other Pparty notice in the manner herein set forth.

9.6    Consent to Jurisdiction.    Each Pparty hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action

Formatted: Justified

-2-

~~791436.01C-LACSR01A-MSW~~

LEECO0002029

or proceeding may be heard and determined in such California State court or, to the extent
permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and
effectively do so, any objection which it may now or hereafter have to the laying of venue of any
such action or proceeding in any such California State or Federal court, and (d) waives, to the
fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such
action or proceeding in any such California State or Federal court. Each of the Parties~~parties~~
~~hereto~~ agrees that a final judgment in any such action or proceeding shall be conclusive and may
be enforced in other jurisdictions by suit on the judgment or in any other manner provided by
law. Each Party ~~party to this Agreement~~ irrevocably consents to service of process in the manner
provided for notices in Section 9.5 hereof. Nothing in this Agreement will affect the right of any
Party~~party to this Agreement~~ to serve process in any other manner permitted by law.

> 9.7     Severability of Provisions.    If any term or other provision of this
Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or
public policy, all other terms and other provisions of this Agreement shall nevertheless remain in
full force and effect so long as the economic or legal substance of the transactions contemplated
by this Agreement is not affected in any manner materially adverse to any Pparty. Upon such
determination that any term or other provision is invalid, illegal or incapable of being enforced,
the Parties~~parties hereto~~ shall negotiate in good faith to modify this Agreement so as to effect the
original intent of the Pparties as closely as possible in an acceptable manner to the end that the
transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

> 9.8     Specific Performance.    The Parties~~parties to this Agreement~~ agree that
irreparable damage would occur in the event that any of the provisions of this Agreement were
not performed by, or were otherwise breached by, the Pparties in accordance with their specific
terms. It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction
or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the
terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or
injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce
specifically the terms and provisions of this Agreement.  Any such injunction(s) or action
seeking specific performance shall be subject to Section 9.6 hereof~~sought in California State~~
~~court~~.

*[signature page follows]*            ⟵ ─ ─ ┤ **Formatted: BodyText 1** │

-2-

LEECO0002030

**Formatted:** Normal, Justified

LEECO0002031

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____
Name: _____
Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____
Name: _____
Title: _____

Formatted: Underline

Formatted: Indent: Before: 0"

[signatures continued on next page]

LEECO0002032

<u>COMPANY</u>

VIZIO, INC.

By: _____
Name: _____
Title: _____

LEECO0002033

Exhibit A

## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
## FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

April [  ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

    Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

    1.    The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$40,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

    Account Name: VIZIO, Inc.
    Account Number: 83900266
    Bank Name: East West Bank
    ABA Number: 322070381
    Bank Address: 19540 Jamboree, Irvine, CA 92612
    Beneficiary Address: 39 Tesla, Irvine, CA 92618
    Amount: US$40,000,000.00

    2.    No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

LEECO0002034

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____


LEECO V LTD.

By: _____
Name: _____
Title: _____

US-DOCS\83351417.10

LEECO0002035

Exhibit B

## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT
## FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

[ ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

    Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

    3.    The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$10,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

    Account Name: VIZIO, Inc.
    Account Number: 83900266
    Bank Name: East West Bank
    ABA Number: 322070381
    Bank Address: 19540 Jamboree, Irvine, CA 92612
    Beneficiary Address: 39 Tesla, Irvine, CA 92618
    Amount: US$10,000,000.00

    4.    No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

LEECO0002036

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____

LEECO V LTD.

By: _____
Name: _____
Title: _____

LEECO0002037

LEECO0002038

FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT

      THIS FRAMEWORK, TERMINATION AND MUTUAL GENERAL RELEASE AGREEMENT (this "Agreement") is entered into as of April [3], 2017, by and between LeEco V Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Buyer"), Le V Merger Sub Inc., a California corporation and indirect wholly owned subsidiary of Buyer ("Merger Sub"), and VIZIO, Inc., a California corporation (the "Company" or "VIZIO"). Buyer, Merger Sub and Company are sometimes referred to herein collectively as the "Parties" and individually as a "Party". Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Merger Agreement (as defined below).

RECITALS

      WHEREAS, Buyer, Merger Sub, the Company and Shareholder Representative Services LLC, a Colorado limited liability company solely in its capacity as the representative of the holders of Company capital stock or options ("Shareholder Representative"), entered into that certain Agreement and Plan of Merger, dated July 6, 2016 (the "Merger Agreement") pursuant to which it was proposed that Merger Sub would merge with and into the Company, with the Company surviving and continuing operations as a wholly owned subsidiary of Buyer (the "Merger");

      WHEREAS, Buyer and the Company now desire to terminate the Merger Agreement and enter into the Agreement contained herein on the terms and conditions set forth herein; and

      WHEREAS, concurrently with the execution and delivery of this Agreement and in accordance with the terms and conditions of this Agreement, as a material inducement to each Party's willingness to enter into this Agreement and as consideration for terminating the Merger Agreement: (i) Buyer will pay US$100,000,000 as follows: (x) Buyer shall direct the Escrow Agent to pay the US$40,000,000 of Buyer Termination Fee Deposit to the Company concurrent with execution of this Agreement, (y) Buyer shall direct the Escrow Agent to pay the remaining US$10,000,000 of Buyer Termination Fee Deposit to the Company upon execution of the JV Agreement, and (z) Buyer shall contribute, or cause to be contributed, assets with a fair market value equal to US$50,000,000, as a capital contribution to the China JV (as defined below); (ii) the Company shall make the LeEco Le App (as defined below) available on its compatible televisions and displays; and (iii) Buyer shall make Inscape Data Client (as defined below) available on its compatible televisions and displays.

      NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties, intending to be legally bound, hereby agree to the following:

    1.    Termination of Merger Agreement and Release of Buyer Termination Fee Deposit.

      1.1    Termination. Effective upon receipt by the Company of the Buyer the $40,000,000 of Termination Fee Deposit pursuant to Section 1.2 hereof (the "Effective Time"), Buyer and the Company hereby terminate the Merger Agreement pursuant to Section 9.1(a) of the Merger Agreement (the "Termination"). From and after the Effective Time, the Merger

LEECO0002039

Agreement shall become null and void, and the rights and obligations of each applicable Party or any of its or their Affiliates to any other Party under the Merger Agreement shall terminate, except for Section 6.5 (Confidentiality of Terms of Transaction, Etc.) and Article XI (Miscellaneous) of the Merger Agreement and the terms governing the release of the remaining Termination Fee Deposit.

      1.2    Release of Buyer Termination Fee Deposit. In connection with and as full consideration for the Termination and the releases set forth in Section 6 hereof, concurrently with the execution and delivery of this Agreement by the Company to Buyer, Buyer agrees to release the Buyer Termination Fee Deposit to Company as follows:

      1.2.1    Buyer agrees to concurrently with the execution of this Agreement to issue a Joint Release Instruction, in the form as attached as Exhibit "A" herewith, (as such term is defined in the Escrow Agreement, dated as of July 6, 2016, by and among Buyer, Company, Shareholder Representative and the Escrow Agent (the "Escrow Agreement")) with Company releasing forty million dollars ($40,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

      1.2.2    Concurrenlty with the consummation of the JV Agreement (as defined below), Buyer agrees to issue a Joint Release Instruction, in the form as attached as Exhibit "B" herewith, with Company releasing the remaining ten million dollars ($10,000,000) from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement) to Company.

      2.    Commercial Relationships.

      2.1    LeEco Le App.

      2.1.1    Buyer shall develop and obtain certification of an application to be made available by the Company on all of the Company's smart televisions and displays in North America (the "LeEco Le App").

      2.1.2    Company shall make the LeEco Le App available on all its compatible smart televisions and displays in North America for all Google Chromecast-enabled televisions and displays as well as for VIA devices for a period of three (3) years from the date that the LeEco Le App obtains certification, subject to customary engineering and certification processes (the "App Processes"). The Company and Buyer shall enter into the Company's customary form agreement(s) for such arrangements. The Company shall use reasonable efforts to assist in the App Processes; provided that Buyer shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the LeEco Le App and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the LeEco Le App.

      2.2    Inscape Data.

2.2.1   The Company shall develop and obtain certification[1] of a data client to be made available by Buyer on all of Buyer's smart televisions and displays (the "Inscape Data Client")

2.2.2   Buyer shall include the Inscape Data Client on all its smart televisions and displays for a period of three (3) years from the date that the Inscape Data Client obtains certification, subject to customary engineering and certification processes (the "Data Client Processes"). Buyer will use reasonable efforts to assist with the Data Client Processes; provided that Company shall be solely responsible for all expenses related to and arising from (a) engineering, development and certification of the Inscape Data Client and (b) taking the necessary measures to comply with applicable Laws in the engineering, development and certification of the Inscape Data Client.

2.2.3   Subject to applicable law, each of the Company and Buyer shall have access to Inscape data sold by the China JV so long as it holds at least 50% of the ownership interests in the China JV.

3.      Formation of a Joint Venture.

3.1   Following the Effective Time, the Parties shall negotiate in good faith and use reasonable efforts to form a commercial relationship between the Company and Buyer for expansion efforts in the People's Republic of China ("China"). The proposed commercial relationship would provide for (i) the Company granting the China JV the right to sell Company televisions in China subject to the mutual consent of the Company and Buyer on branding and distribution; (ii) the Company preloading EUI and Le contents on Company televisions and displays sold in China; and (iii) the Company and Buyer entering into the joint venture in China as described in this Section 3 (the "China JV").

3.2   The proposed terms of the China JV are as follows:

3.2.1   In connection therewith, Buyer will contribute non-cash assets with a fair market value equal to US$50,000,000 as a capital contribution to the China JV (the "Buyer Contribution"). The fair market valuation shall be audited and verified by an independent, internationally recognized accounting firm.

3.2.2   The China JV will have an operational life of three (3) years from the effective date of a formal joint venture agreement (the "JV Agreement") between Buyer and the Company (the "Initial JV Term").

3.2.3   The China JV will be owned and controlled 50% by the Company and 50% by Buyer.

3.2.4   The China JV will promote and market Company-branded devices (televisions, displays, sound bars, etc.) through Buyer's current distributing/omni channels in China.

LEECO0002041

3.2.5    The China JV will operate with the goal of deploying a mutually agreed upon number by Buyer and the Company of Company-branded televisions and displays in China within the Initial JV Term and achieving such unit sales volume target for the China JV (the "Sales Target").

(a)    The Company shall sell units to the China JV at reasonable competitive rates that allow a reasonable margin of profit per unit sold by the China JV.

(b)    The profit on units sold by the China JV, i.e. through advertising, subscriptions, contents and hardware, etc. will be distributed pro rata to the China JV's equity holders on a quarterly basis.

(c)    Upon achievement of the Sales Target during the Initial JV Term, Buyer and the Company will negotiate in good faith to extend the Initial JV Term.

3.2.6    During the Initial JV Term, Company-branded devices will be distributed in China exclusively through the China JV, with EUI and Le content (or as designated by Buyer) as the exclusive content/streaming platform.

3.2.7    The JV Agreement will provide that Buyer will lend up to an aggregate of [XXXXXXXX] to the China JV for working capital purposes over the Initial JV Term (the "Buyer Loan").

(a)    Company and Buyer shall agree upon a three-year Sales Target for the China JV.  If the China JV achieves the Sales Target in the Initial JV Term and the parties agree to continue the China JV operations, then the loan shall be repaid in full.

(b)    Notwithstanding the foregoing, Company will consider participating in the China JV's financial obligations only after it receives full US$50,000,000, in cash or value equivalents, such value equivalents to include assets contributed to the China JV by Buyer and its Affiliates at fair market value.

4.    Formal Agreements.  Buyer and the Company shall negotiate in good faith and execute one or more agreements to document the China JV and the other commercial arrangements set forth in Sections 2 and 3 hereof with the terms specified therein within forty-five (45) days of the date hereof.

5.    Publicity; Confidentiality and Mutual Non-Disparagement.

5.1    Except for a mutually agreed press release stating that the parties to the Merger Agreement have determined to terminate the Merger Agreement due to failure to obtain PRC regulatory approvals, the Parties will keep confidential the terms and status of this Agreement and the transactions contemplated hereby and thereby and none of the Parties shall, without the approval of the other, make any press release or other announcement concerning the existence of this Agreement or the terms of the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by applicable law, in which case the other Party shall be advised and the Parties shall use their reasonable commercial efforts to cause a mutually agreeable release or announcement to be issued.

LEECO0002042

5.2     The Parties shall each refrain from making, and shall cause their respective Affiliates and their and their respective agents, subsidiaries, affiliates, successors, assigns, officers, key employees or directors not to make, any public statement or announcement that (i) states or implies that any Party or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, violated or breached the Merger Agreement or (ii) constitutes an ad hominem attack on, or that otherwise disparages, impugns or is reasonably likely to damage the business or reputation of, (x) in the case of statements or announcements by Company, Buyer, Merger Sub or any of their respective Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of Buyer, Merger Sub or any of their respective Affiliates or subsidiaries, or (y) in the case of statements or announcements by the Buyer or Merger Sub, the Company or its Affiliates or subsidiaries or any of its or their respective officers or directors or any person who has served as an officer or director of the Company or any of its Affiliates or subsidiaries.  The foregoing shall not restrict the ability of any person to comply with any subpoena or other legal process or respond to a request for information from any governmental authority with jurisdiction over the Party from whom information is sought.

6.     <u>Release and Waiver</u>.

6.1     <u>Release By Buyer and Merger Sub</u>.  Effective as of the Effective Time, except as expressly set forth herein, Buyer and Merger Sub, each on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "<u>Buyer Party Releasor</u>" and collectively, the "<u>Buyer Party Releasors</u>") hereby generally releases, remises and forever discharges the Company and the Company's past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "<u>Company Released Party</u>" and collectively, the "<u>Company Released Parties</u>") from any and all claims, demands, causes of action, judgments, liens, indebtedness, obligations, rights, duties, contracts, agreements, undertakings, accounts, damages, liabilities, losses, costs or expenses, including attorneys' fees, of any kind or nature whatsoever (collectively, "<u>Claims</u>") whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof, relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Buyer or Merger Sub or any of their Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by the Company, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "<u>Buyer Party Released Claims</u>"); <u>provided</u>, however, the Buyer Party Released Claims shall not include any Claims arising from any breach by the Company of its obligations under this Agreement.

6.2     Release By Company.   Effective as of the full release of the Buyer Termination Fee Deposit of $50,000,000, except as expressly set forth herein, the Company, on behalf of itself and its current, former and future parents, subsidiaries, Affiliates, related entities, predecessors, successors, officers, directors, managers, members, shareholders, agents, employees and assigns (individually, each a "Company Releasor" and collectively, the "Company Releasors") hereby generally releases, remises and forever discharges Buyer, Merger Sub and each of their respective past, present and future Affiliates, divisions, parents and subsidiaries and their respective shareholders, owners, representatives, attorneys, agents, officers, directors, managers, employees, assigns, heirs and successors in interest, and each of them (each a "Buyer Released Party" and collectively, the "Buyer Released Parties") from any and all Claims whether known or unknown, liquidated or contingent, whether brought in an individual, derivative or representative capacity, now existing or hereafter arising, under contract, tort, violation of law or any other theory of liability, that arise out of or in any way relate, directly or indirectly, to any matter, cause or thing, act or failure to act whatsoever occurring at any time on or prior to the date hereof relating to or arising from (a) negotiation or entry into the Merger Agreement, (b) any breach (or claim by Company or any of its Affiliates of breach) of the Merger Agreement or any of the agreements ancillary thereto by Buyer or Merger Sub, (c) the termination of the Merger Agreement or (d) any of the transactions that have occurred pursuant to or are contemplated by the Merger Agreement or any of the agreements ancillary thereto (collectively, subclauses (a)-(d), the "Company Released Claims"); provided, however, the Company Released Claims shall not include any Claims arising from any breach by Buyer or Merger Sub of its obligations under this Agreement.

6.3     Covenant Not To Sue.   Buyer and Merger Sub, each on behalf of itself and the other Buyer Party Releasors, irrevocably covenants that neither Buyer, Merger Sub nor any of the other Buyer Party Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Company Released Party in respect of any Buyer Party Released Claim.   The Company, on behalf of itself and the other Company Releasors, irrevocably covenants that neither the Company nor any of the other Company Releasors will, directly or indirectly, assert any Claim or demand, commence, institute, or voluntarily aid in any way, or cause to be commenced or instituted any proceeding of any kind against any Buyer Released Party in respect of any Company Released Claim.

6.4     Waiver.   The Parties acknowledge that (a) Section 1542 of the California Civil Code provides, and (b) certain other states have provisions substantially as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Each Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist.   Nonetheless, each Party agrees that the waiver of such provisions is a material portion of the releases intended by this Agreement, and each Party expressly waives and relinquishes any and all Claims, rights or benefits that it may have

LEECO0002044

under Section 1542 of the California Civil Code and any similar such provisions of any jurisdiction. In connection with such waiver and relinquishment, the Parties hereby acknowledge that they or their attorneys may hereafter discover claims or facts in addition to, or different from, those which he now knows or believes to exist, but that they expressly agree to fully, finally and forever settle and release any and all Claims, known or unknown, suspected or unsuspected, which exist or may exist on their behalf against the Company Released Parties and the Buyer Released Parties at the time of execution of this Agreement.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT IS AWARE THAT IT MAY HEREAFTER DISCOVER CLAIMS OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE IT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE MATTERS RELEASED HEREIN. NEVERTHELESS, IT IS THE INTENTION OF EACH PARTY TO FULLY, FINALLY AND FOREVER SETTLE AND RELEASE ALL SUCH MATTERS, AND ALL CLAIMS RELATIVE THERETO, WHICH DO NOW EXIST, MAY EXIST, OR HERETOFORE HAVE EXISTED BETWEEN THEM. IN FURTHERANCE OF SUCH INTENTION, THE RELEASES GIVEN HEREIN SHALL BE AND REMAIN IN EFFECT AS FULL AND COMPLETE GENERAL RELEASES OF ALL SUCH MATTERS, NOTWITHSTANDING THE DISCOVERY OR EXISTENCE OF ANY ADDITIONAL OR DIFFERENT CLAIMS OR FACTS RELATIVE THERETO.

7.    <u>Representations and Warranties</u>. Each Party represents and warrants and agrees as follows:

7.1    Such Party has all requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement (including, without limitation, the releases set forth herein) have, to the extent required, been duly and validly authorized by all corporate proceedings of such Party.

7.2    No authorization, approval or other action, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and/or performance of this Agreement by such Party.

7.3    Such Party or representative thereof has read and considered this Agreement in its entirety and fully understands its contents and the significance of its contents. In executing this Agreement, such Party, or representative thereof, does so with full knowledge of any and all rights that it may have with respect to the matters set forth and the Claims released in this Agreement.

7.4    Such Party has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the Claims disposed of by this Agreement.

7.5    Such Party has received independent legal advice with respect to the matters set forth in this Agreement, the Claims released in <u>Sections 1.1</u> and <u>6</u> hereof and with respect to the rights and asserted rights arising out of such matters, and is entering into this Agreement of its own free will.

7.6    Such Party does not rely upon any statement, representation or promise of another Party (or of any officer, agent, employee, representative, or attorney for another Party),

in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

7.7     Such Party knows of no other Person that may claim an interest in any of the Claims disposed of by such Party and is not aware of any litigation, arbitration or other pending proceeding regarding such Claims.

7.8     Such Party has made such investigation of the facts pertaining to this settlement and Sections 1.1 and 6 hereof, and of all the matters pertaining thereto, as it deemed necessary.

7.9     Such Party will execute all such further and additional documents as shall be reasonable and necessary to carry out the provisions of this Agreement.

8.     Indemnification.  The agreements contained in Sections 1.1 and 6 hereof may be pleaded by any of the Buyer Released Parties or Company Released Parties as a full and complete defense and may be used as the basis for an injunction against any action at law or equity instituted or maintained against any of them in violation hereof.  If any Claim is brought or maintained against any Buyer Released Party or Company Released Party in violation of this Agreement, the releasing party will be responsible for all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the released party in defending same.

9.     Miscellaneous.

9.1     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between such parties, written or oral, that may have related in any way to the subject matter hereof.  This Agreement may not be amended except in a written instrument executed by Buyer and Company.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.

9.2     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.3     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of Law, through a change in control or otherwise) by Company without the prior written consent of Buyer and Merger Sub, or by Buyer or Merger Sub without the prior written consent of the Company.  Specifically with respect to Sections 1.1 and 6 hereof, this Agreement is binding upon the Parties, the Buyer Party Releasors and Company Releasors and their respective successors or assigns, and will inure to the benefit of each of the Buyer Released Parties and the Company Released Parties.  The Parties acknowledge and agree that each of the Buyer Released Parties and the Company Released Parties is a third party beneficiary of Sections 1.1 and 6 hereof, and shall be entitled to enforce the provisions in this Agreement against the Company Releasors or Buyer Party Releasors, respectively, to the same extent as if such Buyer Released Parties and Company Released Parties were party to Sections 1.1 and 6 hereof.

LEECO0002046

9.4     Governing Law.  This Agreement (and any claim or controversy arising out of or relating to this Agreement) shall be governed by and construed in accordance with the domestic Laws of the State of California without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of California.

9.5     Notices.  All notices, requests, demands, claims and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by email (with electronic confirmation of transmission); the Business Day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express); and five Business Days after the date mailed by certified or registered mail, postage prepaid, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

If to Company:

VIZIO, Inc.
39 Tesla
Irvine, California 92618
Attention:  Kurtis J. Binder and Jerry C. Huang
Email:  kurtis.binder@vizio.com and jerry.huang@vizio.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA 92626
Attention:  R. Scott Shean and David C. Lee
Email:  scott.shean@lw.com and david.lee@lw.com

If to Buyer or Merger Sub:

LeEco Global Group Ltd.
16/F, LeEco Building, 105 Yaojiayuan Road
Chaoyang District, Beijing 100025, PRC
Attention:  Charles Hsieh
Email:  charles.hsieh@le.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attention:  Michael V. Gisser and Michael J. Mies
Email:  michael.gisser@skadden.com and michael.mies@skadden.com

LEECO0002047

Any Party may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means, but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving each other Party notice in the manner herein set forth.

9.6     Consent to Jurisdiction.     Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Superior Court of California located in Santa Ana, California, or Federal court of the United States of America, sitting in the Central District of California, Southern Division, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such California State court or, to the extent permitted by law, in such Federal court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such California State or Federal court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such California State or Federal court. Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party irrevocably consents to service of process in the manner provided for notices in <u>Section 9.5</u> hereof. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by law.

9.7     Severability of Provisions.     If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

9.8     Specific Performance.     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by, or were otherwise breached by, the Parties in accordance with their specific terms. It is accordingly agreed that (x) Buyer and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Company and to enforce specifically the terms and provisions of this Agreement, and (y) Company shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by Buyer or Merger Sub and to enforce specifically the terms and provisions of this Agreement. Any such injunction(s) or action seeking specific performance shall be subject to <u>Section 9.6</u> hereof.

LEECO0002048

[*signature page follows*]

LEECO0002049

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework, Termination and Mutual General Release Agreement as of the date first written above.

BUYER

LEECO V LTD.

By: _____
Name: _____
Title: _____

MERGER SUB

LE V MERGER SUB INC.

By: _____
Name: _____
Title: _____

COMPANY

VIZIO, INC.

By: _____
Name: _____
Title: _____

US-DOCS\83351417.10

LEECO0002050

Exhibit A

## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

April [  ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

1.      The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$40,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$40,000,000.00

2.      No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

LEECO0002051

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____
Name: _____
Title: _____

LEECO V LTD.

By: _____
Name: _____
Title: _____

US-DOCS\83351417.10

LEECO0002052

Exhibit B

## JOINT WRITTEN INSTRUCTIONS TO ESCROW AGENT FOR RELEASE OF BUYER TERMINATION FEE ESCROW FUNDS

[ ], 2017

**VIA OVERNIGHT MAIL AND EMAIL**

Citibank, N.A.
787 West Fifth Street, 28th Floor
Los Angeles, CA 90071
Attention: Luda Semenova
Telephone No.: (213) 239-2136
E-mail: luda.semenova@citi.com

Dear Ms. Semenova:

Pursuant to Section 4(a)(ii) of the Escrow Agreement, dated as of July 6, 2016 (the "Escrow Agreement"), by and among LeEco V Ltd., a Cayman Islands exempted company with limited liability (the "Buyer"), VIZIO, Inc. a California corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, and Citibank, National Association (the "Escrow Agent"), the Escrow Agent is hereby jointly instructed, authorized and directed by Buyer and the Company as follows:

3.      The Escrow Agent is jointly instructed, authorized and directed to release to the Company the sum of US$10,000,000, which amount represents the Buyer Termination Fee Deposit Amount (as defined in the Escrow Agreement), from the Buyer Termination Fee Escrow Account (as defined in the Escrow Agreement), by wire transfer of immediately available funds to the account designated below:

Account Name: VIZIO, Inc.
Account Number: 83900266
Bank Name: East West Bank
ABA Number: 322070381
Bank Address: 19540 Jamboree, Irvine, CA 92612
Beneficiary Address: 39 Tesla, Irvine, CA 92618
Amount: US$10,000,000.00

4.      No instructions, authorizations and directions have been given hereunder with respect to any other continuing obligations or duties of the Escrow Agent other than as expressly set forth herein.

*[Signature Page Follows]*

US-DOCS\83351417.10

IN WITNESS WHEREOF, the undersigned have executed these Joint Written Instructions on the date first written above.

VIZIO, INC.

By: _____

Name: _____

Title: _____

LEECO V LTD.

By: _____

Name: _____

Title: _____

LEECO0002054